# EXHIBIT M

## FINRA DISPUTE RESOLUTION

JEFFERIES LLC,

        Claimant,

    - against -                     FINRA Arbitration No: 16-02461

JON A. GEGENHEIMER,

        Respondent.

## JEFFERIES' OPPOSITION TO GEGENHEIMER'S OPENING BRIEF

## I.    INTRODUCTION

Jefferies files this brief in opposition to the opening brief filed by Gegenheimer ("Gegenheimer's Brief") regarding the enforceability of the liquidated damages provision in the Agreement he entered into with Jefferies.  As set forth more fully below, Gegenheimer's Brief contains numerous unsupported and demonstrably false allegations and relies on legal arguments which are either inapplicable or incorrect.  The analysis in Jefferies' Opening Brief remains unchanged.  The liquidated damages provision in the Agreement (referred to herein as the "LD Provision") is enforceable as both a matter of law and a matter of fundamental fairness and should be awarded to Jefferies, along with its attorneys' fees and costs.

## II.    GEGENHEIMER'S FACTUAL MISSTATEMENTS

### A.  The Factual Allegations in Gegenheimer's Brief are Largely Unsubstantiated

Gegenheimer's brief contains numerous factual inaccuracies which are wholly unsupported by any evidence and should be completely disregarded by the Panel.  Indeed, in contrast to the facts alleged in Jefferies' Opening Brief, which contain numerous references to documents produced by the parties in this case and a Declaration of Jefferies employee, Chris Kanoff, Gegenheimer's Brief relies primarily on the factual allegations contained in

EXHIBIT M

Gegenheimer's Answer and Counterclaims in this matter.  Gegenheimer's pleading in this matter is not evidence and the Panel should reject any attempt by Gegenheimer to rely on unsubstantiated factual allegations in determining whether the LD Provision is enforceable.[1]

Moreover, in addition to being unsubstantiated, many of Gegenheimer's factual assertions are demonstrably false.  Contrary to Gegenheimer's allegations:  Gegenheimer was not denied the opportunity to have an attorney review the Agreement; Gegenheimer was not "pressured" to sign the Agreement; and Gegenheimer's recruitment was separate and apart from Jefferies' recruitment of other investment bankers from Credit Suisse.  Rather, as set forth below and in Jefferies' Opening Brief, the Agreement was the result of a lengthy recruiting process and an arm's length negotiation between sophisticated parties.

### B. Gegenheimer Was Not Denied an Attorney

The most egregiously false factual allegation in Gegenheimer's Brief is the unsupported assertion that he was "discouraged" from having an attorney review the Agreement.  *See* Gegenheimer's Brief at p. 3.  To the contrary, as set forth in Jefferies' Opening Brief, Gegenheimer retained and consulted with an attorney with respect to his negotiation of the Agreement with Jefferies.  *See* Jefferies' Opening Brief at p. 8 and Exhibits M through P in Jefferies' Appendix of Exhibits ("Appendix").  Notably, in his responses to Jefferies' discovery requests in this matter, Gegenheimer himself identified Robert Thomas of Doty Barlow Britt & Thieman LLP as the legal counsel who "represented or assisted [him] in [his] negotiations with Jefferies that ultimately led to the May 18, 2016 Agreement."  *See* Exhibit N in Jefferies' Appendix.  Jefferies provided Gegenheimer's attorney with a draft of the Agreement in advance of the negotiations that resulted in the Agreement.  *See* Exhibit O in Jefferies' Appendix.

---

[1] Notably, although the parties agreed to a bifurcated streamlined procedure in this case, the parties have never agreed that a party could rely on its pleadings as evidence and, to the contrary, counsel for the parties have agreed that pleadings have no evidentiary value.

EXHIBIT M

Indeed, not only did Gegenheimer have access to an attorney, but Jefferies *encouraged* Gegenheimer to consult with an attorney with respect to the negotiation of the Agreement.  In fact, Jefferies provided Gegenheimer with a list of attorney referrals.  *See* May 5, 2016 email from Jefferies employee Jason Greenberg to Gegenheimer, attaching a list of attorney referrals (Exhibit J).  Similarly, Heidrick, the recruiting firm that assisted Jefferies in recruiting Gegenheimer, also provided Gegenheimer with a list of attorney referrals.  *See* May 3, 2016 email from S. Atkinson to Gegenheimer, attaching list of attorney referrals, attached hereto as Exhibit V.  Notably, although Jefferies provided Gegenheimer with referrals, Gegenheimer was not required to use one of Jefferies' referrals.  *See* Exhibit J in Appendix (advising Gegenheimer "to feel free to use [the attached list of referrals], or use your own.").  In addition, Jefferies even agreed to reimburse Gegenheimer for his legal fees if Gegenheimer ultimately joined Jefferies. *See* Ex. J. (stating that Jefferies would reimburse Gegenheimer's reasonable attorneys' fees if he joined Jefferies).

Gegenheimer's attorney, Robert Thomas, is experienced in employment matters, specializing in employment agreements, executive compensation, and employment counseling, and was thus highly qualified to advise Gegenheimer regarding the Agreement.  *See* Exhibit P in Appendix.  Not only is Mr. Doty qualified in employment matters, he was very familiar with Jefferies' employment contracts and negotiation process.  In fact, *the day before* Gegenheimer signed the Agreement, Mr. Doty represented four other Jefferies' investment banking candidates in the negotiation of their agreements with Jefferies all of which also contained liquidated damages provisions.  There is no doubt that, contrary to Gegenheimer's self-serving allegations, Gegenheimer had full access to qualified counsel with respect to the negotiation of the

190                                                                    EXHIBIT M

Agreement.  If Gegenheimer is unhappy with the deal he ultimately made, then he must either take responsibility for that himself or take the matter up with his attorney.

### C.  Jefferies Wanted to Hire Gegenheimer Long before the Other Bankers

Gegenheimer's Brief asserts (without any support) that Jefferies' offer of employment to Gegenheimer was made only in conjunction with and as a result of Jefferies' employment offers to five other Credit Suisse investment bankers made around the same time.  *See* Gegenheimer's Brief at p. 2-3.  In particular, Gegenheimer alleges that Jefferies did not present him with an offer letter until after the other Credit Suisse investment bankers had signed offer letters with Jefferies. *Id.* at p. 2.  Gegenheimer goes on to allege that the fact that these other bankers had signed with Jefferies was used to pressure Gegenheimer into signing the agreement.  *See id.* at p. 3.

First and foremost, whether Jefferies made the offer to Gegenheimer in connection with its hire of other investment bankers from Credit Suisse has no bearing on the issue currently before this Panel – whether the LD Provision is enforceable.   Nevertheless, Gegenheimer's allegations on this issue are patently false.  The truth, as supported by the documents produced in this case, is that Jefferies wanted to hire Gegenheimer long before it made offers to the other former Credit Suisse investment bankers that it hired in May 2016.  Indeed, Jefferies initially wanted to fill the position it offered to Gegenheimer by February 2016.  *See* Exhibit D in Appendix at p. 3, stating that the goal was to hire someone to fill the position offered to Gegenheimer "by the end of February."   In a February 2016 email, Jefferies employee Jason Greenberg indicated that they wanted to move Gegenheimer "very quickly through our process" and hoped to "get to an agreement no later than early March."  *See* Exhibit E in Appendix.

The reason Gegenheimer did not receive an offer letter until May 17, 2016, was because of delays caused by logistical reasons or Gegenheimer himself, not Jefferies.  *See e.g.,* Exhibit J

EXHIBIT M

to Jefferies' Opening Brief, in which Greenberg told Gegenheimer he "very much look[ed] forward to locking down May 12th in NYC" for the negotiation of the terms of Gegenheimer's Agreement.  *See also* May 6, 2016 email chain in which Greenberg states that he "finally" had a commitment from Gegenheimer to schedule a date for the negotiation of his offer, and making no reference to any other Credit Suisse bankers (Exhibit L in Jefferies' Appendix).  In addition, see the May 9, 2016 email chain in which Greenberg forwarded an email from Gegenheimer to Jefferies employee Philip Berkowitz, in which Gegenheimer acknowledged that he was "sorry this has been so hard to schedule" and in which Berkowitz stated that Gegenheimer had "to prioritize whether he wants to join." (Exhibit M in Appendix).

Finally, Jefferies' recruitment and offer of employment to Gegenheimer was entirely separate and apart from its recruitment and hire of the other five former Credit Suisse bankers. Indeed, it is notable that Gegenheimer has not attached any documents to his brief showing that his hiring had anything to do with the hire of any other bankers.   Furthermore, the documents discussing Jefferies' desire to hire Gegenheimer reveal no mention of any other Credit Suisse bankers.  *See, e.g.,* Exhibits E and L in Jefferies' Appendix.

### D.  The Only "Pressure" Gegenheimer Faced was the Opportunity to Make More Money than He Had Ever Made in His Life

In his Brief, Gegenheimer alleges that he was pressured into signing the Agreement, for various reasons, including by Jefferies and Heidrick.  *See* Gegenheimer's Brief at p. 3.  Notably, Gegenheimer failed to provide any support for those allegations.  Contrary to Gegenheimer's unsupported and self-serving allegations, Gegenheimer was always free, if he did not like the terms of the Agreement, to not sign it and remain in his lucrative position at Credit Suisse.  If anything, Gegenheimer had the upper hand due to Jefferies' desperate need for additional coverage in the tech M&A field.

EXHIBIT M

Indeed, the only "pressure" facing Gegenheimer with respect to Jefferies' offer of employment was that the offer provided Gegenheimer with the opportunity to make more money than he had ever made in his life.  Pursuant to the documents Gegenheimer provided to Jefferies, in 2015 at Credit Suisse, Gegenheimer made $370,000 and he had never made more than $650,000 in one year at Credit Suisse.  *See* May 6, 2016 email chain regarding potential terms of an offer to Gegenheimer.  (Exhibit L in Appendix).  In fact, Jefferies' understanding was that one of the reasons Gegenheimer was considering employment at Jefferies was because Gegenheimer was dissatisfied with his compensation at Credit Suisse.  *See* Ex. L.

In the Agreement, Jefferies offered Gegenheimer a salary of $350,000 and a guaranteed 2016 Bonus of $720,834 amounting to $1,070,834 in guaranteed compensation for his first year at Jefferies. *See* Agreement at Exhibit A in Jefferies' Appendix at Sections I, A and I, B.  In addition, Jefferies agreed to replace $300,000 in deferred compensation that Gegenheimer would lose by leaving Credit Suisse.  *See id.* at Section II, A.  Rather than any improper pressure, the Agreement presented Gegenheimer with a very attractive employment opportunity, which he eagerly accepted by signing the Agreement.

Unfortunately, he then opportunistically used the very generous terms he agreed to with Jefferies to negotiate even more favorable terms of employment with Credit Suisse.  On that note, Gegenheimer's assertion in brief that his increasing concern about the scope of Jefferies' "orchestrated raid" of Credit Suisse's Tech Group was the reason that he reneged on his Agreement is also wholly unsubstantiated by any evidence.  *See* Gegenheimer's Brief at 3.  To the contrary, the evidence shows that Credit Suisse induced Gegenheimer to breach his Agreement by promoting him to Managing Director and agreeing to pay him $1,150,000 in guaranteed compensation for 2016.  *See* Exhibit R in Jefferies' Appendix.  *See also*

EXHIBIT M

Gegenheimer's Supplemental Discovery Responses, at Response to Information Request No. 7 (Exhibit S to Appendix). Certainly, it was those incentives that caused Gegenheimer to go back on his word and breach his contract with Jefferies.

In his brief, Gegenheimer also continues to argue that the liquidated damage amount he agreed to is a "financially devastating penalty" and that the enforcement of the LD Provision would "threaten him with financial ruin." *See* Gegenheimer's Brief at 20 and 21. These assertions are untrue and disingenuous. As part of its inducement package to prevent Gegenheimer from joining Jefferies, Credit Suisse is paying for Gegenheimer's representation in this case and, upon information and belief, has agreed to indemnify him should the LD Provision be enforced. Accordingly, Credit Suisse is the real party in interest. Moreover, even if Credit Suisse was not footing the bill, Gegenheimer could certainly pay the liquidated damages and, even if he could not, Gegenheimer should not be rewarded for agreeing to a damages number that he could not pay.

## III.   ARGUMENT

### A.   Gegenheimer's Arguments That the LD Provision is Not Reasonable Should be Rejected as Matter of Law

Gegenheimer makes numerous arguments in the brief as to why the LD provision is not reasonable and therefore should not be enforced. None of those arguments are supported by facts or any applicable law.

#### 1.   Gegenheimer Has Not Provided any Case Law to Support His Bald Assertion that the LD Provision is Not Reasonable

In Section III of his Brief, Gegenheimer makes the assertion that the LD Provision is an unenforceable penalty because it is not reasonable, but fails to provide any case law from New

York or California[2] (or any other jurisdiction) that is factually on point to support that assertion. On the other hand, Jefferies has provided the Panel with a number of cases from New York and other jurisdictions that support the conclusion that it is entirely appropriate and reasonable to use an employee's compensation as a liquidated damage when attempting to quantify the damage caused by the loss of that employees' services.  Section III, B, 4, of Jefferies' Opening Brief cites *four* factually similar cases standing for this principle: *Gibbs & Soell, Inc. v. Armstrong World Indus., Inc.*, No. 04 CIV.5103(HB), 2005 WL 615688, at *4 (S.D.N.Y. Mar. 17, 2005); *Pastor v. Solomon*, 26 Misc. 125, 127, 55 N.Y.S. 956, 958 (App. Term 1899); *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751 (6th Cir. 1999); and *Gator Apple, LLC v. Apple Texas Restaurants, Inc.*, 442 S.W.3d 521, 526 (Tex. App. 2014).[3]  As discussed at length in Jefferies' Opening Brief, just like each of those cases, which each used compensation as a measure of the value of an employee's services, the amount of Gegenheimer's first year's guaranteed compensation if he joined Jefferies was a reasonable measure of Jefferies' damages in the event of a breach, given the unquantifiable nature of the damages to Jefferies.

Moreover, Gegenheimer's brief makes the baseless assertion that Jefferies "made no attempt to estimate what damages, if any, it would suffer if Gegenheimer failed to become a Jefferies employee."  *See* Gegenheimer's Brief at p. 16.  To the contrary, as set forth at length in the Declaration of Chis Kanoff, Jefferies specifically considered its likely damages in such situations and came up with a formula to determine the appropriate amount of liquidated

---

[2] Notably, Gegenheimer does agree that California and New York law regarding the enforceability of liquidated damages clauses is essentially the same.  *See* Gegenheimer's Brief at fn. 5.

[3] All of the legal authorities relied upon by Jefferies in this Brief and in its Opening Brief are being provided to the Panel in Jefferies' Appendix of Authorities, which is being filed concurrently with this Brief.

damages to include in its offer letters to investment banking candidates.  *See* Jefferies' Opening Brief, at Section II, A and Exhibit B in Jefferies' Appendix.  Jefferies determined that it suffers significant damages when an investment banking candidate breaches his or her agreement to join Jefferies, but also determined that such damages could not be quantified with any accuracy given the many variables at play.  Jefferies considered a number facts and variables, which are set forth at length in Kanoff's Declaration, in ultimately determining that a liquidated damage consisting of the guaranteed compensation offered to the recruit for his/her first year at Jefferies was reasonable.  *Id.*

Importantly, situations such as this, in which there is undoubtedly damage, but it cannot possibly be quantified with any accuracy, are the precise situations in which courts have held that liquidated damages clauses are appropriate. If it were possible to have an exact accounting of damages, there would be no need to resort to liquidated damages at all, for it is axiomatic that liquidated damages are only available where actual damages are expected to be difficult to determine.  *GFI Brokers, LLC v. Santana*, No. 06 CIV. 3988 (GEL), 2009 WL 2482130, at *5 (S.D.N.Y. Aug. 13, 2009).

Thus, Gegenheimer's assertion that Jefferies did not make such a determination and therefore, the LD provision is unreasonable, should be rejected.

2. <u>The Argument That the LD Provision is Not Reasonable Because Gegenheimer Could Have Joined Jefferies Pursuant to the Agreement and Resigned the Next Day without Paying the Liquidated Damages is Absurd</u>

In his Brief, Gegenheimer argues that the LD Provision is unreasonable because Gegenheimer could have joined Jefferies on August 17, 2016, as provided for in the Agreement, and then resigned the next day, without paying any damages at all.  This argument is completely undermined by common sense and the terms of the Agreement.  No reasonable person in this

EXHIBIT M

industry would resign within such a short time of starting a new position with a new firm, because it would derail the banker's career and have serious financial repercussions.

Because of the substantial amount of money that Jefferies pays investment-banking hires up front, Jefferies' Agreements with new investment banking candidates contain notice provisions that are applicable on the first day the candidate joins Jefferies. In Gegenheimer's case, his Jefferies' Agreement operates very simply. He was supposed to join Jefferies by August 17, 2016. His Agreement then provides for a 365 day notice period if he were to resign from Jefferies at any time on or before December 31, 2017. *See* Agreement (Ex. A to Appendix) at Section III, B.[4] On January 1, 2018, Gegenheimer's notice period would have been reduced to 135 days. *Id*. The Agreement is designed to ensure that Jefferies does not spend substantial time and money hiring investment bankers only to have them leave the firm shortly after they join.

During his notice period, Gegenheimer would have remained a Jefferies employee and received his base salary as provided for in the Agreement. *See* Agreement at Section III, B. Jefferies would have the contractual right to require that Gegenheimer work through his notice period. Indeed, Jefferies has the sole discretion, in accordance with its best interest, to decide whether Gegenheimer would have reported to work during his notice period and "under no circumstances will [Jefferies] take into consideration any request by [Gegenheimer] that Jefferies direct [him] to cease coming in the office or shorten the Notice Period." *Id*. In fact, contrary to the unsupported assertions in Gegenheimer's Brief, Jefferies often insists, as it is contractually entitled to do, that investment bankers physically report to Jefferies and work for all or most of their notice periods. Accordingly, even in the entirely unrealistic scenario in which

---

[4] Notably, such notice periods are standard in the investment banking industry. Gegenheimer was and remains subject to a similar notice period at Credit Suisse. *See* Credit Suisse Retention Agreement (Exhibit R to Jefferies' Appendix) at ¶ 5.

EXHIBIT M

Gegenheimer would resign shortly after joining Jefferies, Jefferies would have received the value of at least one year of work from Gegenheimer, while paying only base salary.  Jefferies would also have had 365 days to identify and hire Gegenheimer's replacement while he was actively engaged in working on deals and bringing in revenue.  Accordingly, even in this "worst case" scenario, Gegenheimer would bring substantial value to Jefferies.

In addition to being subject to a 365 day notice period, if Gegenheimer gave notice of his resignation to Jefferies after he joined Jefferies, but before December 31, 2017, he would suffer substantial economic repercussions.  Depending on when in that period he resigned he would either not have received, or would have to repay to Jefferies, his 2016 Bonus of $720,834.  *See* Agreement (Exhibit A to Appendix) at Sections I, B, 1 and 2.  Similarly, depending on when he resigned in that period, he would either not have received, or would have to repay to Jefferies, the Replacement Cash of $300,000 provided for in the Agreement.  *See* Exhibit A at Section II, A and B.  To illustrate this by way example, if Gegenheimer resigned the day after he began his employment at Jefferies, he would forfeit a total of $1,020,834 under his Agreement from Jefferies.  In addition, he would have already lost the opportunity to be paid his annual bonus for 2016 from Credit Suisse as well as his deferred compensation.  Therefore, for all of 2016 and for 8 months in 2017, Gegenheimer would have earned only his base salary.[5]

Simply put, Gegenheimer could not and would not cease working for Jefferies upon joining. To the contrary, he would need to for work for Jefferies at least one year and, in all likelihood, would work for Jefferies for far longer given the financial repercussions of his

---

[5] Likewise, if Jefferies were to have terminated Gegenheimer without cause or if he resigned for good reason prior to December 31, 2017, Gegenheimer would be permitted to keep his 2016 Bonus and Replacement Cash.  *See* Ex. A at I, B, 3. and II. C.  The mutual contractual goal was for both parties to get the benefits they bargained for without having to face the risk of inappropriate early departure or unjustified termination.

EXHIBIT M

resignation.  Of course, before Gegenheimer could begin his employment he needed to show up

for work on or before August 17, 2016 as he expressly agreed he would or, in the alternative, pay

Jefferies $1,000,000 in liquidated damages.

Given that once he commenced employment he would undoubtedly continue to work for

Jefferies, and produce revenue, for a substantial period of time, the $1 million liquidated

damages is clearly reasonable.

### B.   The fact that a Liquidated Damages Provision Also Encourages Performance Does Not Make it an Unenforceable Penalty

Contrary to Gegenheimer's argument in Section III of his Brief, the fact that, in addition

to fairly compensating Jefferies for the losses it would suffer in the event of Gegenheimer's

breach, the LD provision also has the effect of encouraging performance does not make it an

unenforceable penalty.  First, any argument that the LD Provision is not reasonable and intended

to compel performance because it reserves the right to seek actual damages should be rejected.

Jefferies has never sought to recover both the liquidated damages and actual damages exceeding

the amount provided in LD Provision.  Rather, Jefferies has only reserved its right to prove

actual damages in the event that the Panel determines the LD Provision is not enforceable.

Second, both New York and California courts reject the argument a liquidated damages

provision is an unenforceable penalty merely because it also has the effect of encouraging

performance.  New York courts recognize that "the prospect of damages in the event of a breach

may always be said to encourage parties to comply with their contractual obligations. Liquidated

damages are not transformed into a penalty merely because they operate in this way as well, so

long as they are not grossly out of scale with foreseeable losses."  *GFI Brokers, LLC v. Santana*,

2009 WL 2482130, at *7.  Similarly, California law recognizes that a "liquidated damages

provision is not invalid merely because it is intended to encourage a party to perform, so long as

EXHIBIT M

it represents a reasonable attempt to anticipate the losses to be suffered." *In re VEC Farms, LLC*, 395 B.R. 674, 691 (Bankr. N.D. Cal. 2008); *Jiu Zhou Grp. (HK) Holding Ltd. v. M. Bros., Inc.*, 2017 WL 2829532, at \*12 (Cal. Ct. App. June 30, 2017), *review denied* (Sept. 13, 2017).

Thus, even if the LD Provision encouraged Gegenheimer to perform, because it also represents a reasonable attempt to estimate Jefferies' losses in the event of the breach, it is not a penalty. Because, as discussed at length in Jefferies' Opening Brief and above, the LD Provision is a reasonable attempt to anticipate the losses to be suffered by Jefferies in the event of Gegenheimer's breach, it is enforceable under either California or New York law.

**C.   The Panel Should Apply New York Law to This Matter**

As set forth in great detail in Section III, A of Jefferies' Opening Brief, the Panel should enforce the terms of the Agreement and apply New York law in this matter. Gegenheimer's argument that California law applies predictably glosses over the essential forum selection analysis in this case. As Jefferies set out in its opening brief, both New York and California courts enforce forum selection clauses like the one in the Agreement that provides for a New York venue. In fact, Jefferies cited multiple cases in which California courts have rejected arguments that the enforcement of a forum selection clause requiring a venue other than California is against public policy even in cases where a contract may have violated Cal. Bus. and Prof. Code Section 16600. As the Court in *Troisi v. Cannon Equip. Co.* explained "arguing public policy" "cleverly, but impermissibly, combin[es] the forum selection and choice of law analyses." No. G042084, 2010 WL 2061989, at \*5 1 (Cal. Ct. App. May 25, 2010) (citations omitted). Indeed, "[t]he question is not whether the application of the forum's law would violate the policy of the other party's state, but rather, whether *enforcement of the forum selection*

*agreement* would violate the policy of the other party's state as to the forum for litigation of the dispute." *Id.* (quotation and citation omitted)(emphasis added).

The "clever but impermissible" tactic rejected by the *Troisi* court is the same tactic that Gegenheimer is employing in this case. He has completely ignored the forum selection analysis which dictates that the Panel should view this matter as a New York court of law would and that a New York court would unquestionably apply New York law to this matter. *See* pps. 12-19 of Jefferies' Opening Brief.[6]

In his Opening Brief, Gegenheimer also argues that the recently enacted California Labor Code § 925 supports his argument that the New York choice of law provision is unenforceable because of California's public policy against restrictive covenants. This argument is meritless for two reasons. First, California Labor Code § 925 only applies to agreement signed on or after January 1, 2017. Accordingly, it does not apply here because the Agreement was signed on May 18, 2016. *See* Cal. Labor Code § 925(f). *See also Balducci v. Congo, Ltd.*, No. 17-CV-04062-KAW, 2017 WL 4176464, at *5 (N.D. Cal. Sept. 21, 2017) (finding that California Labor Code § 925 was not applicable and that enforcement of the forum selection clause would not be contrary to public policy and enforcing Colorado venue clause in employment agreement signed in July 2016).

---

[6] Notably, Credit Suisse is paying for Gegenheimer's representation in this case and Gegenheimer's attorneys also represent Credit Suisse. Upon information and belief, Credit Suisse also has agreed to indemnify Gegenheimer. These facts are notable because, just like the Agreement, Gegenheimer's Credit Suisse Retention Agreement also provides for the application of New York venue and law. *See* Exhibit R to Jefferies' Appendix at ¶ 12. In addition, Gegenheimer's Credit Suisse Retention Agreement also prohibits Gegenheimer from engaging in "Competitive Activity", as defined by that Agreement, prior to February 28, 2017. *See id.* at ¶ 6. Jefferies is certain that, in the event of a breach of the Credit Suisse Retention Agreement by Gegenheimer, Credit Suisse, through the exact same counsel representing Gegenheimer here, would argue that New York law applies to the Credit Suisse Retention Agreement, regardless of California's public policy.

EXHIBIT M

Second, California Labor Code § 925 does not apply to employment agreements where the employee was represented by counsel, as was the case with Gegenheimer.  *See* Cal. Labor Code § 925(e).  Accordingly, California Labor Code § 925 does not apply here and does not support Gegenheimer's position that the New York choice of law provision in the Agreement is unenforceable.  To the contrary, it supports the proposition that sophisticated parties who are represented by counsel should be held to the terms of the agreements they enter into.  For that reason and the reasons set forth in Section III, A of Jefferies' Opening Brief, the Panel should apply New York law here.

### D. Even if CA Law applied, the LD Provision is not a Restraint on Trade Under Section 16600

#### 1. The Agreement is Essentially a Term Employment Agreement; It is Not a Post-Employment Restrictive Covenant

The parties agree that New York and California law is virtually the same with respect to the enforceability of liquidated damages clauses.  Accordingly, if California law was to apply, the only material argument made by Gegenheimer is that the LD Provision is contrary to public policy because it is a non-competition covenant that violates Section 16600 of the California Business & Professions Code.  As set forth in Jefferies' Opening brief, the enforcement of the LD Provision would not be contrary to California public policy, because the LD Provision, which required Gegenheimer to pay Jefferies should he not commence employment with Jefferies by a date certain, is not a restrictive covenant and does not implicate Section 16600.

Throughout his Brief, Gegenheimer discusses inapplicable law related to post-employment restrictive covenants.  The LD Provision is not a post-employment restrictive covenant.  Nor did the Agreement require Gegenheimer to cease working for Credit Suisse or refrain from working for any other competitor prior to joining Jefferies.  In fact, the Agreement

EXHIBIT M

only prohibited Gegenheimer from working for a competitor *while he was to be employed by Jefferies*.

Rather than being a restrictive covenant, the Agreement is akin to a term employment agreement in which an employee agrees to work for an employer for a specified period of time. In this case, Gegenheimer was required to commence his employment by a certain date and, as discussed above, was required to work for Jefferies for at least one year.[7]  The California Labor code expressly recognizes the validity of term employment agreements.  *See* Cal. Lab. Code §§ 2920, 2922, 2924-2926, and 2855 (discussing employment for a specified term, circumstances in which the employee or employer may prematurely terminate such an agreement without breaching it, and the 7-year limit on fixed-term contracts).

Fixed term employment contracts are enforceable by both employees and employers.  *See Silva v. McCoy*, 259 Cal. App. 2d 256, 259 (1968) (fixed-term "obligations of plaintiff [employee] and defendants [employers] to each other were mutual and binding").   In fact, California courts have encouraged the use of fixed-term agreements by an employer. *See*, *e.g.*, *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 862 (1994) ("If Metro wanted to assure the continued availability of these employees (and their voice qualities and personalities) for future assignments or simply to shrink the pool of available talent, it could enter into exclusive long term contracts to that end.").

Despite the fact that they inherently prohibit an employee from working for a competitor, term employment contracts do not violate Section 16600 as an expression of California public policy by seeking to restrain an individual from engaging in a lawful profession, trade or

---

[7] Likewise, Jefferies was required to hire Gegenheimer by that certain date and could not terminate him without cause until December 31, 2017 without having to pay Gegenheimer substantial compensation.

EXHIBIT M

business.   Rather, Labor Code sections 2920, 2922, and 2924-2926 are the Legislature's expression of "public policy" regarding fixed-term contracts – that fixed-term employment contracts provide benefits - both to the contracting parties and to overall commerce - that preclude application of more general prohibitions on private contracting. *See De Haviland v. Warner Bros. Pictures*, 67 Cal. App. 2d 225, 235 (1944) (Labor Code provisions regarding fixed-term employment contracts were "enacted with the object of promoting the welfare of large classes of workers whose personal services constitute their means of livelihood and which is calculated to confer direct or indirect benefits upon the people as a whole").

Indeed, California courts have repeatedly interpreted, enforced, and recognized the validity of term contracts for the last 70 years.  *See, e.g., CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1106-07 (9th Cir. 2007); *Touchstone Television Prods. v. Super. Ct.*, 208 Cal. App. 4th 676, 683-84 (2012); *Khajavi v. Feather River Anesthesia Med. Grp.*, 84 Cal. App. 4th 32, 38-39 (2000); *Daly v. Exxon Corp.*, 55 Cal. App. 4th 39, 45 (1997); *Tollefson v. Roman Catholic Bishop*, 219 Cal. App. 3d 843, 854 (1990); *Barndt v. Cty. of Los Angeles*, 211 Cal. App. 3d 397, 404 (1989); *Millsap v. Nat'l Funding Corp. of Cal.*, 57 Cal. App. 2d 772, 777 (1943).  This confirms the conclusion that Section 16600's general prohibition on contracts in restraint of trade obviously does not override the fact that the Labor Code *specifically authorizes* term employment contracts term."  *See Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1503, 1504 (1999). ("[W]e give effect to a specific statute relating to a particular subject in preference to a general statute.").  Furthermore, it is not proper to "use unfair competition law to condemn actions the Legislature permits."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999).

EXHIBIT M

Put simply, contracts *of employment* as opposed to *post-employment restrictive covenants*, do not constitute the type of trade restraint the Legislature prohibited in Section 16600.  In *Allied N. Am. Ins. Brokerage Corp. of California v. Woodruff-Sawyer*, the court, while recognizing that non-competition provisions are void under Section 16600, also recognized that term obligations are enforceable.  No. C 04-2527 MJJ, 2005 WL 2354119 (N.D. Cal. Sept. 26, 2005).  Indeed, Section 16600 "has consistently been interpreted as invalidating any employment agreement that unreasonably interferes with an employee's ability to compete with an employer *after* his or her employment ends."  *Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 509, 163 Cal. Rptr. 3d 192, 204 (2013), *as modified* (Oct. 29, 2013), *as modified on denial of reh'g* (Nov. 7, 2013).

It is clear that fixed-term contracts do not constitute the type of trade restraint the Legislature prohibited in Section 16600.  For all the same reasons, Section 16600 does not apply to an agreement to begin working by a particular date, like the Agreement at issue here.  Rather than being an impermissible restrictive covenant, the LD Provision is essentially a lawful agreement to commence employment on a fixed date.  Contrary to Gegenheimer's repeated assertions in his Brief, the LD Provision does not restrain or prohibit Gegenheimer from working for a competitor or working for Credit Suisse at any time, but instead requires him *to join Jefferies* on or before August 17, 2016.  Thus, the LD Provision is not prohibited by Section 16600 and is entirely appropriate under California law and should be enforced.

Moreover, practical realities dictate that the LD Provision did not restrain trade at all. Gegenheimer never stopped working for Credit Suisse for a single day.  In addition, he was able to negotiate a promotion and compensation from Credit Suisse that even exceeded the lucrative offer he received from Jefferies.  Lastly, Credit Suisse is paying for Gegenheimer's

EXHIBIT M

representation and, upon information and belief, has agreed to indemnify him.  The Agreement is not a prohibited restraint on trade.  In this case, it is merely the cost for Credit Suisse to retain a valuable employee in the investment banking industry and compensate Jefferies for its loss.

### E.   **In the Event that the Panel Finds the Portion of the LD Provision Referring to Competitive Activity Void, The Panel Should Simply Strike that Portion and Enforce the LD Provision**

Significantly, the portion of the LD Provision referring to Competitive Activity that Gegenheimer relies on to support his argument that the LD Provision violates Section 16600, is merely *a limitation* on the circumstances in which Gegenheimer would be liable to pay liquidated damages.  Liability is limited to situations in which Gegenheimer *fails to join Jefferies* because he remained with Credit Suisse or joined a competitor so as not to be economically onerous in a situation where a hire such as Gegenheimer dies, becomes disabled, or otherwise fails to join Jefferies for an unforeseeable and justifiable reason.  In the unlikely event that the Panel finds the sentence of the LD Provision referring to Competitive Activity to be void or unenforceable under Section 16600, California law dictates that the Panel should strike that sentence because it would not have any effect on the enforceability of the LD Provision or the remainder of Agreement.  The Panel may then enforce the remaining LD Provision without even the possibility of implicating Section 16600.  Notably, the Agreement at issue specifically provides for severability.  *See* Agreement at III, H.

It is well settled under California law that "where a contract has void and valid provisions, a court may sever the void provision and enforce the remainder of the contract." *FLF, Inc. v. Barney & Barney, LLC*, No. A131131, 2012 WL 4897750 (Cal. Ct. App. Oct. 16, 2012)(citing Civ. Code, § 1599 [6]; Rest.2d Contracts, § 184, p. 30.).  In fact, California takes a "very liberal view of severability, enforcing valid parts of an apparently indivisible contract

EXHIBIT M

where the interests of justice or the policy of the law would be furthered." *Id.* (citations omitted).

In *Thomas Weisel Partners LLC v. BNP Paribas*, No. C 07–6198 MHP, 2010 WL 546497 (N.D. Cal. Feb. 10, 2010), the United States District Court for the Northern District of California considered a contractual provision that contained confidentially, employee non-solicitation, and no-hire covenants. *See id.* at *1, 3. The court found that the "no hire" provision restrained mobility of current employees and was void under Section 16600. *Id.* at *6. However, the court declined to invalidate the entire employment agreement or even the entire non-solicitation provision. *See id.* at *6, 8. The court found that the provision at issue also contained permissible confidentiality and "no solicitation" language alongside the impermissible "no hire" language. *Id.* at *7. The court explained that the "no hire" language could simply be voided without requiring any rewriting of the agreement by the court. *Id.*

Here, following *FLF* and *Thomas Weisel*, in the event that the Panel finds the sentence of the LD Provision that limits liability to situations in which Gegenheimer returns to Credit Suisse or engages in Competitive Activity to be void or unenforceable under Section 16600, the Panel can simply strike that sentence. Below is an example of the provision as modified:

> If during the period beginning from the date you execute this Agreement until your Start Date (the "Interim Period"), you fail to commence employment by August 17, 2016, you agree to pay Jefferies $1,000,000 as liquidated damages ("Liquidated Damages"), which represent only an approximation of a portion of the anticipated loss created by such a violation. ~~For the avoidance of doubt, this Liquidated Damages provision is applicable only if you voluntarily fail to commence employment with Jefferies (except as a result of Jefferies' written withdrawal of this offer): (a) because you return as an employee of Credit Suisse or (b) to engage in Competitive Activity (as defined in the Jefferies Employee Handbook).~~ You agree the Liquidated Damages are reasonable and do not operate as a penalty, but reflect Jefferies' reasonable approximation of a portion of its anticipated loss as a

EXHIBIT M

> result of Jefferies' reliance on your commitment to render services pursuant to this Agreement by your Start Date, Jefferies' forbearance in holding the position of Managing Director in its Investment Banking Division open for you and not hiring another individual for this position during the Interim Period, and all costs incurred by Jefferies to fill the Investment Banking Division Managing Director Position.  Nothing in this section shall prevent Jefferies from recovering its actual damages exceeding the Liquidated Damages, and Jefferies shall have the right to avail itself of all other available remedies.

Because the sentence to be stricken is a mere limitation on Gegenheimer's liability to pay liquidated damages under the LD Provision, the removal of the language has no effect on the remainder of the provision.  The Panel can strike the above language and, without rewriting or changing the Agreement, can enforce the remainder of the LD Provision.  Gegenheimer still unquestionably violated the Agreement by "failing to commence employment by August 17, 2016" and therefore must pay the agreed upon damages.  With the sentence at issue stricken, the LD Provision unequivocally does not implicate Section 16600, and is therefore enforceable under California (and New York) law.

**F.**  **Gegenheimer Waived His Right to Assert Any Defenses or Counterclaims against Jefferies' Claim for Liquidated Damages**

Finally, it is significant that in signing the Agreement, Gegenheimer expressly waived any defenses, right of set-off, or counterclaims.  Specifically, the Agreement provides that Gegenheimer would "not assert any defenses, rights of set-off, or counterclaims as a reason for not fully repaying any amounts due under this Agreement."  Ex. A. at III, C.  Such provisions are valid and enforceable.

New York courts have held that contractual clauses which waive the right to assert affirmative defenses and counterclaims are valid and enforceable.  *See, e.g., Middle East Bank, New York Branch v. Harmony Sportswear Inc.*, No. 93 Civ. 228 (JFK), 1994 WL 74057 (S.D.N.Y. Mar. 10, 1994) (dismissing affirmative defenses and counterclaims by both borrower

and guarantor defendants, pursuant to valid and enforceable express waiver of right to assert affirmative defenses and counterclaims).   In *Orix Financial Services, Inc. v. Thunder Ridge Energy, Inc.*, the court explained that guarantors could not "rely on defenses that were waived by a guarantee to defeat summary judgment, even if the defendant establishes an issue of fact."   No. 01 Civ. 4788 RJH/HBP, 2006 WL 587483, at *12 (S.D.N.Y. Mar. 8, 2006).  *See also Brooklyn Fed. Saving Bank v. 9096 Meserole St. Realty LLC*, 29 Misc. 3d 1220(A), 918 N.Y.S.2d 396 (Sup. Ct. 2010).  ("Since defendants validly waived all defenses, counterclaims, and setoffs in the loan documents, their answer and opposing papers are not sufficient to preclude summary judgment to plaintiff.")(citations omitted).

Gegenheimer's agreement that he "will not assert any defenses, rights of set-off, or counterclaims as a reason for not fully repaying any amounts due under this Agreement" is valid and enforceable, and Gegenheimer's defenses should be denied for this reason alone.

EXHIBIT M

## IV.   **CONCLUSION**

For the reasons set forth above and in Jefferies' Opening Brief in Support of its Claim for Liquidated Damages, Gegenheimer should be found liable for breach of contract and Jefferies should be awarded: 1) damages in the agreed upon amount of $1,000,000; and 2) all of its attorneys' fees, costs, and expenses expended in this matter in an amount to be determined at a future proceeding.

Respectfully submitted,

_____

Andrew J. Shapren
Anne E. Kozul
Buchanan Ingersoll & Rooney PC
Two Liberty Place
50 S. 16th Street – Suite 3200
Philadelphia, PA  19102
(215) 665-8700

Counsel for Jefferies LLC

Dated:  January 16, 2018

EXHIBIT M

## **CERTIFICATE OF SERVICE**

I certify that on January 16, 2018, I served a true and correct copy of Jefferies LLC's

Response in Opposition to Gegenheimer's Opening Brief Regarding Liquidated Damages

on the following via the FINRA Portal and electronic mail:

Robert D. Goldstein, Esquire
Daniel J. Green, Esquire
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, NY  10177
rgoldstein@ebglaw.com
djgreen@ebglaw.com

*Counsel for Respondent*

Anne E. Kozul

EXHIBIT M

Exhibit "V"

EXHIBIT M

Message

| | |
|---|---|
| **From**: | Atkinson, Scott [satkinson@heidrick.com] |
| **Sent**: | 5/3/2016 10:33:35 AM |
| **To**: | Jon Gegenheimer [jon.gegenheimer@aol.com] |
| **Subject**: | Attorneys |
| **Attachments**: | Attorneys.docx |

Jon – As promised you will find a list of attorneys that have represented our Jefferies' candidates before and can help you during the cone process. If he's available, Larry Moy would be my first choice. Scott

EXHIBIT M

CONFIDENTIAL

JG00000267

# Attorneys

**Larry Moy**
Outten & Golden LLP

212-245-1000, ext. 9821 Work
**[ HYPERLINK**
**"mailto:LSM@outtengolden.com" ]**

3 Park Avenue
New York, NY 10016

**Brian S. Kaplan**
Kasowitz Benson Torres & Friedman LLP
Partner

212-506-1743 Work
**[ HYPERLINK**
**"mailto:bkaplan@kasowitz.com" ]**
1633 Broadway
New York, New York 10019

**Jeff Laska**
Morrison Cohen LLP
Partner

212-735-8666 Work
917-522-3166 Fax
347-237-1739 Mobile
**[ HYPERLINK**
**"mailto:jlaska@morrisoncohen.com" ]**
909 Third Avenue
New York, NY 10022-4784
**[ HYPERLINK**
**"http://www.morrisoncohen.com/" ]**

EXHIBIT M

CONFIDENTIAL
JG00000268

# EXHIBIT N

EXHIBIT N

**FINRA ARBITRATION**

**NO. 16-02461**

---

**JEFFERIES LLC,**

**Claimant,**

**v.**

**JON A GEGENHEIMER**

**Respondent.**

---

**January 24, 2018**

1    **MZ000001**

2    Jim Oaks: Testing, testing. One, two, three, four. One, two, three, four.

3    Test.

4    **MZ000002**

5    Larry Mills: Then we'll proceed. This is the arbitration in Jefferies LLC

6    versus Gegenheimer. FINRA Case Number 1602461. First, I'd like to introduce

7    the arbitrators. I'm Larry Mills. I'm the panel chair. We have Jim Oaks, who

8    is going to be operating the recorder in this hearing, and Ms. Lou is going

9    to -- she didn't know this, but she's going to be handling the exhibits for

10   the hearing and making sure that the exhibits are available, and we can send

11   those to FINRA at the end of the hearing. I am constrained to ask the panel

12   whether you have any further disclosures that come up. Mr. Oaks, do you have

13   any disclosures?

14   Jim Oaks: I have no disclosures, no.

15   Larry Mills: Okay, and Ms. Lou, any further disclosures?

16   Ms. Lou: I know that the -- in the exhibits there was some involvement of Mr.

17   Gegenheimer and some of him activities with respect to certain companies'

18   intel, like Cisco. I do hold some small shares in those.

19   Larry Mills: And I have no further disclosures. In light of the disclosures,

20   do the parties accept and confirm the composition of the panel?

21   Male 1: For Mr. Gegenheimer, we accept the panel.

22   Male 2: Jefferies accepts the panel.

23   Larry Mills: All right. Thank you. The arbitrators have filed their oaths. If

24   you haven't, let me know. We all have filed out oaths. This is a controversy

25   that's been submitted to this panel for hearing in accordance with the code

2

EXHIBIT N

1   of arbitration procedure of FINRA. The panel is authorized to determine each

2   of the matter set forth, particularly with this bifurcated hearing the matter

3   that is being submitted to us for this hearing, which is solely whether the

4   liquidated damages clause in the applicable agreement is enforceable or

5   unenforceable, full stop. Nothing -- no other issue will be decided by the

6   panel in this -- in this hearing. There is going to be no testimony, so I

7   don't have to admonish you not to interrupt each other. The submission of the

8   matter to arbitration does not preclude any right that FINRA might otherwise

9   have to adopt, administer, or enforce any of its rules with respect to the

10  parties. We have been selected as neutral arbitrators to decide this matter.

11  We are not FINRA Dispute Resolution employees. Since we don't have witnesses,

12  I don't have to talk about oaths, but the declarations that had been

13  submitted in this proceeding are being treated as sworn testimony under oath

14  and are being presented as evidence. The briefing is argument only and not

15  considered evidence by the panel. We have already admitted Arbitrator's

16  Exhibit 1, which consists of all the pleadings in the case, and I recall

17  reciting all those. I'm not going to recite them. They are detailed in the

18  initial prehearing conference scheduling order if you're keeping score. We

19  have also received and reviewed your briefing on the issue and the appendix

20  of documents, and we will review the legal authorities that are submitted by

21  both sides. FINRA, as part of the dispute resolution process, has an

22  evaluation process. Each party or representative is asked to voluntarily

23  complete an evaluation of this arbitration. For your convenience, FINRA has

24  made it possible for you to complete this evaluation online via the Internet,

25  and you can find the evaluation form online. Much of the rest of the FINRA

3

EXHIBIT N

1   opening script is irrelevant because we're not having witnesses today. I

2   understand from Counsel that we're solely going to have oral argument and

3   then the matter will be submitted to the panel for decision.

4   **MZ000003**

5   Larry Mills: And a very curious thing is that I'm to ask you not to have your

6   Blackberries if anybody still has Blackberries on, because it interferes with

7   the digital recorder – big, bold statement in the FINRA script. So, this is

8   the end of my opening remarks. Normally, we would move to opening statements,

9   but since we're going to go to closing arguments we will do that when Mr.

10  Gegenheimer arrives. I hate to do this again, but I think since we have the

11  time I would like to go around the table and you – it's better if you

12  identify yourselves and your positions again so we have a record of who is in

13  the room and we know we actually had a hearing. So, I'm going to ask you to

14  do it again. Sorry to do that. So, if we could go around the table. Thank

15  you.

16  Dan Green: Dan Green, Epstein Becker and Green, for Jon Gegenheimer.

17  Robert Goldstein: Robert Goldstein, Epstein Becker and Green, for Jon

18  Gegenheimer.

19  David Jacobs: David Jacobs, Epstein Becker and Green, for Jon Gegenheimer.

20  Ron Green: Ron Green, Epstein Becker and Green, for Mr. Gegenheimer.

21  Chris Kanoff: Chris Kanoff, Co-Head of Investment Banking at Jefferies and

22  Company.

23  Scott Kresch: Scott Kresch, in-house counsel at Jefferies.

24  Anne Kozul: Anne Kozul, Buchanan Ingersoll and Rooney, for Jefferies.

25

1  Andrew Shapren: And Andrew Shapren, also from Buchanan Ingersoll and Rooney,

2  and also representing Jefferies.

3  Larry Mills: All right. That concludes my opening remarks. Does any – do

4  Counsel have any matters that they'd like to put on the record at this time?

5  I'm not suggesting you start your arguments, but are there any preliminary

6  matters that you want to put on the record, either side? Mr. Shapren?

7  Andrew Shapren: The Claimant does not have any preliminary matters.

8  Larry Mills: Great.

9  Robert Goldstein: Nor does the Respondent.

10 Larry Mills: All right. So, Jim, we'll go off the record now.

11 **MZ000004**

12 Larry Mills: All right. We're turning to Mr. Shapren for closing arguments on

13 behalf of Jefferies LLC.

14 Andrew Shapren: Thank you very much. I'll save the introduction since we've

15 been through that a few times now, but I do want to thank the panel for

16 accommodating and agreeing to this bifurcated, somewhat unusual procedure

17 we've agreed to. We do think it's the most efficient way to move this case

18 forward and we appreciate your accommodation on that. This case centers on a

19 written contract that was entered into between Jefferies and Mr. Gegenheimer

20 on May 18th, 2016, that Mr. Gegenheimer was employed by Credit Suisse at the

21 time, and after months of discussions and negotiations he and Jefferies

22 entered into an agreement that Mr. Gegenheimer would join Jefferies as a

23 managing director in its investment banking division on or before August 17th,

24 2016, and that if he failed to do that, he would pay Jefferies one million

25 dollars in liquidated damages. Despite this agreement, six days after signing

1    it Mr. Gegenheimer reneged on his word and told Jefferies he was going to

2    stay at Credit Suisse. Those facts are undisputed, and those facts are why we

3    are here today. Now, as you know, Mr. Kanoff, who is here today, has

4    submitted a declaration in support of our request. We agreed he does not need

5    to provide live testimony, but he wanted to be here anyway because this is an

6    issue of critical importance to Jefferies and he wants to make sure that if

7    the panel has any questions he can help us answer them here today. Now,

8    you're here today to decide a single issue, which is whether you are going to

9    hold Jefferies and Gegenheimer to the express terms of the arms-length

10   contract they entered into with the advice and assistance of Counsel, or

11   whether you're going to reward Mr. Gegenheimer for opportunistically

12   breaching that contract. And make no mistake, Mr. Gegenheimer is not a victim

13   here. He's an opportunist. He shrewdly negotiated a promotion with Jefferies

14   and a pay compensation package that was far more generous than what he had

15   been earning at Credit Suisse and with eyes wide open, he signed the

16   agreement at issue because it was a great deal for him and a great

17   opportunity and he knew it. And he then violated the agreement after he was

18   able to leverage that deal to get the same promotion from Credit Suisse and

19   an even more generous compensation package. In a span of days, his pay

20   doubled. Now, he's certainly allowed to work wherever he wishes, and he's

21   allowed to make as much money as he can possibly make, but he must satisfy

22   the agreed-upon consequences of his knowing breach of the contract. Now, the

23   quote on the screen here is a quote from a case that stands for a principle

24   that you can find in just about any jurisdiction: "Our legal system is built

25   on the sanctity of contracts." And the idea here is not really all that

6

1   controversial. Parties must do what they have agreed to do, and Mr.

2   Gegenheimer must do what he has agreed to do, which is pay Jefferies one

3   million dollars. The law dictates that result and as an arbitration panel

4   sitting in equity, fundamental fairness dictates that result as well. Now,

5   before we get into the details of the case, I think it's essential that we

6   discuss the setting for this case, which is the investment banking business.

7   Our adversaries are quick to point out that a million dollars is a lot of

8   money for a breach of employment contract, and they're right that one million

9   dollars is a lot of money, but it's set forth in our briefs and as it will be

10  further explained today, in this context it is not an exorbitant sum at all,

11  and in fact it is likely a very conservative damages figure. A lot of the

12  cases in FINRA are in the retail brokerage business. This is not that

13  business. The investment banking business is very different. The deals are

14  big, the revenues are high, and the services of top investment bankers is in

15  very high demand. You've seen Mr. Gegenheimer's resume. It's attached to our

16  brief. It's very impressive and I think we can all agree on that. These

17  individuals are the best and the brightest. They come from the top schools.

18  They're the top of the class, and they're very, very, highly compensated

19  individuals. And I'm sure that they're very valuable employees. So, as you're

20  thinking about this one-million-dollar figure today, keep in mind a few

21  things. Keep in mind that Jefferies was going to pay Mr. Gegenheimer over one

22  million dollars for his first year of employment, and keep in mind that

23  Credit Suisse paid him

24  $1,150,000.00

25  **MZ000005**

7

EXHIBIT N

1  for his work in 2016 alone. And also keep in mind that neither Jefferies or

2  Credit Suisse is in the business of losing money. They both obviously believe

3  that Gegenheimer would generate far more than his compensation in revenue for

4  the firm. And as Mr. Kanoff told you in his declaration, Jefferies expects

5  its lateral managing directors to produce between 5 and 7 million in their

6  first year and ramp up to 25 million by their fifth year. Now, we asked in

7  discovery for Gegenheimer's revenue history at Credit Suisse and he objected,

8  and we didn't get that, but you don't need those records to know the obvious,

9  which is that Credit Suisse isn't going to pay Mr. Gegenheimer over 1.1

10 million unless he was generating far more than that in revenue. So, is a

11 million dollars a lot of money? You bet it is, but it's no different in

12 substance than the liquidated damage amounts that were enforced in the many

13 cases we've presented to you. We're just playing with bigger numbers here.

14 This case takes place in an industry where compensation and revenues and the

15 stakes are significantly higher than many other – than many other industries.

16 Let's go over some of the important facts here. Jefferies began searching for

17 a new managing director in its Tech group specializing in M&A – a very

18 specific position they were looking for – in late November 2015, about six

19 months before it actually entered into the agreement with Gegenheimer, and

20 they engaged a search firm, Heidrick and Struggles, to help in that endeavor.

21 Jefferies and Heidrick identified, contacted, and considered several

22 different candidates, including Mr. Gegenheimer, and by February 16, 2016 –

23 this is Exhibit E to our brief – we saw that Gegenheimer had spoken to Jason

24 Greenberg, who is the head of Tech M&A at Jefferies, and Greenberg wanted to

25 have Gegenheimer meet various Jefferies employees in New York and California

1    and to try to get him into an agreement no later than early March.

2    Gegenheimer indicated he was interested and engaged Jefferies in the

3    recruitment process, and in fact, he had numerous in-person meetings, many

4    emails, certainly many phone calls. This is Exhibit F to our brief, which was

5    a summary of the various meetings that Mr. Gegenheimer had with both bankers

6    and executives at Jefferies, as well as you see Scott Atkinson – he is a

7    recruiter for Heidrick. Several meetings. Now, by mid-March, we saw that

8    Heidrick and Jefferies had zeroed in on Gegenheimer as the candidate for the

9    Junior MD slot they were trying to fill, and you see we redacted some names

10   of people who aren't involved here for their privacy. But Jefferies wanted to

11   hire a Senior MD and a Junior MD by mid-June. Heidrick was telling Jefferies

12   that Gegenheimer would be a great hire as a number two MD in the group. By

13   early May, Jefferies and Gegenheimer began working on scheduling a meeting to

14   negotiate their agreement. They tried to meet in early May in New York. That

15   didn't work out, and ultimately, on May 18th, 2016, Gegenheimer came to the

16   Jefferies San Francisco office to sign the agreement. He had counsel, but he

17   didn't bring the lawyer to the meeting. Jefferies did, however, send a draft

18   of the contract to Mr. Gegenheimer's lawyer, Rob Thomas at Doty Law. And

19   Jefferies didn't have any lawyers present at its meeting with Mr.

20   Gegenheimer; in fact, there weren't any Jefferies businesspeople present

21   other than Operational Support. Mr. Kanoff was there – was available mobily.

22   Now, Gegenheimer and Jefferies reached the agreement at issue at arm's

23   length. There really can be no question on that. First of all, Gegenheimer is

24   a highly sophisticated and experienced professional. He specializes in

25   mergers and acquisitions in the tech industry. He's very familiar with

EXHIBIT N

1  complicated contracts and frankly, in particular, liquidated damages

2  provisions. Second, he's not a guy who is desperate for a job. He had a good

3  job at Credit Suisse. He'd been there for 13 years. It's not like he was on

4  the outs. He was making several hundred thousand dollars a year. He didn't

5  have to enter into an agreement with Jefferies and he faced no pressure to do

6  so. If he didn't want to join Jefferies, if he didn't like the terms of the

7  agreement, if he didn't like the liquidated damages clause, all he had to say

8  was, "No, thanks," leave the office, go back to his nice job at Credit

9  Suisse. On the other hand –

10 **MZ000006**

11 as Jason Greenberg said in an email on May 5th, 2016, Jefferies desperately

12 needed M&A expertise in the tech sector. That's in the last sentence there.

13 This is Exhibit L to our opening brief. And after this six-month process, Mr.

14 Gegenheimer was the candidate that Jefferies wanted to fill that need, and as

15 such, if anyone had the upper hand in the negotiations, it was Gegenheimer

16 and that's somewhat reflected in this email. You see, Mr. Greenberg is

17 proposing to offer him a one-year guarantee at 800k. Now, we know that

18 somewhere between May 5th and May 18th that became over a million. Mr.

19 Gegenheimer's leverage is also shown in Exhibit M, an email he sent to Scott

20 Atkinson and Jason Greenberg in which it's very clear that it was Jefferies

21 that was waiting on Gegenheimer's willingness to commit to Jefferies. And

22 also, we know that Gegenheimer retained and consulted with an attorney with

23 respect to his negotiation of the agreement. He told us that in his discovery

24 responses: "Identify by name and firm any legal counsel who represented you

25 or assisted you in your negotiations with Jefferies that ultimately led to

EXHIBIT N

1   the May 18, 2016 agreement." Respondent identifies Robert Thomas. And

2   although Gegenheimer has alleged in his papers that he was discouraged from

3   using an attorney, the documents show that not only did he have an attorney,

4   but Jefferies encouraged him to consult with an attorney. Exhibit J to the

5   brief: Jason Greenberg goes ahead and sends him a list of attorneys that are

6   familiar with Jefferies agreements and processes, a list of referrals.

7   Exhibit V to the brief: Scott Atkinson from Heidrick also sends him the list

8   of referrals. Now, he wasn't required to use one of these referrals and in

9   fact, he didn't. He used a different attorney, and he was free to use an

10  attorney of his choice. And also important, if you go back to Exhibit J you

11  see at the end there Mr. Greenberg says: "Feel free to use or use your own.

12  Our guys, as I think you know, will reimburse reasonable attorney's fees if

13  you join." So, if he joined, he was going to get reimbursed. He had every

14  opportunity to use an attorney, and the attorney was well qualified. I showed

15  you his Internet bio here: "Specializes in employment agreements, executive

16  comp, and employment counsel". He was highly qualified to advise Mr.

17  Gegenheimer. So, there can be no doubt that he had full access to qualified

18  counsel or that he was aware of and understood the liquidated damage

19  provision and its implications when he signed the agreement. So, why did Mr.

20  Gegenheimer enter into the agreement? Well, he entered into it because it was

21  a great deal for him. It was a great opportunity, and to say the agreement

22  was fair to Mr. Gegenheimer would be an understatement. Rather, the terms

23  reflect the arm's-length nature of this transaction and the leverage that

24  Gegenheimer had. So, we're going to take a little time and go through the

25  provisions of the agreement now, so the panel can understand those provisions

11

EXHIBIT N

1   and importantly, the mutuality of the obligations throughout the agreement.

2   First of all, there's no question that Mr. Gegenheimer signed the agreement

3   May 18th and in doing so he acknowledged and agreed that "You have read and

4   understand this agreement. You voluntarily agree to the terms and conditions

5   in this agreement, and you have been provided with the opportunity to consult

6   with independent legal counsel of your choice prior to executing this

7   agreement." So, let's look at the relevant terms. Right out front, there is

8   the agreement. "Your employment with Jefferies will commence at a mutually

9   agreeable time on or before August 17th, 2016." Why that date? Well, Mr.

10  Gegenheimer had a 90-day garden leave provision, or notice period, as they're

11  often called, with Credit Suisse. So, he had to give 90 days' notice of his

12  intent to resign, and as a result, Jefferies agreed to hold the position open

13  for him for those 90 days. Gegenheimer agreed to join at the end of that 90-

14  day period. Now, Jefferies agreed to generously compensate Mr. Gegenheimer,

15  and you know, we reference these numbers a lot in our brief, but here's the

16  portions of the contract that actually set that out. He was going to get more

17  than $1.3 million in the first year. Salary –

18  **MZ000007**

19  350,000, a first-year 2016 bonus of 720,834, and replacement cash of 300,000

20  that was meant to replace the per comp that he was going to leave behind at

21  Credit Suisse, and though that was negotiated – it was originally 280 and

22  crossed out and brought up to 300. Now, because of the substantial amount of

23  money that Jefferies was paying Gegenheimer up front, the agreement contained

24  a notice provision that was applicable on the first day he joined Jefferies.

25  Again, as we said in our briefs, he was going to work for Jefferies for at

1  least a year and probably much longer. So, after joining Jefferies on August

2  17, 2016, the agreement provides for a 365-day notice period if he resigned

3  any time before the end of 2017. Then the notice period would go down to 135

4  days. During this notice period, Gegenheimer would have remained an employee

5  of Jefferies. He would have received his base salary only and Jefferies would

6  have the contractual right to require him to work for the firm. Now, in

7  addition to this 365-day notice period, if Gegenheimer gave notice of his

8  resignation any time after joining Jefferies – well, before the end of 2017 –

9  there would be very serious economic repercussions. Depending on when in that

10 period he resigned, he would either not have received or would have had to

11 repay the 2016 bonus of 720,834. And those provisions – that's the agreement

12 Section 1B2 and Section 2B. And the same thing goes for the replacement cash.

13 Depending on when he resigned, he either wouldn't get that, or he would have

14 to just give it right back. Now, obviously these provisions are designed to

15 ensure that once Mr. Gegenheimer joins, he's going to be with Jefferies for a

16 substantial period of time. That's the deal. Now, Mr. Gegenheimer had similar

17 protections. Those were built in to ensure that Jefferies, after he joined,

18 didn't up and fire him without cause or didn't force him to resign for good

19 reason. And the agreement in Section 1B3 provides that if Jefferies did

20 terminate Gegenheimer without cause or if he resigned for good reason prior

21 to the end of 2017, he gets to keep his 2016 bonus. And he also gets to keep

22 his replacement cash, free and clear. So, the mutual contractual goal was for

23 both parties to get the benefit of the deal here without having to face the

24 risk of an inappropriate early departure by Mr. Gegenheimer and without him

25 having to face the risk of an unjustified termination early on in his career

13

228                                                EXHIBIT N

1   at Jefferies. Now, there's also mutual protection in the agreement for the

2   time in which Gegenheimer was serving his notice period with Credit Suisse.

3   Of course, now we're talking about the liquidated damages provision, and

4   let's take a look at that provision. "If during the period beginning from the

5   date you execute this agreement until your start date, the interim period,

6   you fail to commence employment by August 17th, 2016, you agree to pay

7   Jefferies one million dollars as liquidated damages, which represent only an

8   approximation of a portion of the anticipated loss created by such a

9   violation. For the avoidance of doubt, this liquidated damages provision is

10  applicable only if you voluntarily fail to commence employment with Jefferies

11  except as a result of Jefferies' written withdrawal of this offer A. because

12  you returned as an employee of Credit Suisse; or B. to engage in competitive

13  activity as defined in Jefferies' employee handbook. You agree the liquidated

14  damages are reasonable and do not operate as a penalty, but reflect

15  Jefferies' approximation of a portion of its anticipated loss as the result

16  of Jefferies' reliance on your commitment to render services pursuant to this

17  agreement by your start date, Jefferies' forbearance in holding the position

18  of Managing Director in its Investment Banking division open for you and not

19  hiring another individual for this position during the interim period, and

20  all costs incurred by Jefferies to fill the Investment Banking division

21  Managing Director position. Nothing in this section shall prevent Jefferies

22  from recovering its actual damages exceeding the liquidated damages and

23  Jefferies shall have the right to avail itself of all other available

24  rights." We're going to talk about a lot of the different sections in that –

25  **MZ000008**

14

EXHIBIT N

1  liquidated damages clause as we go through this argument this morning. Now,

2  the one million dollars, we know comes from looking at Gegenheimer's agreed

3  first year's compensation at Jefferies - the $350,000 salary, the 720,000

4  2016 bonus, which is about 1,070,000 - rounded down to one million, and we'll

5  talk more about that, too. Now, importantly, Jefferies had a similar but

6  greater obligation to pay liquidated damages under the agreement. The

7  agreement provides, "If, following your acceptance of this offer and the date

8  of your resignation from your current employer, but prior to the start date

9  Jefferies rescinds the offer or materially changes the terms of the offer to

10  constitute good reason as defined herein, Jefferies will treat you as if you

11  employment commenced and was terminated by Jefferies without cause, i.e. you

12  will be paid the 2016 bonus and the 2017 bonus and the replacement cash." And

13  as we said in our briefs, when you add this up it's actually over a million

14  dollars. It is the 2016 bonus of 720,000 and change and the replacement cash

15  of 300, which is about $1,020,000. There was not 2017 bonus contemplated in

16  the agreement. So, both parties had to pay liquidated damages if they failed

17  to honor their commitment to either hire Mr. Gegenheimer or Mr. Gegenheimer

18  to show up for work. Gegenheimer had to pay - Gegenheimer had to pay a

19  million; Jefferies would have had to pay 1,020,000. So, when we look at this

20  agreement as a whole, you can see the mutuality of the agreement and the

21  arm's-length nature. Jefferies was making a substantial commitment to Mr.

22  Gegenheimer. He was getting more money than he'd ever made in his life. He

23  was also getting express commitments from Jefferies to hold the job open for

24  him during his notice period and to keep him employed through at least

25  December 31st, 2017, and if Jefferies violated either of those promises, it

15

EXHIBIT N

1  was going to have to pay Gegenheimer substantial compensation. In the same

2  way, Gegenheimer had to show up for work on August 17, 2016 and remain

3  employed at least through December 31st, 2017, and if he didn't, he was going

4  to have to pay substantial compensation. That was the deal. Now, despite

5  making this arm's-length deal, on May 24th Gegenheimer emailed Chris Kanoff to

6  tell him that he would not join Jefferies as agreed but would remain with

7  Credit Suisse, and you can see he's already cc'ing the lawyers at Epstein

8  Becker and Green, presumably because he knows what's coming. Now, Jefferies

9  later discovered after getting this that Mr. Gegenheimer had received a

10 better deal from Credit Suisse. This is Exhibit R, the retention agreement

11 that memorializes his 2016 deal. And as you can see, Credit Suisse agreed to

12 pay him $1,150,000 for 2016 – basically the same salary of 250 but a $900,000

13 incentive award. And Gegenheimer acknowledged in his discovery responses that

14 since he signed the agreement with Jefferies he got that incentive award of

15 900,000 and he also got the same promotion that Jefferies was going to give

16 him to Managing Director. And this is notable because as Jefferies understood

17 it, at least, one of the reasons Mr. Gegenheimer wanted to leave was because

18 he was unhappy with his compensation, and this is compensation history that

19 Heidrick collected from Mr. Gegenheimer and provided to Jefferies. And as you

20 can see, his compensation at Credit Suisse had never come close to the $1.1

21 million and change that he got in 2016. Now, as part of the papers we

22 submitted in advance of the hearing, we submitted the declaration of Chris

23 Kanoff, and he explained that the liquidated damages provision is typical of

24 Jefferies employment contracts for high-level investment banking recruits,

25 and he explained the reasons that Jefferies uses these provisions and told

1   you that Jefferies invests a significant amount of time, effort and resources

2   in identifying, recruiting and hiring investment banking employees and then

3   makes a very substantial commitment to those employees in these agreements.

4   Now, the candidate typically has – there's a –

5   **MZ000009**

6   notice period of 60, 90, 120 days, 180 days, it all depends. And that leaves

7   Jefferies in a very precarious state of affairs in which it's just spent

8   months recruiting the right candidate, agrees to a deal that includes a very

9   substantial financial commitment, and then has to sit in limbo while the

10   candidate is on this notice period. So, if at some point during that notice

11   period the candidate then reneges on the agreement, Jefferies suffers

12   significant damages and frankly, that's typically going to happen because

13   like here, the candidate went and got a better deal at their current firm or

14   somewhere else. Now, at the time Jefferies is entering into these agreements

15   it can't tell with any accuracy what the damage is going to be. Certainly,

16   any breach is going to cause lost revenue; certainly, any breach is going to

17   increase recruiting cost. But there's no way to tell how much and no way of

18   telling what other types of damage Jefferies might suffer, just too many

19   facts and variables to consider. So, Jefferies set out to come out with a

20   damage that it could propose to candidates that would provide it with fair,

21   average compensation in the event of a breach. And importantly, when you

22   evaluate the reasonableness of a liquidated damages clause, you consider the

23   circumstances at the time the agreement was entered into, not later, not in

24   hindsight – at the time. And DAR & Associates Inc. versus Uniformed Services

25   Inc. Case 17 in Jefferies' appendix, is a New York case that stands for the

17

232                                    EXHIBIT N

1   proposition that liquidated damages provisions must be interpreted at the

2   time the agreement is entered into, not after the date of the breach.

3   Similarly, California Civil Code, statute section 1671(b), Statute 5 in

4   Jefferies' appendix, which is a California statute that provides for

5   liquidated damages, specifically states that the party seeking to invalidate

6   a liquidated damages provision must show it is unreasonable, again, at the

7   time the contract was made. Accordingly, what happened after signing and what

8   the actual damages may ultimately be are not pertinent to your analysis

9   today. So, with that in mind, let's look at the factors that Jefferies

10  considered when setting the liquidated damages, it would propose to

11  candidates, and they're set forth in Kanoff's declaration. For today's

12  discussion, I've grouped them into four categories and the first is "Lost

13  Revenue". All the slides that I put on there are going to be the exact bullet

14  points that were in Kanoff's declaration, and lost revenue is probably the

15  top consideration. The employee is not joining and therefore, it's going to

16  cause lost revenue to Jefferies. But how much? Well, we don't know. We don't

17  know how long the candidate would have stayed at Jefferies. We don't know

18  exactly how much revenue he or she would have generated. We don't know how

19  much profit Jefferies would have made off that revenue, and as we'll talk

20  about more in a minute, we don't know when or whether Jefferies is going to

21  be able to mitigate that damage and fill that position with another qualified

22  candidate. Now, we do know that the amount of revenue generated by managing

23  directors at Jefferies is very substantial. We talked about that before. And

24  we also know that large revenue producers are going to get paid more money

25  than small revenue producers; that's just the way it works. So, using

1   compensation as a factor of damage is going to reflect in a comparative sense

2   the amount of revenue a candidate would produce. Now, the next topic I call

3   "Recruiting Considerations", and again, we just pulled three of the bullet

4   points out of Kanoff's declaration. You've seen the amount of time and effort

5   that goes into finding a candidate. Just look at Gegenheimer. Jefferies hired

6   Heidrick. A broad search was conducted. Multiple candidates were considered.

7   Various levels of Jefferies' management were involved. Many meetings were had

8   with Gegenheimer, and after that it still took several weeks to get a deal in

9   place, and that's just one example. So, in thinking about the damage that it

10  would suffer in the case of a breach Jefferies had to consider the fact that

11  it may have lost alternate candidates that were passed over as it focused on

12  the candidate it struck the deal with. They had to think about, "Well, we're

13  going to have to now reignite this recruitment process and we don't know how

14  long that's going to take or how hard it's going to be." And it also needs to

15  consider whether it's going to be able to find a suitable replacement

16  candidate and if so, when? Maybe months, maybe a year, maybe two years, maybe

17  longer. There's no way to predict any of these things when entering into

18  agreements like the one in this case.

19  **MZ000010**

20  Now, the next category I call "Other Unquantifiable Losses", and these,

21  again, are straight from Mr. Kanoff's declaration. And Jefferies also took

22  into account other losses it may suffer when a candidate violates the

23  agreement, like the loss of credibility and goodwill with clients, employees,

24  and industry counterparts who may be aware of the candidate's decision to

25  renege on the agreement. They're going to look negatively upon Jefferies.

EXHIBIT N

1  It's embarrassing, plain and simple. The loss of goodwill with Jefferies
2  employees who may have learned of changes to their reporting lines, titles,
3  or standing. That happens routinely. Jefferies is not all that large a
4  company comparatively to Credit Suisse and others. When there is a hire,
5  people know about it and it affects other employees' standing with the
6  company, and then when someone reneges, that can be very unpleasant. And
7  losses due to other business decisions Jefferies may make in reliance on the
8  candidate's agreement to work at Jefferies – maybe Jefferies can't allocate
9  resources to something else because it allocated resources to this candidate.
10 Maybe Jefferies is making other employment decisions, terminating the
11 employment of someone or hiring more younger support bankers in reliance on
12 the candidate's agreement to join. There's no way to quantify the damage
13 suffered in any of these circumstances. And finally, Jefferies considered
14 what I call "Practical Factors". First, Jefferies knows these candidates are
15 going to be represented by counsel during the negotiation. It also knows
16 they're sophisticated people and that those folks have leverage. Accordingly,
17 they're going to set a number that these folks are likely to agree to and if
18 all sides agree, it's going to be a reasonable number. We also looked at the
19 amount that Jefferies contractually agrees to pay the candidate in the event
20 Jefferies was the party that breached the contract. Again, mutuality –
21 Jefferies is on the hook, too. And finally, the fact that the liquidated
22 damage amount in those instances where there is an intentional breach will
23 likely be reimbursed by the candidate's current firm as part of its efforts
24 to convince the candidate to breach the Jefferies contract in order to stay
25 at his or her current firm. Now, that's not to say that these individuals

EXHIBIT N

1   couldn't pay the damage on their own. They could, but Jefferies knows the

2   reality of the situation, which is that it's most likely that the firm that

3   induced the breach is going to cover it. So, considering all of this, why

4   does using first-year's guaranteed compensation make sense in this context?

5   Well, first of all, it's going to be the same or less than what Jefferies is

6   agreeing to pay if Jefferies is the party to breach. And secondly,

7   compensation is inextricably tied to the value of the employee. I mean, look

8   at the factors we just talked about: loss of revenue – employees that produce

9   more revenue get paid more. Recruiting issues – it's going to be harder to

10  replace the highly compensated employees most of the time than it is the less

11  highly compensated employees. The other unquantifiable losses – typically,

12  the breach by a higher-compensated employee is going to cause more internal

13  and external disruption, embarrassment, reputational harm. And for all these

14  reasons, compensation is always going to be tied to the likely extent of

15  damage Jefferies would suffer in the loss of an employee. Why else use

16  compensation? Well, it's a real, identifiable number that the parties at the

17  negotiating table can point to. It's something that candidates and their

18  counsel can look at, see how it's formed, and agree to if they think it's

19  reasonable. And finally, there's just no other way to do this. There is no

20  reasonable calculation that could take into effect all of these issues and

21  variables, and that is the precise reason why liquidated damages are needed

22  in the first place. Jefferies believed that using first-year's comp would

23  provide it with fair average compensation in the event of a breach and it

24  realized by using liquidated damages there could be some cases where the

25  liquidated damage doesn't cover the actual damage, but it felt that reducing

EXHIBIT N

1   the burden and cost of collecting those damages was going to be worth the

2   tradeoff. Now, with that background, let's talk about the law that dictates

3   that the liquidated damages provision is enforceable. And first we need to

4   discuss which state's law applies, and the parties have spilled a lot of ink

5   on this issue. Our position is that New York law applies –

6   **MZ000011**

7   in this case, but to be perfectly frank – and we'll go through this analysis

8   – we think the agreement is enforceable under New York law or California law.

9   So, I don't want to get too twisted around the choice of law issue. The

10  reason it really matters is because Gegenheimer's primary defense throughout

11  this case has been that the liquidated damages clause is a restrictive

12  covenant that violates Section 16600 of the California Labor and Professions

13  Code. And you may or may not be familiar with that, but it's a statute that

14  prohibits restraints on trade and where you see that most of the time is that

15  non-competes, non-solicitation of customer provisions are void in California.

16  Now, we think that argument should be rejected, first of all, because it's

17  not a restrictive covenant. We'll talk a little bit about that – we'll talk a

18  lot about that later. And also, because it contains a New York choice of law

19  and a New York forum provision. So, let's talk about the forum and choice of

20  law provisions. This is what the agreement says: "The agreement shall be

21  governed by and construed in accordance with the laws of the state of New

22  York." And Gegenheimer also agreed to exclusive jurisdiction in New York. It

23  says: "Any arbitration proceeding with respect to matters related to the

24  agreement shall be brought before FINRA in the borough of Manhattan in the

25  state of New York." So, why are we here in San Francisco? Well, FINRA

EXHIBIT N

1    initially assigned the matter to New York and then moved it to San Francisco

2    and the reasoning was they wanted to follow FINRA Rule 13213(a)(1), which

3    says: "A hearing should usually be in the location closest to the place where

4    the associated person – Mr. Gegenheimer – is located." Now, that decision,

5    which I think we all understand given the rule, does not preclude this panel

6    from enforcing the clear terms of the agreement. This panel can apply

7    whatever law it sees fit. You are not a de facto California court just

8    because you happen to be in California, and in this case the panel should

9    enforce the agreement by considering the legal issues in this matter as would

10   a New York, as opposed to a California, court. And that's because of the

11   forum selection clause, which is enforceable in both California and New York.

12   As we discussed in our brief, there's really no question that a New York

13   court would enforce the forum selection clause, and California courts enforce

14   forum selection clauses as well. Contrary to Gegenheimer's arguments, they do

15   that even when there's actual restrictive covenants involved, and we don't

16   think there is one here, but the courts don't make a distinction there. And

17   in our brief, we cited a number of cases for this principle. Perhaps the most

18   instructive is [PH 00:02:56] Truizi versus Canon Equipment Company, Case 59

19   in our appendix. And the Court enforced the forum selection clause providing

20   for a Minnesota forum is an actual restrictive covenant case, and it rejected

21   the argument that the forum selection clause was unenforceable based on

22   public policy, underlining section 16600. And the Court explained that

23   arguing public policy cleverly but impermissibly combines the forum selection

24   and choice of law analysis. And the Court said: "The question is not whether

25   the application of the forum's law would violate the policy of the other

23

238                                              EXHIBIT N

1  party's state, but rather whether enforcement of the forum selection

2  agreement would violate the policy of the other party's state as to the forum

3  for litigation of this dispute." And the Court found that enforcement of the

4  forum selection clause itself did not contravene a public policy in

5  California, even if the other forum might consider the choice of law issues

6  and find that the other state's restrictive covenant law was controlled. So,

7  with that, the panel should analyze the choice - the panel should enforce the

8  forum selection clause and analyze the choice of law as if it was a New York

9  court. Now, a New York court would apply New York law in this case. New York

10  courts regularly enforce choice of law provisions as long as the law provided

11  for is a reasonable relationship to the parties and the application is not

12  contrary to a fundamental public policy of a jurisdiction with materially

13  greater interest. Now, New York has a reasonable relationship to the parties

14  in this case. Jefferies is headquartered there, but it's not just

15  headquartered. Its principal place of business is there and most of its

16  employees are there. We'll talk in a minute about - you know, Mr. Gegenheimer

17  is no stranger to New York, either. Now, the application -

18  **MZ000012**

19  of New York law is not contrary to a fundamental public policy of a

20  jurisdiction with a materially greater interest. In this case, it's obviously

21  California. Now, again, Gegenheimer is saying, "Hey, California's public

22  policy based on 16600 means that you cannot apply New York choice of law, and

23  that neither a California or a New York court would apply New York choice of

24  law." Again, we disagree that 16600 is even applicable here. But even if it

25  is, California does not have a materially greater interest than New York, and

24

EXHIBIT N

1   New York courts have rejected this same argument time and time again and

2   enforced New York choice of law provisions contained in restrictive covenant

3   agreements where people like Mr. Gegenheimer who are based in California were

4   the defendants. We cited those cases in our brief: Marsh USA Inc versus

5   Hamby, Case 37; Ayco versus Frisch, Case 5; Estee Lauder versus Batra, Case

6   20. And everything in our appendix is in alphabetical order. They all

7   recognize that New York has a substantial interest in enforcing both forum

8   selection and choice of law provisions in an agreement with a New York

9   company. And discussions of all those cases are in our brief. I just want to

10  hit one, which is the Ayco versus Frisch case where the Defendants were

11  located in California and argued California had a materially greater interest

12  in the case, and it was a restrictive covenant case. The Ayco court focused

13  on the fact that the Plaintiff was headquartered in New York but also, its

14  internal groups and divisions were based in New York. It had nearly 800

15  employees in New York, and the Defendants themselves availed themselves of

16  Plaintiff's resources in New York. The Ayco court concluded that the

17  Defendant's location in California did not mean California had a materially

18  greater interest. Well, here, Gegenheimer intentionally engaged with

19  Jefferies, which he knew had its headquarters in New York, principal place of

20  business in New York, most of its employees in New York, and in fact, many of

21  Gegenheimer's communications and meetings regarding potential employment were

22  in New York. This is Exhibit J of Jefferies' brief. Gegenheimer made

23  arrangements to meet with Jefferies employees Phil Berkowitz and Jason

24  Greenberg in New York in February of 2016. Exhibit H: he went back to New

25  York to meet with Ben Lorello. Exhibit M: you see here that Greenberg and

1  Gegenheimer are actually discussing setting up the meeting to negotiate the

2  agreement and are talking about how that originally was going to be in New

3  York. Now, in addition to his contacts with Jefferies, you can see in the

4  emails attached as Exhibit T of Jefferies brief – Gegenheimer is in New York

5  all the time. That's just evident by his discussions with Jefferies. There's

6  four different emails where he's talking about, "Hey, I'm going to be in New

7  York for a client meeting." "I'm going to be in New York for a dinner." "I

8  have a deal in New York." He is no stranger to New York, and frankly, Credit

9  Suisse is headquartered in New York. And this was his – Mr. Gegenheimer's

10 resignation to Credit Suisse, which was later reneged, and you can see that

11 the person Mr. Gegenheimer resigns to, Gregory Weinberger, is in New York.

12 And his retention agreement with Credit Suisse provides for New York law. So,

13 Mr. Gegenheimer has substantial ties to New York. Jefferies obviously has

14 substantial ties to New York. New York has a compelling interest in providing

15 companies like Jefferies with access to a consistent forum for enforcement of

16 its contracts. Therefore, California's interests are not materially greater

17 to New York's, and New York – and a New York court would enforce the terms of

18 the agreement and apply to New York law. Real quick – last thing on this

19 issue: Gegenheimer cited a recent statute, California Labor Code Section 925,

20 and that does not change this analysis. Now, what that statute did do is make

21 voidable choice of law and forum selection clauses in employment agreements.

22 It certainly does, but it doesn't apply here for two reasons. One, it only

23 applies to agreements signed on or after January 1st, 2017. Here, we're May

24 18th, 2016, so it doesn't apply. Secondly, and I think more importantly, the

25

26

EXHIBIT N

1   legislature in California saw fit to say, "Hey, listen. This prohibition does

2   not apply if –

3   **MZ000013**

4   the employee was represented by legal counsel in connection with the signing

5   of the employment agreement, and certainly Mr. Gegenheimer was here." And we

6   think that's important. That shows you that the legislature took into account

7   that when a sophisticated individual represented by counsel enters into an

8   agreement, that agreement should be enforced. Now, before I turn to the next

9   part here, I think this would be a good time if we could just take a five-

10  minute break or so, if that's okay with the panel.

11  Larry Mills: Sure. Is that acceptable? All right. We'll be off the record.

12  **MZ000014**

13  Larry Mills: All right. We are back on the record. Before Mr. Shapren

14  continues with his closing argument, I want to acknowledge that Mr.

15  Gegenheimer arrived earlier in the hearing and he has been here during the

16  entire closing argument thus far, and he continues to be in the room. This is

17  for the record. Mr. Shapren, when you're ready.

18  Andrew Shapren: Thank you very much. So, we just talked about the choice of

19  law, and as I told you, I don't think that is a dispositive issue in this

20  case because the liquidated damages provision is going to be enforceable

21  under either New York or California law. Both states regularly enforce

22  liquidated damages provisions, and they have very similar law and that's set

23  forth at length in our brief. But I wanted to go over some of the basic

24  underpinnings of that law now, and first – and Gegenheimer acknowledges this

25  in his briefs – New York law and California law regarding the enforceability

1  of liquidated damages clauses is essentially the same. It's stated in Truck

2  Rent-a-Center versus Puritan Farms – this is the general test in New York: "A

3  contractual provision fixing damages in the event of a breach will be

4  sustained if the amount liquidated bears a reasonable proportion to the

5  probable loss and the amount of actual loss is incapable or difficult of

6  precise estimation." And similarly, in California a liquidated damage

7  provision is reasonable where the validity of a liquidated damages provision

8  is assessed by reference to a two-part test, and here's the test. It must be

9  the case that fixing the amount of actual damages was impracticable or

10  extremely difficult, and that the amount selected must represent a reasonable

11  endeavor by the parties to estimate fair compensation for the loss sustained,

12  and that is the [PH 00:02:03] Jesu Group Holding, Ltd. versus Embros Inc,

13  Case 31 in the appendix. And you can see the tests are worded a little bit

14  differently, but it's basically the same test. Now, we talked about this

15  earlier: both states hold that a liquidated damage provision should be

16  interpreted as of the date of its making, not as of the date of the breach or

17  using hindsight as a benefit. Now, also – this is very important – both

18  states hold that the party challenging the liquidated damages provision –

19  here, Mr. Gegenheimer – has the burden of establishing that the provision

20  does not meet the requirements of an enforceable liquidated damages

21  provision. This is United Title Agency LLC versus Surfside 3 Marina, New York

22  law: "The party challenging a liquidated damages clause must establish either

23  that actual damages were readily ascertainable at the time the contract was

24  entered into, or that the liquidated damages were conspicuously

25  disproportionate to foreseeable and probable losses." New York law: In re

EXHIBIT N

1   Landmark W, LLC. Again, citing the statute – California Civil Code 1671(b)

2   creates a presumption of validity for a liquidated damages clause and places

3   the burden on the party seeking to invalidate it to demonstrate that the

4   provision is unreasonable under the circumstances existing when the contract

5   was executed, and that's Case 29. Also, both states also recognize that the

6   amount of liquidated damages does not have to be a precise and exact measure

7   of damage. GFI Brokers, LLC versus Santana in New York said "A liquidated

8   damages provision will not be deemed a penalty simply because it is not

9   perfectly calibrated to actual damages. Rather, the provision need only

10   achieve a reasonable mechanism for estimating the compensation which should

11   be paid to satisfy any laws flowing from the breach. The appropriate analysis

12   is not whether a better quantification of damages could have been drafted by

13   thee contracting parties but whether the amount of liquidated damages

14   actually inserted in the contract is reasonable." Now, when the Defendant in

15   this case protested that the mechanism for the liquidated damage in that case

16   could have been a better, more precise measure of damages, the Court

17   responded: "Were it possible to have the exact accounting Santana seems to

18   desire, there would likely be no need to resort –

19   **MZ000015**

20   to liquidated damages at all for it is axiomatic that liquidated damages are

21   only available where actual damages are expected to be difficult to

22   determine," and that's Case 25 in the appendix. Now, California states the

23   same thing, but it states it a little differently. This is Case 47, Radisson

24   Hotels. "California law permits a considerable degree of latitude in fixing

25   the sum of liquidated damages. Given the current statutory policy which

29

EXHIBIT N

favors the validity of such agreements except in certain consumer transactions and which casts the burden on the opposing party to prove unreasonableness and requires only that the liquidated damages bear a reasonable relationship to the range of harm that might reasonably be anticipated." Furthermore, Edwards versus Symbolic International Inc, Case 19: "Because courts look at reasonableness in the provision at the time the contract was made, the amount of damages actually suffered has no bearing on the validity of the liquidated damages provision." Now, finally, as far as these basic underpinnings, both New York and California say it is essential to take into account the circumstances of the transaction, including the sophistication of the parties, their relative bargaining power, whether they were represented by counsel. Here's what that GFI Brokers case said: "Much of the historic hostility of liquidated damages clauses reflects a concern that such clauses are often unconscionably imposed by the stronger or more sophisticated party on the weaker. Accordingly, many courts have looked for the parties' respective bargaining positions, including the parties' sophistication, whether the transaction was at arm's length, and whether the parties were represented by counsel in evaluating the reasonableness of the liquidated damages clause." Edward versus Symbolic again – California law. The law revision commitment comments to the 1978 amendment, Cal Civ Code 1671, state that among factors to be considered in determining whether a liquidated damages provision is reasonable are the relative equality of the bargaining power of the parties and whether the parties were represented by lawyers at the time the contract was made. So, both states give deference – deference to liquidated damages provisions where the parties are

EXHIBIT N

1  sophisticated, where they're represented by counsel, where they have equal

2  bargaining power. And as we've seen with Mr. Gegenheimer, he's a highly

3  sophisticated party, had access to qualified counsel, had substantial

4  bargaining power, and entered into agreement with fair and mutual terms. Both

5  California and New York law dictate that you should give deference to the

6  parties' agreement in situations like this. Now, we've looked at all those

7  legal principles and the first thing I showed you was sort of this two-part

8  test that the states apply. So, let's just look at that in relation to this

9  case. First, the liquidated damages provision is going to be enforceable

10  under either state's law because damages in the event of breach of an

11  agreement by Gegenheimer are difficult to determine. Ryan v. Orus, Case 51,

12  recognizes that damages from breach of an employment contract are inherently

13  incapable of accurate estimation, and we saw that earlier. We went through

14  the declaration. We went through all the variables and all the facts that

15  Jefferies looked at. I'm not going to do that again, but I think we can all

16  see that the damages would have been very difficult to contemplate at the

17  time the agreement was entered into. This is exactly the situation that

18  liquidated damages clauses should be used in. The second part of the test is

19  that the liquidated damage amount bears a reasonable relation to Jefferies'

20  probable losses in the event of a breach. Again, we know how the one-million-

21  dollar amount was derived. It is roughly Mr. Gegenheimer's first year

22  guaranteed compensation, and that amount is reasonable and it's not, again,

23  grossly or conspicuously disproportionate to the probable or foreseeable loss

24  at the time the agreement is signed. And for that reason, courts have

25  repeatedly found that using compensation as a factor in setting liquidated

31

EXHIBIT N

1   damages for the loss of an employee – to try and set that value is a

2   reasonable thing to do. And we showed you four cases on that very point. I

3   want to talk about those. First, let's look at Gibson Soul Inc v. Armstrong

4   World Industries, Case 26.

5   **MZ000016**

6   And this involved a liquidated damages provision contained in an agreement

7   between two companies who agree not to hire each other's employees. And in

8   the event of a violation, the agreement said one company has to pay the other

9   company's one-year's compensation as set forth on the employee's W2.

10  Armstrong went ahead and hired an employee in violation of the agreement, and

11  then when it got sued, its argument was, "Well, wait a minute, this

12  liquidated damage is disproportionate to any actual damage that the other

13  party would've suffered." But the court disagreed and said it was

14  enforceable. And the court said actual damages were difficult to ascertain

15  because neither party could envision, nor would the court expect them to, the

16  cost of losing employees of varying experience and value. Went on to say the

17  amount set in the agreement was a reasonable prediction of what harm would

18  likely befall the non-breaching party at the time the contract was made. So,

19  the court is recognizing that competition is a good tool for valuing the

20  damage caused by a lost employee. Similarly [PH 00:01:12] Pastor v. Solomon,

21  case 46 in the appendix involved a liquidated damages provision in an

22  agreement pursuant to which actors who had agreed to perform in a play would

23  not perform anywhere else during the run. And if they breach that, they had

24  to pay the compensation they would have earned during the run. Now, as our

25  research pointed out, this is a very old case. It is in 1898. Let's submit

32

247                                                    EXHIBIT N

1    after 120 years, it's still good law, and frankly, the conclusion it comes to

2    is not all that complicated. It's rather common sense. The court enforced the

3    liquidated damage amount, and it did so because it said the amount to be

4    earned by breaching actors was an appropriate measure of the importance of

5    their services and indicated a probable substantial loss if the engagement

6    was broken. Now, those are New York cases, but we had two other cases outside

7    of New York that we cited, and again, the legal test employed in those cases

8    is the same test that New York and California employ. This is not unique to

9    those states. Vanderbilt versus Dinardo is a case from the Sixth Circuit, and

10   it bears a pretty remarkable resemblance to this case. And in that case, the

11   court [INDISCERNIBLE 00:02:31] enforced a liquidated damages provision in a

12   football coach's term employment agreement. You know, we're talking about a

13   valuable employee, certainly, at Vanderbilt. The contract had reciprocal

14   liquidated damages provisions just like in this case, and Vanderbilt had to

15   pay Dinardo his remaining salary if it decided to replace him, and if he left

16   before the end of his term, he had to pay Vanderbilt the remaining salary.

17   Now when Dinardo left, he said, "Hey, my salary has no relationship to

18   Vanderbilt's damages, and court you shouldn't enforce this. This is

19   unreasonable." Same argument that Mr. Gegenheimer's making in this case. And

20   the court found the liquidated provision was enforceable this time under

21   Tennessee law which again has the same principles, and the Sixth Circuit

22   upheld, I'm sorry, the District Court found it enforceable and Sixth Circuit

23   then upheld the District Court's finding that Vanderbilt did not need to

24   undertake an analysis to determine actual damages. The Sixth Circuit Court of

25   Appeals said, "Under the circumstances of this case, the court finds the use

1   of the formula based on definite salary to determine the amount of liquidated

2   damages is reasonable. Although Dinardo's base salary is not specifically

3   related to any specific anticipated damages in the event he resigns it is

4   reasonable given the nature of the unquantifiable damages in this case. The

5   potential damage to plaintiff extends far beyond the cost of merely hiring a

6   new head football coach. It is this uncertain potentiality that the parties

7   sought to address by providing for a sum certain to apply toward its

8   anticipated expenses and losses." Now, this principle stated by the Sixth

9   Circuit is the exact reason for the liquidated damages provision in this

10  case. Now, the Sixth Circuit also considered the fact that the liquidated

11  damages provision was reciprocal and was the result of negotiation between

12  two parties each of whom was represented by counsel. Now, the last case we

13  saw earlier on this point, and I don't have a quote on the screen for this,

14  but it was the Gator Apple versus Apple Texas Restaurants, case 24 in the

15  appendix. And in that case, the Court of Appeals in Texas upheld the

16  enforcement of a liquidated damages provision.

17  **MZ000017**

18  in a franchise agreement pursuant to which an Applebee's franchise agreed not

19  to hire the employees of another Applebee's franchise, and in the event of a

20  violation, the agreement provided that the franchise that formerly employed

21  the individuals would be entitled to three times the hired employee's annual

22  salary plus costs and fees. Now, when Gator Apple went and hired multiple

23  employees from Apple Texas in violation of the agreement, Apple Texas sued.

24  And the court upheld the enforcement of the liquidated damages provision this

25  time under Kansas law which again, same test. And the court concluded that

34

EXHIBIT N

1  Gator Apple had failed to meet its burden of establishing the liquidated

2  damages clause as a penalty. The court reasoned that the evidence showed that

3  damages attributable to the loss of a manager-level employee could include

4  many aspects such as fees paid to a search firm to find a replacement

5  candidate, relocation costs of a replacement candidate, loss of productivity

6  while the new candidate is trained brought up to speed, loss in sales,

7  productivity, and goodwill between existing management and staff, and lost

8  profits. That should sound – it's stated a little differently, but is should

9  sound familiar to a lot of things that we talked about earlier in this case.

10  Certainly, the casual dining business is not the investment banking business,

11  but the principles are the same. And the court also rejected the arguments

12  that the provision was void because it was unreasonably high, and that the

13  actual damages would have been simple to calculate objectively. So, each of

14  these cases, Solomon, Gibbs, Dinardo, Gator Apple, used compensation as a

15  measure to value an employee's services in determining a liquidated damage

16  amount. Just like in these cases, the amount of Gegenheimer's first year

17  compensation was a reasonable measure of Jefferies damage in this case, and

18  the liquidated damages clause Gegenheimer agreed to is enforceable as a

19  matter of law. Now, real quickly, the fact that Gegenheimer breached the

20  agreement a week after signing it does not make the liquidated damages

21  provision unenforceable because as we discussed you look at the agreement as

22  the date of the signing not the date of the breach. And as the Bidga v.

23  Fischbach case, Case 9 in the appendix, explained, although the liquidated

24  damage might have more accurately reflected actual damages if it had included

25  a mechanism to adjust the damages based on the time of the breach, a

EXHIBIT N

1  liquidated damages clause is not a penalty simply because the balance between

2  actual and probable damages turns out not to be perfectly or flexibly

3  proportioned, and that reasoning applies here. Jefferies had to hold

4  Gegenheimer's position open for 90 days, and at the time they signed it,

5  nobody knew if he would back out of the agreement the next day or the 90th

6  day. So, the fact that Gegenheimer decided to breach a week after signing

7  does not make the liquidated damages amount plainly disproportionate to

8  Jefferies probable loss at the time of signing the agreement. The law

9  dictates that the provision is reasonable. It's not grossly or conspicuously

10  disproportionate to the probable loss at the time the agreement was signed,

11  and it's enforceable under both state's law. Now, let's address Gegenheimer's

12  arguments for why the liquidated damage amount is unreasonable. Then first

13  and foremost, you shouldn't be considering those arguments at all, because he

14  expressly waived his right to assert any defenses or counter-claims against

15  Jefferies claim for liquidated damage, and that is section 3C of the

16  agreement, and we talked about this in our statement of claim, and we talked

17  about it in our briefs. He will not assert any defenses, rights of set-off,

18  or counter-claims as a reason for not fully repaying any amounts due under

19  this agreement, and you can't see it blown up there, but if you go to that

20  page under C, you'll see D, and that is the reciprocal agreement. So, this

21  isn't just that Gegenheimer's agreed to this, Jefferies agrees to the same

22  thing, and it says that if Mr. Gegenheimer brings a suit to collect the

23  monies he's due if Jefferies was to breach, Jefferies isn't going to raise

24  defenses, right of set-offs, or counter-claims. Now, Gegenheimer's defenses

25  should be denied for this reason alone, and we can't, and FINRA, you know

36

EXHIBIT N

1   this, we can't bring a motion to dismiss on this subject. We can't bring a

2   motion for summary judgment. This is the time to raise it, and we have, and

3   you should enforce this clause by considering his defenses to be waived.

4   **MZ000018**

5   Now, even if you overlook this contractual waiver, his arguments still fail.

6   Now, first, Gegenheimer's generally argued that the liquidated damages

7   provision is an unenforceable penalty, because it's not reasonably related to

8   the measure of actual damages, but he's failed to provide any case from New

9   York or California or anywhere else on point to support the assertion that

10  using first year's compensation makes an agreement unlawful. Now we've showed

11  you the cases I just went thorough, and we spent a lot of time on them now,

12  and in our briefs. Now, Mr. Gegenheimer's gone to great lengths to try to

13  distinguish those cases in his briefs, and they will again today, and we

14  think they've taken a few liberties with those cases in doing that. So,

15  rather than go tit-for-tat, I invite you to read the cases. Read Gibbs. Read

16  Pastor v. Solomon. Read Vanderbilt v. Dinardo. Read Gator Apple. Come to your

17  own determination as to the principles they stand for. The reality is that

18  there aren't any cases that hold that compensation is not a reasonable

19  measure of liquidated damage for the loss of an employee's services, and if

20  there was, I assure you, you would have seen it. It's an entirely appropriate

21  measure of damage for Jefferies and Gegenheimer to agree to. Now, Gegenheimer

22  also makes the baseless argument that Jefferies made no attempt to estimate

23  the damage they would suffer if Gegenheimer failed to become a Jefferies

24  employee. Well, we've discussed the declaration of Chris Kanoff at length

25  today. I'm not going to go over that again, except to tell you that it shows

37

EXHIBIT N

that Jefferies specifically considered its likely damages, its situations
where a candidate went through this lengthy recruiting process, signed an
agreement, and then breached the agreement. Jefferies determined to not
calculate the damage with any accuracy and that it needed a formula to
estimate the appropriate amount of average fair compensation in the event of
a breach, and it came up with the first year's guaranteed comp as a
reasonable measure. Now, Gegenheimer says it is reasonable. Well, that
doesn't take into account anything about a specific employee, their rank,
their responsibilities, their experience, their revenue-generating abilities,
well, of course, it does. Using compensation takes into account somebody's
rank, somebody's revenue-generating ability, somebody's experience. The
higher compensated, the higher all those things are going to be, and that's
the whole point here. Higher compensated employees have a higher rank, have
more responsibilities, have more experience, generate more revenue. It is a
good measure of an employee's value. So, Gegenheimer's assertion that
Jefferies did not make any attempt to estimate its damages should be
rejected. Gegenheimer also argued that the liquidated damages provision's
unreasonable because Gegenheimer couldn't have joined Jefferies on August 17th
as he had to, and then resigned the next day, and he wouldn't have had to pay
the liquidated damage. Now, we spent a lot of time on this on our opposition
to kind of lay it out, and we talked about the agreement earlier, but this
argument's undermined by common sense and the terms of the agreement. No
reasonable investment banker is going to do that. They would absolutely
derail their career, and it would have really serious financial
repercussions. Gegenheimer had the 365-day notice provision if he resigned

1   any time before September 31st, 2017. Accordingly, even in the absurd scenario

2   in which he would join and then immediately resign, he still needs to work

3   for Jefferies for a year, and that would bring value to Jefferies. Jefferies

4   would get one year of work from Gegenheimer, only pay him base salary, and in

5   the meantime have 365 days now to try and go find a replacement for him when

6   the notice period's up. Now, we also know this just isn't realistic, because

7   the financial repercussions would be very significant. Again, have to either

8   not receive or repay the 2016 bonus, the replacement cash, so, that would

9   forfeit over a million dollars, and remember, he would now have already lost

10  his opportunity to get his annual bonus from Credit Suisse. That's out the

11  window, and his deferred compensation from Credit Suisse is out the window.

12  So, he could not and would not have resigned days after. He would have needed

13  to work at least one year, and I think we see how the agreement's designed.

14  It's most likely he's going to work at Jefferies for a very long time, and

15  produce substantial revenue during that timeframe, and that tells us that the

16  one million damages clause is reasonable. Gegenheimer also says, "Well, it's

17  an unenforceable penalty, because this has the effect of comp –

18  **MZ000019**

19  compelling my performance. It's put in here to intimidate me and make me have

20  to show up for work even if I don't want to." Well, both of New York and

21  California courts reject that argument that a liquidated damages provision is

22  an unenforceable penalty merely because it has the effect of encouraging

23  performance. GFI Brokers, "The prospect of damages in the event of a breach

24  may always be said to encourage parties to comply with their contractual

25  obligations." Liquidated damages are not transformed into a penalty merely

EXHIBIT N

1    because they operate in this way as well, so long as they are not grossly out

2    of scale with foreseeable losses. So, again, that's the important test. So,

3    even if the liquidated damage did have the effect of compelling Mr.

4    Gegenheimer's performance, and first of all, it certainly didn't work, but

5    it's not an unenforceable penalty because it is a reasonable attempt to

6    estimate Jefferies losses in the event of a breach, and Ray v. EC Farms and

7    the [00:01:04] GE Zubru case, 30 and 31 in the appendix, stand for that same

8    proposition in California. Now, since the time that Mr. Gegenheimer filed his

9    answer to statement of claim, his defense has primarily been that the

10   liquidated damages provision is unenforceable under California law, because

11   it's a restrictive covenant, and we'll talk about that. But in his opposition

12   brief, he raised for the first time the argument that the liquidated damages

13   provision is unreasonable under New York law, because it reserves the right

14   to seek actual damages in excess of liquidated damage. And the argument is

15   Jefferies is trying to have its cake and eat it too. It's trying to have its

16   liquidated damages and also have the right to go get actual damages too.

17   Well, this is a red herring, and the reason it's a red herring is because

18   never once has Jefferies sought to recover both liquidated and actual

19   damages. That is true in our statement of claim. That is true today. We have

20   always asked the panel to give us the liquidated damages and have only

21   reserved the right to prove actual damages if the panel determines the

22   liquidated damage clause is unenforceable. Now, let's turn to this argument

23   about Section 16600 of the California Business and Professions Code, and this

24   is again the argument that Gegenheimer made throughout this case. And the

25   argument is it's unenforceable because it's a restrictive covenant that

40

1   violates Section 16600 of the California Business and Professions Code, and

2   that says, "The contracts by which anyone is restrained from engaging in a

3   lawful profession, trade, or business of any kind are void." Now, this

4   argument fails for the simple reason that the liquidated damages provision

5   which required Gegenheimer to pay Jefferies if he did not commence employment

6   by a certain date is not a restrictive covenant. It doesn't implicate Section

7   16600. It requires him to start employment by a date certain, and then to

8   work for Jefferies for at least a year and probably longer. And Jefferies was

9   required to hire Gegenheimer on that date, and it couldn't terminate him

10  without cause until December 31st, 2017 without having to pay him

11  compensation. Now, in his briefs, Gegenheimer repeatedly says that the

12  agreement quote, "prohibited him from working for Credit Suisse or any other

13  competitor for the three months preceding his employment with Jefferies." The

14  agreement doesn't say anything like that. In fact, it requires him to honor

15  his notice provision with Credit Suisse, in other words, to work at Credit

16  Suisse for the three months prior to the time he joins Jefferies. It didn't

17  prohibit Gegenheimer from working for Credit Suisse or any other competitor

18  except for during one time which is the time he's supposed to be working for

19  Jefferies. Let's look at it again. If during the period beginning from the

20  date you execute this agreement until your start date, the interim period,

21  you fail to commence employment by August 17th, 2016, you agree to pay

22  Jefferies one million as liquidated damages which represent only an

23  approximation of a portion of the anticipated loss created by such a

24  violation. The breach is failing to work for Jefferies. It's not working for

25  a competitor.

EXHIBIT N

MZ000020

Now, in the next sentence, the provision limits the circumstances under which

Mr. Gegenheimer failing to join Jefferies is a breach, and you see, it says

it's applicable only if you voluntarly fail to commence employment because

you return as an employee of Credit Suisse or engage in competitive activity,

and that's obviously the sentence that Gegenheimer continues to point to.

Well, again, it's just a limitation, and when we look at it, the reason it's

in there it's obvious. We're trying to avoid a situation in which an

employee, a candidate, let's say, dies or becomes disabled or there's some

other reason why he can't join. I think we'd all agree it would be

economically onerous to impose that on someone in such a situation, and it

also reflects reality, and this is the reason people breach these agreements,

because they get better deals. Now, the agreement functions like a term

employment agreement, not like a restrictive covenant. Gegenheimer had to

join on August 17th. He had to stay there for at least a year. And term

employment agreements are expressly permitted under California Labor Code

Sections 2922, 2924, 2925, and those are Statute 2 in the appendix. And

they're enforceable by employers and employees, Silva v. McCoy, Case 53. And

as the Metro Traffic Control case shows, California courts have even

encouraged the use of fixed-term agreements by an employer. Here's what the

court said, "If Metro wanted to ensure the continued availability of these

employees, and their voice qualities and personalities for future

assignments, or simply to strengthen the pool of available talent, it could

enter into exclusive long-term contracts to that end." Now, obviously, if

you're an employee, and you're subject to a term agreement to work for a

EXHIBIT N

1  company for a year, two years, or whatever the case may be, you're prohibited

2  from working for a competitor during that same timeframe. Yes, even though

3  these contracts intrinsically prohibit someone from working for a competitor,

4  they don't violate Section 16600. As the court in De Haviland versus Warner

5  Brothers, Case 18, said, "The legislature has determined that fixed-term

6  employment contracts provide benefits both to the contracting parties and to

7  overall commerce that preclude the application of more general prohibitions

8  on private contracting such as 16600." Allied North American Insurance

9  Brokerage Corp, Case 2 comes to the same conclusion. Angelica Textile

10 Services v. Park says, "Section 16600 has consistently been interpreted as

11 invalidating agreements that interfere with an employee's ability to compete

12 with an employer after his or her employment ends, not during the term of

13 contractual employment." So, Section 16600 does not override the fact that

14 the labor code specifically authorizes term-employment contracts. And

15 Gegenheimer's agreement is no different in the way it functions. It requires

16 him to work for Jefferies on August 17th, 2016, and thereafter. The fact that

17 he can't violate that agreement to go work for a competitor doesn't make it

18 an unlawful restraint of trade. In short, I think a simple way to phrase this

19 concept is contracts of employment as opposed to post-employment restrictive

20 covenants are not restraints of trade prohibited by 16600, and certainly, the

21 provision to not restrain trade at all. Gegenheimer never stopped working for

22 Credit Suisse for a single day. He got a promotion, got compensation that

23 exceeded even the most lucrative offer he got from Jefferies. I don't think

24 it's a far stretch to say Credit Suisse is paying for his representation here

25 today. I don't think Mr. Gegenheimer has four lawyers from Epstein, Becker, &

EXHIBIT N

1   Green on his payroll. And again, I'll leave it to you to decide, but I think

2   it's pretty clear Credit Suisse is indemnifying him as well. It's not a

3   restraint of trade. It's merely the cost for Credit Suisse to retain a

4   valuable employee, and to compensate Jefferies for its loss. Now, we saw in

5   Hedstrom v. Truxtun, Case 28, a California court actually enforced liquidated

6   damages clause in a term employment agreement, and it actually it stated

7   things pretty interestingly. It said, "We don't even really think this is a

8   liquidated –

9   **MZ000021**

10  damages clause. It's an alternative to performance." Either side could've

11  just decided we don't want to perform this term-employment contract any

12  longer, and if we don't then you got to pay the consequences. And the court

13  said that that was appropriate. Now, Gegenheimer chose not to perform the

14  agreement but to remain with Credit Suisse, and he too should pay the

15  consequences. Now, if you do find, well wait a minute, we think even this

16  reference to competitive activity violates 16600, you can strike it, and the

17  reason why is it's merely a limitation on the circumstances in which

18  Gegenheimer would be liable to pay liquidated damages, and we saw that. The

19  limitation is a benefit to Gegenheimer. It tightens the circumstances under

20  which he can breach. It's not a restraint on trade. But if you find maybe it

21  is, you can strike it, and notably the agreement has a severability provision

22  in it. The provisions in this agreement are severable. Any provisions in this

23  agreement held to be unenforceable or invalid in any jurisdiction shall not

24  affect the enforceability of the remaining provisions. In addition, any

25  provision of this agreement held to be accessibly fraud as to degree,

44

259                                                    EXHIBIT N

1   duration, geographical scope, activity, or subject shall be construed by

2   limiting and reducing it to be enforceable to the extent compatible with the

3   applicable law. Case 21 in our appendix, we cited FLFA v Barney and Barney,

4   and it says, "California takes a very liberal view of severability. And under

5   California law, a court can sever a void provision of a contract and enforce

6   the remainder where the interests of justice or policy of the law would be

7   further." And we cited Thomas Weisel Partners versus BNP Paribas, Case 55,

8   which was pretty interesting, and involved an actual restrictive covenant

9   that contained confidentiality and employee non-solicitation clause, so you

10  can't solicit our employees, and an employee no-hire clause. You can't hire

11  our employees after your employment. And the court said, "Well, we think the

12  no-hire part goes a little too far and does violate 16600, but we're okay

13  with the confidentiality and the non-solicitation of employees." And rather

14  than invalidate the whole agreement or even just that paragraph, the non-

15  solicitation clause, the court explained that the no-hire language could

16  simply be voided without requiring any rewriting of the agreement by the

17  court. Take out the offending provision. Enforce everything else. So, if the

18  panel finds a sentence in a liquidated damages provision that limits

19  liability to situations in which Gegenheimer returns to Credit Suisse or

20  engages in competitive activity to be void or enforceable under 16600, the

21  panel can simply strike that sentence. And as we can see, it doesn't change a

22  thing. Mr. Gegenheimer still violates the provision, because he didn't

23  commence employment by August 17th, 2016. And with the sentence stricken, then

24  there's clearly no question about 16600, although we don't think there's one

25  anyway. Similarly, for all the same reasons, if the panel entertains

45

260                                        EXHIBIT N

1  Gegenheimer's argument that the last sentence of the liquidated damages

2  provision makes a void, it could strike that sentence too. Given that

3  Jefferies has not sought to enforce that sentence, striking it has absolutely

4  no effect on the rest of this provision or anything else in the agreement,

5  and the panel sitting in equity should certainly not allow a drafting issue,

6  which is not at issue at all under relief actually requested in the case, to

7  dictate that this arms-length, mutual agreement is unenforceable. Now,

8  looking to the panel's decision and the future of the case, if you decide the

9  liquidated damages provision is enforceable, Jefferies is entitled to its

10  fees and cost. The agreement requires Gegenheimer to pay Jefferies'

11  attorney's fees and costs if it is the prevailing party in the matter, and as

12  we said in our brief, both California and New York courts enforce contractual

13  agreements to pay attorney's fees. Accordingly, in addition to the liquidated

14  damage, Jefferies is entitled to its fees and costs in this matter, and if

15  you determine that Jefferies is entitled to its fees and costs, we'll need to

16  have subsequent proceedings whether on the papers if we can agree or –

17  **MZ000022**

18  or another hearing before the Court, and before the panel, and we'll deal

19  with that. Now, if the panel decides the provision is unenforceable,

20  Jefferies is entitled to its actual damages. So, as you know, today you're

21  here just to decide the one issue, and if you find the liquidated damages

22  provision is not enforceable, Jefferies may still recover its actual damages

23  incurred due to Gegenheimer's breach, and if that's the event, we're going to

24  need additional hearings on that issue to be scheduled at a future date. Now,

25  as I'm about to wrap up here, I want to touch on one last thing, and we've

EXHIBIT N

1   talked about the arms-length nature of this agreement, about Mr. Gegenheimer

2   being a sophisticated party, about the agreement being mutual, and the other

3   side wants you to just toss that all aside, tear up the agreement, says it's

4   meaningless. Well, think about this, suppose after signing the agreement

5   Jefferies learned that another one of the candidates that had interviewed,

6   and who was just as qualified as Gegenheimer, was willing to join Jefferies

7   for less money than Gegenheimer. Jefferies said, "Boy, this is great. We

8   could save some money here," and sent Mr. Gegenheimer an email, and said,

9   "Hey, sorry, Jon, we decided we're going to go with another candidate." And

10  when Mr. Gegenheimer said, "Well, you need to pay me my one million, twenty

11  thousand dollars in liquidated damages." Jefferies said, "Get outta here.

12  That agreement doesn't mean a thing." How would you feel now? I think we'd

13  all feel pretty upset at Jefferies disregard for the contract, and on the

14  effect that it would have on Mr. Gegenheimer. Well, he did the same thing. He

15  entered into the agreement with Jefferies, and when a better offer came

16  along, he said, "The hell with it. Sorry, Jefferies. Credit Suisse and its

17  lawyers are going to take care of this for me. I'm not paying you. Good

18  luck." His behavior is just as objectionable, and they should not be allowed

19  to violate contracts with immunity, and they shouldn't be left off the hook.

20  So, here's what we're asking for. We're asking you to find Gegenheimer liable

21  for breach of contract. We're asking you to award Jefferies the liquidated

22  damage in the amount of one million dollars. We're asking you to award

23  Jefferies its attorney's fees and costs incurred in this matter, and we're

24  asking you to assess all FINRA fees to Gegenheimer. And now, before

25  concluding, obviously we're going to have more argument. We may have

EXHIBIT N

1  rebuttable. See how it goes. But Jefferies just wants to make it clear to the

2  panel we're committed to be here as long as we need to today, even if we have

3  to come back tomorrow. I don't think that's going to happen, but we're

4  committed to do that too. So, if the panel has any questions, needs more

5  legal authority, needs evidence, needs whatever it needs, let us know, and

6  Jefferies will be here to do that, and thank you very much for your time and

7  your attention.

8  Larry Mills: Thank you, Mr. Shapren. I'm thinking we'll probably want to take

9  a break before we have the closing argument from the other side. Is that

10  reasonable?

11  Robert Goldstein: Yes.

12  Larry Mills: All right, how much time –

13  Ron Green: Can I just ask a question before we recess for a few moments. I'm

14  reading the firm's, your representation as to what the issue to be

15  adjudicated today is. I don't think it includes whether Mr. Gegenheimer has

16  breached the contract. It is whether or not the liquidated damage clause in

17  the agreement is enforceable or unenforceable, not whether it's been

18  breached.

19  Larry Mills: Right. We have entered, the panel has entered an order limiting

20  the issue to be decided as the first part of this hearing as that issue,

21  whether the liquidated damages clause is enforceable or unenforceable, so the

22  – and even the relief, you know, awarding a million dollars, no, that's not

23  part of what we do today, or whenever we make an award or attorney's fees or

24  costs. I realize that that's the panoply of remedies that would be available

25  if the liquidated damages clause is enforceable, but that's not before us

1  today. If there's a miscommunication about that, we should resolve it. I

2  think we're in agreement that that's what we're about. So, the award will

3  simply answer that question and provide the panel's reasoning and support of

4  the answer to that question. By the way, I'll defer to the panel. Is that –

5  Ms. Lou: That's my understanding too.

6  Jim Oaks: That's my understanding, Yeah.

7  Andrew Shapren: I mean, aren't we dealing with technicalities? I mean, if the

8  liquidated damages clause is enforceable, what option is there other than to

9  award Jefferies one million dollars?

10  Larry Mills: Well, I'm not, I'm not, I'm not suggesting that there would be

11  some –

12  **MZ000023**

13  other remedy. I'm suggesting that we have been asked to decide one question,

14  and that was my stipulation, and that's what I put in the order on behalf of

15  the panel, but that's what this is about, and we are bifurcated. So, if

16  there's need for a further hearing to, you know, lock in whatever is going to

17  happen in the future, we'll just have to do that. That's the panel's

18  understanding of what we're doing. Anyway, I do think we should take a break.

19  How much time would you like for your break?

20  Jim Oaks: Fifteen minutes?

21  Larry Mills: All right. So, we'll be off the record.

22  **MZ000024**

23  Larry Mills: Record. We are proceeding with closing arguments in this case.

24  Next from Mr. Gegenheimer, Mr. Goldstein, are you going to argue?

25  Andrew Goldstein: Yes, sir.

1   Larry Mills: You may proceed.

2   Andrew Goldstein: Thank you. I'd like to focus most of my time on the legal

3   issues and the enforceability of the liquidated damages provision, since that

4   is the sole issue for our proceeding today. Before I do, I just want to spend

5   just a few moments on some of the background facts that Mr. Shapren had

6   alluded to, because I think there's some more information that wasn't

7   disclosed that would be helpful. I think the most important thing to bear in

8   mind is Mr. Gegenheimer did not see an offer letter until the day after the

9   five managing directors from the Credit Suisse Investment Banking Group had

10  already walked out the door to join Jefferies. That was deliberate. Jefferies

11  had been talking to Mr. Gegenheimer prior to that date, and they had general

12  discussions, but the liquidated damages provision was never given to him

13  until the day after the five most-senior managing directors in his group

14  walked out the door. The next day, he gets a phone call from Jefferies, "Come

15  in and sign the agreement." It's not negotiable. That is the context I think

16  that's the most important thing to remember here. The fact that they may have

17  been talking generally, which we've never denied, doesn't really factor into

18  whether or not he had rational or reasonable effort or ability to analyze, to

19  think about, and determine whether or not that liquidated damages clause was

20  appropriate, and you have to put yourself in the mind of someone who just saw

21  the people in his group that he depends on – Mr. Gegenheimer's a service

22  provider. He doesn't go out and generate business or get clients. He provides

23  service, M&A service to the people that he works for. Those people are gone.

24  That's the situation that he's facing. I think it's important to keep that in

25  mind, because there's somewhat of a suggestion that there was parity in

50

1  bargaining power, and that's simply not the case. So, let's turn to the law

2  now, because I think that really is the most important issue here. Jefferies

3  has taken the position from the beginning that this is a matter for New York

4  law. This should be governed by New York law, and they still maintain that it

5  should be in a New York forum. They base that on New York choice of law, and

6  New York court and provision, New York choice of forum provision in the offer

7  letter. One thing they left out, I'm a little surprised, is the forum

8  selection provision was decided. At the early stages of this arbitration, in

9  fact before a panel was appointed, Jefferies made a motion. They made a

10 motion to the director, FINRA, to transfer this proceeding to New York, and

11 they invoked the forum selection provision. The motion was denied, so the –

12 FINRA has already made the decision not to enforce the New York forum

13 provision, but even more significantly, the director in this order denying

14 the motion said the parties may re-raise this issue to the panel for further

15 consideration. Jefferies never did that. Jefferies chose to accept the

16 director's decision, which is perfectly fine. This has been litigated in

17 California. There have been no requests to transfer, so under those

18 circumstances, there's nothing to re-litigate. The forum selection provision

19 doesn't exist anymore. So, that undermines this notion that the panel should

20 basically act like it's sitting in the shoes of a New York panel and do what

21 a New York panel would do. You're not a New York panel. We're not in New

22 York. We're in California which makes perfect sense, because everything that

23 happened, happened in California. So, now that we're in California, what

24 would a California court do with the New York choice of law provision? I

25 think we all know the answer to that. A California court is not, and I can

51

EXHIBIT N

1   say this emphatically, is not going to enforce a New York choice of law

2   provision that is in a contract that contains restrictions that fall within

3   16600. There's very little room to debate that. So, I think it's fair to say

4   that California court would, assuming the forum selection provision was as

5   open as it is here, California court is going to apply California law.

6   **MZ000025**

7   So, what does California Law say about the restriction that we're talking

8   about? Jefferies has taken the position that this provision doesn't violate

9   16600. It's not a restrictive covenant. It something that happens before Jon

10  Alan Gegenheimer even starts working there. That's not an accurate assessment

11  of 16600. 16600 is not limited to post-employment restrictions. Yeah, it

12  comes up a lot. I mean those are probably the majority of cases under 16600

13  but the literal language of 16600 does not limit its breadth and scope to

14  post-employment restrictions. We cited to a case in our brief that I think

15  it's a fairly similar case on this issue, Golden v. California Emergency

16  Physicians. That involved a company that had a settlement agreement with a

17  former employee. The settlement agreement had a provision that says, "In the

18  future, you agree you won't accept employment or seek employment with us."

19  So, they're talking about a future prospective employment relationship.

20  Golden had no trouble. The court of Golden had no trouble saying that

21  violates 16600. It didn't matter that the provision was talking about a

22  potential future employment relationship and the Golden Court went on citing

23  [PH 00:01:28] Edwards, that the scope of 16600 is very broad and it's not

24  limited to the standard non-compete or non-solicit or other post-employment

25  restrictions. So, now we know, I think it's fair to say that California Court

EXHIBIT N

1   or any forum in California is bound to apply California Law because of the

2   public policy interest and the statutory prescription against any kind of

3   restraint. Let's talk a little bit about the restraint. Jefferies has taken a

4   lot of different approaches with the liquidated damages provision. One of

5   them was the restraint that calls for liquidated damages, it's not a

6   restrictive covenant. He hasn't worked there yet, so it doesn't count. Well,

7   I think we've established under 16600, it does count. There's a three-month

8   period that in Jefferies' agreement, Mr. Gegenheimer cannot work for – he

9   cannot go return to Credit Suisse and remain their employee or work for a

10  competitor. That's a classic restriction. It's a classic restriction on his

11  ability to pursue a [INDISCERNIBLE 00:02:46]. He would have violated that

12  provision if he accepted an offer from another firm other than Credit Suisse.

13  He would have violated that provision if he accepted a new offer from Credit

14  Suisse at any point during that period. And those are the only two

15  violations. If he went to – he decided to go back to school, if he decided to

16  switch careers, Jefferies would still have the same loss, but the LD, the

17  liquidated damages provision wouldn't apply. I think we see, I think it's

18  pretty clear, what Jefferies was trying to do. They were trying to make sure

19  that a candidate who was going to be out for 90 days, nothing they can do

20  about that, he's got a garden leave, they just wanted to lock him in, make

21  sure that they were gonna get this guy, and he wasn't gonna be either

22  persuaded to come back to Credit Suisse or be persuaded to go somewhere else

23  before he joined Jefferies. The notion that it was done because Jefferies

24  wanted to recapture or get reimbursed for its investment in recruiting

25  employees is frankly nonsense. They already validated that investment, they

          EXHIBIT N

1    admitted in their pleadings. They had other candidates. They had three other

2    candidates that they characterized a highly qualified who wanted the job.

3    They made the offer to Mr. Gegenheimer on the 18th, he signed on the 18th and

4    he changed his mind six days later, six days. There's no reason why they or

5    Jefferies should assume that it's going to take them another year and

6    hundreds of thousands of dollars to find a replacement when they had already

7    identified at least three other candidates to fill that position. It just

8    doesn't make sense. I think it's pretty clear, and I don't think there's much

9    room for debate that the liquidated damages provision and in particular the

10   underlying restriction of not being to work for either Credit Suisse or

11   another competitor violates the –

12   **MZ000026**

13   statutory prohibition in California against restraints of employment and

14   California public policy, this is a long standing public policy. Let's talk

15   about some of the other claims or arguments that Jefferies has advanced in

16   its effort to try and get out of 16600. And they've been very clever, they've

17   come up with different interesting ways to avoid 16600. The first we just

18   talked about. Jefferies argues, "This is not a restrictive covenant. This

19   isn't what 16600 is about. This is a preemployment promise to join." Well,

20   the language of the provision says otherwise. It's a prohibition against Mr.

21   Gegenheimer going to work for a competitor or rejoining Credit Suisse in that

22   90-day period before he leaves. There's no legal distinction between that and

23   the post-employment restrictions for purposes of 16600. Let's talk about why

24   the other claims because this one is kind of interesting. Jefferies claimed

25   that don't worry, it doesn't matter that the offer letter has a provision

1  that is violative with 16600. It's a fixed term contract. That takes it out

2  of 16600. As long as you have a fixed-term contract, you can violate 16600

3  all you want. This is not the case. First, it's not a fixed-term contract. In

4  paragraph three of the offer letter, it states very clearly, "This is an at

5  will employment." You can't have it both ways. You can't say in your

6  agreement, "this is an employment at will," but then when it's convenient you

7  say, "Well, we could treat it like a fixed-term contract and that way 16600

8  won't apply." But 16600 would apply even if it like a fixed-term contract.

9  There's nothing about California's acceptance of fixed-term contracts. If

10  you're in an agreement to work for someone for two years or three years,

11  nothing is inherently wrong with that, but that doesn't mean that those

12  provisions or those contracts can restrict employee movement when you're not

13  employed. While you're employed, if you agree to a two-year term of

14  employment, there's nothing wrong with that, and as Counsel said, there's a

15  lot of cases. I think Counsel put a page and a half of string sites for this

16  proposition. But there's nothing unusual or particularly controversial about

17  those cases. The fixed-term contracts, what we're losing sight of with those

18  cases and that whole discussion loses sight of, is the restriction. Those

19  cases did not have restrictions on what an employee could do before or after

20  that fixed-term contract, that's where 16600 comes in. So, it's not a fixed-

21  term contract by its own terms. It's not a fixed-term contract and even if it

22  was, it's just not an exception to 16600. One of the arguments that Counsel

23  has made to try and get out of 16600 is that, "Why don't we, we'll just blue

24  pencil it. There is a severance provision in the contract, why don't we just

25  take out the offending section." And they cite the cases that say you can

55

270                                         EXHIBIT N

1    take out certain provisions. Let me quote one of the cases that Counsel has

2    cited and they're just a common-sense matter. When you have a provision

3    that's illegal in California, which this is, you can't just go to court and

4    say, "Just take this piece out and that piece out. It will be legal and we'll

5    all be happy." It doesn't work that way. One of the cases that Counsel cited

6    makes that very clear. In FLF, Inc. v. Barney and Barney LLC, where

7    [INDISCERNIBLE 00:04:10] was made to sever or to delete offending provisions

8    of restrictive covenants. The court says on page nine of the print out that

9    we have, and we'll make sure if you don't already have copies, we'll provide

10   them to you. I believe Mr. Shapren has already provided them. Here's what the

11   court said, "We reject any suggestion by plaintiff that we should remake the

12   contract so as to render the noncompetition and non-solicitation provisions

13   lawful. Numerous cases have consistently refused to apply a savings clause to

14   remake or rewrite an illegal covenant not to compete; otherwise, employees

15   could serve broadly, [INDISCERNIBLE 00:04:59] illegal-

16   **MZ000027**

17   not to compete in their employment contracts. Many, perhaps most employees

18   would honor those clauses without consulting Counsel or challenging the

19   clause in court, thus directly undermining the statutory policy favoring

20   competition." The court rejected the request to sever an unlawful provision

21   or a portion of an unlawful provision for that reason, and it makes a perfect

22   sense. If that's all, if an employer could get away with putting in illegal

23   provisions and just relying on the fact that, "Well, if it ever gets tested,

24   if a judicial authority or an arbitration panel decides they don't like it,

25

56

271                                                    EXHIBIT N

1  then we'll just have them severe it." It's not that simple and this case, in

2  particular, that Jefferies has cited, makes that crystal clear.

3  Larry Mills: Could give us the name of the case again? Sorry, my mind is not

4  following.

5  Robert Goldstein: Sure. Not a problem. It's FLF, Inc., v. Barney and Barney.

6  Larry Mills: Okay, page nine you said?

7  Robert Goldstein: It's page nine [INDISCERNIBLE 00:01:08]

8  Larry Mills: Of your copy. All right. Thank you. I just want to make sure I

9  have that.

10 Andrew Shapren: It's page nine, and it continues on to page ten.

11 Robert Goldstein: Correct.

12 Larry Mills: Thank you.

13 Robert Goldstein: Jefferies made yet another attempt to try and take what is

14 clearly a restriction and try and call it something else. Also cited two

15 cases, and Counsel alluded to cases that call for early termination. And the

16 fact that in some cases if you have a term contract, you can agree that if

17 someone terminates the contract early, they can make payments. That's

18 permissible in California but that's because it's not a restriction. It's

19 simply agreeing that you can pay in lieu of performance. It doesn't restrict

20 what someone can do. In fact, it gives them the opportunity to compete. It's

21 simply a replacement for performance. And the cases are very, very clear on

22 that. In fact, the reason the case that Counsel cited where they said they

23 weren't even sure if it was a liquidated damages provision, is because it's

24 not. A liquidated damages provision applies if there's a breach. In the early

25 termination cases, there's no breach. Parties agree, "If you terminate this

EXHIBIT N

1  case, if you terminate this contract two months before its term or a year

2  before its term, you're going to pay us with what you would have, services

3  that you would have provided." that's perfectly fine. If it said, "You're not

4  allowed to leave and if you do, here's going to be your penalty." That's

5  different. That would put it under the rubric of 16600. So, pretty much every

6  argument that Jefferies has tried to make to call the restriction something

7  else, it just doesn't work. It falls apart at the most basic analysis.

8  Jefferies also talks about a waiver provision. Let's take a look at that

9  waiver provision that Jefferies [INDISCERNIBLE 00:03:17]. And essentially

10 Jefferies is saying, "We can put anything we want in an offer letter, even if

11 it's unlawful, even if it violates California statute, as long as we make

12 sure that they waive it and we stick in a waiver provision." I think we all

13 know that that's not going to work. The language is on page three of the

14 offer letter, and the section three, subsection C and D. Subsection C is the

15 provision that applies to Mr. Gegenheimer. And it says, "In the event of an

16 action to enforce this agreement, he'll pay all costs associated with

17 enforcement by Jefferies." That's the standard attorney's fees provision. But

18 the last sentence, which I think is what Jefferies is counting on, is where

19 it says, "you'll not assert any defenses, rights or set off or counter claims

20 as the reason for not fully repaying any amounts due under this agreement."

21 Now, what's interesting is the provision that deals with Mr. Gegenheimer's

22 obligations talks about repaying any amounts due. The corollary provision

23 that applies to Jefferies that appears right below has similar provision but

24 a little different. It says, "Jefferies will not assert any defenses, rights

25 or set off or counterclaims as a reason for not fully paying –

58

273                                    EXHIBIT N

MZ000028

any amounts due under this agreement…" that's not an accident. There's no mistake in draftsmanship where Gegenheimer's obligation deals with "repaying amounts to" whereas Jefferies it's "fully paying any amounts to". They are referring to the make whole payments and the advances that Mr. Gegenheimer received upon starting or would have received upon starting work at Jefferies. That's not the equivalent of a million-dollar liquidated damages provision. Liquidated damages provision means he's got to pay out of his own pocket to make up for a loss. This provision is simply saying, "If you breach the agreement, you have to give us back what we already gave you. You shouldn't get a windfall." There's nothing wrong with that. It's perfectly appropriate, but you can't translate that into a waiver of all of your defenses to every other provision in the agreement. If it was that easy, we wouldn't have agreements anymore because everything or we wouldn't have breach of contract claims anymore because everyone would just put in a waiver. Really, that's kind of what Jefferies is trying to set up here. If they can prevail on this liquidated damages provision in California, 16600 essentially would be eviscerated because any time you want to get around 16600, you can put in a waiver provision. You can couch it in terms that you try and characterize as just a promise not to, or a promise to join someone as opposed to not doing something, instead of overtly restricting an employee from doing something. It's a roadmap that employers can use, and Jefferies probably would continue using. So, this goes beyond just Mr. Gegenheimer, this is something by Counsel's own admission, this is a practice that they put together. They are going to continue to do that. Whatever might happen in

59

EXHIBIT N

1   other states – we'll, talk about New York in a minute – whatever might happen

2   in other states, that can't happen in California. The public policy and the

3   statutory law in California does not permit these kinds of creative attempts

4   to end run the public policy. And clever drafting doesn't change that. Now

5   let us talk a little bit about liquidated damages themselves. And this is

6   really an additional argument. In our view, the liquidated damages provision

7   fails under California Law. It's not some variation of the restriction in the

8   way Jefferies has tried to characterize it. And you really could stop the

9   inquiry right there, but let's just go a step further to see why it fails for

10   other reasons as well. In California and in New York, there are other factors

11   that you have to look at to see if the liquidated damages provision is

12   actually a valid one, and not a penalty. [INDISCERNIBLE 00:03:10] a lot of

13   law in that, but all jurisdictions. Putting aside whether or not there's any

14   statutory restriction or public policy issue, and I agree with Mr. Shapren's

15   description of the law, "A liquidated damages provision must be judged by the

16   parties' reasonable estimate of what their potential losses would be in the

17   event of a breach and it's measured at the time the parties enter the

18   contract." So, in Gegenheimer's case, the amount of the liquidated damages

19   provision should have been measured on around March 18th when the parties sat

20   down to sign the contract. Of course, there was no negotiation, so there was

21   no meeting of the minds regarding the liquidated damages provision to begin

22   with. But even if there was, the parties would have to reach an agreement

23   that this is a reasonable estimate of damages. So, what has Jefferies offered

24   to show that it made a reasonable estimate? Well, it's actually made two

25   arguments that aren't particularly consistent. The first argument is Mr.

EXHIBIT N

1  Kanoff has submitted a declaration explaining all the factors that they take

2  into account when they make an offer of employment and the candidate decides

3  after signing the offer, "I change my mind." It's an investment there, they

4  lose an investment, they lose some money. They lose time. So, Mr. Kanoff

5  said, "We decided a few years ago we want to recoup those losses." So, he

6  came up or he claims in his declaration that they came up with various

7  factors to make up those damages. So, nothing is wrong with that in terms of

8  using that analysis

9  **MZ000029**

10  for Mr. Gegenheimer, I think the most glaring problem here is that firstly,

11  none of these factors have anything to do with Mr. Gegenheimer. Let's start

12  with one. The 5A, "The significant money, time and institutional resources

13  spent on selecting and recruiting a candidate. Generally, it takes

14  approximately six months to complete the recruitment of a senior investment

15  banker." First, Mr. Gegenheimer, he's very good at what he does. He's not a

16  senior investment banker. He's an M&A specialist. So, just by that term alone

17  this doesn't apply. But more importantly, in Mr. Gegenheimer's case, they'd

18  already done it. They say in their pleadings, Mr. Shapren acknowledged it.

19  They'd spent months with their recruiting firm looking for candidates. And in

20  their pleading, and their statement of claim, they point out that they had

21  three other qualified applicants who wanted the job and they chose

22  Gegenheimer. Gegenheimer could have said no, in which case they would have

23  hired one of the other three. Gegenheimer quit or I shouldn't say quit, he

24  notified them that he was no longer interested in working for Jefferies six

25  days after he signed. There is no reason, no rational basis to think that

1  they would have to start from scratch and start looking for a new M&A

2  specialist when they'd already invested the time and money in searching out

3  other candidates. Those candidates didn't go away. They didn't disappear six

4  days afterwards and if they did, it wouldn't take Jefferies' own pleadings so

5  that it didn't take them that long to find someone else, because they hired

6  someone else to provide those M&A services just a few months later. By the

7  time they filed their statement of claim, they had already hired someone. So,

8  I think we can eliminate that as a factor that has anything to do with Mr.

9  Gegenheimer. Number two or B, "The significant revenue loss that would be

10 caused by the candidate intentionally breaching the contract and not working

11 at Jefferies, the expected revenue from laterally hired managing directors at

12 Jefferies is between 5 million and 7 million in the first year, climbing

13 steadily to approximately 25 million in the fifth year." This has nothing to

14 do with Mr. Gegenheimer. Let's start with the fact that Mr. Gegenheimer was

15 not a lateral managing director. He was a director at Credit Suisse who was,

16 provided services. He was a service provider to the investment bankers. He

17 wasn't a business generator. Then Jefferies was very careful in how they

18 wrote this, to their credit. The expected revenue from laterally hired

19 managing directors. Jefferies was going to give Mr. Gegenheimer the title of

20 managing director as a sweetener to try and persuade him to join, but he

21 wasn't a lateral managing director and there was no way there'd be any

22 expectation he'd be generating revenue of $5 to $7 million. You saw what his

23 salary was on one of Mr. Shapren's good slides. His salary was $250,000. This

24 isn't a two-million-dollar business generator. So, we can scratch that factor

25 off, because it has nothing to do with Mr. Gegenheimer. The next one, "The

EXHIBIT N

1  willingness of a candidate who is represented by competent Counsel during the

2  negotiation process and who has significant leverage over Jefferies during

3  the negotiation process to agree to an acceptable liquidated damages

4  provision." Now, I have to be honest, I'm not 100% sure of what this really

5  means. But to the extent they're looking at what the tolerance level is for a

6  candidate to agree on a liquidated damages number, that's not an appropriate

7  factor. The appropriate factor is what is the reasonable estimate, not what

8  is your tolerance. But in our case, you don't even get there, because there's

9  no negotiation. This was a calculation that Jefferies has made years earlier.

10  "This is what we're going to do. We're going to use their first year of

11  comp." So, paragraph C or subsection C doesn't apply.

12  Next factor, "The amount that Jefferies contractually agrees to pay the

13  candidate, in the event Jefferies was the party that breached the contract."

14  That's not an estimate of damages. That's just an estimate of what Jefferies

15  is willing to pay for severance or for terminating a newly hired employee

16  without cause. It has nothing to do with calculating estimated damages.

17  **MZ000030**

18  This one, I take particular exception to this factor, number E, or letter E,

19  "The fact that the liquidated damages amount in those instances where there's

20  an intentional breach will likely be reimbursed by the candidate's current

21  firm as part of its efforts to convince the candidate to breach the

22  Jefferies' contract in order to stay at his or her current firm." That is not

23  an estimate of damages. It has nothing to do with estimating what your losses

24  would be if the candidate chooses not to join you. What it does tell us is

25  this was a factor that they considered say, "How high can we go? How much

EXHIBIT N

1  leverage and how much of a Sword of Damocles can we put over this candidate,

2  so we make sure that they have financial incentive to join us, taking into

3  account that their employer is probably going to be reimbursing them?" It's a

4  measure of how much of penalty they can put on the employee, not how much

5  their losses would be. I'll quickly go through some of these others because

6  they're clearly, on their face, inapplicable. Mr. Kanoff says in subsection

7  F, "The lost opportunities of not being able to recruit alternate candidates

8  who were informed by Jefferies that Jefferies would not be pursuing their

9  hire, because Jefferies was pursuing the candidate who intentionally breached

10  his contract." Well, look, this happens all the time. I mean this a fairly

11  standard practice, not just in investment banks but with any kind of

12  employer. But in Gegenheimer 's case, in particular, this doesn't apply.

13  Again, we go back to the fact that this was six days and there was no reason

14  why Jefferies couldn't go back to either the three candidates [INDISCERNIBLE

15  00:01:55], which by itself indicates it's not that hard to find someone to

16  fill that position. I'm not suggesting that it's an easy position to fill,

17  but there are candidates out there and it certainly wouldn't take the amount

18  of time that Jefferies seems to think it would. Subsection G, "The loss of

19  credibility and goodwill with clients, employees and industry counterparts

20  who may be aware of the candidate's decision to renege on his own agreement

21  to join Jefferies and will look negatively upon Jefferies' failure to

22  successfully hire the candidate." When I read this, my first reaction is,

23  "Wow, they're really grasping at straws." There's no goodwill because Mr.

24  Gegenheimer hadn't started working there yet. So, I'm not really sure what

25  goodwill with clients there could be. The only way there could be goodwill

1   with clients is if Jefferies was counting on the clients that it hoped the

2   candidate will bring from their other employer. If that's what they're

3   talking about, the law is very clear that employers don't have any kind of

4   protectable interest in goodwill from clients that an employee brings from a

5   prior firm. That's particularly true in New York which has is the law that

6   Jefferies is advocating. There's, the [INDISCERNIBLE 00:03:18] case is BDO

7   Seidman v. Hirschberg where it very explicitly says, "You don't have any

8   goodwill interest in clients and client relationships that an employee brings

9   from another firm." Other than that, I'm at a loss as to what other kind of

10  goodwill we're talking about, but there's certainly no goodwill associated

11  with Mr. Gegenheimer deciding not to join. I is, "Losses due to other

12  business decisions Jefferies may make in reliance on the candidate's

13  agreement to work with Jefferies." Again, I struggle a little bit to

14  understand what the point is but that's not a basis to assess damages.

15  There's no indication here of how you could even measure something like this

16  and it sounds so speculative that I don't see how it really has any meaning,

17  much less gives an employer an ability to try and estimate what damages would

18  be. Then J, which I think is sort of a recap of some of the earlier factors,

19  is "the significant additional money, time and senior resources that will

20  need to be spent on selecting and recruiting a replacement candidate."

21  Essentially the same factor in number one, recruitment costs, replacement

22  costs. And we've already addressed that. In this case in particular, there

23  would be very little, if any, because the work had already been done, other

24  candidates had already been identified. So, just when on their face, even if

25

1   this was a valid analysis for the liquidated damages provision, the valid use

2   of an –

3   **MZ000031**

4   analysis for the liquidated damages provision in Mr. Gegenheimer's offer

5   letter, they don't apply. They – they may apply to some investment bankers

6   out there, but they certainly don't apply to Mr. Gegenheimer and Jefferies

7   cannot just take this sort of generic, one-size-fits-all analysis that it put

8   together years earlier for a different level, for senior level managing

9   directors, which Mr. Gegenheimer is not, and just apply it to him without

10  taking into account any of the factors about Mr. Gegenheimer himself. What

11  does he do? What is his – what is the estimate of the revenues he's going to

12  raise? But there is an even deeper problem with the list that Jefferies

13  claims it relies on. It has absolutely no connection to their decision to use

14  compensation as the basis for liquidated damages. There's no question that in

15  some circumstances, liquidated damages can be based on compensation. Depends

16  on the analysis. If an employer determines that we hire people and we pay

17  them X number of dollars, expecting a return on that of X, you know, there's

18  at least some justification, at least some logic there. But Jefferies, by its

19  own admission, did not do that. They used these factors, recouping costs,

20  lost good will, all these factors that have nothing to do with Mr.

21  Gegenheimer and then there's this logical leap to "let's just use his

22  compensation." No connection here at all. They did not do the analysis that

23  is required to measure the appropriate amount of liquidated damages. So, for

24  that reason alone, the liquidated damages provision would fail in California,

25  or New York, again, taking out the 16600 equation. So, let's look at the

EXHIBIT N

1   other aspects of the liquidated damages provision that support and just

2   reinforce the notion that this is not really about making ourselves whole.

3   What this really is about is locking in someone – especially someone more

4   junior person – locking that person in while they're on garden leave, while

5   they're vulnerable, to being called back to their prior employer or being,

6   you know, recruited somewhere else – and making sure that they're going to

7   join you or join the firm at the end of their garden leave. That's what this

8   is about. You see it, if for no other reason than the fact that the

9   liquidated damages only applies during the three-month period before

10  employment starts. That's the period that Jefferies is worried about. Once

11  the employee starts, liquidated damages go away. Counsel has made some jokes

12  at our expense regarding our scenario that an employee could, under the offer

13  letter, start working at Jefferies after the garden leave period ends, and

14  then quit. And they won't be subject to liquidated damages. Regardless of

15  whether that's a common thing – and I'm not suggesting that it happens all

16  the time, it's really to make the point of the distinction between liquidated

17  damages while someone who's on garden leave and not taking any measure of

18  protection once they start working. But, let's look at that scenario. If Mr.

19  Gegenheimer was worried about – looked at his agreement, and he decided, "You

20  know what, I'm really worried that they're gonna go after me for a million

21  dollars. Maybe what I should do is just ride out my garden leave, start at

22  Jefferies, give it a week or two, and then leave. That way I get out of the

23  million dollars." They built in an escape hatch for their own liquidated

24  damages provision. And what happens if that event takes place, that they

25  decide – for whatever reason, to leave Jefferies after starting, getting rid

EXHIBIT N

1   of the liquidated damages provision? They have a 365-day notice period. In my

2   career I've never seen a 365-day notice period provision, let alone one

3   that's enforced. But, even there, the worst, the most that that employee

4   would be liable for, if they didn't honor the 365-day notice provision is

5   paying back the bonus, paying back some [INDISCERNIBLE 00:04:27] payments,

6   reimbursing Jefferies for money that Jefferies gave them. There's nothing

7   wrong with that. It's perfectly appropriate, but it's not the same as digging

8   into your pocket and writing a check for a million dollars. So, it's – I

9   think it's a little disingenuous for Jefferies to try and equate the two and

10  say, "They still – we still can enforce and protect our investment because

11  they have all these monetary penalties after they start, if they quit within

12  the first year. Not really. They don't really have any monetary penalties.

13  **MZ000032**

14  Just paying back what they – what they were given, which is perfectly

15  reasonable. There's another very important point that again, I was a little

16  surprised that it wasn't really addressed. Let's assume this agreement is

17  covered in New York. Let's assume you – the panel decides, "Yes, we're gonna

18  pretend we're in New York, we'll put up [PH 00:00:25] 90s fliers and we're

19  gonna proceed as a New York forum. And as a New York forum, we're going to

20  apply New York law. And by the way, that's not always the case. And I think

21  we've cited cases where even a New York court is not going to enforce a New

22  York choice of law, in deference to California. And I'll get to those cases

23  in a minute, because I think that's important. Counsel has made that flat,

24  absolute statement that a New York court would always apply a New York choice

25  of law provision, and that's just wrong. But now let's getting back to – it's

1  got to our example. If New York law were to apply, the liquidated damages

2  provision is invalid. Its unenforceable in New York, as a matter of law. I

3  don't know if Jefferies just didn't think about this ahead or took a –

4  decided that it just wasn't worth addressing but this is really an example of

5  overreaching. Not only did Jefferies put in the liquidated damages provision

6  that you have to pay a million dollars, which is only a portion of our

7  losses, they go on to say, "We're also gonna reserve the right to get actual

8  damages." That is fatal to that provision, under long-standing New York law.

9  We cited a large number of cases in our brief. There are no cases that say

10 otherwise. And their provision falls squarely within that exception. It is

11 invalid, as a matter of law. Mr. Shapren indicated – he addressed it very,

12 very quickly and then moved on, but Mr. Shapren said, "That doesn't matter

13 because we don't do that. We don't go after actual damages." Well, with all

14 due respect, that's not the point. Unless Mr. Shapren wants to testify and

15 make a representation of warranty that they will never do that in the future,

16 even that, I don't think, would satisfy this issue. The provision is in

17 there, they've done it. It renders the provision invalid and unfortunately –

18 so, they don't really get anything by going to New York law. The only

19 possible exception that – to what relief they would get in New York versus

20 California is in New York they could potentially, if they strike – the

21 liquidated damages provision is illegal in New York – it's invalid on its

22 face. That doesn't necessarily foreclose them from seeking actual damages,

23 unless a New York court also determined that that restriction, the underlying

24 restriction was invalid. That's – I'm not gonna speculate. Courts decide

25 things a lot of different ways. I can't say its unenforceable or enforceable,

69

EXHIBIT N

1  that underlying restriction. But let's assume that was the case that they at

2  least had the theoretical possibility of going for actual damages. That's

3  what we'd be left with. And Mr. Shapren has already made it clear they can't

4  prove actual damages. They've already said it multiple times. It's

5  impossible. So, you know, they might have overplayed a little bit their hand,

6  if it's impossible to calculate monetary damages, don't – what's the point of

7  going forward with monetary damages? Even if there was some basis we – just

8  in discovery, haven't received anything suggesting any actual losses. For the

9  vast part, we never got it. So, I don't think that's really – there's any

10 place for that in this proceeding. But whatever, you know, the panel thinks

11 in terms of getting actual damages, there's no question that in New York, the

12 law that Jefferies has advocated so strenuously to apply will invalidate that

13 liquidated damages provision as a matter of law. So, you know, I think just

14 to wrap up, you know, the overall concept here, I think it's fairly clear,

15 what Jefferies' intention was. And you know, I'm not gonna – I'm not gonna

16 ascribe any judgement one way or the other, you know, businesses have to

17 proceed how they see fit, but what this was not was a legitimate attempt to

18 recoup losses. That just wasn't happening here. The analysis that they

19 described, and that they put in Mr. Kanoff's declaration, makes that pretty

20 clear. This was a way for Jefferies to get some insurance that the employees

21 that they're hiring from other companies, whether it's a raid or –

22 **MZ000033**

23 poaching or whatever you want to call it, everyone in the industry has garden

24 leaves. Not 365-day garden leaves, but 60 or 90-day garden leaves. And this

25 was their insurance. To maximize the likelihood that the employee on garden

EXHIBIT N

1   leave will actually start working for them at the end. Certainly, it has a

2   chilling effect. I'm sure the majority of people signing these agreements see

3   that, you know, don't necessarily think about asking a lawyer and they just

4   assume, "Oh boy, I better platter this, even if another opportunity comes

5   along, because I don't have the money, I can't pay that." So, it has that

6   chilling effect. What Jefferies is now asking – I think this is – in some

7   ways a test case. Jefferies wants to continue doing this. If Jefferies is

8   allowed to undermine not only California law, but New York law, and putting

9   in what I think any decent, fair-minded person would say is unconscionable

10  penalty for not moving forward with the new employment six days after first

11  signing an offer letter. If they're allowed to do it in this case, they're

12  just going to do it, and it's gonna become an industry-driving… this could

13  really become a huge problem and if they're allowed to do it in California,

14  then it's even worse, because now you have a blueprint for getting around

15  16600. You know, they tried to do it in the past – people have tried to do

16  it, and companies, through the Forum Selection Provision. And it's true that

17  in the past, prior to Rule 925, Forum Selection Provisions were kind of a

18  loophole, a way to get out of California. And especially in Federal courts,

19  it worked a lot of times. We have 925 now, so you can't do that and I've

20  never, by the way, we've never maintained that Section 925 applies here.

21  We've cited it to point out why this is such an important public policy in

22  California. But the expression of public policy in 16600 and in Section 925

23  would be undermined if you have these crafty, creative provisions, liquidated

24  damages, because you didn't join with us – as long as you didn't go to these

25  competitors. I mean, it's – it's I think pretty apparent on its face what's

71

EXHIBIT N

1   going on here. And if I can just offer, I'm almost done, but I just want to

2   mention one other issue, that Counsel had mentioned with regard to the

3   limitation on the restriction. If you – if the panel believes this is, as I

4   understand it, Jefferies' argument was if the panel believes that a

5   restriction during that 90-day period against going back to Credit Suisse or

6   accepting employment with a competitor, if you – "we don't think there's

7   anything wrong with it, we think it's fine under 16600, but if you don't like

8   it, just cross it out. Just blue pencil it." Doesn't work that way. Even if

9   you could blue pencil it, which you can't, but even if you could, all it does

10  is it expands the liability. Now you're saying, "You have to come to us, you

11  can't do anything else but come to us in three months." So, now you've taken

12  away the limitations, the limited, you can't go to Credit Suisse. You can't

13  go to a competitor. Now you can't go anywhere. You can't go, you know, it

14  just makes it broader. It doesn't save the provision. So, you know, it's not

15  – you can't, the statute in California and California law has been developed

16  in such a way that all of these creative, novel ways of trying to get around

17  it just don't work. That's another example. I have nothing more to say right

18  now, unless there are any questions.

19  Larry Mills: I, for one, have some questions. But I think I'd like to have

20  another round back and forth, get a little rebuttal and then maybe my

21  questions will be answered. Maybe not. But …. Anyway, did you want to –

22  Andrew Shapren: Yeah, can we take five or ten?

23  Larry Mills: Okay, how about let's take a 10-minute break. We'll go off the

24  record.

25  **MZ000034**

1   Larry Mills: And we'll go on the record. Thank you.

2   Andrew Shapren: Thank you very much. Mr. Goldstein began his argument by

3   telling you that Mr. Gegenheimer didn't see an offer until the day after 5

4   other bankers left and he was called to the office and told it was non-

5   negotiable. And pressured into signing it. You don't have any evidence of any

6   of those things. The only evidence you have is the declaration of Chris

7   Kanoff, and the documentary evidence that's attached to our brief. And what

8   that tells you is something very different. And we had these up on the screen

9   earlier, so I won't belabor the point, but Exhibit J. You know, this is Jason

10  Greenberg on May 5th. Thirteen days before Gegenheimer signed the agreement.

11  "Jon, very much looked forward to locking down May 12th in NYC." He's talking

12  about to negotiate the deal. Exhibit M, "Jon Gegenheimer to Scott Atkinson

13  and Jason Greenberg." And I won't read the whole thing, but he goes on and

14  on. This is now May 9th. So, this is nine days before he signed the agreement.

15  Gegenheimer himself says, "I'm sorry this has been so hard to schedule. I

16  have a management presentation in Palo Alto on Thursday now with a prep

17  session with my client on Wednesday. It's not something I can bail on. I

18  tried as hard as I could to get another day but there are too many people

19  traveling from various places, and I lost. I asked my lawyer to give me all

20  the dates this week and next when he can be in New York and I know he will

21  get back to me as soon as he can." And then he ends it, "Sorry again, this

22  has been hard. I'm trying to make it the highest priority." And then there's

23  an internal Jefferies email from Phil Berkowitz to Jason Greenberg. He says,

24  "He ost to prioritize" – a typo – "whether he wants to join. Our clock

25  ticking." And so, that's a fiction that he was just called after these other

1  bankers leave and is thrown this agreement and he had no choice. This was

2  going on before all that. Talked a lot about 16600 and I don't want to repeat

3  myself too much, but again, Mr. Goldstein said repeatedly, it prohibits him

4  from working for a competitor for the 90 days before he joins. It just

5  doesn't. He can set up shop for Credit Suisse, doing investment banking, in

6  the office next door to Jefferies in San Francisco. There's nothing we can do

7  about it. It compels him to work for Jefferies by August 17th and if he

8  doesn't do that, because he decides to stay in Credit Suisse or work for a

9  competitor, then the liquidated damage kicks in. It does not prevent him from

10 working anywhere other than in the period that he is supposed to be working

11 at Jefferies per the terms of the agreement. And that is why this is akin to

12 a term employment agreement. And let me get this straight. We all agree that

13 term employment agreements are enforceable, so the argument from the other

14 side is, "Well, you can have a term employment agreement, but you can't agree

15 that that term should start on a certain day. Well, that doesn't make any

16 sense. This is just like a term employment agreement, it is not a restraint

17 of trade. And it should be enforced. And then, make no mistake, California

18 absolutely allows liquidated damages. We showed you all those cases - they

19 reference the statute. Section 1671b. Not only recognizes them, but says

20 they're presumed valid. And the burden is on the party challenging them. Mr.

21 Goldstein said, "Well, it's not a term agreement, because the agreement says

22 it's at will." Well, it says that Gegenheimer can resign and he can be fired

23 and certainly you can't make somebody work for you for a period of time. 13th

24 amendment prohibits that. You cannot specifically force someone to work you.

25 And that's true and that's true in the agreement. But there are obviously

1   very serious financial repercussions to Mr. Gegenheimer leaving the firm, and

2   that's why it is like a term agreement. Talked about severability. And Mr.

3   Goldstein talked about this FLF v. Barney and Barney case which we cite, and

4   we do. And he's right, that case was a typical non-compete. I mean, a non-

5   compete that in California everyone in – everyone agrees violates 16600 and

6   yes, the Court did say, "Listen, we're not gonna just rewrite this non-

7   compete for you and turn it into a confidentiality clause or some other

8   clause that might be…

9   **MZ000035**

10  enforceable, and I don't think that's surprising to anyone who is familiar

11  with the body of case law of non-competes in California. What it doesn't mean

12  is that a court is never going to sever a provision. And I ask you to read

13  the Thomas Weisel v. BnP Paribas case – I talked about it earlier. And the

14  Court did just that. Said, "We're gonna, this 'you can't hire an employee'

15  provision is no good. But we're gonna enforce the provision literally right

16  next to it. Because that is good." This Hedstrom case – we've both talked

17  about it a lot and it's the one where the court says, "You know, for a term

18  employment agreement, or other things like it, you know, when you have this

19  idea that you can leave or the firm can terminate you, but there's payments

20  to be made, it's not really like a liquidated damage, it's like an

21  alternative to performance." And Mr. Goldstein tried to distinguish that, but

22  I'm not sure he really did. I mean, in this case, both parties said, you

23  know, "I'm going to employ you on August 17th." And Gegenheimer said, "I'm

24  going to join you on August 17th." But both sides also had the option to

25  breach that promise. Now, if they did, and whether you want to call it a

75

1    breach or they just didn't fulfil the promise, it really doesn't matter. They

2    had to pay. So, in many ways, the Hedstrom case is right on point. Mr.

3    Goldstein talked about our waiver provision and how the one says "paying" and

4    the other one says "repaying". I think that's a little bit of wordsmithing. I

5    mean, if it wasn't to apply to the liquidated damage, it could just say that.

6    Or it could be right under a repayment provision and say, "It applies here."

7    So, I don't think that is the clear out for Mr. Gegenheimer that my

8    adversaries think it is. Now, we spent a lot of time on this argument that

9    Jefferies didn't specifically sit down with Mr. Gegenheimer and hash out the

10   details of the liquidated damages clause. But that's not required. And again,

11   we've studied this case a number of times. Edwards versus Symbolic, number

12   19. And it specifically stands for that proposition that you do not need to

13   show that an actual specific negotiation on the term of the liquidated

14   damages clause took place. And that's on page five.

15   Larry Mills: Thank you.

16   Andrew Shapren: Of that case. You know, we also heard a lot of argument that

17   these things in the Kanoff declaration don't have to do with Gegenheimer.

18   Well, they do have to do with Gegenheimer. You know, they say, "Well, lost

19   revenue? Well, there's not really lost revenue for Gegenheimer. He's just

20   this junior guy and you know, it's just not applicable." Well, first of all,

21   he's not a junior guy. He's been with Credit Suisse for 14 years. He's

22   getting paid over a million dollars a year. He's doing fine. And secondly, no

23   evidence has been presented from that side that Gegenheimer is not this

24   revenue producer, he's not valuable or anything like that. And when we tried

25   to get those records from Credit Suisse, he objected. So how can you object

EXHIBIT N

1   to us getting the records, and then say, "Oh, by the way, you're totally

2   wrong. The guy's not a big revenue producer." Can't do it. And even so, his

3   comp speaks for itself. If he was not a valuable employee, if he wasn't a

4   good producer, Credit Suisse wouldn't pay him what they're paying him, they

5   wouldn't pay these lawyers to be here. They wouldn't indemnify him. Actions

6   speak louder than words on that one. We heard a lot about how Mr. Gegenheimer

7   reneged six days after he signed. It just completely ignores the law that we

8   went over repeatedly this morning, which is you look at these agreements at

9   the time that they are made. Now we also heard a lot about how there's

10  supposedly these three other candidates that Jefferies had just waiting in

11  the wings to snap up this position. That's not true at all, and what Mr.

12  Goldstein was relying on was our Statement of Claim. And here's what it says,

13  "[PH 00:04:39] Heidrick identified and reached out to qualified potential

14  candidates for the position, including Gegenheimer, who was employed in

15  Technology M&A Credit Suisse. Thereafter, several potential candidates,

16  including Gegenheimer expressed their strong interest in the position and

17  engaged with Jefferies in a lengthy recruitment process that included several

18  interviews."

19  **MZ000036**

20  "Jefferies considered several qualified applicants and by March of 2016 had

21  determined that Gegenheimer was the best candidate for the position. At that

22  time, Jefferies informed Gegenheimer that it intended to extend him an offer

23  of employment." And we saw in the emails that that's true. And then it took

24  another two months to consummate that. So, maybe in March Jefferies could

25  have gone and focused on another candidate, but you know, there's a big jump

77

292                                                    EXHIBIT N

1   between both sides saying, "We're interested in each other" and both sides

2   signing on the dotted line. And it would take a long time to reignite these

3   discussions. And when we talked about the recruiting costs as being a measure

4   of damage, it's not the costs that we already spent on Gegenheimer, it's

5   these costs that are gonna have to be spent in the future to essentially do

6   the same process or most of the same process. We also heard about Jefferies

7   hiring another tech M&A investment banker three months later or whatever the

8   timeframe is. And Jefferies did hire another tech M&A investment banker. But

9   it was someone who was, indeed, much more senior than Mr. Gegenheimer and if

10  you remember, we flashed on the board how Jefferies was looking for two

11  people – the senior MD, the number one, the junior MD, the number two. So, it

12  was a different search – a different position. We heard a lot about how and I

13  think we saw it coming, you know, the use of compensation does not comport

14  with the type of actual damages Jefferies would suffer and that's in the

15  briefs. But, as we went through all those cases this morning, they all said

16  that the liquidated damage amount does not have to have a connection to the

17  actual damage. It just has to be a reasonable formula. And it is. We talked

18  again about, well, hey, this agreement's no good because once the employee

19  starts, he can just breach – leave the next day, leave the week after, and he

20  won't have to pay the liquidated damages. And we heard a couple things on

21  that and one is, well, he could just breach the notice provision too. And

22  still all he would have to pay is repay the bonus, replacement cash, whatever

23  it might be. Well, that's not true. You breach the notice provision, you're

24  gonna get sued for that too and you're subject to all the consequential

25  damages for that. Whatever they may be. And in addition, it ignores kind of

1   the point that Mr. Gegenheimer has his notice provision, he has to work for

2   Jefferies, and it changes the analysis. Now Jefferies is getting the benefit

3   of the bargain. They're getting a year of his work, they're getting time to

4   find a replacement. So, the liquidated damage shouldn't apply past that. It's

5   a different set of circumstances, it's a different analysis. We talked,

6   again, about the provision in the liquidated damages clause that says

7   Jefferies reserves the right to get actual damages over and above the

8   liquidated damage. None of the cases relied on by Credit Suisse address the

9   point we've made, which is the party trying to enforce it has never sought to

10  enforce that provision in this case. It's never put it in the statement of

11  claim. Not in the briefs. Nowhere. We have always only wanted the agreed upon

12  damage that Jefferies agreed upon with Mr. Gegenheimer. There are no cases

13  they rely on that address our severability argument on that point. That that

14  provision could be stricken very easily, and the clause enforced as written.

15  And secondly, none other cases are like this case, involving people that have

16  mutual covenants, involving people with equal bargaining power, involving

17  people that have access to attorneys. And we saw that both New York and

18  California think that that is extremely important and that you should give

19  deference to contracts entered into by parties like the ones in this case. We

20  also heard – we're jumping ahead of ourselves a little bit – that we can't

21  prove actual damages. Well, I don't know if we've ever said that. We

22  certainly said we can't predict what they're going to be with reasonable

23  accuracy. But if need be, we'll certainly put on a calculation of lost

24  revenue and other costs and we'll have expert testimony and we can't

25  [INDISCERNIBLE 00:04:33] the end of the penny, that's for sure, but there's

1  certainly damage. And we're certainly entitled to present you our proofs on

2  that and you can rule on that. But again, I don't think we should ever get

3  there. I think they completely misconstrued our goodwill argument. We're not

4  suggesting that we can't – that we can take the goodwill that Mr.

5  **MZ000037**

6  Gegenheimer generated at Credit Suisse. It's a pretty simple argument. When

7  someone comes to join you and others find out that he then later reneged,

8  it's embarrassing, it hurts your reputation internally, externally, and you

9  don't know how far that's gonna go. And I don't think that's too hard to see.

10  I mean, that's why firms like Credit Suisse fight so hard to keep someone who

11  leaves. They don't want to be the ones in the news that says, "Jon

12  Gegenheimer up and went to Jefferies and left Credit Suisse." Nobody wants

13  that kind of press. Now finally, I want to address this whole argument that

14  this provision is unconscionable and that you somehow need to stop Jefferies

15  from doing what it's trying to do; and Jefferies is trying to do this, and

16  Jefferies is trying to do that. What about Mr. Gegenheimer? Is he not

17  relevant here? I mean, he's very experienced. Is he incompetent? Is Credit

18  Suisse gonna go tell its clients, "Folks, we just got to tell you, Mr.

19  Gegenheimer is incapable of reading a contract and determining whether or not

20  he wants to enter into that contract or not. He's incapable of consulting

21  with the attorney that he hired and saying, 'I am concerned about this

22  provision, do you think I should enter into it, or should I just go back to

23  my cushy, $100,000 – several hundred thousand dollar a year job at Credit

24  Suisse? What should I do? Let me think it over. Let's talk it over.'" Of

25  course, he can do that. So, it's not you that has to stop Jefferies from

80

EXHIBIT N

1  doing anything. If this provision was so unconscionable, no one would enter

2  into it. These aren't day workers that are fighting to put food on the table

3  at night. These aren't people that have no choice but to sign this agreement.

4  They sign the agreement because they want to work for Jefferies, they think

5  it's a great opportunity, they think the compensation is fair or more than

6  fair, and they're jumping at it. And they don't think the liquidated damages

7  clause is unconscionable. They don't think it's a problem at all. So, I

8  reject the notion that you somehow have this duty to stop sophisticated

9  parties from entering into [INDISCERNIBLE 00:02:14] contracts. In fact, the

10 case law says the duty you have is to give those parties deference. Thank you

11 very much.

12 Larry Mills: Great. Thank you. I'm hopeful we don't need to take a break but

13 if you –

14 Robert Goldstein: No, no, no.

15 Larry Mills: I'd like to continue.

16 Robert Goldstein: Absolutely, no, I'll try to be as brief as I can. A lot of

17 different points that Mr. Shapren made that I want to address. I think I at

18 first would like to address an argument that Mr. Shapren made – they made

19 this in their brief also. That I really think needs to be pointed out. This

20 notion that the restriction in paragraph 5b – it's not a restriction, it's

21 not a restraint, it's simply saying you promise to join us. I mean, the

22 language speaks for itself.

23 Jim Oaks: I'm just going to interrupt. I'm wondering if we could impose upon

24 the opposing Counsel to throw up that language up on the screen?

25 Robert Goldstein: That would actually be very helpful.

81

EXHIBIT N

1   Jim Oaks: Because I think it's important, we're all here because of this

2   language, in this paragraph. And I think it's important.

3   Larry Mills: Is that easy to do?

4   Andrew Shapren: Ah, we'd have to fire up the projector and find it. I mean,

5   can we all turn to it on our –

6   Larry Mills: I mean, I've got it –

7   Jim Oaks: If not, it's in appendix – it's in the appendix of exhibits and

8   it's Exhibit A. It's on page four.

9   Larry Mills: I have it. I've been looking at it.

10  Andrew Shapren: Whatever you'd rather, but –

11  Larry Mills: I think the panel can look – you know, look on –

12  Jim Oaks: Okay.

13  Larry Mills: The paper.

14  Robert Goldstein: Okay.

15  Larry Mills: Okay, we're there. The whole panel is there.

16  Robert Goldstein: So, let's look at the language. "If during the period from

17  the date you execute this agreement, until your start date, the interim

18  period, you fail to commence employment by August 17th, 2016, you agree to pay

19  Jefferies a million dollars as liquidated damages." That by itself is,

20  standing alone, doesn't have any specific conditions but then it goes on to

21  say, "You agree to pay Jefferies a million dollars as liquidated damages,

22  which represent only an approximation of a portion of the anticipated loss

23  created by such a violation. For the avoidance of doubt, this liquidated

24  damages provision is applicable only if you voluntarily fail to commence

25  employment with Jefferies, except as a result of Jefferies' written

82

297                                                    EXHIBIT N

1   withdrawal of this offer. A, because you return as an employee to Credit

2   Suisse, or B, to engage in competitive activity as defined in the handbook."

3   So, this by

4   **MZ000038**

5   its own terms, this provision is not a promise to join Jefferies. It is a

6   promise that you will not take a job with Credit Suisse, or with a competitor

7   which prevents you from joining Jefferies. If they wanted this to be a

8   straight "promise you'll join Jefferies and if you don't join Jefferies, you

9   have to pay us a million dollars." – I'm not saying that wouldn't have its

10  own problems, but it wouldn't be as clear as it is here that this is an

11  attempt to prevent competition during that period. The fact that someone

12  under this provision could get a job in another industry, or a firm that

13  doesn't directly compete with Jefferies, or could go back to school –

14  Jefferies would save, would get the exact same damages. And that would be a

15  voluntary choice by the candidate, but they wouldn't be liable for the

16  liquidated damages. The only time Jefferies wanted to impose liquidated

17  damages during that three-month period is if they go to Credit Suisse or a

18  competitor. Essentially, this is a – it's a million-dollar fine to get out of

19  your contract. I mean, that's really what they're doing here. They – by

20  trying to characterize this as some sort of promise to join and not a

21  restriction, they're – I think Jefferies is taking a semantical gamesmanship

22  approach to try and wiggle out of 16600 but we've already seen, and I think

23  virtually every case dealing with 16600 makes clear, it's got a very broad

24  scope. If it was simply – if it only applied to clauses that said, after you

25  leave, you know, we have all seen the typical post-employment restrictions at

83

1   the, you know, for a period of six months after your employment terminates,

2   you won't solicit clients, you won't do this or that. Those are 90% of what

3   we see out there, in this context. But the language of the statue is not

4   limited to that. And the case law is not limited to that. Any provision that

5   has the effect of restricting an employee from exercising his or her freedom

6   of mobility is gonna fall, run afoul of 16600. And the notion that well, we

7   can just cross it off, you know, we've already addressed that. That's not the

8   … that's not the panacea or the appropriate way to correct that provision.

9   Just the language that they use here emphasizes what they're really looking

10  for. "For the avoidance of doubt, this liquidated damages provision is

11  applicable only if you voluntarily…" So, they're not just saying that it's

12  limited to going back to Credit Suisse or going to a competitor. They're

13  highlighting it for the avoidance of doubt. They're making it crystal clear

14  what the restriction is. I don't think anyone can credibly say that this is

15  not a restriction, and no one can credibly say that this is not a restriction

16  that falls squarely within 16600. Nor would it be any more appropriate if you

17  took out Credit Suisse and other competitors and just said, "You have to work

18  for us in three months, and you can't work anywhere else because you have to

19  join us." That would actually broaden it. It might be at least a little more

20  intellectually appropriate and logical, and consistent with Counsel's

21  argument, but it would be just as unenforceable. There was some discussion

22  about whether or not the liquidated damages provision was negotiated and

23  whether or not this was something that Mr. Gegenheimer knowingly went into.

24  You know, I don't want to get too far afield, because this is an issue that's

25  primarily based on a legal determination, but I will point out that Jefferies

84

299                                          EXHIBIT N

1   has not – Jefferies is trying to enforce this agreement. Jefferies is the

2   master of its own documents in terms of what was done and what kind of

3   negotiations were had. We know there were none. If there were, Jefferies

4   would have provided something. Jefferies would have provided a document. The

5   only documents show that they were planning to send him to the office and put

6   him in a conference room.

7   **MZ000039**

8   Which is exactly what happened. The attempt to equate Mr. Gegenheimer with

9   Jefferies is silly. Mr. Gegenheimer is a fairly – I'm not, and I'm not trying

10  to minimize Mr. Gegenheimer here, obviously he's a very highly skilled and

11  well compensated professional. But to suggest that he stands with equal – at

12  equal footing with Jefferies, under these circumstances, where his entire

13  team – not his entire, but substantial part of his team has just walked out

14  the door, he's being given a contract, and basically, it's a take it or leave

15  it proposition. That's – that's not parity. That's not – he doesn't have any

16  leverage there. The only leverage that exists there is Jefferies which is

17  really why they structured it this way. They use a process called the CONE,

18  which we pointed out in our papers and attached some exhibits pointing out

19  that that's their process. It's – it's also been referred to as the "cone of

20  silence". They separate people, and they're not the only ones who do this.

21  It's nothing inherently wrong with it. But it doesn't support their claim

22  that these were arms-length negotiations where they went back and forth and

23  debated the issue. There was no debate. Jefferies had a formula for

24  liquidated damages, it plugged it in, it was non-negotiable, and to suggest

25  that they were on equal footing or there was equal bargaining power is simply

1   nonsense. As far as the waiver language – I don't think it bears much more to

2   say than you can't put in a contract that one of the parties waives anything

3   that's illegal in that agreement. If the restricted – if the restriction in

4   the liquidated damages provision is violative of 16600, or if you apply New

5   York law, violative of New York law, a waiver is not going to be the panacea

6   and save the contract. If that was the case, we wouldn't have breach of

7   contracts anymore, because everyone would just put in a waiver. But what I

8   thought was interesting is Counsel's approach to the meaning of the

9   distinction where Mr. Gegenheimer's waiver would be with respect to his

10  repayment obligations; and Jefferies' waiver was respect to defenses to its

11  payment obligations. And it's pretty clear – "repayment" and Counsel's use

12  that exact term, "repayment" would be the bonus that he was given, signing

13  bonus, make whole payments. No one is disputing he would have to give that

14  money back. It wouldn't be fair for him to keep that money. But that's not

15  the same as a liquidated damages provision. But Counsel seemed to imply that

16  there might be some ambiguity there, that maybe it could be interpreted a

17  different way. But I think it's one of the most basic tenants of contract

18  law, that if there is some ambiguity in an agreement, its construed against

19  the drafter. I don't think there's any dispute – Jefferies drafted this

20  agreement. They knew what they were doing. They knew why they put those words

21  in there. Those words had meaning and there was a reason why they used

22  "repay" for Mr. Gegenheimer. The waiver argument just falls apart on that

23  level as well. The other point that I – another way to look at the

24  restriction in 5b against working for Credit Suisse or a competitor during

25  the garden leave, and the 365-day notice period that comes into play, we've

86

1   already talked about it, or I've already talked about the difference there

2   and you know, you don't have liquidated damages the minute you start working.

3   You have 365-day notice period, which can't be enforced literally. You can't

4   get an injunction – no judge is gonna require someone to work 365 days. And

5   the penalty is far, far different than it would be for the, under the

6   liquidated damages. Now, Mr. Shapren said, "Well, we would just sue them in

7   that event, and we get actual damages." But they've already said, they can't

8   calculate actual damages. That's why they have a liquidated damages provision

9   pre-commencement. So, how would they suddenly have the ability to calculate

10  damages if someone breaches the notice provision? Doesn't

11  **MZ000040**

12  make sense. And the reason is because that's not really the reason they're

13  doing this. They're doing this, so they can have leverage over employees who

14  are on garden leave, they're vulnerable to going somewhere else, it happens.

15  Sure, it happens to most firms. It's part of the process. But that's really

16  what's going on here. To keep that chilling effect in place. And I'm sure it

17  works. I'm sure there are a large number of employees who see a provision

18  like that and think, "Well, I guess there's nothing I can do, I'm not gonna,

19  you know, if another opportunity presents itself I'm just going to have to

20  ignore it. And let's, you know, not to be lost and you've sort of started

21  with the whole California issue and I'm gonna bring us back to that. We are

22  in California. Mr. Gegenheimer is in California. Jefferies' office, where Mr.

23  Gegenheimer was gonna work is in California. The agreement was signed in

24  California. Everything here is in California. California, we all know, has a

25  very strong public interest in employees' freedom to pursue their career. The

1  entire premise of Jefferies' case is completely inconsistent with California

2  public policy. Not only is the liquidated damages provision illegal, it's

3  illegal in California, but the 365-day notice period, which again, I've –

4  this is the first time I've ever seen a one-year notice provision. But that

5  by itself, it's – there, it's a penalty on top of another penalty. It's

6  completely contrary to California policy whether it would be effective in

7  another state, I tend to doubt it, but you can argue whether or not a New

8  York court would enforce a 365-day notice period. I don't think they would,

9  but you know, I guess reasonable minds can differ. I don't think anyone can

10  disagree that a California court would toss a 365-day notice period out of

11  hand, just as they would the restriction against working for a competitor

12  before you accept, commence employment with Jefferies. Whether it's before

13  employment or after employment, restriction of trade, or restriction of an

14  employee's right and it's illegal. And just to close the loop, we still have

15  heard no explanation as to how Counsel gets around the law in New York about

16  preserving or reserving the right to actual damages. Simply saying, "We won't

17  do it, we promise. We promise, we won't do it." That's not good enough. "We

18  haven't done it." That's not good enough. Put aside that there's no evidence

19  that they haven't done it, on its face, the reasoning behind striking

20  liquidated damages provisions that also reserve the right to seek actual

21  damages is because you're not really liquidating damages. You're setting a

22  floor. That's, all the cases say that. So, "nothing [INDISCERNIBLE 00:03:18]

23  shall prevent Jefferies from recovering its actual damages exceeding the

24  liquidated damages and Jefferies shall have the right to avail itself of all

25  other available revenues." That can't be more clear than that, that they're

1  reserving the right to go beyond liquidated damages. If they don't intend to

2  do it, why did they put that there? Of course, they put that there to reserve

3  their right. So, you know, for Mr. Shapren to say, "We haven't done it, we

4  won't do it." Maybe that's true, [INDISCERNIBLE 00:03:48], I don't know. But

5  that's not the point. The point is, it's in this provision, they're reserving

6  their right, and that nullifies this provision – there's really no dispute.

7  There are – we've cited in our briefs, a large number of cases in New York

8  identical provisions, and they're on their face, [INDISCERNIBLE 00:04:09].

9  So, if Jefferies had its way, and this was resolved under New York law, they

10 lose. At the end of the day, the only difference between California applying

11 to this provision or New York law applying to this provision is in

12 California, the liquidated damages provision would be stricken because of the

13 underlying restraint of trade. It's the restraint of trade that really

14 offends 16600. In New York, the liquidated damages provision is invalid. I

15 don't even want to say "would be" it is invalid. But, potentially, Jefferies

16 could seek, at least theoretically, they could seek actual damages for the –

17 **MZ000041**

18 underlying breach. I don't see that happening here because they haven't

19 produced any. You know, we could argue about that, if it came to that. But

20 that's the distinction. In either state, the liquidated damages clause is

21 out. That's all.

22 Larry Mills: All right. Anything further?

23 Andrew Shapren: Yes.

24 Larry Mills: I think I'll be – ping pong here. Hopefully we'll be running

25 down in terms of time.

1   Andrew Shapren: We are.

2   Larry Mills: Go ahead.

3   Andrew Shapren: You know, I'm not sure what Mr. Goldstein's talking about.

4   Well, "They promise they won't seek liquidated damages and actual damages.

5   They said they haven't done it." Well, we haven't done it. The statement of

6   claim is very clear. We want liquidated damages. If we don't get liquidated

7   damages, we want actual damages. And that's completely consistent with the

8   law and that's in our brief as well. And they haven't addressed, with respect

9   to those cases, the fact of the equal bargaining power that we have here, and

10  the deference that you're required to give to the parties and they haven't

11  addressed the severability argument we made; and none of the cases they cite

12  address any of those three points. It's interesting that Mr. Goldstein said

13  that notice provisions I guess are now illegal in California. Who knew. Who

14  knew? So, I guess Credit Suisse's notice provision that Mr. Gegenheimer was

15  supposed to serve is illegal. It's not illegal. Okay? It is something that

16  would have to be litigated, but again, are we just going to just let poor Mr.

17  Gegenheimer off the hook? The guy, he doesn't know what he signs. Doesn't

18  matter. Listen, he signed it, term employment agreements are absolutely

19  enforceable. This is a one-year term, called it a term, call it a

20  [INDISCERNIBLE 00:01:55] provision, call it whatever you want. Term

21  agreements are enforceable. You know, Mr. Goldstein kind of went off again

22  with no evidence about well, Jefferies uses this CONE and here's what it is,

23  and they separate them and all these other things. But, that's not what

24  happened to Jon Gegenheimer. Nobody was even there. Operational Support was

25  in the office. That's it. He wasn't under any pressure. Mr. Kanoff was

90

305                                          EXHIBIT N

1   remote. If he didn't like it, he just say, "See you later. I'm gonna go back

2   to my job." They said we provided no evidence of negotiation. We showed you

3   Exhibit O, an email where Tyra Harrington and Jefferies sends Mr.

4   Gegenheimer's lawyer the draft agreement. I don't know what Mr. Gegenheimer

5   and his lawyer talked about with respect to the agreement. I don't know if

6   they discussed the liquidated damages clause, but they certainly could have.

7   And that's not Jefferies' issue. And it's not Jefferies' problem as to

8   whether Mr. Gegenheimer took advantage of the Counsel that he had. Now,

9   something really jumped out at me, and that was when Mr. Goldstein said Mr.

10  Gegenheimer doesn't have any leverage. Think about that for a minute. Mr.

11  Goldstein didn't violate his agreement with Jefferies because he had to crawl

12  back to Credit Suisse and go to –

13  Larry Mills: Mr. Gegenheimer. You meant to say –

14  Andrew Shapren: Yes, Mr. Gegenheimer.

15  Larry Mills: We understood but go ahead.

16  Andrew Shapren: For a pay cut, or for the same pay. His pay doubled. The guy

17  has leverage. He has serious leverage and he used it, and frankly, he used it

18  very effectively. The only problem was, he has a contractual obligation that

19  he has to fulfill when he exacted that leverage. And finally, you know, I'm –

20  I think Mr. Goldstein used the word "dumbfounded" when talking about

21  paragraph 5b, the liquidated damages provision. And said that we were trying

22  to construe it into being a promise to join the firm. Well, I'm a little

23  dumbfounded by that. I mean, I don't know how else you could read the first

24  sentence. It is a promise to join the firm, by August 17th, 2016. And then Mr.

25  Goldstein contradicted himself. I don't know if you caught that, but he said,

91

1  "You know, taken out the second sentence is no good because it actually

2  broadens the circumstances under which Mr. Gegenheimer could be liable." And

3  he's right. And that's the point we've been trying to make. It is the second

4  sentence, with respect to staying at Credit Suisse or engaging in competitive

5  activity is a limitation. It is a benefit for the employee. It is to ensure

6  that the liquidated damage isn't enforced if they die or become disabled or

7  retire or something else happens where you know, in good conscience,

8  Jefferies might say, "You know what, we don't – yes, we're damaged, but we

9  don't think it's right to enforce it under these circumstances."

10  **MZ000042**

11  It is an agreement to join the firm. And it is enforceable in California.

12  Thank you.

13  Larry Mills: Thank you, Mr. Shapren.

14  Robert Goldstein: Very, very briefly.

15  Larry Mills: I think this might be the end of the line. I'm just cuing you

16  in. Unless you have something burning, because I'm starting to hear the same

17  things.

18  Robert Goldstein: Right, I'm gonna try and be very brief and just limit

19  myself to exactly what Mr. Shapren brought up. The – I think we're still at

20  odds over what the provision really says. But I don't see why there should be

21  any disagreement. The agreement is very clear. It has a provision, the line –

22  the first line states that Mr. Gegenheimer will pay a million dollars if he

23  fails to join Jefferies. Clear enough. He is – I'm not suggesting that he's

24  not making a commitment in that line to join Jefferies. But you can't ignore

25  the next sentence. That it only applies if he goes to a competitor or stays

307                                                    EXHIBIT N

1    with Credit Suisse. That is the restriction that renders it unlawful. If they

2    wanted to, in the absence of a liquidated damages provision, if they wanted

3    to – and there was no other restriction, and Jefferies wanted to sue Mr.

4    Gegenheimer purely for not joining in six months, I don't think the lawsuit

5    would go very far, but at least it wouldn't violate 16600 because it

6    wouldn't, it wouldn't forbid him from working somewhere else. So, what

7    they're really doing is – they're requiring, he has to buy his freedom by

8    paying a million dollars. That's what it boils down to. That's not the

9    purpose of a liquidated damages clause. Buying your freedom is the, is the

10   way Jefferies tried to maximize the number of people and the assets of a

11   company that it had just [PH 00:02:11] raided. And let's not forget the

12   context here. Because it's important. This wasn't a one-off, you know, they

13   needed an M&A guy and you know, they just had to fill a position. They were

14   talking to Mr. Gegenheimer, we've always maintained that, but they were also

15   talking to his five managing directors, running that business. That was –

16   those were the people he supported. It was very carefully timed. The five

17   managing directors, again, his lifeline – essentially, I mean, a large

18   portion of his work was supporting those guys. They leave. Gegenheimer hasn't

19   had an agreement yet, he may have been talking, they may have been discussing

20   general terms, but he doesn't see the liquidated damages provision until the

21   next day, after they're gone, and he's sitting in a conference room, with no

22   one but an assistant or a secretary. That's the context that I think we need

23   to remember. So, you know, to suggest that this was, you know, and I've heard

24   arms' length bargaining – it's been said many, many times today and then in

25   the briefs, that's simply not applicable. At the end of the day, though,

93

EXHIBIT N

1   these factual issues, sort of window dressing. I mean, they help a little bit

2   to understand the context, but you don't really need to resolve them, because

3   the law is so clear. The law is so clear on the language of the restriction

4   and in New York, the language of the restriction against having a liquidated

5   damages provision that also seeks actual damages. The law does not exclude

6   liquidated damages provisions where they also reserve the right to actual

7   damages, as long as you promise you won't do it. As long as you say you won't

8   do it. No. It's invalid. And if they had no intention of doing it, they

9   wouldn't have put it in. Full stop, it's illegal in New York. So, if

10  Jefferies wants to continue, you know, unless they want to withdraw their

11  claim that the contract is governed by New York, you really don't even have

12  to go any further than that to invalidate the liquidated damages provision.

13  Larry Mills: Thank you. Go for it.

14  Andrew Shapren: I think you know this, but much of what Mr. Goldstein just

15  said, there's absolutely no evidence in the record for and frankly, you

16  should just disregard it. And one other thing, we used the term "buying

17  freedom". There's another term for that, and it's called "an alternative to

18  performance." And that's what it really is, and we know that California

19  courts enforce those.

20  Larry Mills: All right. I think we've – I think your position –

21  Robert Goldstein: [INDISCERNIBLE 00:04:50]

22  Larry Mills: I was gonna say your positions are clear, in the briefs and in

23  the argument, frankly. The Panel had the opportunity to confer

24  **MZ000043**

25

94

309                                    EXHIBIT N

1    briefly during the last break and the suggestion was made, which – and we all

2    agreed – that we would want to huddle after the arguments are closed, to talk

3    about the types of questions that we have, partly to avoid redundancy of

4    questioning and maybe just organize our thoughts a little bit. So if you'll

5    bear with us and how much time do we think we need?

6    Jim Oaks: 15 minutes.

7    Larry Mills: Yeah, I would say at least 15 – how about –

8    Jim Oaks: 30?

9    Larry Mills: No, it will be 15 minutes. We'll make it 15 minutes. We don't

10   want to hold you here, but we also want to make sure we're efficient about

11   our questioning and we, all three of us have questions. So, we'll take a 15-

12   minute break. We can go off the record.

13   **MZ000044**

14   Larry Mills: We're back on the record. Panel has conferred and turns out we

15   have similar questions. I'm going to take the lead. I may step on toes and

16   ask questions raised by my co-panelists. I apologize to them if I do that.

17   I'm just for consistency, and they're going to chime in as, you know, as

18   things come up. And one general question that the panel has, and we keep

19   coming back to this, is the state of the record in this arbitration about the

20   negotiation of the offer letter, the terms of it. There's a lot of discussion

21   of arm's length dealing, there is some suggestion that Mr. Gegenheimer had

22   plenty of time to consult with counsel. And when you actually look at the

23   record, and we've tried to do that and be, you know, not take into account

24   assertions, if they're not supported somewhere in the record. We have a

25   number of questions about that. And to crystalize one of the questions right

1  off the bat, which I think I'd really like to get an answer to, in Exhibit A,

2  the offer letter, in our packet that was supplied to us, there is a hand-

3  written change in the agreement, in Roman numeral II, capital A, changing an

4  amount for – that Jefferies would pay, of $280,000 to $300,000. It's in pen,

5  it's initialed. We don't have any indication of how that came about, whose

6  initials they are, what was being negotiated, but it signals to us that there

7  was some discussion of the provisions of this and in fact, there were some

8  discussions on behalf of Mr. Gegenheimer. So, I'm kind of looking this way,

9  Mr. Goldstein.

10  Robert Goldstein: I can answer the question.

11  Larry Mills: To get some answer about what was going on there. And again, I

12  am concerned, and I'll accept whatever you want to tell me about the record,

13  because I understand where the burden of proof is. We understand where the

14  burden of proof is. But I'm just trying to clarify what we do know, or what

15  we can maybe infer logically from seeing this document.

16  Robert Goldstein: Yeah. This was a mistake in the agreement. The purpose of

17  this provision was to replace, make Mr. Gegenheimer whole, for whatever he

18  would be forfeiting by leaving Credit Suisse. Very often, when you leave one

19  company and you go to another in the financial services industry, you leave

20  behind certain bonuses or deferred comp that hadn't vested yet. So it's very

21  common, in the industry, that if you're hired by a rival firm, they will make

22  whole whatever it is you're forfeiting. That's all this is. There was a

23  number in here of $280,000 but it actually was $300,000. It was just the

24  wrong number was put in here, and it was just a simple fix the number.

25  Larry Mills: When was the change made, I guess, is what I'm wondering.

1  Robert Goldstein: I believe it was made the day – well, it had to have been

2  made on the 18th because that was the only time the agreement was provided to

3  Mr. Gegenheimer. I do believe Mr. Gegenheimer spoke to a Jefferies'

4  representative on the phone and they discussed that change and it was not a

5  negotiation, it was just, "you got the number wrong."

6  Larry Mills: Did I assume that these – this is Mr. Gegenheimer's initials

7  here and it's in the blue ink that he signed on the back?

8  Robert Goldstein: Correct.

9  Male 1: They're not mine. [INDISCERNIBLE 00:03:43]

10  Larry Mills: Okay, yeah, you're – I can't – this must be, could be a copy,

11  just a copy doesn't show –

12  Robert Goldstein: So that's all that is.

13  Larry Mills: Okay, well, that's one thing. Also –

14  Ms. Lou: Can I just –

15  Larry Mills: Yeah, yeah, jump in, please.

16  Ms. Lou: So jumping, just going back to this, the record, where in this

17  record can I find the time that Mr. – is it Gegenheimer or Gegenheimer?

18  Male: Gegenheimer.

19  Ms. Lou: Was supposed to be at Jefferies on May 18th? Is there a confirmation

20  date or something?

21  Robert Goldstein: I believe there was an email confirming that – do you –

22  [Background conversation] I'm sorry, are you asking that he would be there

23  August 17th or in their office May, when he signed?

24  Ms. Lou: May. And then it follows to another question that the panel had, is

25  what is "cone"? Is that – is that C-O-N-E for something?

97

EXHIBIT N

1  Andrew Shapren: I can answer that.

2  Ms. Lou: Okay. But first of all the record – where – what time was the

3  appointment?

4  Andrew Shapren: I don't believe there's an email that says, "This is the time

5  of the appointment." At this point.

6  Ms. Lou: Okay.

7  Andrew Shapren: The CONE is a

8  **MZ000045**

9  process that Jefferies uses with some folks, where basically the negotiation

10 is done at one time. So, the banker and his or her lawyer show up, Jefferies'

11 business people, like Mr. Kanoff and sometimes someone like Mr. [PH 00:00:14]

12 Crash is there. And they all get together, pull out a draft agreement, and

13 they basically hash it out until either everyone agrees or they all decide no

14 deal. And sometimes that can take a very long time. So that's the CONE, and

15 that's why you see, "Hey, when are we going to do the CONE?" And things like

16 that. But I think it's important to know that in this case, I mean, that's

17 not really what happened. Mr. Kanoff was remote. No lawyers were there. Mr.

18 Gegenheimer came to the office, there was some administrative staff there,

19 they emailed the agreement to his lawyer, he got a copy of it. There were

20 apparently some markups.

21 Ms. Lou: There are mark ups?

22 Andrew Shapren: Well, the one we talked about.

23 Robert Goldstein: One mark up.

24 Ms. Lou: Okay.

25 Andrew Shapren: And it went from there.

EXHIBIT N

1   Ms. Lou: Was it, again, there's no time as to – we don't have the information

2   as to what time?

3   Andrew Shapren: Correct.

4   Ms. Lou: Okay.

5   Larry Mills: Does CONE refer to just simply you have a bunch of people

6   negotiating, there's a whole bunch of them, and they were coming down in a

7   cone? Or is this the "cone of silence"? It's like –

8   Andrew Shapren: It's a nickname that –

9   Larry Mills: Shut off all the cell phones and you're gonna bash heads? Is

10  that it?

11  Andrew Shapren: Exactly.

12  Chris Kanoff: It's a joke on [INDISCERNIBLE 00:01:24].

13  Larry Mills: All right, yeah, the Coneheads. That's me. Well, building on

14  this question, remembering, we're looking at documents, fairly limited

15  testimony, if any, about the documents, so these are, this is why some of

16  these questions are coming up. I see in Exhibit O, an email to Mr. Thomas

17  dated May 18th, at 10:11 PM – that says, "The attached is the contract for

18  Jon." Can somebody explain to me why – first of all, the time is interesting.

19  Because if we're trying to get Mr. Thomas in the loop to advise Mr.

20  Gegenheimer, and he's getting the contract at 10:00 PM, was the meeting at

21  midnight? This is kind of building on this –

22  Andrew Shapren: I thought you might ask this. And I can explain it. I'm

23  trying to find it, but it doesn't really matter. When you produce documents,

24  electronically, emails – from a system – the emails are produced, the time is

25  UTC time. Greenwich Mean Time. So sometimes you'll even see in a chain – it's

1   only the top email that's in Greenwich Mean Time. Sometimes you'll see in a

2   chain where the other ones are a snapshot of like local time. And it just, it

3   doesn't make any sense and it's got everybody all confused. And actually

4   fought with my tech people over this at some point, but they say this is the

5   way you do it. So, that's why he's getting the agreement at what appears to

6   be 10:00.

7   Larry Mills: Okay, well, the question raised for me is how much time ahead of

8   the May 18th signing did Mr. Gegenheimer's attorney, Mr. Thomas, have a

9   version – maybe not the final – of the offer letter to review? And I don't

10  see any evidence on that in the record right now.

11  Andrew Shapren: Yeah, so while, I mean, universal time is 8 hours ahead of

12  Pacific time.

13  Larry Mills: Okay. So, this – okay, I can read that. I can subtract and

14  figure it out.

15  Andrew Shapren: You don't have evidence of exactly what time Mr.

16  [INDISCERNIBLE 00:03:39] showed up. I understand that.

17  Larry Mills: Right.

18  Andrew Shapren: The one thing I think you need to understand is that Mr.

19  Thomas is – we've heard a lot about the five folks that left the day before.

20  He represented four of them. So he negotiated four of the same agreements the

21  day before.

22  Larry Mills: Okay.

23  Andrew Shapren: So, he knows the agreement inside and out.

24  Larry Mills: And I presume those four agreements had a liquidated damages

25  clause in them?

EXHIBIT N

1   Andrew Shapren: Basically the same form.

2   Robert Goldstein: I'm sorry, we're kind of going outside the record.

3   Larry Mills: Yeah, I know, but – let me just make crystal clear what I'm

4   about here. The burden of proof is important in this type of case. And if the

5   record is silent, then the inferences are gonna be drawn against the party

6   that had the burden of proof. And I just want to make that clear. We have not

7   had a discussion. I don't know how my co-panelists are feeling. I'm feeling

8   ill at ease, because I don't feel I have information that would be useful. I

9   don't know if it changed my mind, I don't know – I don't have a mind yet. I

10  haven't made a decision about this. But it's troubling, because I don't feel

11  as if I have a full picture. I'm not putting it on Counsel, I'm not – there's

12  no blame here. I'm just telling you how it is in here. So maybe I should just

13  go ahead, we can ask some more questions –

14  **MZ000046**

15  Ron Green: [INDISCERNIBLE 00:00:01] a question, Mr. Hill. Respectfully.

16  Larry Mills: Mills, yeah. Whatever, whatever. You can call me whatever.

17  Ron Green: Better to call you by your correct name. I apologize. It seems to

18  me that through no fault of anyone, there's not been much discovery in this

19  case. And if the panel is not comfortable with the state of the record, in

20  making such a seminal decision, does the panel prefer that it hold its award

21  in abeyance pending enriching the record? Because we're getting answers from

22  lawyers, and then – they are what they are. But it's not testimony. We have

23  two likely witnesses right here, not prepared to testify today, but clearly

24  important to the question you just raised. They were both present on the 18th

25  and they spoke to one another on the 18th about the very change, the only

EXHIBIT N

1  change in that agreement. So, if it's important to the panel to get a more

2  fulsome record, should we adjourn and provide the panel with the documents it

3  wants and revisit this issue at a subsequent time? The case isn't going away.

4  Larry Mills: Right. I need to confer with my co-panelists on that. I can't

5  make a decision. I understand – I have discomfort, from myself, mainly, I'm

6  sorry – I'm speaking too much –

7  Ms. Lou: No, no, no.

8  Larry Mills: If I'm not – if I'm saying something that you disagree –

9  Jim Oaks: No.

10 Larry Mills: Jump in. I had anticipated, personally, that we would – there

11 was going to be some testimony. Maybe limited. And also an opportunity for

12 cross examination. And also an opportunity to ask the principals, who are

13 here, about what came down. So I had thought -the reason we had two days is

14 we were gonna have limited testimony, maybe just the morning, maybe an hour,

15 just short, on that. That missing link gives me some concern. I don't want to

16 – Counsel, to me, control what the evidence is and what we hear. And so I

17 almost throw it back to you. If you feel it would be helpful or something

18 would be helpful, but I realize it would be – you know, we've set aside these

19 two days. And we want to make sure we use them efficiently. If we can't do it

20 in these two days, I'm inclined just to leave the record the way it is and go

21 forward. Because I don't think we want to just keep pushing this off for a

22 few more, you know, snippets of testimony or whatever it may be.

23 Robert Goldstein: Sir, I think I speak for everyone that nobody wants any of

24 you to feel uncomfortable or feel like you don't have all the information you

25 need. So, I think – and I defer to Mr. Shapren and his view, but certainly if

1   there's categories of information or specific pieces of information or gaps

2   that you need to fill in, we'd be happy to furnish those. You know, we could

3   probably work something out. I mean, Mr. Shapren and I have generally been

4   cooperative about things like this.

5   Larry Mills: Yeah, and I appreciate that.

6   Robert Goldstein: So, you know, I think we could do that and hopefully

7   alleviate your – you know, whatever concerns you have.

8   Jim Oaks: I think everybody said, I know opposing Counsel said they were

9   prepared for two days, if necessary. So.

10  Larry Mills: Right. Well, there's gonna be another day anyway, because we

11  need to deliberate. And we're not gonna deliberate after a long day. We're

12  gonna – we would be deliberating tomorrow. So, assuming we're going to return

13  anyway, it may be useful. But before we decide how to proceed, why don't we

14  run through some more questions. Some of them are legal, as opposed to

15  factual. But I just want you to know, at least from this arbitrator's

16  perspective, I'm feeling uneasy. Not comfortable. Do you want to jump in with

17  questions? Jim asked some –

18  Jim Oaks: Well, we all asked the question, let's turn the table here. Mr.

19  Gegenheimer is working over here for Jefferies and you're trying to recruit

20  him to become a banker for you. How would you have structured his contract? I

21  assume you'd leave out liquidated damages in the contract?

22  Robert Goldstein: Absolutely. I mean –

23  Jim Oaks: They wouldn't be in a –

24  Robert Goldstein: It's never, I mean, I have never seen. I've been practicing

25  for a long time in this area. This is the first time I've seen liquidated

EXHIBIT N

1  damages for not starting at a firm, when your garden leave is over. There

2  have been liquidated damages in the context of a non-solicit – in a state

3  where those are enforceable. So, if you violate a post-employment, non-

4  solicitation of clients' provision, you know, there may be a liquidated

5  damages provision that says, you know, "You have to pay 50% or whatever the

6  margin is, for clients that you solicit in violation of this agreement."

7  That's the only time I've seen liquidated damages. Liquidated damages – so,

8  to answer your question, I would absolutely not put that provision, certainly

9  not in California, because it's illegal. But even in New York, I wouldn't put

10  that in.

11  **MZ000047**

12  Jim Oaks: You wouldn't, and the firm wouldn't?

13  Robert Goldstein: The firm would not. I think I can speak for the firm. We

14  have the founder here.

15  Andrew Shapren: Well, I don't know, what firm are you talking about?

16  Larry Mills: Yeah, exactly.

17  Andrew Shapren: I mean, he's talking about the Epstein, Becker and Green

18  firm. You're talking about Credit Suisse.

19  Jim Oaks: I'm talking about Credit Suisse.

20  Robert Goldstein: Oh, you're talking about Credit Suisse.

21  Jim Oaks: I'm talking about Credit Suisse.

22  Robert Goldstein: What I can tell you is, I've never seen that with them.

23  Obviously, I can't speak for them. But I have never seen anything remotely –

24  Jim Oaks: So Jefferies is the only firm on Wall Street using liquidated

25  damages? Is that what you're telling me?

1  Robert Goldstein: The only one I've seen. There may be others. But the only

2  one I've seen.

3  Andrew Shapren: We know of at least one other.

4  Jim Oaks: Okay.

5  Larry Mills: Okay.

6  Ms. Lou: Well, I guess –

7  Larry Mills: Go ahead.

8  Ms. Lou: Just to ask, you know, to follow on his hypothetical question, how

9  would you protect your client from situations like this?

10  Robert Goldstein: Well, look, when you have a, you're hiring someone who has

11  a garden leave, I don't believe I've ever seen an agreement that imposes a

12  penalty or a fine for choosing not to go to that firm at the end of the

13  garden leave. Employees, all the employees for – I shouldn't say all, but the

14  vast majority of employees at will. It's the cost of doing business. It's a

15  risk. The way I have drafted these things, and how I've typically seen them

16  drafted, you give them a start date, if they don't start within a certain

17  time, then it's over. But this is a cost of doing business. This is part of

18  what companies do. And to try and recoup that from the candidates creates so

19  many problems, as we can see here. I've never seen it. I guess Jefferies and

20  then one other firm out there, that I'm not familiars with does it, but

21  that's not industry standard.

22  Ms. Lou: Thank you.

23  Ms. Lou: I have a quasi-legal question. We – the agreement has a New York

24  forum selection clause and it also has the New York law selection clause,

25  choice of law clause. The forum selection clause appears to the panel, I

105

EXHIBIT N

1   think I can say, kind of gone because of the action of FINRA. We may change

2   our mind, but at this point, I think that's pretty clear. But, we don't have

3   to sit as a New York panel or a California panel. We could be anywhere, and

4   we could still apply New York law which is agreed in the agreement and I

5   understand the arguments about California fundamental policy and whatnot, but

6   I just want to signal I don't think any of the arguments about forum

7   selection are kind of falling on, you know, who cares about that? It's really

8   about the choice of law. And we do have a choice of law clause, and we have

9   to deal with a potential conflict of fundamental California policy, but

10  that's it. So, I think that that's kind of a general analysis that we're

11  into. And you can argue forum – choice of forum is important to be – or if it

12  is important, tell me why it's important because I'm not, we're not getting

13  that. The choice of forum in the agreement.

14  Andrew Shapren: Yeah, it would be important, and I think the point you made

15  is right. You're not a California panel or a New York Panel, you're a panel

16  that's going to apply whatever law and equity principles you think is right.

17  The distinction is that California courts have made a distinction between

18  forum selection clauses, which are enforceable regardless of whether you

19  think 16600 applies, and choice of law clauses, which are, they're more

20  likely to say, are not enforceable if you think 16600 applies.

21  Larry Mills: [INDISCERNIBLE 00:03:47] Okay.

22  Andrew Shapren: And that's it. And what I guess the point we were making was,

23  if FINRA applied its rule, but it didn't apply the legal principle of, well,

24  California treats forum selection clauses differently than choice of law. And

25  my suggestion is, you could do that, if you saw fit to do that.

1   Larry Mills: Yeah, but we may not need to do that.

2   Andrew Shapren: You may not need to do that.

3   Larry Mills: Following on that line a bit, I guess I'll ask each side. What

4   do you say to the point that California law is the same as New York law on

5   liquidated damages provisions. Forget about the restraint or the 16600, is

6   that correct in your view? That it's basically the same law on liquidated

7   damages in New York and California? I know there are different nuances in the

8   case law, but the basic test is the same?

9   Andrew Shapren: The test is the same.

10  Robert Goldstein: Agreed.

11  Larry Mills: Okay, that's what's coming out to us. Sorry… by the way, jump in

12  if you –

13  Ms. Lou: I can jump in. What are the parties' view on mitigation of damages

14  at this point of the proceedings?

15  **MZ000048**

16  Andrew Shapren: From our point of view, that would come into play if and when

17  we ever have to put on actual damages. So in other words, if we have to put

18  on actual damages, then one of the defenses would be, did you mitigate the

19  damage? And how did you do that? And were you able to replace this person and

20  when? So, from our point of view, at this point, it's not applicable, but it

21  may be in the future.

22  Robert Goldstein: We agree.

23  Ms. Lou: Thanks.

24  Larry Mills: I may have misheard. But I thought at some point someone

25  suggested that the million-dollar amount of liquidated damages was agreed

107

322                                        EXHIBIT N

1  between the parties and I am hearing strong evidence that Jefferies just came

2  up with that amount and put it in the agreement and then it was signed. I'm

3  not hearing evidence of real agreement in the sense of joining and talking

4  about it and saying, "That's what – that's the amount we agreed on." In that

5  sense.

6  Andrew Shapren: Well, I think, in that sense, I think you're right. I mean, I

7  would suggest, you know, we have written contracts with all sorts of terms in

8  them and parties sign them. They agree to them. But yes, no one negotiated

9  that provision, but we showed you the law that basically says that's not

10 required. You don't need a specific negotiation.

11 Larry Mills: Right.

12 Ms. Lou: And this whole percentage of the first year's salary, or the

13 testimony that this was something that was decided some years back because,

14 to avoid litigation, etc. –

15 Andrew Shapren: Right.

16 Larry Mills: That's why we're here. Sorry, that was a low blow.

17 Ms. Lou: Has that been applied for each individual candidate? That first-year

18 salary being the liquidated damages amount?

19 Andrew Shapren: Right, that's my understanding. Chris, are you familiar with

20 anything different?

21 Chris Kanoff: Yeah, it's a very standard part of our contracts and

22 [INDISCERNIBLE 00:02:00] consultation with legal [INDISCERNIBLE 00:02:03]

23 kind of is an approximation of what our damages are, and it came about –

24 liquidated damages – contracts have evolved in investment banking. There

25 wasn't always garden leaves. So once there became garden leave, the employees

EXHIBIT N

1  all of a sudden had quite an advantage on [INDISCERNIBLE 00:02:20] contract.

2  It was very one-sided, because you sit and wait for them to show up. And then

3  they might not show up. And so that's when liquidated – we came up with

4  liquidated damages, to make sure when we sign the contract, that there's

5  really an intention of everybody coming and then create an assessment in the

6  event that they don't come of what our damages were, which we've been –

7  that's what [INDISCERNIBLE 00:02:42].

8  Ron Green: If I may interrupt, I'm terribly sorry, but I was concerned about

9  this. Questions are directing to unsworn witnesses. It's one thing for the

10  lawyers to argue, and everyone understands it's just argument, but I'd like

11  to cross examine this witness about what he just said, and I happen to have

12  facts at my disposal which may be relevant to cross examination, which I

13  cannot do under these circumstances. So I ask the panel again, if you think

14  it is important to get answers to these questions, in respect for me to do

15  that, perhaps to reschedule this and put some witnesses under oath, so we can

16  direct and cross-examine those witnesses on points you think are important.

17  Larry Mills: You know, I'm not sure we have formulated, you know, if you

18  asked me whether I could conduct an examination of either of these

19  individuals about something, it wouldn't take long. Because I'm not – I just

20  want to have a better understanding of the factual background. I'm not sure

21  we need that. I'm really – over my skis because we are, we didn't consult

22  about this, whether we would like extra –

23  Ms. Lou: I think we should just pose traditional questions, and then just

24  take a few minutes to talk amongst ourselves.

25

EXHIBIT N

1   Larry Mills: All right, let's do that. That would be as to how we proceed.

2   But let me just finish with some other questions. Your point is made, and

3   it's a good one. I mean, I understand what you're doing. Pardon me. Sorry.

4   Um, there's been testimony about the fact that the agreement was signed, and

5   six days later there was – it was rescinded from Mr. Gegenheimer's point of

6   view. And I understand that we're looking at the liquidated damages clause at

7   the time the contract was made. At the time the contract was made, liquidated

8   damages clause was only designed to cover, it looks like, 90 days of garden

9   leave. So, you still have a limited period of time of 90 days and there is a

10  little bit of a disconnect with

11  **MZ000049**

12  with the one-year salary for a 90-day period of potential – to cover that

13  period of garden leave, for a potential breach. That's just, I'm just stating

14  in the air. It just – there's something about that that's troubling to me,

15  and I'd welcome some guidance on that.

16  Andrew Shapren: Sure. I mean, think about you know, six days go by and

17  whatever news gets out or preparations were made, or you know, discussions

18  were had within Jefferies. Think about what would happen 90 days later, if on

19  the eve of Mr. Gegenheimer joining, he then rescinds. Now you've had 90 days

20  of internal preparations for him joining. There are countless other ways –

21  they may have hired additional junior people, they may have fired someone.

22  They may have changed the lines of reporting. They're now 90 days further

23  away from talking to the other candidates that they didn't try and negotiate

24  a contract with. You know, how do you now, you're 90 days further away from

25  reigniting that. How are you gonna turn that around quickly? And you know, it

110

EXHIBIT N

1  also it's not just, "Oh, you lost 90 days of revenue" I mean, there's a whole

2  ramp up period here. You start on August 17th, you're not going anywhere for a

3  while. It might take a while to ramp up your revenue, but at some point,

4  you're going to. And now, you're restarting from scratch. And I think it

5  makes it less likely that you can find a replacement quickly and when I say

6  quickly, I mean within a year. That the deal is done, and the person is

7  there. And it's more likely that there's gonna be all these other internal

8  disruptions and it's more likely that the news gets out and there's further

9  reputational harm as well.

10 Larry Mills: I hear you. This is a question, Mr. Goldstein. And I'm sorry – I

11 either wasn't taking notes very well, or I didn't hear something you said,

12 but you were talking about the liquidated damages clause as "unenforceable in

13 New York because there is a reserved right to get actual damages" and you

14 were very sure about that, and I'm confident that there is some law that says

15 that, but I don't know what case or what statute says that.

16 Robert Goldstein: Sure, it's um…

17 Larry Mills: Because it didn't make it into my notes.

18 Robert Goldstein: Okay, we can refer you to the pages in our memorandum. And

19 we have some of the cases here. One of those cases is Jarro Building

20 Industries Corp. v. Schwartz. I'll pull out the brief and [INDISCERNIBLE

21 00:02:57]

22 Larry Mills: If it's in your brief, I'm gonna read the briefs again. And I'll

23 get it.

24 Robert Goldstein: Okay.

25 Larry Mills: but I was just –

111

EXHIBIT N

1  Robert Goldstein: We'll tell you precisely the pages.

2  Larry Mills: Okay.

3  Robert Goldstein: It's in the brief, the opposition brief.

4  Larry Mills: Right, oh yeah.

5  Robert Goldstein: Mostly [INDISCERNIBLE 00:03:13] file.

6  Larry Mills: For sure, yeah. Well, I can – I might be able to find it if it's

7  under, if it's [INDISCERNIBLE 00:03:19].

8  Robert Goldstein: All this paper…

9  Larry Mills: Yeah, I don't want to get bogged down with this, but if it's an

10 important point to run down and I – here it is. Jarro – J-a-r-r-o. And I see

11 a quote – it's on page 15 of, 14 and 15. Thank you. That answers my question.

12 Robert Goldstein: Right, so it's on 14 through – I think it goes through 16.

13 Larry Mills: Right. Well, I recalled reading something about it, but I

14 couldn't put my finger on it. Okay, thank you. Sorry to belabor this.

15 Jim Oaks: While you're going through, I just have a general question. Garden

16 leave, you're in limbo for 90 days. Do they – do the company send you home?

17 Do they just put you in a corner office and say, "Play games on your device"?

18 Or what goes on?

19 Robert Goldstein: A company can do, generally a company can do whatever they

20 want. And usually these garden leave provisions say, you know, you will still

21 be an employee. You're still gonna receive your basic wages. The company

22 reserves the right to have you not come into the office anymore. And the way

23 it usually works is the employee is cut out of the network. They, you know,

24 if an employee is leaving because he or she is going to a competitor,

25 employers don't want them in their offices.

EXHIBIT N

1   Jim Oaks: Obviously, yeah, yeah.

2   Robert Goldstein: They shut them off, they turn off their phones, but they're

3   still technically employees. That's where they get the garden leave. You tend

4   to your garden during that period and –

5   **MZ000050**

6   you get paid. Now I know Jefferies has taken the position that they require

7   employees to work during that notice period. That's very unusual. Usually

8   contrary to what employers want. But you know, that's obviously an employer

9   can do that. They have the right to ask the employee to work. The employee

10  can say no. There's no indentured servitude. But, so theoretically, the

11  employee could work – in my experience, I can't think of a scenario where

12  someone on garden leave worked more than a couple of weeks after giving

13  notice to help transition.

14  Jim Oaks: And then they go home?

15  Robert Goldstein: Then they go home and wait for their check.

16  Jim Oaks: And wait for the check and wait for the 90 days and head to the new

17  firm?

18  Robert Goldstein: Exactly.

19  Jim Oaks: Okay.

20  Andrew Shapren: It really depends on the situation, frankly. And Jefferies

21  does often require people to work for most of their notice periods and

22  transition deals, work on new deals. Help them with client relationships and

23  you know, Mr. Goldstein is right. I guess they could say no, but employees

24  don't want to pick that legal fight. You know, a lot of them are saying,

25

1  "Yes, I will serve out my notice period and then I will move on to my next

2  employer." So, it really depends on the circumstances.

3  Robert Goldstein: Yeah, and then it also depends on the length. I mean, a

4  year – 365 days, I think, has a, you know, a different impact than a 30 – the

5  standard is 30, 60 or 90, depending on one's rank. And the higher ranked

6  individuals often have 90 days. 365 I think is a whole different –

7  Jim Oaks: So that would qualify Mr. Gegenheimer as a senior person? 90 days.

8  Robert Goldstein: Mr. Gegenheimer – 365 days at –

9  Larry Mills: No, he's talking about the –

10  Robert Goldstein: Oh, you're talking about Credit Suisse?

11  Jim Oaks: Yeah.

12  Larry Mills: Yeah.

13  Robert Goldstein: Yeah, no, I think he –

14  Jim Oaks: You said "90 days is for senior people." So, he was a senior

15  person.

16  Ron Green: If I may, just to clarify this. This concept of garden leave in

17  the industry is driven primarily by regulatory concerns. The continuity of

18  service to clients.

19  Larry Mills: Right.

20  Ron Green: And that means you are vice president, oftentimes, it's 30 days.

21  If you're a director oftentimes, it's 60 days. If you're MD, oftentimes it's

22  90 days. Depending upon the regulatory concerns that are paramount to the

23  employer at the time. Typically, the employer controls the amount of time,

24  and the schedules are ceilings. And as Mr. Goldstein points out, it will vary

25  from firm to firm, from case to case, but that's typical.

114

EXHIBIT N

1  Male 1: And our experience is it has nothing to do with regulatory issues.

2  Garden leave began in Europe and –

3  Larry Mills: Yeah, that's what I thought.

4  Male 1: And as it being so successful over there, [INDISCERNIBLE 00:02:41]

5  decided, well, if it works over there, we're gonna import it over here.

6  Larry Mills: It's a British thing, isn't it?

7  Male 1: Yes. Exactly. The regulators had nothing to do with us having garden

8  leave in the industry.

9  Larry Mills: I got it. Okay. I think the panel should confer briefly, like,

10  less than – if you'd stay in place for maybe five minutes and we'll try to

11  assess where we think we should go with this. Let me ask, first of all, Mr.

12  Gegenheimer and Mr. Kanoff, can you – could you return tomorrow morning if

13  the panel needs more?

14  Jon Gegenheimer: Absolutely.

15  Chris Kanoff: Yeah.

16  Larry Mills: Okay, let's talk about this.

17  Jim Oaks: Okay, should I go off the record?

18  Larry Mills: Oh sorry, we're off the record.

19  **MZ000051**

20  [OVERLAY]

21  Larry Mills: Oh gosh, thank you. See, I'm losing it. We're back on the

22  record. The panel has conferred about the possibility of having limited

23  testimony in support of answers to questions, various questions that the

24  panel has. And we have decided that the – not to proceed with additional

25  testimony. We feel we have enough information in the record to proceed. We

EXHIBIT N

1  certainly have enough legal argument and briefing. By the way, you are – both

2  sides are to be commended for that. It's been amazing. Giving us really good

3  information. So, we have decided not to continue that. You've had your

4  closing argument and typically following closing argument, the hearing would

5  be closed, meaning we would not receive any further communications from you.

6  We'll go deliberate and put out a written award. So I – but I need to inquire

7  if the parties have any other issues, objections, or anything that you want

8  to put on the record before I close the hearing. I didn't want to do that

9  precipitously.

10 Andrew Shapren: Yeah, I guess I have a question, I guess on the procedure. I

11 mean, you know, the award that you issue now, I think everyone agrees, is not

12 going to be a final award.

13 Larry Mills: Right.

14 Andrew Shapren: And I don't know if you know how that works, in the FINRA

15 context. In other words, is it gonna be in the form of an order? Is it gonna

16 be, you know, an award, like we're used to seeing at the end of a case? Is

17 that to be determined based on the future process?

18 Larry Mills: Well, I can tell you that the panel chair has been researching

19 this.

20 Andrew Shapren: I had a feeling.

21 Larry Mills: FINRA has a 24-page award information form that it asks the

22 panel to fill out. Many of the questions are irrelevant to what we're doing

23 today. And actually, FINRA, you know, in some cases FINRA actually prepares

24 the award, based on the information sheets. So we check box here, check box

25 here, and send in. I don't think this is that type of case. This is not gonna

1   be a final award in the sense that it would be something you could take to a

2   court and say, "Vacate this or confirm this." So it will be an interim award

3   in the kind of lingo of arbitration. And there's nothing in this FINRA form

4   that talks about interim awards. So, I think it could be – I could style it

5   as an order. It will definitely not be a final award. So that should be

6   clear. And you asked another question that I'm spacing on – what –

7   Andrew Shapren: I think you answered my question.

8   Larry Mills: I think it's important to tell you that these awards are not,

9   you know, this is not findings of fact, conclusions of law. And you know,

10  we'll give some reasons, but don't look for a bunch of case citations and all

11  that sort of thing. I mean, we're a panel and we need to deliberate and come

12  to a conclusion together and we may reach the same conclusion for different

13  reasons, so we'll do the best we can to describe our reasoning process to get

14  there. But I guess going back to my question, is there anything else that you

15  want to put on the record or anything we, you want us to know before we close

16  the record? Because we'll be cutting off communication.

17  Andrew Shapren: One – just one housekeeping. You had mentioned this morning

18  that we may need a clean set of our exhibits to our brief.

19  Larry Mills: Oh.

20  Andrew Shapren: I have one, if you need it.

21  Ms. Lou: I'm good.

22  Andrew Shapren: You got it? Okay.

23  Robert Goldstein: Also, just similar to Mr. Shapren, we promised earlier we

24  would get you a compendium of the cases, so you would have those. We can get

25  each one of you that.

117

EXHIBIT N

1   Ms. Lou: This is separate – you didn't previously submit that, is that right?

2   Robert Goldstein: Not the cases, no.

3   Ms. Lou: Okay.

4   Larry Mills: Yeah. You want to wait for that?

5   Robert Goldstein: We can do that.

6   Male 2: We can submit – put it on to the portal.

7   Robert Goldstein: Or, yeah, however –

8   Male 2: Or however.

9   Robert Goldstein: It's easier for you.

10  Larry Mills: My question is, are we gonna read all those cases? But – I don't

11  think we're gonna read all those cases, so it seems like a lot of work for –

12  I mean, yeah.

13  Jim Oaks: I would say forget it.

14  Larry Mills: I think we're on the record here, I think we're not saying we're

15  gonna do a bad job of –

16  **MZ000052**

17  assessing the law, but I think it's fair to say it's doubtful that we would

18  actually spend much time with those. So, I don't think it's useful to submit

19  that. We all have access to, you know, [PH 00:00:14] Use Case Maker myself,

20  but I can look up these cases. So, is there anything further for today?

21  Andrew Shapren: Nothing further from the Claimant.

22  Robert Goldstein: Nor from the Respondent.

23  Larry Mills: All right. Thank you. I now have to go into script mode again to

24  close the hearing and I'm sorry about this, but this is FINRA requiring this.

25  So the hearing is now closed, meaning we will accept no further submissions

1   from either side and there should be no communication, no further arguments

2   or letters or anything while we are deliberating. The decision will be

3   forwarded to the parties or their counsel – actually I asked at the outset

4   which counsel would be on there, so the two, the two who were designated will

5   get the interim award or order, whatever we decide to call it. This is FINRA.

6   In order to expedite the delivery of the panel's decision to the parties, the

7   panel may either execute a hand-written copy of the award, unlikely. Or each

8   arbitrator may execute a counterpart copy of the award. Possible. We each

9   have to participate and sign off on it, one way or the other. Party

10  evaluations, as I mentioned, at the beginning of the case, I ask that each

11  party or representative complete an evaluation of the arbitration. Your

12  participation, while strictly voluntary, greatly assists FINRA dispute

13  resolution and its ongoing effort to improve the arbitration process. And you

14  can find the arbitration form on the FINRA website. FINRA is also concerned

15  about information security and identity theft. So, the parties should take

16  all documents that are not needed for the official record – the record is the

17  record which will be forwarded to FINRA. And make sure to safeguard that.

18  I've already said this. No party will contact any member of this arbitration

19  panel directly. All communications, if any, should be directed to the staff

20  person assigned to the case. So if there's some burning thing that you need

21  to do, fine, but you can't communicate with the panel while we're

22  deliberating. And this is not observed or observed in the breach. I'm

23  supposed to request that the parties leave the room at the same time so

24  there's no lingering to chat with the arbitrators or whatever and we will

25  observe that. So we'll try to not fraternize. I must say, on behalf of the

EXHIBIT N

1  panel, we appreciate your cooperation in presenting the issue. It's well

2  presented. I mean, we've gotten really good briefs and you know, both sides

3  have been very well represented. And you make it hard for us, but that's what

4  – you know, that's why we get all the big bucks you get as a FINRA

5  arbitrator. So we'll get – we'll try to get this out of – we're gonna

6  deliberate – our procedure is we'll close this out. Leave here. We're gonna

7  leave too. We might huddle for just a few minutes. We'll come back tomorrow.

8  We'll deliberate and see if we can get the interim award out in short order.

9  Probably won't be tomorrow, but we'll try to get it out as quickly as we can.

10 And you won't hear from us, other than through FINRA, with the delivery of

11 the interim award. So, thank you very much.

12 All: Thank you. Thank you very much.

13 Larry Mills: We can go off the record.

14

15

16

17

18

19

20

21

22

23

24

25

120

EXHIBIT N



I, Anders Nelson, certify that the foregoing transcript of proceedings in the California Northern District Court, in the matter of *Jefferies LLC v. Jon A Gegenheimer*, FINRA Arbitration No. 16-02461, on January 24, 2018, was prepared using the required transcription equipment and is a true and accurate record of the proceedings.

Anders Nelson
Project Manager

Sworn to before me this
February 13, 2018

Signature, Notary Public

KATHRYN PAIGE DEVITO
Notary Public – State of New York
NO. 01DE6305958
Qualified in Queens County
My Commission Expires Jun 16, 2018

Stamp, Notary Public

# EXHIBIT O

## FINRA ARBITRATION
## NO. 16-02461

### JEFFERIES LLC,

#### Claimant,

v.

### JON A. GEGENHEIMER,

#### Respondent.

## ORDER REGARDING LIQUIDATED DAMAGES

Pursuant to a stipulation of the parties, this case came before the panel on January 24, 2018, for the first portion of a bifurcated proceeding. The parties requested the panel to decide the sole issue of whether the liquidated damages clause, Section V.B. of the agreement between the parties dated May 18, 2016, is enforceable or unenforceable.

The panel considered the documentary evidence, extensive memoranda of law, and the arguments of counsel, and now hereby makes and enters this Order determining the issue presented.

### Factual Background

Claimant Jefferies LLC ("Jefferies") is a financial services firm with its headquarters and principal place of business in New York, New York. Respondent Jon A. Gegenheimer ("Geigenheimer") is an investment banker employed by Credit Suisse since 2003 in San Francisco, California. On May 18, 2016, Jefferies and Gegenheimer entered into a written agreement ("the Agreement") under the terms of which Gegenheimer agreed to join Jefferies as a managing director specializing in mergers and acquisitions in Jefferies' technology group in San Francisco. The Agreement provided that Gegenheimer would receive an annual salary of $350,000, a fiscal year 2016 retention bonus of $720,834, and up to $300,000 to replace deferred compensation from Credit Suisse that Gegenheimer would forfeit by leaving Credit Suisse and joining Jefferies.

338                                                    EXHIBIT O

The Agreement further provided that Gegenheimer's employment with Jefferies would not commence until August 17, 2016, because Gegenheimer was required to provide Credit Suisse with ninety (90) days prior written notice of his intention to resign. The Agreement obligated Gegenheimer to pay Jefferies liquidated damages if he failed to commence employment with Jefferies. The liquidated damages clause, Section V.B. of the Agreement, provides as follows:

> If during the period beginning from the date you execute this Agreement until your Start Date ("the Interim Period"), you fail to commence employment by August 17, 2016, you agree to pay Jefferies $1,000,000 as liquidated damages ("Liquidated Damages"), which represent only an approximation of a portion of the anticipated loss created by such a violation. For the avoidance of doubt, this Liquidated Damages provision is applicable only if you voluntarily fail to commence employment with Jefferies (except as a result of Jefferies' written withdrawal of this offer): (a) because you return as an employee of Credit Suisse or (b) to engage in Competitive Activity (as defined in the Jefferies Employee Handbook). You agree the Liquidated Damages are reasonable and do not operate as a penalty but reflect Jefferies' reasonable approximation of a portion of its anticipated loss as a result of Jefferies' reliance on your commitment to render services pursuant to this Agreement by your Start Date, Jefferies' forbearance in holding the position of Managing Director in its Investment Banking Division open for you and not hiring another individual for this position during the Interim Period, and all costs incurred by Jefferies to fill the Investment Banking Division Managing Director Position. Nothing in this section shall prevent Jefferies from recovering its actual damages exceeding the Liquidated Damages, and Jefferies shall have the right to avail itself of all other available remedies.

Jefferies determined the liquidated damages amount by taking Gegenheimer's agreed first year compensation at Jefferies and rounding down to $1,000,000.

On May 24, 2016, Gegenheimer informed Jefferies that he would not join Jefferies as agreed, but instead would remain with Credit Suisse. On or about August 10, 2016, Credit Suisse offered Gegenheimer a retention award of $1,150,000 in guaranteed total compensation for 2016; Gegenheimer accepted the offer and signed a Retention Agreement.

2

EXHIBIT O

## Legal Analysis

Section V.I. of the Agreement between the parties provides that the Agreement shall be governed by, and construed in accordance with, the laws of the State of New York and that any arbitration with respect to the Agreement shall be brought before FINRA in the Borough of Manhattan in the State of New York.

Before the panel was appointed, FINRA determined that the arbitration hearing would be held in San Francisco pursuant to Rule 13213 of the FINRA Arbitration Code for Industry Disputes. Rule 13213 provides that FINRA will generally select the hearing location closest to where the associated person was employed at the time of the events giving rise to the dispute. FINRA advised the parties that they may raise the issue of the hearing location with the panel after its appointment. Neither party made such a motion pursuant to Rule 13213(a)(4).

FINRA did not make a legal determination regarding the parties' agreement regarding the choice of the applicable law. The panel will enforce the parties' agreement and apply New York law in deciding the issue presented. New York has a reasonable relationship to the parties and the transaction (Jefferies is headquartered and has its principal place of business in New York and Gegenheimer does business there.) and New York law regarding the enforceability of liquidated damages provisions is not materially different than the law of California.

Under New York law, a liquidated damages provision will be enforced where
(1) the amount bears a reasonable proportion to the probable loss; and   (2) the amount of the actual loss is incapable or difficult of precise estimation.
The liquidated damages provision should be interpreted as of the date of the agreement and not as of the date of its breach. The party challenging the enforceability of the liquidated damages provision (Gegenheimer in this case) must establish either
(1) that actual damages were readily ascertainable at the time the contract was entered into; or
(2) that the liquidated damages amount is conspicuously disproportionate to foreseeable or probable losses.

The panel finds and concludes that Gegenheimer has failed to satisfy his burden of proof. Based on the record in this proceeding, the actual

3

EXHIBIT O

damages that would be sustained by Jefferies were inherently incapable of accurate estimation at the time the Agreement was entered into and the liquidated damages amount is reasonable in light of the anticipated probable harm.

Nonetheless, Gegenheimer also contends that the liquidated damages clause is not enforceable as to him, a resident and employee in the State of California, because the clause violates the strong fundamental public policy of the State of California codified in California Business & Professions Code Section 16600 ("Section 16600"), which provides that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

Section 16600 has been applied in many cases to nullify post-employment non-competition agreements and restrictive covenants that would keep California residents from engaging in lawful employment. However, Section V.B. of the Agreement is not a post-employment restrictive covenant. Section 16600 does not apply to an agreement to begin working by a particular date as provided in the Agreement. The Agreement did not require Gegenheimer to cease working for Credit Suisse or refrain from working for any other competitor before joining Jefferies. The liquidated damages clause in the Agreement did not restrain Gegenheimer from engaging in his profession in violation of Section 16600.

### Conclusion

Based on the record in this case, the panel finds and concludes that the liquidated damages clause in Section V.B. of the Agreement between the parties is enforceable by Jefferies against Gegenheimer.

Having decided the sole issue presented for decision, the panel will await the determination of the parties as to whether this decision fully disposes of this case or whether there is a need to schedule a further hearing in the future on a mutually agreeable date. To that end, the parties shall advise FINRA on or before February 28, 2018, as to whether a further hearing is required. If so, FINRA will assist in scheduling briefing and a hearing on the remaining issues. If the parties have not contacted FINRA on or before February 28, 2018, FINRA will consider the claims and any counterclaims in the arbitration as withdrawn and shall proceed to dismiss this case.

IT IS SO ORDERED.

4

EXHIBIT O

DATED this 29th day of January, 2018.

To expedite the transmittal of this Order to the parties, arbitrators Loo and Oakes have authorized the Panel Chair to sign this Order on their behalf.

MINNIE LOO
Arbitrator

A. JAMES OAKES
Arbitrator

LAWRENCE R. MILLS
Arbitrator

5

EXHIBIT O

# EXHIBIT P

EXHIBIT P

**Buchanan Ingersoll ⚊ Rooney** PC

Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA  19102-2555

T 215 665 8700
F 215 665 8760

www.bipc.com

**Andrew J. Shapren**
215 665 3853
andrew.shapren@bipc.com

February 2, 2018

**VIA EMAIL AND PORTAL**

Michele Collins, Case Manager
FINRA
300 South Grand Avenue
Suite 1700
Los Angeles, CA 90071-3135

      Re:    **Jefferies LLC v. Jon Alan Gegenheimer**
             **FINRA Arbitration Case Number:  16-02461**

Dear Michele:

      Pursuant to the January 29, 2018 Order of the Panel in the above-referenced matter, I write on behalf of Jefferies to request that additional hearings be scheduled in order to adjudicate the remaining outstanding issues in this case.  To that end, Jefferies requests that the Panel schedule a prehearing conference for the purpose of scheduling dates for the necessary hearings.

                Sincerely yours,

                */s/ Andrew J. Shapren*

                Andrew J. Shapren

cc:  Robert D. Goldstein, Esq.

                EXHIBIT P

# EXHIBIT Q

David Jacobs (State Bar No. 73545)
EPSTEIN BECKER & GREEN, P.C.
1925 Century Park East, Suite 500
Los Angeles, California 90067-2506
Telephone: 310.556.8861
Facsimile: 310.553.2165
djacobs@ebglaw.com

Attorneys for Petitioner
JON A. GEGENHEIMER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| JON A. GEGENHEIMER,<br><br>                    Petitioner,<br><br>          v.<br><br>JEFFERIES LLC,<br><br>                    Respondent. | CASE NO.<br><br>**NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD DATED JANUARY 29, 2018**<br><br>[FINRA Arbitration No.: 16-02461]<br><br>Arbitration Award Service Date: January 29, 2018<br><br>[Filed concurrently with: Memorandum of Law, Declaration of David Jacobs; Notice of Interested Parties; Compendium and Proposed Order]<br><br>DATE:          TBD<br>TIME:          TBD<br>DEPT:          TBD |

1

**PLEASE TAKE NOTICE** that on _____, 2018, at _____, or as soon thereafter as the matter may be heard in Department _____ of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Petitioner Jon A. Gegenheimer ("Gegenheimer" or "Petitioner") will petition the Court to Vacate the Arbitration Award pursuant to Section 10 of the Federal Arbitration Act ("FAA").

Petitioner seeks to vacate the arbitration award issued in *Jefferies LLC v. Jon A. Gegenheimer,* FINRA Case No.: 16-02461, on the grounds that the arbitrators' award exceeded their powers, (9 U.S.C. §10) by issuing an award in manifest disregard of the law.

This petition will be based on this notice of petition and petition, the concurrently filed memorandum of points and authorities, the supporting declaration of David Jacobs ("Jacobs Decl."), the exhibits, the pleadings and papers filed herein, the other written and oral evidence as may be presented at the time of the hearing, and upon all other matters as the Court may take judicial notice of and which the Court deems appropriate.

Respectfully submitted,

DATED: February 2, 2018          EPSTEIN BECKER & GREEN, P.C.

By:     */s/ David Jacobs*
        David Jacobs

        Attorneys for Petitioner
        JON A. GEGENHEIMER

Firm:45310221v1                 NOTICE OF PETITION AND PETITION TO VACATE
                                ARBITRATION AWARD
EXHIBIT Q

### PETITION TO VACATE ARBITRATION AWARD

Petitioner Jon A. Gegenheimer as and for his Petition to vacate an arbitration award entered in favor of Respondent Jefferies LLC, states as follows:

### PRELIMINARY STATEMENT

1.      This is an action to vacate an arbitration award brought pursuant to the Federal Arbitration Act, 9 U.S.C. § 10.  This Petition seeks to vacate the FINRA Arbitration Panel's January 29, 2018 Interim Final Award issued in manifest disregard of both New York and California law.  A copy of that award is attached to the Declaration of David Jacobs ("Jacobs Decl.") as Exhibit A.

### JURISDICTION

2.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the parties to this dispute are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

### THE PARTIES

3.      Petitioner Jon A. Gegenheimer ("Gegenheimer") is a resident of the state of California who resides at 60 Rausch Street, Unit 206, San Francisco, California 94103.

4.      Upon information and belief, Respondent Jefferies LLC ("Jefferies") is a Delaware Limited Liability Corporation.  Upon information and belief, Jefferies' principal place of business in 520 Madison Avenue, New York, New York 10022.

5.      Pursuant to the terms Gegenheimer's May 18, 2016 offer letter with Jefferies (the "Offer Letter") the parties agreed to arbitrate any disputes related to the Offer Letter before the Financial Industry Regulatory Authority ("FINRA").  A copy of the Offer Letter is annexed as Exhibit B to the Jacobs Decl.

### VENUE

6.      Venue is proper in this district under 9 U.S.C. § 10.  The arbitration award at issue was rendered within the Northern District of California.  Gegenheimer resides within the Northern District of California.

///

---

3

NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

## **FACTS**

7.    On May 18, 2016 Gegenheimer accepted an offer of employment to work in Jefferies' technology investment banking group in San Francisco, California by executing the Offer Letter.

8.    Section V(B) of the Offer Letter provides:

> If during the period beginning from the date you execute this Agreement until your Start Date (the "Interim Period"), you fail to commence employment by August 17, 2016, you agree to pay Jefferies $1,000,000 as liquidated damages ("Liquidated Damages"), which represent only an approximation of a portion of the anticipated loss created by such a violation. For the avoidance of doubt, this Liquidated Damages provision is applicable only if you voluntarily fail to commence employment with Jefferies (except as a result of Jefferies' written withdrawal of this offer): (a) because you return as an employee of Credit Suisse or (b) to engage in Competitive Activity (as defined in the Jefferies Employee Handbook). You agree the Liquidated Damages are reasonable and do not operate as a penalty, but reflect Jefferies' reasonable approximation of a portion of its anticipated loss as a result of Jefferies' reliance on your commitment to render services pursuant to this Agreement by your Start Date, Jefferies' forbearance in holding the position of Managing Director in its Investment Banking Division open for you and not hiring another individual for this position during the Interim Period, and all costs incurred by Jefferies to fill the Investment Banking Division Managing Director position. Nothing in this section shall prevent Jefferies from recovering its actual damages exceeding the Liquidated Damages, and Jefferies shall have the right to avail itself of all other available remedies.

9.    On May 24, 2016 Gegenheimer informed Jefferies that he had changed his mind and intended to continue his employment with current employer, Credit Suisse Securities (USA) LLC.

10.    On August 19, 2016 Jefferies filed a Statement of Claim in FINRA seeking to enforce the terms of Section V(B) of the Offer Letter.  A copy of Jefferies' statement of claim is annexed as Exhibit C to the Jacobs Decl.

11.    On October 19, 2016 Gegenheimer filed an Answer and Counterclaim to Jefferies' Statement of Claim.  Among the defenses Gegenheimer asserted in his Answer and

Firm:45310221v1                    NOTICE OF PETITION AND PETITION TO VACATE
ARBITRATION AWARD
EXHIBIT Q

Counterclaim were that Paragraph V(B) of the Offer Letter (a) constituted an unlawful and unenforceable restraint on Gegenheimer's right to engage in a lawful profession, trade, or business in violation of California Business and Professional Code § 16600; and (b) was an illegal and unenforceable penalty. A copy of Gegenheimer's Answer to Jefferies' Statement of Claim is annexed as Exhibit D to the Jacobs Decl.

12. On November 8, 2016 Jefferies filed its Answer to Gegenheimer's Counterclaims. A copy of Jefferies' Answer to Gegenheimer's Counterclaims is annexed as Exhibit F to the Jacobs Decl.

13. On November 21, 2016 FINRA's Director of Dispute Resolution issued an Order denying Jefferies' request to transfer venue from California to New York. A copy of the November 21, 2016 Order is annexed as Exhibit G to the Jacobs Decl.

14. On December 20, 2017 the Arbitration Panel issued an Order bifurcating the arbitration proceeding. Pursuant to the Order "the sole issue to be adjudicated by the Panel in the first part of the hearing shall be whether the liquidated damages clause in the agreement at issue is enforceable or unenforceable." A copy of the December 20, 2017 Order is annexed as Exhibit H to the Jacobs Decl.

15. On January 24, 2018 the Arbitration Panel heard oral argument on the issue of whether Section V(B) of the Offer Letter was enforceable.

16. On January 29, 2018 the Arbitration Panel issued an Interim Final Award finding that Section V(B) of the Offer Letter was legally enforceable. A copy of the January 29, 2018 Interim Final Award is annexed as Exhibit A to the Jacobs Decl.

## THE INTERIM FINAL AWARD MANIFESTLY DISREGARDS CALIFORNIA BUSINESS AND PROFESSIONAL CODE § 16600

17. The Interim Final Award correctly quotes Section 16600's language that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

18. Despite recognizing that (a) Gegenheimer is entitled to the protections of Section 16600; and (b) Section 16600 voids "every contract by which anyone is restrained from engaging

5

NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

in a lawful profession" the Interim Final Award finds that Section 16600 "does not apply" to the Offer Letter.

19.     The Interim Final Award recognizes that Section 16600 is applicable law, and proceeds to ignore Section 16600 on the grounds that Section V(B) of the Offer Letter and the restrictive covenant therein "is not a post-employment restrictive covenant" when the law is clear that 16600 is not limited to post employment.

20.     The Interim Final Award also applies New York law to the contract contrary to clear California law that the law of non-California jurisdiction may not be used to enforce a restrictive covenant on a California employee.

## THE INTERIM FINAL AWARD MANIFESTLY DISREGARDS NEW YORK CONTRACT LAW

21.     The Interim Final Award, which purports to apply New York law, was issued in manifest disregard of the rule that "liquidated damages and actual damages are mutually exclusive remedies under New York law."  Trilegiant Corp. v. Sitel Corp., 09 Civ. 6492 (KBF), 2013 U.S. Dist. LEXIS 72828 at *20 (S.D.N.Y. May 20, 2013); see also Agerbrink v. Model Serv. LLC, 196 F. Supp. 3d 412, 417-18 (S.D.N.Y. 2016) citing Jarro Bldg. Indus. Corp. v. Schwartz, 54 Misc.2d 13, 281 N.Y.S.2d 420, 420 (2d Dep't 1967) (holding that a clause which "operates to give appellant a minimum recovery regardless of actual damages and also affords him the option to disregard the liquidated damages specified if the actual damages exceed the amount stipulated" was invalid as a penalty); Stock Shop v. Bozell & Jacobs, 126 Misc.2d 95, 481 N.Y.S.2d 269 (Sup. Ct. N.Y. Cty. 1984) ("[t]here is, therefore, no true liquidation of damages since the plaintiff is given the option to disregard the liquidated sum and sue for actual damages.  Such a clause is invalid.").

22.     The Arbitration Panel was made fully aware of New York's prohibition on liquidated damages clauses (such as Section V(B) of the Offer Letter) which allow the non-breaching party to elect whether to collect actual damages or the liquidated damages amount. The relevant authority was cited in Gegenheimer's pre-hearing briefs and multiple times during the course of oral argument.  In response to an arbitrator's question, Gegenheimer's counsel

6

identified the specific pages of Gegenheimer's pre-hearing brief discussing this area of New York law.

23.     Jefferies presented no cases or authority on which the Arbitration Panel could rely contradicting the proposition that where a contract clause purports to provide the non-breaching party the option of either liquidated damages or consequential damages, the liquidated damages clause is void and unenforceable.

24.     The Arbitration Panel decided that New York contract law applied to the agreement, and proceeded to ignore New York law under which the liquidated damages provision is unenforceable.

**WHEREFORE**, Petitioner respectfully requests that this Court vacate the Interim Final Award in this matter and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED:   February 2, 2018              EPSTEIN BECKER & GREEN, P.C.

By:   _/s/ David Jacobs_
      David Jacobs

      Attorneys for Petitioner
      JON A. GEGENHEIMER

7

NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

1   David Jacobs (State Bar No. 73545)
    EPSTEIN BECKER & GREEN, P.C.
2   1925 Century Park East, Suite 500
    Los Angeles, California 90067-2506
3   Telephone:  310.556.8861
    Facsimile:  310.553.2165
4   djacobs@ebglaw.com
5
    Attorneys for Petitioner
6   JON A. GEGENHEIMER
7
8               UNITED STATES DISTRICT COURT
9              NORTHERN DISTRICT OF CALIFORNIA
10                  SAN FRANCISCO DIVISION
11

| | |
|---|---|
| 12  JON A. GEGENHEIMER, | CASE NO. |
| 13             Petitioner, | **MEMORANDUM OF LAW IN SUPPORT OF PETITION TO VACATE ARBITRATION AWARD DATED JANUARY 29, 2018** |
| 14             v. | |
| 15 | [FINRA Arbitration No.: 16-02461] |
| 16  JEFFERIES LLC, | |
| 17             Respondent. | Arbitration Award Service Date: January 29, 2018 |
| 18 | [Filed concurrently with: Notice of Petition and Petition to Vacate, Declaration of David Jacobs; Notice of Interested Parties; Compendium and Proposed Order] |
| 19 | |
| 20 | |
| 21 | DATE:           TBD |
| 22 | TIME:           TBD<br>DEPT:           TBD |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

1

1

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ...........................................................................6

II.   BACKGROUND FACTS ...................................................................................8

      A.    Jefferies' Offer of Employment .................................................8

      B.    Relevant Provisions in Jefferies' Offer Letter ....................................10

      C.    Gegenheimer's Decision to Remain Employed By Credit Suisse ......................12

      D.    Jefferies Commences The FINRA Arbitration ...................................12

      E.    The FINRA Hearing .............................................................13

      F.    The Panel's January 29, 2018 Award ..........................................14

III.  ARGUMENT .....................................................................................14

      A.    The Award Is A Final Determination Of The Panel That Is Subject
            To Review For Manifest Disregard Of The Law ...............................14

            1.    Standard of Review Under the FAA ....................................14

            2.    The Award is a Final Interim Award Subject to Review
                  under the FAA ..........................................................15

      B.    The Panel's Decision Was In Manifest Disregard Of California Law
            By Enforcing A New York Choice Of Law Provision That Deprived
            Gegenheimer Of His Rights Under Section 16600 And California
            Public Policy ...................................................................16

      C.    The Panel's Award Was In Manifest Disregard Of New York Law
            By Enforcing A Liquidated Damages Provision Which Also Reserves
            The Right To Seek Actual Damages ...........................................22

IV.   CONCLUSION ..................................................................................26

2

1

2
# TABLE OF AUTHORITIES

3
**Page(s)**

4
**Federal Cases**

5
6
*Agerbrink v. Model Service LLC*,
196 F. Supp. 3d 412 (S.D.N.Y. 2016)..............................................................22, 24

7
*Application Grp., Inc. v. Hunter Grp., Inc.*,
8
61 Cal.App.4th 881, 897 (1998) ............................................................................ 20

9
*Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. Co.*,
630 F. Supp. 2d 1084, 108891 (N.D. Cal. 2009) .................................................. 20

10
*Beneficial Life Ins. Co. v. Knobelauch*,
11
653 F.2d 393, 395-96 (9th Cir. 1981) ............................................................. 18, 19

12
*Collins v. DR Horton*,
13
505 F.3d 874 (9th Cir. 2007) ......................................................................... 15, 23

14
*Comedy Club, Inc. v. Improv West Associates*,
15
553 F. 3d 1277 (9th Cir. 2009) ...................................................................... 18, 19

16
*Gatsinaris v. ART Corp. Sols., Inc.*,
No. SACV 15-0741-DOC, 2015 U.S. Dist. LEXIS 90086, at *29
17
(C.D. Cal. July 10, 2015) .................................................................................... 21

18
*Golden v. California Emergency Physicians Med. Grp.*,
19
782 F.3d 1083 (9th Cir. 2015) ....................................................................... 18, 19

20
*Hart Surgical, Inc. v. Ultracision, Inc.*,
21
244 F.3d 231 (1st Cir. 2001)................................................................................... 5

22
*Immersion Corporation v. Sony Computer Entertainment America LLC*,
No. 16-cv-00857-RMW (N.D. Cal. Apr. 19, 2016)............................................... 18

23
*In Re First Union Baptist Church of Bronx*,
24
No. 12-14099 (MEW) (Bankr. S.D.N.Y. Aug. 4, 2017)........................................ 25

25
*Metallgesellschaft A.G. v. MIV Capitan Constante*,
26
790 F .2d 280, 283 (2d Cir.1986)........................................................................... 15

27
*New United Motor Mfg., Inc. v. United Auto Workers Local*,
617 F. Supp.2d 948 (N.D. Cal. 2008) .................................................................... 15

28

3

*O. P. M. Leasing Servs., Inc.*,
   23 B.R. 104, 112 (Bankr. S.D.N.Y. 1982) ......................................................... 25

*Pac. Reins. Mgmt. Corp. v. Ohio Reins. Corp.*,
   935 F.2d 1019 (9th Cir. 1991) ......................................................................... 15

*San Martine Compania De Navegacion*,
   293 F.2d 796, 801 (9th Circ. 1961) ................................................................. 15

*Scott v. Snelling & Snelling*,
   732 F. Supp. 1034, 1042 (N.D. Cal. 1990) ................................................. 16, 21

SG Cowen Sec. Corp. v. Messih, No. 00-Civ-3328,
   2000 U.S. Dist. LEXIS 6697, at *11-12 (S.D.N.Y. May, 17, 2000) ..................... 22

*Stryker Sales Corp. v. Zimmer Biomet, Inc.*,
   231 F. Supp. 3d 606 (E.D. Cal. 2017) ............................................................... 21

*TGG Ultimate Holdings, Inc. v. Hollett*,
   224 F. Supp. 3d 275, 281-83 (S.D.N.Y. 2016) .................................................. 22

*U.S. Fidelity & Guar. Co. v. Braspetro Oil Services, Co.*,
   369 F.3d 34 (2004) ..................................................................................... 23, 25

*XLO Concrete Corp. v. John T. Brady & Co.*,
   482 N.Y.S. 2d 476, 479 (N.Y. App. Div. 1984) ................................................. 26

**State Cases**

*Chamberlain v. Augustine*,
   172 Cal. 285, 287-288 (1916) .......................................................................... 16

*Chateau D'If Corp. v. City of New York*,
   219 A.D. 2d 205 (N.Y. App. Div. 1st Dep't. 1996) ............................................ 24

*Edwards v. Arthur Andersen*,
   44 Cal.4th 937, 948 (2008) .............................................................................. 15

*Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   20 Cal.App.3d 668, 672 (1971) ........................................................................ 21

*Jarro Bldg. Indus. Corp. v. Schwartz*,
   54 Misc. 2d 13 (2d Dep't 1967) ............................................................ 24, 25, 26

*Metro Traffic Control, Inc. v. Shadow Traffic Network*
   22 Cal.App.4th 853, 859 (1994) ....................................................................... 15

4

*Morlife, Inc. v. Perry*,
    56 Cal.App.4th 1514, 1520 (1997) .................................................... 16

*Muggill v. Reuben H. Donnelley Corp.*,
    62 Cal.2d 239, 242 (1965) ..................................................... 16, 19

*South Bay Radiology Medical Associates v. Asher*,
    220 Cal. App. 3d 1074 (1990) ....................................................... 18

*Stock Shop v. Bozell & Jacobs*, Inc.,
    126 Misc. 2d 95 (Sup. Ct. N.Y. Cty. 1984) ............................... 23, 24

*Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.,*
    393 N.Y.S. 2d 365 (App. Ct. 1977) ............................................. 24

*Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    24 Cal.App.3d 35, 41-42 (1972) ............................................. 18, 19

*X.L.O Concrete Corp. v. John T. Brady & Co.*,
    482 N.Y.S. 2d 476 (N.Y. App. Div. 1984) ................................... 25


**Federal Statutes**

9 U.S.C.
    Section 10(d) ............................................................................... 15

Federal Arbitration Act,
    9 U.S.C. Section 10 ............................................................. 5, 13, 14

**California Statutes**

California Business & Professions Code
    Section 16601 ............................................................................ 15
    Section  16600 .......................................................................*passim*

**Other Authorities**

FINRA
    Rule 2010 .................................................................................. 11
    Rule 13213 ................................................................................ 11

Firm:45347325v1

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

1   Petitioner Jon Gegenheimer ("Gegenheimer" or "Petitioner"), by his attorneys Epstein
2   Becker & Green, P.C., respectfully submits this memorandum of law in support of his Petition to
3   vacate an interim final arbitration award pursuant to the Federal Arbitration Act ("the FAA"), 9
4   U.S.C. § 10.

5   ## I.   PRELIMINARY STATEMENT

6   Gegenheimer seeks to vacate a January 29, 2018 award (the "Award") issued in an
7   arbitration proceeding conducted in San Francisco, California pursuant to the Financial Industry
8   Regulatory Authority ("FINRA") dispute resolution process because it is in manifest disregard of
9   both California and New York law.[1]   The Award ignores California statutory law and strong
10  policy against restrictive covenants not to compete by determining that Gegenheimer, a
11  California resident, must pay $1 million in liquidated damages for failing to commence
12  employment with Respondent Jefferies, LLC. ("Jefferies") and remaining with his current
13  employer, Credit Suisse. Furthermore, the Award disregards New York law that states a
14  liquidated damages provision that also allows for the recovery actual damages is unenforceable.
15  Because of the Award's manifest disregard of the law, it should be vacated.

16  Jefferies commenced the FINRA arbitration against Gegenheimer seeking to enforce a
17  liquidated damages provision in Jefferies' May 18, 2016 offer letter ("Offer Letter") to
18  Gegenheimer. (Exhibit B.)  Gegenheimer was employed by Credit Suisse in its San Francisco
19  office at the time he received and executed the Offer Letter. The liquidation damages provision
20  provided that if Gegenheimer did not commence employment with Jefferies by August 17, 2016
21  because he decided to remain with Credit Suisse or because he accepted employment with one of
22  Jefferies' competitors, he would have to pay Jefferies $1 million. Jefferies signed the Offer
23  Letter on May 18, 2016.  Thus, the liquidated damages provision operated as a restraint on
24  Gegenheimer's professional mobility between May 18, 2016 and August 17, 2016.

25
26
27
---
28  [1] Gegenheimer is an Associated Person under FINRA rules and Jefferies is a FINRA Member
    firm, which requires them to resolve all disputes pursuant to FINRA's arbitration process.

Firm:45347325v1                          MEMORANDUM OF LAW IN SUPPORT OF
              NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD
EXHIBIT Q

On May 24, 2016, Gegenheimer determined that he wanted to remain employed by Credit Suisse and informed Jefferies of his decision. As a result, Jefferies commenced the FINRA arbitration against Gegenheimer seeking $1 million in liquidated damages.

Gegenheimer and Jefferies recognized that the enforceability of the liquidated damages provision was determinative of Jefferies' claims and agreed to bifurcate the arbitration to have the FINRA panel first determine the validity of the provision. After the parties briefed the issue and appeared for oral argument on January 24, 2018, the FINRA panel issued an interim final award which found that: (1) the enforceability of the liquidated damages provision should be determined under New York law, and (2) under New York law, the liquidated damages provision was enforceable. (Exhibit A.) The Award also erroneously determined that section 16600 of the California Business & Professions Code ("Section 16600") applies only to post-employment restrictive covenants and not to pre-hire restraints.

Gegenheimer seeks an order vacating the Award because it violates Section 16600 by imposing an unlawful restraint on Gegenheimer's right to pursue the employment of his choice. The Award manifestly disregards Section 16600's protections against non-compete agreements based on the faulty premise that it applies only to post-employment restrictions. As a matter of law, Section 16600 applies to any agreements restraining competition, not only post-employment restrictions. Moreover, the Award manifestly disregards California's strong public policy and statutory prohibition against employment agreements that impose restraints on California residents' freedom to pursue their lawful professions. Gegenheimer has, at all relevant times, been a San Francisco resident who worked in Credit Suisse's San Francisco office, met with Jefferies in San Francisco, signed the Offer Letter in San Francisco, and would have worked out of Jefferies' San Francisco office. As a California citizen, he has the right, as a matter of law, to pursue any employment opportunities without fear of a massive financial penalty. Pursuant to the Arbitrators' ruling, the Offer Letter prohibited him from seeking any employment opportunities in his industry -- other than for Jefferies -- from the day he signed the Offer Letter until his employment with Jefferies was to begin, unless he paid a penalty of $1 million. This is contrary to the well-established California law.

The Award also allowed Jefferies to bypass California law altogether by applying New York law, pursuant to a choice of law provision in the Offer Letter, to determine the enforceability of the liquidated damages clause. In other words, the Award provides out-of-state employers with a roadmap to evade California's prohibition on covenants not to compete. Pursuant to the Award's reasoning, an out-of-state employer merely has to (a) include a choice of law provision in employment agreements with California citizens designating the laws of a state that permits restraints on employee mobility; and (b) ensure its California employees comply with the restraint by imposing a massive financial penalty if the employee accepts employment with another employer.

The Award also manifestly disregards New York law in determining the enforceability of the liquidated damages provision. Under longstanding New York law, a liquidated damages provision that also permits the recovery of actual damages is an unenforceable penalty. Jefferies' liquidated damages provision expressly permits Jefferies to seek actual damages in addition to the $1 million liquidated damages, rendering it unenforceable under New York law. The Panel was made aware of this legal principle on multiple occasions, but chose to ignore it by declaring the liquidated damages provision enforceable under New York law.

For these reasons, and those stated below, the Court should vacate the Award.

## II. BACKGROUND FACTS

### A. Jefferies' Offer of Employment

The parties do not dispute the basic, material facts in this matter.[2] Gegenheimer has, at all relevant times, lived and worked in California. He has been employed by Credit Suisse since 2003 and currently serves as a Managing Director in Credit Suisse's M&A Group. In that capacity, he provides services to the Investment Banking & Capital Markets Division (the "Tech Group") based in San Francisco, California. (Exhibit D ¶ 47.) Credit Suisse is a global financial services company, advising clients in all aspects of finance.

---

[2] The background facts are set forth in the parties' respective pleadings. Jefferies' Statement of Claim is annexed hereto as Exhibit C. Gegenheimer's Answer with Counterclaims is annexed hereto as Exhibit D.

Firm:45347325v1

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

Jefferies is an investment banking firm. On May 18, 2016, when Gegenheimer was a Director in the Tech Group, he accepted an offer of employment from Jefferies to work in its competing West Coast Technology Group based in San Francisco.

Jefferies' offer to Gegenheimer was made in conjunction with its orchestrated raid of Credit Suisse's Tech Group by hiring five Managing Directors -- Stephen West, William Brady, Cameron Lester, John Metz and Charles Davis (collectively, the "Former Credit Suisse Employees") -- with whom Gegenheimer worked. (Exhibit B ¶ 15.) The Former Credit Suisse Employees, who were responsible for a substantial portion of the Tech Group's business, collectively resigned from Credit Suisse on May 17, 2016. (Exhibit D ¶ 53-54.)

Although Gegenheimer had been in discussions with Jefferies about potential employment prior to the en masse resignations of the Former Credit Suisse Employees, Jefferies did not present him with the Offer Letter until the day after the Former Credit Suisse Employees announced their resignations. (Exhibit D ¶ 50-51.) On May 18, 2016, Jefferies called Gegenheimer to its San Francisco office, where he was put in an empty conference room with only a telephone and the Offer Letter. Gegenheimer had never seen the Offer Letter prior to that time; and it contained numerous terms that he had never previously discussed with Jefferies, including the $1 million liquidated damages provision.

Sitting alone in Jefferies' conference room, Gegenheimer called Christopher Kanoff, Jefferies' Executive Vice President and Co-Head of Investment Banking, to discuss the Offer Letter. Kanoff told him, in no uncertain terms, that the Offer Letter was not negotiable. During the January 24, 2018 oral argument before the Panel, Jefferies' counsel conceded that the terms of the liquidated damages provision were non-negotiable.[3] (Jacobs Decl. ¶ 16) Gegenheimer was also informed that he had to sign the Offer Letter that day, otherwise it would be revoked. This tactic, which Jefferies referred to as the "CONE,"[4] was used to isolate Gegenheimer and

---

[3] The only change to the Offer Letter was a correction on page 2 which corrected an erroneous figure.

[4] CONE is a reference to the "Cone of Silence" from the old television series Get Smart.

Firm:45347325v1

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

1  coerce him into signing the Offer Letter before he had a reasonable opportunity to review and

2  consider its terms. (Exhibit I at 2-3).[5]

3      Faced with intense pressure from Jefferies, as well as Gegenheimer's understandable

4  concerns regarding his professional future given the resignations of the Former Credit Suisse

5  Employees, Gegenheimer signed the Offer Letter on May 18, 2016 while sitting alone in

6  Jefferies' empty conference room. (*Id.*, Attachment B ¶¶ 50-51). Although Gegenheimer signed

7  the Offer Letter on May 18, 2016, it stated that Gegenheimer's employment with Jefferies would

8  not commence until August 17, 2016 because Gegenheimer was required to provide Credit

9  Suisse with ninety (90) days' prior written notice of his intention to resign. During that ninety

10  day notice period (often referred to as a "Garden Leave"), Gegenheimer would remain a Credit

11  Suisse employee.

12      **B.    Relevant Provisions in Jefferies' Offer Letter**

13      The provision at issue in the FINRA arbitration was Section V(B) of Jefferies' Offer

14  Letter. That Section required Gegenheimer to pay the sum of $1 million in liquidated damages

15  to Jefferies if he failed to commence employment with Jefferies on August 17, 2016 because he

16  decided to remain employed by Credit Suisse or accepted employment with a Jefferies

17  competitor during the Garden Leave period. (the "Restrictive Covenant LD Provision"). The

18  Restrictive Covenant LD Provision provides that:

19          If during the period beginning from the date you execute this
20          Agreement until your Start Date (the "Interim Period"), you fail to
           commence employment by August 17, 2016, you agree to pay
21          Jefferies $1,000,000 as liquidated damages ("Liquidated
           Damages"), which represent only an approximation of a portion of
22          the anticipated loss created by such a violation. **For the avoidance
           of doubt, this Liquidated Damages provision is applicable only
23          if you voluntarily fail to commence employment with Jefferies
           (except as a result of Jefferies' written withdrawal of this
24          offer): (a) because you return as an employee of Credit Suisse
25          or (b) to engage in Competitive Activity (as defined in the**

26  ───────────────────────────
    [5] The documents in the Exhibits supporting the parties' arguments are confidential and subject to
27  a protective order and, consequently, not being produced in support of this petition, but in any
    event, the documents are not necessary for the Court's legal determination as to whether the
28  Panel evinced a manifest disregard for the law, as is demonstrated below.

Firm:45347325v1                          MEMORANDUM OF LAW IN SUPPORT OF
               NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

1
2
3
4
5
6
7
8

> **Jefferies Employee Handbook**). You agree the Liquidated Damages are reasonable and do not operate as a penalty, but reflect Jefferies' reasonable approximation of a portion of its anticipated loss as a result of Jefferies' reliance on your commitment to render services pursuant to this Agreement by your Start Date, Jefferies' forbearance in holding the position of Managing Director in its Investment Banking Division open for you and not hiring another individual for this position during the Interim Period, and all costs incurred by Jefferies to fill the Investment Banking Division Managing Director position. *Nothing in this section shall prevent Jefferies from recovering its actual damages exceeding the Liquidated Damages, and Jefferies shall have the right to avail itself of all other available remedies.*

9
10

(Exhibit B, section V(B) at p. 4) (emphasis added.)

11
12
13
14
15
16
17

The Restrictive Covenant LD Provision applied only if Gegenheimer chose to return to Credit Suisse or accepted employment with a Jefferies competitor prior to the commencement of his employment with Jefferies on August 17, 2016. Once Gegenheimer became employed by Jefferies, the Restrictive Covenant LD Provision no longer applied; instead, the Offer Letter imposed a different, but equally oppressive provision that required Gegenheimer to provide Jefferies with 365-days' prior written notice if he intended to resign from Jefferies at any time in 2017. Section III(B) is essentially a one-year non-competition provision and provides that:

18
19
20
21
22
23
24
25
26
27

> Through 2017, you are required to provide Jefferies with 365 days' written notice of your intention to terminate your employment (the "Notice Period"). Thereafter, you are required to provide Jefferies with 135 days written notice of your intention to terminate your employment (the "Notice Period"). During the Notice Period, you will continue to receive your salary payments at the rate then in effect, but not any bonus, at the regular payroll dates, your fiduciary duties and your obligations to Jefferies as an employee of Jefferies will continue, and you will cooperate in the transition of your responsibilities. Jefferies shall have the right, in its sole discretion, to direct that you no longer come in to the office during the Notice Period or to shorten the Notice Period. In determining whether to exercise this right, Jefferies will act solely in its own best interests, and under no circumstances will it take into consideration any request by you that Jefferies direct you to cease coming into the office or shorten the Notice Period.

28

Firm:45347325v1                   MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

(Exhibit B, section III(B) at p. 3.)

## C.    Gegenheimer's Decision to Remain Employed By Credit Suisse

Over the course of the six (6) days after Gegenheimer signed the Offer Letter, when Gegenheimer had the time to actually consider Jefferies' offer, he became increasingly concerned about Jefferies' conduct, including its orchestrated raid of Credit Suisse's Tech Group.  As a result, he decided that he did not wish to participate in that conduct or be associated with Jefferies.  (Exhibit D ¶ 52-54.)  On May 24, 2016, less than a week after Gegenheimer signed the Offer Letter, he notified Jefferies of his decision to remain employed by Credit Suisse. (Exhibit D ¶ 55.)

## D.    Jefferies Commences The FINRA Arbitration

Jefferies commenced the FINRA arbitration on August 19, 2016, asserting a single claim against Gegenheimer for breaching the Offer Letter. (Exhibit C.)  Jefferies sought $1 million in damages pursuant to the Restrictive Covenant LD Provision.  In its Statement of Claim, Jefferies sought to justify the $1 million liquidated damages by alleging that Gegenheimer's decision against joining Jefferies, which was made just six days after Gegenheimer signed the Offer Letter, would cause Jefferies to suffer significant damages due to the time and expense of finding a replacement.  (Exhibit C ¶ 23.)

When Jefferies commenced this arbitration, it filed its Statement of Claim in FINRA's New York office and designated New York as the appropriate hearing location.  However, shortly after the FINRA arbitration commenced, FINRA transferred the arbitration to San Francisco pursuant to FINRA Rule 13213, which provides that the venue for arbitrations involving employment disputes between a member firm and an associated person is generally the location closest to where the associated person was employed when the dispute arose.

Gegenheimer's Answer denied Jefferies' material allegations and asserted counterclaims against Jefferies for violating FINRA Rule 2010, engaging in unfair competition and engaging in abuse of process based on Jefferies' unlawful use of the $1 million liquidated damages provision as a pretext for its true purpose of threatening Gegenheimer with an unconscionable financial penalty if Gegenheimer decided against commencing employment with Jefferies.  (Exhibit D ¶¶

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD
EXHIBIT Q

58-76.) Gegenheimer also alleged that he was coerced into signing the Offer Letter as a result of Jefferies' use of strong-arm tactics, including its use of the CONE strategy of isolating Gegenheimer, telling him the Offer Letter was not negotiable and insisting that Gegenheimer had to sign the Offer Letter without allowing him sufficient time to review the agreement in detail. (Exhibit I at 2-3; see also Exhibit D ¶¶ 49-51).

On November 1, 2016, Jefferies filed a motion to transfer the hearing location for this matter from California to New York based on the New York venue provision in the offer letter. (Exhibit E). On November 22, 2016, FINRA denied Jefferies' motion and refused to enforce the New York venue provision in the Offer Letter. (Exhibit G).

**E.      The FINRA Hearing**

The hearing on Jefferies' claim and Gegenheimer's counterclaims was initially scheduled to take place in San Francisco, California from January 23 through 26, 2018. After the parties completed document discovery, they agreed that the enforceability of Restrictive Covenant LD Provision was a threshold legal issue that should be resolved prior to the arbitration. Accordingly, the parties jointly requested permission from the Panel to submit briefs on this issue. On December 21, 2017, the Panel granted that request. (Exhibit H.) The parties simultaneously submitted Opening Briefs on January 3, 2018 and Responsive Briefs on January 15, 2018. (Exhibits I, J, K, L.)

On January 24, 2018, the parties appeared before the Panel to present oral argument. During the hearing, the Chairman of the Panel stated that the sole purpose of the hearing was to make a final determination regarding the legal enforceability of the Restrictive Covenant LD Provision. The parties also argued their respective positions regarding the enforceability of the Offer Letter's New York choice of law provision. (January 31, 2018 Declaration of David Jacobs ("Jacobs Dec."), ¶ 3.)

Gegenheimer argued that under California law, the New York choice of law provision was unenforceable because it deprived Gegenheimer of his statutory rights under Section 16600. (Jacobs Dec. ¶ 4.) Jefferies, on the other hand, argued that the Panel should enforce the New York choice of law provision and find the Restrictive Covenant LD Provision enforceable under

New York law. Jefferies also argued that if California law applied, the Restrictive Covenant LD Provision would not violate Section 16600 because that statute did not apply to restraints on mobility prior to the commencement of employment.

Gegenheimer's counsel also expressly raised the fact that the Restrictive Covenant LD Provision was invalid under New York law because it reserved the option for Jefferies to seek actual damages in addition to the $1 million in liquidated damages. (Jacobs Dec. ¶ 6.) Jefferies responded to that argument by stating that Jefferies has never sought actual damages in addition to liquidated damages. The Panel Chairman asked whether there was case law regarding the New York rule. In response, Gegenheimer's counsel pointed out the numerous New York cases cited in Gegenheimer's Responsive Brief supporting Gegenheimer's position. (Jacobs Dec. ¶ 5.)

**F.    The Panel's January 29, 2018 Award**

On January 29, 2018, the Panel issued the Award finding that that New York law applied to the Offer Letter; and, under New York law, the Restrictive Covenant LD Provision was enforceable. (Exhibit A.) The Panel rejected the California law cited by Gegenheimer and found that, even if California law applied, the Restrictive Covenant LD Provision did not violate Section 16600 because that statute only applies to post-employment restrictions.

The Panel recognized that its determination regarding the enforceability of Restrictive Covenant LD Provision effectively resolved the primary issues in the arbitration (other than Jefferies' request for attorneys' fees.) Accordingly, the Award instructed that the arbitration would be deemed closed unless the parties requested further proceedings.

**III.    ARGUMENT**

**A.    The Award Is A Final Determination Of The Panel That Is Subject To Review For Manifest Disregard Of The Law**

**1.    Standard of Review Under the FAA**

Under the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 10, a district court may vacate an arbitration award:

(1) where the award was procured by corruption, fraud or undue means;
(2) where there was evident partiality or corruption on the part of the

14

arbitrators; (3) where the arbitrators were guilty of misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

The Ninth Circuit has adopted a "manifest disregard of the law" standard under which a procedurally proper arbitration award may be vacated. To demonstrate manifest disregard, the moving party must show that the arbitrator "underst[oo]d and correctly state[d] the law, but proceed[ed] to disregard the same." *San Martine Compania De Navegacion*, 293 F.2d 796, 801 (9th Circ. 1961).

In *Collins v. DR Horton*, 505 F.3d 874 (9th Cir. 2007), the Ninth Circuit recognized that "federal courts of appeals have repeatedly held [that] 'manifest disregard of the law' means something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law. It must be clear from the record that the arbitrators recognized the applicable law and then ignored it." *Id.* at 879-80. Moreover, to rise to the level of manifest disregard "[t]he governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable." *Id.* (emphasis added).

Under that standard, the Award is in manifest disregard of both California law and New York law and should be vacated in its entirety.

## 2. The Award is a Final Interim Award Subject to Review under the FAA

The Award is ripe for review by the Court because it constitutes the FINRA Panel's final determination of a fundamental issue that the parties agreed to submit to the Panel. *Pac. Reins. Mgmt. Corp. v. Ohio Reins. Corp.,* 935 F.2d 1019, 1022-23 (9th Cir. 1991) (interlocutory arbitration order was subject to district court review); *New United Motor Mfg., Inc. v. United Auto Workers Local*, 617 F. Supp.2d 948, 954 (N.D. Cal. 2008) (finding that an arbitration award regarding liability only was final, in part, where "[t]here [was] no evidence that either party believed that either the parties or the Arbitrator would be able to reopen or revisit the liability phase once [the arbitrator] issued his award."). *See also Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 235 (1st Cir. 2001) (where parties agreed to bifurcate the issues of liability and

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD
EXHIBIT Q

damages, the arbitrator's ruling on liability was a "final" partial award that was subject to district court review); *Metallgesellschaft A.G. v. MIV Capitan Constante,* 790 F .2d 280, 283 (2d Cir.1986) (award that finally and definitely disposed of a separate, independent claim could be confirmed even though it did not dispose of all claims that were submitted to arbitration).[6]

### B. The Panel's Decision Was In Manifest Disregard Of California Law By Enforcing A New York Choice Of Law Provision That Deprived Gegenheimer Of His Rights Under Section 16600 And California Public Policy

The Panel determined that the Restrictive Covenant LD Provision was an enforceable obligation by applying New York law, despite the fact that Gegenheimer lived and worked in California at all relevant times, met with Jefferies in California to discuss employment, signed the Offer Letter in California and was expected to work in Jefferies' San Francisco office. By applying New York law to determine the enforceability of the Restive Covenant LD provision, the Panel improperly deprived Gegenheimer of his fundamental rights under California law and enforced an illegal restraint that violates Section 16600, which provides that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." *Cal.Bus.&.Prof.Code* §16600.

Employers may not lawfully include covenants not to compete in agreements with their employees. *Edwards v. Arthur Andersen*, 44 Cal.4th 937, 948 (2008). Section 16600 reflects "an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice. *Id*. at 946; *Metro Traffic Control, Inc. v. Shadow Traffic Network,* 22 Cal.App.4th 853, 859 (1994). Noncompetition agreements are invalid, even if narrowly drawn, unless they fall within the applicable statutory exceptions (which are not in issue in our case).[7] *Edwards*, 44 Cal.4th at 955.

---

[6] If the Court determines that the Award is not final under 9 U.S.C. § 10(d), Gegenheimer respectfully requests that the Petition be stayed pending the completion of any further matters in the FINRA arbitration.

[7] The exceptions in which non-compete agreements are lawful concern the sale of the goodwill of a business (Section 16601 of the Business & Professions Code); the dissolution or

Firm:45347325v1

MEMORANDUM OF LAW IN SUPPORT OF NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

California courts have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat. *Scott v. Snelling & Snelling*, 732 F. Supp. 1034, 1042 (N.D. Cal. 1990); *Edwards*, 44 Cal.4th at 955. The law protects Californians and ensures "that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice." Section 16600 protects "the important legal right of persons to engage in businesses and occupations of their choosing." *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1520 (1997).

Section 16600 invalidates provisions in employment contracts prohibiting an employee from working for a competitor or imposing a penalty if he does so. *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal.2d 239, 242 (1965). Indeed, employment agreements that seek to recover liquidated damages if an individual moves to a competitor have been held to be unenforceable. *Chamberlain v. Augustine*, 172 Cal. 285, 287-288 (1916). In *Chamberlain*, the defendant had a business relationship with the plaintiff. The parties entered into an agreement that provided that the defendant could not enter into a business arrangement with any other entity for a three-year period unless he paid the plaintiff $5,000 in liquidated damages. The defendant, within the three-year period, entered into an agreement with a competitor of the plaintiff, and the plaintiff brought an action to recover the $5,000 in liquidated damages. The Court, however, held that the liquidated damages provision was a restraint on competition and was unenforceable.

> It will be observed that [the defendant's] covenant with respect to liquidated damages is not expressly cast in a negative form, and because of this, it is insisted by [the plaintiff] that it is not a contract restraining [the defendant] from exercising a lawful business, but is merely an agreement that if he did engage in such business he would pay the sum of five thousand dollars in liquidated damages, and that the contract does not, therefore, violate the code provision....But none the less, it is a contract which operates to restrain [the defendant] from carrying on the business mentioned. It imposes upon him a liability in the sum of five thousand dollars if he does engage in such business. If the contract is valid, he is not as free to do so as he would have been if he were not as bound by it. To the extent that the necessity of

---

disassociation of a partnershio (Section 16602); and the dissolution or termination of a limited liability company (Section 16602.5).

Firm:45347325v1

MEMORANDUM OF LAW IN SUPPORT OF NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

paying five thousand dollars deters him from engaging therein, he would be restrained. This is clearly a restraint if a substantial character and the form in which it is cast does not make it less a restraint….The covenant in question clearly operates to restrain the defendant from "exercising a lawful profession, trade or business" and as it does not fall within the exceptions given in [the precursor to Section 16600 et seq.], it is, therefore, void. *Id.* at 288.

There is no question that the Restrictive Covenant LD Provision is an unlawful restraint under Section 16600, as it expressly prohibits Gegenheimer from choosing to remain employed by Credit Suisse or accepting employment with a competitor of Jefferies during the three month period between May 18, 2016 when Gegenheimer signed the Offer Letter and the August 17, 2016 start date with Jefferies. The restraint on Gegenheimer's professional mobility by itself violates Section 16600, but the Restrictive Covenant LD Provision goes even further by imposing an extortionate $1 million penalty if Gegenheimer chose to remain employed by Credit Suisse.

In *Comedy Club, Inc. v. Improv West Associates*, 553 F. 3d 1277 (9th Cir. 2009), the Ninth Circuit vacated portions of an arbitration award under similar circumstances where an arbitrator's award enforced a provision that violated Section 16600. The *Comedy Club, Inc.* Court stated that "[e]ven under the permissive standard with which we view arbitral decisions, the economic restraint of § 9.j. on competition is too broad to be countenanced in light of the clear prohibition of § 16600, as interpreted by the California courts." *Id.* at 1293. The Court went on to hold that "[t]he grounds given by the arbitrator for disregarding *Dayton Time Lock* [which applied Section 16600 to in-term covenants not to compete] are fundamentally incorrect. We hold that the arbitrator's ruling that § 9.j. is a valid covenant not to compete ignores CBPC § 16600 and thus is in manifest disregard of the law." *Id. See also Immersion Corporation v. Sony Computer Entertainment America LLC*, No. 16-cv-00857-RMW (N.D. Cal. Apr. 19, 2016) ("in keeping with Supreme Court and Ninth Circuit precedent, the court concluded that an arbitration award within the purview of the FAA may be vacated if the court finds that enforcement would violate 1) an 'explicit, well defined and dominant public policy' that 2) 'specifically militates against the relief ordered by the arbitrator'"). *See also South Bay Radiology Medical Associates*

18

1  *v. Asher*, 220 Cal. App. 3d 1074 (1990) (arbitrator's enforcement of contract in violation of

2  section 16600 is a defect in arbitrator award that is not waived by untimely petition to vacate).

3       The Award in this case suffers from the same defect as the arbitration award that was

4  vacated in *Comedy Club*.  Just as the award in *Comedy Club* was fundamentally incorrect that

5  Section 16600 did not apply to in-term restrictions, the Award in this case was fundamentally

6  incorrect that Section 16600 is limited to post-employment non-compete agreements.  The

7  Award in this case is even more egregious because it not only authorizes the unlawful restraint

8  on Gegenheimer's freedom of employment, but it also permitted Jefferies to impose a $1 million

9  penalty on Gegenheimer for not complying with the illegal restraint.  Section 16600 prohibits

10  employers from including any provisions in an employment agreement that imposes a financial

11  penalty if an employee fails to comply with a restrictive covenant.  In *Muggill*, 62 Cal.2d at 242,

12  the California Supreme Court rejected a provision in a retirement plan that disqualified an

13  employee from receiving retirement benefits if the employee accepted employment with a

14  competitor, holding that a "provision forfeiting plaintiff's pension rights if he works for a

15  competitor restrain[ed] him from engaging in a lawful business and [was] therefore void." See

16  also *Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 24 Cal.App.3d 35, 41-42 (1972)

17  (involving forfeiture of benefits from profit-sharing plan); *Beneficial Life Ins. Co. v. Knobelauch*,

18  653 F.2d 393, 395-96 (9th Cir. 1981) (involving forfeiture of benefits from commission

19  advances), *aff'd*, 414 U.S. 117 (1973).

20       The Award allows Jefferies to evade the purview of Section 16600 by erroneously

21  concluding that the Restrictive Covenant LD Provision does not violate the statute and only

22  imposes a restraint on Gegenheimer's professional mobility prior to his start date with Jefferies.

23  Section 16600 is not limited solely to post-employment restrictive covenants.  In *Golden v.*

24  *California Emergency Physicians Med. Grp.*, 782 F.3d 1083 (9th Cir. 2015), the Ninth Circuit,

25  applying California law, held that a "no re-hire" provision in a settlement agreement between an

26  employee and former employer, in which the employee waived all rights to future employment

27  with that employer, created a restraint of "substantial character" that could limit an employee's

28  opportunity to engage in a chosen line of work and fell within Section 16600's "considerable

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

breadth." *See also Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. Co.*, 630 F. Supp. 2d 1084, 108891 (N.D. Cal. 2009). The Panel was aware of this case but ignored it.

The Panel's decision to reject California law and apply New York law to determine the enforceability of the Restrictive Covenant LD provision under New York law was also in manifest disregard of California law. The Panel was made aware that California law prohibits enforcement of choice of law provisions in employment agreements that would deprive a California citizen of his or her statutory rights under Section 16600. *Application Grp., Inc. v. Hunter Grp., Inc.*, 61 Cal.App.4th 881, 897 (1998). The Panel was also presented with substantial legal authority demonstrating that the New York choice of law provision in the Offer Letter should not be enforced under these circumstances, and the issue was addressed at length during the oral argument on January 24, 2018. (Jacobs Decl. ¶ 15.) Without any explanation, the Panel ignored California law and applied New York law to bypass Section 16600 and declare the illegal restraint to be enforceable.

The Panel's application of New York law violates well-settled California law that choice of law provisions in employment agreements are unenforceable if the designated law would deprive a California resident of the protections in Section 16600. In *Application Grp., Inc.*, 61 Cal.App.4th at 897, for example, a California Appellate Court refused to enforce a Maryland choice of law provision in an employment contract that restricted the employee's freedom to pursue alternate employment. The employment agreement at issue in *Application Grp*., Inc. was between a Maryland-based employer and employee and contained a non-competition clause and a Maryland choice of law provision. After the employee accepted employment with a competitor based in California, the employee and her new employer commenced an action in California seeking a declaratory judgment that California law governed the enforceability of the non-competition provision. Although the employee worked in Maryland and had not set foot in California at any time during her employment with the plaintiff employer, the *Application Grp., Inc*. Court refused to enforce the Maryland choice of law provision and applied California law. The Court held that the employee's acceptance of a job with a California employer triggered

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD
EXHIBIT Q

Section 16600 and California's fundamental policy against enforcement of non-competition clauses.

The California rule prohibiting enforcement of out-of-state choice of law provisions in employment agreements with California residents has been specifically applied to invalidate New York choice of law provisions in employment agreements. In *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 20 Cal.App.3d 668, 672 (1971), a California Court of Appeals held that a New York choice of law clause in an employment agreement containing a non-competition provision was invalid and must yield to California law. The *Frame* Court stated that "[w]e conclude from the California Supreme Court's treatment of the problem that section 16600 does represent a 'strong public policy' of this state. Therefore the agreement for application of New York law must not be allowed to defeat that policy."

In this case, the Panel was aware of – but simply ignored – the significant amount of California authority presented to it which unequivocally demonstrated that the New York choice of law provision could not be invoked to deprive Gegenheimer of his statutory rights. *See Scott*, 732 F. Supp. at 1041 (rejecting Pennsylvania choice of law provision and applying California law to determine enforceability of covenants restricting competition in franchise agreements); *Gatsinaris v. ART Corp. Sols., Inc.*, No. SACV 15-0741-DOC, 2015 U.S. Dist. LEXIS 90086, at *29 (C.D. Cal. July 10, 2015) (refusing to enforce a Colorado choice of law provision in an employment agreement and holding that "California public policy dictates that § 16600 applies to the contract.") (citation omitted); *Stryker Sales Corp. v. Zimmer Biomet, Inc.*, 231 F. Supp. 3d 606 (E.D. Cal. 2017) (refusing to enforce Michigan choice of law provision in employment agreement between Michigan-based company and California employee).

The Panel's decision to disregard California law and public policy by enforcing the New York choice of law provision is particularly improper because Gegenheimer has lived and worked in California throughout his employment with Credit Suisse, and he was to work in Jefferies' San Francisco office. The only connection this matter has to New York is the fact that Jefferies is headquartered there. (Exhibit B, ¶ 4.) That tenuous connection is woefully insufficient to justify the application of New York law to an employment agreement that restricts

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

1    a California citizen's right to pursue alternate employment in violation of California law and

2    public policy.

3         Indeed, even a New York court would disregard the Offer Letter's New York choice of

4    law provision under these circumstances and apply California law because California

5    unquestionably has a far greater interest in the outcome of this dispute, given that all of the

6    underlying events occurred in California; and the dispute implicates significant California public

7    policy concerns. *See, e.g.*, *TGG Ultimate Holdings, Inc. v. Hollett*, 224 F. Supp. 3d 275, 281-83

8    (S.D.N.Y. 2016) (refusing to enforce a New York choice of law provision against employees

9    who lived and worked in California because the underlying events occurred in California and

10   New York law would be contrary to a significant public policy of California); *SG Cowen Sec.*

11   *Corp. v. Messih*, No. 00-Civ-3328, 2000 U.S. Dist. LEXIS 6697, at *11-12 (S.D.N.Y. May, 17,

12   2000) (under New York choice-of-law rules, a contractual New York choice-of-law clause in a

13   non-competition agreement was invalid as enforcement of the non-compete provision under New

14   York law would violate the public policy of California, which had more substantial contacts with

15   the contract).

16        The Award at issue here is in manifest disregard of California law and public policy by

17   enforcing a restraint that is unlawful under Section 16600. Like the award that was vacated by

18   the Ninth Circuit in *Comedy Club*, the Award in this case should be vacated.

19   **C.    The Panel's Award Was In Manifest Disregard Of New York Law By**
     **Enforcing A Liquidated Damages Provision Which Also Reserves The Right**
20   **To Seek Actual Damages**

21        Even if the Panel was permitted to apply New York law to determine whether the

22   Restrictive Covenant LD provision is enforceable, the Award must be vacated because it ignores

23   the longstanding principle under New York law that a liquidated damages provision that also

24   retains the right for the non-breaching party to seek actual damages is invalid as a matter of law.

25   See *Agerbrink v. Model Service LLC*, 196 F. Supp. 3d 412 (S.D.N.Y. 2016) (liquidated damages

26   clause that gives a party the option either to retain certain funds from the breaching party as

27   liquidated damages or, alternatively, to hold those funds as 'security' toward an anticipated

28   judgment the non-breaching party may obtain by pursuing other remedies against the party, is an

22

1   unenforceable penalty under New York law). "Under no circumstances, however, will liquidated

2   damages be allowed where the contractual language and attendant circumstances show that the

3   contract provides for the full recovery of actual damages, because liquidated and actual damages

4   are mutually exclusive remedies under New York law." *U.S. Fidelity & Guar. Co. v. Braspetro

5   Oil Services, Co.*, 369 F.3d 34 (2004), 71.

6          The Panel was well aware that New York law prohibits liquidated damages provisions

7   that also reserve the right to seek actual damages. Gegenheimer's Responsive Brief addressed

8   this issue at length and provided the Panel with ample legal authority. (Exhibit K.)   The Panel

9   was also reminded of the New York rule at the hearing, as well. (Jacobs Dec. ¶ 15.) Jefferies'

10  only response was that it has never sought actual damages in addition to liquidated damages.

11  (Jacobs Decl. ¶ 16.) The Panel Chairman asked Gegenheimer's counsel if there was case law

12  regarding the New York rule. Gegenheimer's counsel pointed out the cases set forth in

13  Gegenheimer's Responsive Brief that supported its position that the Restrictive Covenant LD

14  Provision was invalid. (Jacobs Dec. ¶ 15.)

15         The Award was issued five days later and determined that the enforceability of the

16  Restrictive Covenant LD Provision is governed by New York law and, under New York law, is

17  fully enforceable. (Exhibit A.) However, the Award inexplicably ignored New York law, which

18  was addressed at length in the written submissions and the January 24, 2018 oral argument, that

19  the reservation of Jefferies' right to seek actual damages in excess of the $1 million liquidated

20  damages rendered the Restrictive Covenant LD Provision invalid as a matter of New York law.

21  (*Id.*)

22         The New York law ignored by the Panel is not discretionary or open to interpretation. It

23  is a rule that is "well-defined, explicit, and clearly applicable to the case." *Collins v. DR Horton*,

24  Inc., 505 F. 3d 874 (9th Cir. 2007). Nor is there any ambiguity in the Restrictive Covenant LD

25  Provision, which requires Gegenheimer to pay $1 million in liquidated damages for any breach

26  of the restraint and expressly permits Jefferies to recover even more damages in excess of the

27  liquidated sum:

28

Firm:45347325v1                                    MEMORANDUM OF LAW IN SUPPORT OF
                    NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD
EXHIBIT Q

If during the period beginning from the date you execute this Agreement until your Start Date (the "Interim Period"), you fail to commence employment by August 17, 2016, you agree to pay Jefferies $1,000,000 as liquidated damages ("Liquidated Damages"), which represent only an approximation of a portion of the anticipated loss created by such a violation. . . . ***Nothing in this section shall prevent Jefferies from recovering its actual damages exceeding the Liquidated Damages, and Jefferies shall have the right to avail itself of all other available remedies***.

(Exhibit B.) (Emphasis added.)

As Gegenheimer explained to the Panel in its Responsive Brief and at the January 24, 2018 oral argument, New York law is crystal clear that a liquidated damages provision that also permits the non-breaching party to seek actual damages is unenforceable as a matter of law. *See Agerbrink v. Model Service LLC*, 196 F. Supp. 3d at 412; *Stock Shop v. Bozell & Jacobs*, 126 Misc.2d 95, 481 N.Y.S.2d 269 (Sup. Ct. N.Y. Cty. 1984) ("[t]here is, therefore, no true liquidation of damages since the plaintiff is given the option to disregard the liquidated sum and sue for actual damages. Such a clause is invalid").

The seminal New York case invalidating a liquidated damages provision that retains the option of actual damages is *Jarro Bldg. Indus. Corp. v. Schwartz*, 54 Misc.2d 13, 281 N.Y.S.2d 420, 420 (2d Dep't 1967). The court in *Jarro* rejected a liquidated damage clause that allowed the plaintiff to recover liquidated damages in the amount of 25 percent of the total contract price and also gave the plaintiff the right to sue for "such actual damages as it may establish." The Court reasoned that the clause afforded the plaintiff "the option to disregard the liquidated damages specified if the actual damages exceed the amount stipulated." *Id.* at 426. The *Jarro* court explained that:

A liquidated damage clause must always be examined rather closely. The policy of the law is to approve such clauses where they are reasonable. The underlying purpose is to permit parties to look to the future, anticipate that there may be a breach and make a settlement in advance. This implies two things: (1) that the amount specified be a fixed amount, and (2) that both parties be bound to that amount. <u>The clause here does not disclose a fixed amount. In essence it fixes a minimum which must be paid by the home owner to the contractor, but leaves the door wide open to</u>

MEMORANDUM OF LAW IN SUPPORT OF NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD

EXHIBIT Q

> him to prove actual damage in addition to the so-called liquidated
> damage.  This is no settlement at all and it permits the contractor to
> have his cake and eat it too.  (Emphasis added.)

Following *Jarro*, New York courts have routinely rejected liquidated damages clauses that, like the clause in Jefferies' Offer Letter, also permit the non-breaching party to seek actual damages.  See *In re O. P. M. Leasing Servs., Inc.*, 23 B.R. 104, 112 (Bankr. S.D.N.Y. 1982) (liquidated damages provision "was not a reasonable estimation of actual damages at the time it was executed as, by its terms, it is in force in addition to [Plaintiff's] right to recover actual damages).  The *In re O. P. M. Leasing Servs. Inc.* Court went on to explain that:

> Such a cumulation of remedies for [Plantiff] renders the [liquidated
> damages provision] void as a penalty. (collecting cases). The
> general, common-sense rule underlying this determination is that
> "liquidated damages and actual damages are mutually exclusive
> remedies under New York law."  *Trilegiant Corp. v. Sitel Corp.*,
> No. 09-CV-6492, 2013 WL 2181193, at *7 (S.D.N.Y. May 20,
> 2013); *Vacold LLC v. Cerami*, 545 F.3d 114, 130 (2d Cir.2008);
> *Chateau D'If Corp. v. City of New York*, 219 A.D.2d 205, 209, 641
> N.Y.S.2d 252 (N.Y.App.Div. 1st Dep't 1996) ("No one would
> quarrel with [the] conclusion that a liquidated damages clause and
> a provision entitling a nondefaulting vendor to further damages are
> incompatible and cannot coexist"). After all, the purpose of a valid
> liquidated damages provision is to provide a reasonable "estimate
> ... of the extent of the injury that would be sustained as a result of a
> breach of the agreement" when other measures of damages are
> unavailable. *Truck Rent-A-Ctr.*, 393 N.Y.S.2d 365, 361 N.E.2d at
> 1018. Because the liquidated damages provision [  ] guarantees
> Defendants a "minimum recovery" regardless of actual damages,
> while preserving their right to pursue actual damages if they so
> desire, the Remedy Clause is unenforceable.

Most recently, this principle was reinforced in *In Re First Union Baptist Church of Bronx*, No. 12-14099 (MEW) (Bankr. S.D.N.Y. Aug. 4, 2017) (citing *Jarro* and holding that a liquidated damages provision that preserved the option to seek additional damages is an unenforceable penalty under New York law); *U.S. Fidelity & Guar.*, 369 F.3d at 71 ("Under no circumstances . . . will liquidated damages be allowed where the contractual language and attendant circumstances show that the contract provides for the full recovery of actual damages, because liquidated and actual damages are mutually exclusive remedies under New York law");

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD
EXHIBIT Q

*XLO Concrete Corp. v. John T. Brady* & Co., 482 N.Y.S. 2d 476, 479 (N.Y. App. Div. 1984) ("[W]hen the parties by their contract provide for the consequences of a breach, lay down a rule to admeasure the damages[,] and agree when they are to be paid, the remedy thus provided must be exclusively followed") (internal quotation marks and citation omitted)).

The Restrictive Covenant LD Provision in Jefferies' offer letter provides that the $1 million payment "represent[s] only an approximation of a portion of [Jefferies' alleged] anticipated loss" and expressly permits Jefferies to seek further damages in excess of the $1 million liquidated amount, as well as other unspecified remedies. (Exhibit B.) Like the liquidated damages provision that was found to be unenforceable in *Jarro*, the liquidated damages provision in this case allows Jefferies "to have its cake and eat it too" and is therefore an unenforceable penalty.

The Award simply ignores that fundamental legal principle without any explanation. At a bare minimum, even if the Panel was permitted to apply New York law to determine the enforceability of the Restrictive Covenant LD Provision, the provision should have been rendered invalid as a matter of New York law and Jefferies would then be required to prove actual damages, if any.

## IV.  **CONCLUSION**

For the foregoing reasons, Gegenheimer respectfully requests that the Arbitration Panel's January 29, 2018 Award determining that Section V(B) in Jefferies Offer Letter is enforceable be vacated in its entirety.

Respectfully submitted,

DATED:   February 2, 2018                    EPSTEIN BECKER & GREEN, P.C.


By:      */s/ David Jacobs*
_____
David Jacobs

Attorneys for Petitioner
JON A. GEGENHEIMER

MEMORANDUM OF LAW IN SUPPORT OF
NOTICE OF PETITION AND PETITION TO VACATE ARBITRATION AWARD
EXHIBIT Q

# EXHIBIT R

EXHIBIT R

1   SULLWOLD & HUGHES
James A. Hughes (SBN 88380)
2   1999 Harrison Street, 18th Floor
Oakland, CA 94612-3520
3   Telephone: (510) 496-4616
Facsimile: (415) 762-5338
4

5   BUCHANAN INGERSOLL & ROONEY LLP
Andrew J. Shapren (PA I.D. 91142)
6   *(pro hac vice application to be submitted)*
Two Liberty Place
7   50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555
8   Telephone: (215) 665-8700
Facsimile: (215) 665-8760
9

  *Attorneys for Respondent Jefferies LLC*
10

11               **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| 14   JON A. GEGENHEIMER, | CASE NO. 3:18-cv-00746 VC |
| 15               Petitioner, | **RESPONDENT JEFFERIES LLC'S NOTICE OF MOTION AND** |
| 16     vs. | **MOTION TO DISMISS PETITION TO VACATE ARBITRATION AWARD;** |
| 17   JEFFERIES LLC, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 18               Respondent. | Judge:         Hon. Vince Chhabria |
| 19 | Date:           March 29, 2018 |
| 20 | Time:           10:00 a.m. <br> Courtroom:   Courtroom 2, 17th Floor |

21

22   **TO PETITIONER AND HIS COUNSEL OF RECORD:**

23         PLEASE TAKE NOTE that on March 29, 2018, at 10:00 a.m. in Court 2 of the above-

24   entitled court located at 450 Golden Gate Avenue, San Francisco, California 94102, Respondent

25   Jefferies LLC will and hereby does move this Court pursuant to Federal Rules of Civil Procedure

26   12(b)(6) for an order dismissing Petitioner's Petition to Vacate Arbitration Award.

27

28

---

Motion to Dismiss Petition to Vacate                       3:18-cv-00746 VC

EXHIBIT R

1         This motion is made on the grounds that the Court lacks jurisdiction to hear the Petition and

2    review the interlocutory Order Regarding Liquidated Damages issued by the arbitration panel

3    assigned to hear and decide the entirety of the dispute between the parties.  A district court may

4    only review an arbitrator's ruling that can fairly be considered a final and binding award.  To be

5    final, an arbitration award must be, and must be intended by the arbitrators to be, a complete

6    determination of every issue submitted.  In this case, the order on appeal, denominated an Order

7    Regarding Liquidated Damages, addresses a single legal question regarding contract interpretation

8    and enforcement.  The Order does not fully decided the parties' others claims and defenses and

9    leaves numerous disputed, substantive questions unresolved, including the ultimate issues of

10   liability and remedies.   Moreover, as the title of the Order suggests and as expressly articulated in

11   the Order itself, the arbitrators in this case understood that their determination was not final; they

12   contemplated further proceedings, including further negotiations by the parties; and they retained

13   jurisdiction of the matter to address the unsettled issues.

14        This Motion is based on this Notice of Motion and Motion to Dismiss, the accompanying

15   Memorandum of Points and Authorities contained herein, and the accompanying Declaration of

16   Andrew J. Shapren in Support of Motion to Dismiss, all of which are filed concurrently herewith;

17   all pleadings and papers on file in the action; and upon such other evidence or oral argument as the

18   Court may consider in connection with this Motion.

19

20   DATED: February 22, 2018                                    SULLWOLD & HUGHES

21

22                            By: _____*/s/ James A. Hughes*_____

23                                 JAMES A. HUGHES

                             *Counsel for Respondent Jefferies LLC*

24

25   OF COUNSEL:

26   Andrew J. Shapren (*pro hac vice* to be submitted)

27

28                                    - 2 -

EXHIBIT R

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 1

II. STATEMENT OF RELEVANT FACTS ............................................................................ 1

    A. Gegenheimer Signs, and then Breaches, His Agreement with Jefferies. ..................... 1

    B. The Parties Submit Their Dispute Regarding Gegenheimer's Breach of the Agreement and the Liquidated Damages Remedy to FINRA Arbitration. ................. 3

    C. The Parties Agree to Present Their Dispute to the Panel Through a "Bifurcated" Proceeding. ................................................................................................................ 4

        1. The Panel accepts the Parties' Agreement on "Bifurcated Proceedings." ....... 4

        2. The January 24, 2018 Hearing on the First Portion of the Proceeding ............ 4

    D. The Order Regarding Liquidated Damages ................................................................. 5

    E. February 20, 2018 Order Denying Stay of Arbitration Proceedings .......................... 6

III. ARGUMENT ..................................................................................................................... 7

    A. Absent Extreme Circumstances, Courts Cannot Review Non-Final Arbitration Awards that Fail to Conclusively Decide Each Issue Before the Panel. ..................... 7

    B. The Order Regarding Liquidated Damages is not Final and, Therefore, is not Reviewable. ................................................................................................................ 9

    C. Petitioners' Lone Case is Inapposite. ....................................................................... 12

IV. CONCLUSION ................................................................................................................ 13

EXHIBIT R

1

**TABLE OF AUTHORITIES**

2

3

**Page(s)**

4

**Cases**

5

*Aerojet–General Corp. v. Am. Arbitration Association,*
6    478 F.2d 248 (9th Cir. 1973) .......................................................................... 7, 8, 9, 11

7  *American Federation of Government Employees, AFL–CIO, Local 3090 v. Federal
    Labor Relations Authority,*
8    777 F.2d 751 (D.C. Cir. 1985) ................................................................................ 7

9  *Anderson v. Norfolk & Western Ry. Co.,*
    773 F.2d 880 (7th Cir. 1985) .................................................................................. 8

10  *Berkowitz v. Republic of Costa Rica,*
    CV 17-148, 2018 WL 521118 (D.D.C. Jan. 23, 2018) .......................................... 7
11

12  *Blue Cross Blue Shield of Mass., Inc. v. BCS Insurance Co.,*
    671 F.3d 635 (7th Cir. 2011) .................................................................................. 7

13  *McKinney Restoration Co. v. Illinois District Council No. 1,*
    392 F.3d 867 (7th Cir. 2004) .................................................................................. 8
14

15  *Michaels v. Mariforum Shipping, S.A.,*
    624 F.2d 411 (2d Cir. 1980) ............................................................................... 7, 8

16  *Millmen Local 550, United Brotherhood of Carpenters & Joiners of America, AFL-
    CIO v. Wells Exterior Trim,*
17    828 F.2d 1373 (9th Cir. 1987) .................................................................... 7, 8, 9, 11

18  *Pacific Reinsurance Management Corp. v. Ohio Reinsurance Corp.,*
    935 F.2d 1019 (9th Cir. 1991) ........................................................................ 12, 13
19

20  *Quixtar, Inc. v. Brady,*
    328 Fed. Appx. 317 (6th Cir. 2009) ....................................................................... 7

21  *Schatt v. Aventura Limousine & Transportation Service, Inc.,*
    603 Fed. Appx. 881 (11th Cir. 2015) ..................................................................... 7
22

23  *Smart v. International Brotherhood of Electrical Workers, Local 702,*
    315 F.3d 721 (7th Cir. 2002) .................................................................................. 8

24  *Southwest Regional Council of Carpenters v. Drywall Dynamics, Inc.,*
    No. CV–13–272–MWF, 2013 WL 12143955 (C.D. Cal. June 17, 2013) .................. 13
25

26  *In re Sussex,*
    781 F.3d 1065 (9th Cir. 2015) ..................................................................... 7, 8, 11

27

28

- i -

EXHIBIT R

*Union Switch & Signal Division American Standard, Inc. v. United Electrical, Radio*
*    & Machince Workers of America, Local 610,*

900 F. 2d 608 (3d Cir. 1990) ................................................................................. 10, 11

**Rules**

FINRA Rule 13904 ................................................................................................... 9

**Statutes**

9 U.S.C. § 10 ........................................................................................................... 7

Cal. Business & Professional Code § 1660 ............................................................. 5

**Other Authorities**

4 Commercial Arbitration § 128:3 .......................................................................... 7

EXHIBIT R

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The Order Regarding Liquidated Damages that is the subject of the Petition to Vacate is an interim determination of a single issue that is not, was not intended to be, and was not understood to be a final award. There remain for the arbitration panel to hear and determine numerous other substantive issues relating to liability and available remedies that the parties submitted for arbitration through their pleading documents. On these points there can be no serious dispute. Although Petitioner has declined to make this fact known to the Court, the Panel itself has plainly explained that the Order was addressed only to the "first portion" of the arbitration proceeding and was never "intended to be a Final Award .... subject to confirmation or vacatur by a court." Declaration of Andrew J. Shapren, Ex. B at 2. Accordingly, for the reasons fully discussed below, Respondent Jefferies respectfully submits that this Court lacks jurisdiction to review the Petition to Vacate, and the Petition must be dismissed.

### II. STATEMENT OF RELEVANT FACTS

#### A. Gegenheimer Signs, and then Breaches, His Agreement with Jefferies.

Jefferies is a New York financial-services firm that maintains a global investment banking practice. In late November 2015, Jefferies began searching for a new managing director in order to fill a need for capacity in its Technology Group's M&A coverage. Jefferies, with the assistance of an executive search firm, identified, contacted, and considered several qualified potential candidates for the position, including Petitioner Gegenheimer, a highly educated, experienced, and successful investment banker who was employed in a similar position at Credit Suisse. After interviewing Gegenheimer and other potential candidates, Jefferies informed Gegenheimer that it intended to extend him an offer of employment, and Gegenheimer communicated to Jefferies that he was interested in joining Jefferies. Thereafter, Jefferies and Gegenheimer, both represented by counsel, negotiated Gegenheimer's compensation, start date, and other terms of employment.

On May 18, 2016, after many months of discussions, Jefferies and Gegenheimer executed an employment agreement (the "Agreement"). *See* Shapren Decl., Ex. C. Because Gegenheimer's

1  contract with Credit Suisse contained a notice or "garden leave" requirement, the Agreement

2  required Jefferies to hold the position open for Gegenheimer for 90 days and required Gegenheimer

3  to join Jefferies on or before August 17, 2016. Other terms of the Agreement included a generous

4  compensation package for Gegenheimer including a seven-figure sum in his first year alone,

5  consisting of a salary, a bonus for the fiscal year 2016, and money to replace deferred compensation

6  that he would forfeit by leaving Credit Suisse.

7       The Agreement also included a liquidated damages provision that is typical of Jefferies'

8  employment contracts with its high level investment banking recruits.[1]  Shapren Decl., Ex. C

9  ¶ V, B. The provision in the Gegenheimer Agreement provides in relevant part:

10       **If during the period beginning from the date you execute this Agreement until your Start Date (the "Interim Period"), you fail to commence employment by August 17, 2016, you agree to pay Jefferies $1,000,000 as liquidated damages ("Liquidated Damages"), which represent only an approximation of a portion of the anticipated loss created by such a violation.** For the avoidance of doubt, this Liquidated Damages provision is applicable only if you voluntarily fail to commence employment with Jefferies (except as a result of Jefferies' written withdrawal of this offer): (a) because you return as an employee of Credit Suisse or (b) to engage in Competitive Activity (as defined in the Jefferies Employee Handbook). You agree the Liquidated Damages are reasonable and do not operate as a penalty, but reflect Jefferies' reasonable approximation of a portion of its anticipated loss as a result of Jefferies' reliance on your commitment to render services pursuant to this Agreement by your Start Date, Jefferies' forbearance in holding the position of Managing Director in its Investment Banking Division open for you and not hiring another individual for this position during the Interim Period, and all costs incurred by Jefferies to fill the Investment Banking Division Managing Director Position. Nothing in this section shall prevent Jefferies from recovering its actual damages exceeding the Liquidated Damages, and Jefferies shall have the right to avail itself of all other available remedies.

22 Shapren Decl., Ex. C ¶ V, B (emphasis added).

23      The Agreement also provides that Gegenheimer will pay "all costs associated with the

24 collection by Jefferies of its rights under this Agreement, including reasonable attorneys' fees,

---

[1] Jefferies expends substantial resources during its recruiting and hiring process for investment banking employees. Jefferies suffers significant damages, therefore, if a candidate intentionally breaches his contract to join Jefferies. It is not possible to quantify Jefferies' damages with accuracy, so Jefferies developed a reasonable formula that would provide it with fair average compensation in the event of breach.

1    provided Jefferies is the prevailing party in such enforcement action." Gegenheimer further agreed

2    that he "will not assert any defenses, rights of set-off, or counterclaims as a reason for not fully

3    repaying any amounts due under this Agreement." *Id.* at ¶ III, C.

4          On May 24, 2016, Gegenheimer informed Jefferies that he would not join Jefferies as

5    agreed, but instead would remain with Credit Suisse. Jefferies has since discovered that after

6    breaching the Agreement, Gegenheimer obtained more favorable terms of employment at Credit

7    Suisse, including a promotion to Managing Director and a significant increase in guaranteed

8    compensation for 2016. In reneging on his promise to join Jefferies, Gegenheimer breached the

9    Agreement and triggered the liquidated damages provision.

10   **B.     The Parties Submit Their Dispute Regarding Gegenheimer's Breach of the
             Agreement and the Liquidated Damages Remedy to FINRA Arbitration.**
11

12         Despite his contractual obligation to do so, Gegenheimer refused to satisfy Jefferies demand

13   for payment of the liquidated damages provided for in the Agreement. Accordingly, on August 19,

14   2016, Jefferies initiated FINRA arbitration proceedings by filing a Statement of Claim against

15   Gegenheimer. Shapren Decl., Ex. D. Jefferies asserted a single cause of action against

16   Gegenheimer, claiming that Petitioner "breached the Agreement by advising Jefferies that he will

17   not join Jefferies as provided for in the Agreement." *Id.* at ¶ 36. With respect to remedies, Jefferies

18   asked the Panel to enforce the liquidated damages provision and award the "[l]iquidated damages

19   … in the amount of $1,000,000." *Id.* at 10. Jefferies also requested compensatory damages, but

20   only "if the liquidated damages clause is not enforced." *Id.* Lastly, Jefferies sought an award of

21   attorneys' fees and costs, as well as "further relief the Panel may deem just and proper." *Id.*

22         In his Answer to the Statement of Claim, Gegenheimer denied that he had breached the

23   Agreement. He also raised eight affirmative defenses. The first three of those defenses asserted

24   that the "so-called liquidated damages provision" was "unlawful," "illegal," "unconscionable," and,

25   ultimately, "unenforceable." Shapren Decl., Ex. E at 6. The second three defenses cast a wider

26   critique, asserting that the *entire* Agreement is "void and unenforceable" for reasons like fraudulent

27   inducement, "illegal purpose[s]," and "illegal consideration." *Id.* at 6-7. Additionally,

28   Gegenheimer submitted four counterclaims, each of which is based on some variation of

- 3 -

1 Petitioner's belief that the Agreement and/or the liquidated damages provision are illegal and
2 unenforceable.

3 **C.** **The Parties Agree to Present Their Dispute to the Panel Through a "Bifurcated" Proceeding.**
4

5 1. The Panel accepts the Parties' Agreement on "Bifurcated Proceedings."

6 By letter dated December 19, 2017 from Jefferies' counsel, the parties informed the Panel of
7 their agreement to have the Panel hear Jefferies' claim and Gegenheimer's defenses and
8 counterclaims in an atypical bifurcated process. Shapren Decl., Ex. F. While bifurcation usually
9 draws a line between liability, on the one hand, and the nature and amount of damages, on the other,
10 the parties decided to carve out, and have the Panel resolve first, a single threshold legal question.
11 Specifically, the parties asked the Panel to "solely adjudicate whether the liquidated damages clause
12 in the agreement is enforceable or unenforceable." *Id.* at 1. While admitting that the "case largely
13 revolves around" that legal issue and recognizing they might use an answer to that question to "fully
14 dispose of the case," the parties also expressly noted that resolution of the enforceability issue
15 would ***not*** dispose of the case in its entirety. *Id.* Rather, the parties understood that the "Panel's
16 decision … may result in the need for another hearing to be scheduled on the future" concerning,
17 for example, "Jefferies' actual damages and/or Gegenheimer's counterclaim." *Id.*

18 By order dated December 20, 2017, the Panel approved the parties' agreement to take an
19 intermediate step toward the resolution of the matter. Shapren Decl., Ex. G. The Panel understood
20 that, in deciding to hear argument only on the enforceability of the liquidated damages provision, it
21 would be deciding the case in a piecemeal fashion. *Id.* ("The sole issue to be adjudicated by the
22 Panel in ***in the first part of the hearing*** shall be whether the liquidated damages clause in the
23 agreement is enforceable or unenforceable.").

24 2. The January 24, 2018 Hearing on the First Portion of the Proceeding

25 The arbitration hearing on this first phase of the case took place on January 24, 2018. Both
26 parties submitted briefs addressing choice of law issues and the enforceability of the Agreement's
27 liquidated damages provision. For its parts, Jefferies also submitted various evidentiary exhibits, as
28 well as a Declaration of Chris Kanoff, an Executive Vice President and Global Co-Head of

1   Investment Banking at Jefferies, explaining the reason and need for, and history and calculation of,

2   the liquidated damages clause. At the close of its presentation, Jefferies requested an award from

3   the Panel that, in addition to finding the liquidated damages provision to be enforceable as a matter

4   of law, would also include a determination that Gegenheimer had breached the Agreement, that the

5   breach caused liquidated damages in the amount of $1,000,000, and that other fees and costs should

6   be paid to Jefferies. Shapren Decl., Ex. H. Counsel for Gegenheimer objected, however, on the

7   grounds that questions concerning the ultimate determinations of liability and damages had not been

8   briefed, had not been litigated, and had not been argued; rather, the only issue before the Panel was

9   the question whether the liquidated damages provision was enforceable or not. The Panel agreed,

10   expressly stating that the only issue before them was the enforceability of the liquidated damages

11   clause. The Panel made clear it would make no other findings.

12                    **D.**     **The Order Regarding Liquidated Damages**

13         The Panel issued its determination on January 29, 2018. Shapren Decl., Ex. A. It did not

14   style its findings as an "award," but, recognizing the narrow scope of the issue presented at the

15   hearing, entitled it an "Order Regarding Liquidated Damages." The Panel held that the "liquidated

16   damages clause … of the Agreement is enforceable by Jefferies against Gegenheimer." *Id.* More

17   specifically, the Panel found that "the actual damages that would be sustained by Jefferies were

18   inherently incapable of accurate estimation at the time the Agreement was entered into." *Id.* at 3-4.

19   Additionally, "the liquidated damages amount [set forth in the Agreement] is reasonable in light of

20   the anticipated probable harm" to Jefferies. *Id.* at 4. Lastly, "[t]he liquidated damages clause in the

21   Agreement did not restrain [the respondent] from engaging in his profession." *Id.* Thus, the policy

22   and restrictions in California Business & Professions Code Section 1660 do not apply.

23         The Order clearly pronounced the Panel's understanding that its opinion was limited in

24   reach. The Panel first explained that the January 24, 2018 hearing was not and was not intended to

25   be a full hearing on the merits of the claims, counterclaims, and defenses of the parties. Rather, that

26   hearing was merely the "***first portion*** of a bifurcated proceeding" in which additional hearings,

27   testimony and evidence, and argument were expected. *Id.* at 1. Indeed, the Panel expressly noted in

28   its "Conclusion" that the Order, by itself, did not resolve each and every issue. *Id.* at 4. Just as the

parties, through their pleadings, had determined in the first instance which issues and disputes were to be arbitrated, so too did the Panel leave it to the parties to determine between themselves whether the Order "fully disposes of this case or whether there is a need to schedule a further hearing in the future." *Id.* at 4. The Panel retained jurisdiction if the parties decided a "hearing on the remaining issues" would be needed. *Id.*

**E.** **February 20, 2018 Order Denying Stay of Arbitration Proceedings**

Recognizing that the Order did not end the arbitration proceedings, counsel for Jefferies requested a conference with the Panel to schedule additional hearings on the remaining issues. Shapren Decl., Ex. I. In his February 8, 2018 response to Jefferies' request, counsel for Gegenheimer informed the Panel that Gegenheimer had filed the instant Petition to Vacate. Instead of agreeing to additional hearings in arbitration, therefore, counsel requested that the Panel "suspend any further proceedings in this matter" pending resolution of that Petition. Shapren Decl., Ex. J. Jefferies opposed the request for a stay of arbitration on the grounds that the Panel had not yet even considered, much less determined, a number of issues concerning both liability and proper remedies and that Gegenheimer's request was nothing more than "wasteful procedural gamesmanship" that would cause further undue delay. Shapren Decl., Ex. K.

By Order dated February 20, 2018, the Panel granted Jefferies' request to schedule additional hearing dates and specifically denied Gegenheimer's request for a stay. Shapren Decl., Ex. B. In notably unambiguous language, with direct relevance to whether Petitioner had the right to subject the Order Regarding Liquidated Damages to the review of a court, the Panel explained that the Order "was not intended to be a Final Award or 'Interim Final Award' subject to confirmation or vacatur by a court." *Id.* Rather, the Order only "concluded the first portion of a bifurcated proceeding." *Id.* For that reason, "[t]he arbitration must continue to resolve the remaining issues." *Id.*

# III. ARGUMENT

## A. Absent Extreme Circumstances, Courts Cannot Review Non-Final Arbitration Awards that Fail to Conclusively Decide Each Issue Before the Panel.

The Federal Arbitration Act provides courts with jurisdiction only to vacate an "award," rather than every arbitral decision. 9 U.S.C. § 10. Indeed, "[t]he language of the [FAA] is unambiguous: it is only after an award has been made by the arbitrators that a party can seek to attack any of the arbitrators' determinations in court." *Michaels v. Mariform Shipping, S.A.*, 624 F.2d 411, 414 (2d Cir. 1980). More specifically, to be appealable and reviewable by a court of law, an arbitration award generally must be a final and complete disposition of all the issues submitted for arbitration by the parties. *Millmen Local 550, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Wells Exterior Trim*, 828 F.2d 1373, 1375 (9th Cir. 1987) (citations omitted); *see also Aerojet–General Corp. v. Am. Arbitration Ass'n*, 478 F.2d 248, 251 (9th Cir. 1973) ("[C]ourt review of evidentiary rulings should not be had before a final award has been rendered."); 4 Commercial Arbitration § 128:3 ("[A] court lacks authority to review the validity of an arbitrator's interim ruling that does not finally resolve the issues submitted."). Thus, the FAA denies courts the authority to even consider the merits of any arbitration decision that is non-final, interim, or interlocutory. *In re Sussex*, 781 F.3d 1065, 1071–72 (9th Cir. 2015) ("The [FAA] does not suggest that a court could otherwise intervene before a final award is made.").[2]

---

[2] This final-judgment requirement is also the governing rule in the majority of courts of appeals. *In re Sussex*, 781 F.3d at 1073 ("The majority of our sister circuits expressly preclude any mid-arbitration intervention." (citations omitted)). *See also Schatt v. Aventura Limousine & Transp. Serv., Inc.*, 603 Fed. Appx. 881, 887 (11th Cir. 2015) ("[T]he FAA allows review of final arbitral awards only, but not of interim or partial rulings."); *Blue Cross Blue Shield of Mass., Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638 (7th Cir. 2011) ("Review [of an arbitration proceeding] comes at the beginning or the end, but not in the middle"); *Quixtar, Inc. v. Brady*, 328 Fed. Appx. 317, 320 (6th Cir. 2009) ("[C]ourts generally should not entertain interlocutory appeals from ongoing arbitration proceedings."); *Michaels*, 624 F.2d at 414 ("Under the [FAA] ... a district court does not have the power to review an interlocutory ruling by an arbitration panel."); *see also Berkowitz v. Republic of Costa Rica*, CV 17-148, 2018 WL 521118, at \*6 (D.D.C. Jan. 23, 2018) ("Indeed, '[t]he Arbitration Act contemplates that courts should not interfere with arbitrations by making interlocutory rulings.' And our Circuit has held that 'it is a cardinal principle of arbitration that [arbitration] awards are reviewable and enforceable only if they are "final" – that is, if they purport to resolve all aspects of the dispute being arbitrated.'" (citing *Am. Fed'n of Gov't Emps., AFL–CIO, Local 3090 v. Fed. Labor Relations Auth.*, 777 F.2d 751, 755 (D.C. Cir. 1985); other citations omitted)).

Motion to Dismiss Petition to Vacate     391     EXHIBIT R46 VC

1    The complete-finality rule derives not only from the language of the FAA, but also from the

2  long-standing policy of deference to and favoritism towards arbitration.  As the Ninth Circuit

3  explained in *Aerojet–General*, "[t]o permit what is in effect an appeal of an interlocutory ruling of

4  the arbitrator would frustrate" the "basic purpose of arbitration," namely, "the speedy disposition of

5  disputes without the expense and delay of extended court proceedings."  478 F.2d at 251 (citations

6  omitted).  *See also Millmen Local 550*, 828 F.2d at 1375, 1377 (holding that the "rule requiring

7  finality" advances the purposes of arbitration:  "the speedy resolution of grievances without the time

8  and expense of court proceedings" and the avoidance of "piecemeal litigation of a claim");

9  *Michaels*, 624 F.2d at 414 ("[A] district court should not 'hold itself open as an appellate tribunal'

10  during an ongoing arbitration proceeding, since applications for interlocutory relief 'result only in a

11  waste of time, the interruption of the arbitration proceeding, and … delaying tactics in a proceeding

12  that is supposed to produce a speedy decision.'" (citation omitted)).

13    "To be considered 'final,' an arbitration award must be intended by the arbitrator to be [a]

14  complete determination of every issue submitted ...."  *Millmen Local 550*, 828 F.2d at 1376 (quoting

15  *Anderson v. Norfolk & Western Ry. Co.*, 773 F.2d 880, 883 (7th Cir. 1985)).  Thus, "[w]here a

16  substantive task remain[s] for the arbitrator to perform," an award is not final.  *McKinney*

17  *Restoration Co. v. Ill. Dist. Council No. 1*, 392 F.3d 867, 871 (7th Cir. 2004) (citations omitted).

18  Where, however, there is nothing left for the arbitrator to do, either because the award is an

19  exhaustive decision on every claim before her or the arbitrator thinks it is a complete determination,

20  the award is final and reviewable.  *cf. Smart v. Int'l Bhd. of Elec. Workers, Local 702*, 315 F.3d 721,

21  725 (7th Cir. 2002) ("[I]f the arbitrator himself thinks he's through with the case, then his award is

22  final and appealable…." (citations omitted)).  Where an arbitrator retains jurisdiction in order to

23  decide a substantive issue the parties have not yet resolved, this retention of jurisdiction "indicates

24  that the arbitrator did not intend the award to be final."  *Millmen Local 550*, 828 F.2d at 1376-77.

25    The Ninth Circuit has repeatedly held that "judicial review prior to the rendition of a final

26  arbitration award should be indulged, *if at all*, only in the most extreme cases."  *In re Sussex*, 781

27  F.3d at 1072 (quoting *Aerojet–General Corp.*, 478 F.2d at 251).  Thus, while the finality

28  requirement is not a "blanket rule precluding intervention in an ongoing arbitration," it is "close,"

- 8 -

1  *id.* at 1073, and the only two exceptions to the rule that have been specifically recognized by the

2  Ninth Circuit are exceedingly narrow.  In *Millmen Local 550*, for example, the court suggested that

3  early judicial intervention might be allowed in "exceptional case[s]" where the only functions

4  remaining for the arbitrators to complete were "ministerial act[s]" like the "mathematical

5  computations of the award." *Id.* at 1375 n. 1.  In *Aerojet–General*, the court hypothesized a non-

6  final award that might cause "severe irreparable injury" to one or more of the parties.  478 F.2d at

7  251.  "In such case the courts should be free to prevent a manifest injustice." *Id.*

8       **B.**     **The Order Regarding Liquidated Damages is not Final and, Therefore, is not**

9            **Reviewable.**

10       The arbitration decision giving rise to Petitioner's rush to court, the Order Regarding

11  Liquidated Damages, has all the markers of a non-final, interim order that is not reviewable under

12  the FAA.  Accordingly, Petitioner's request for vacatur should be dismissed before even

13  considering the merit (or lack of merit) of the Petition.

14       As an initial matter, it is worth noting that the Order Regarding Liquidated Damages is not

15  an "award" either in substance or in name.  Petitioner begs the question by referring to the Order as

16  an "interim final award," *see, e.g.*, Petitioner's Memorandum of Law in Support of Petition to

17  Vacate ("Pet'r's Mem. of Law") at 6, while never once mentioning the actual title of the Order.  The

18  Petition does not and cannot cite to any document in the record, any language in the Order, or any

19  FINRA rule that would justify using Petitioner's preferred nomenclature.  As a matter of fact, under

20  its plain terms, the Order does not purport to *award* either party anything.  Moreover, Rule 13904 of

21  FINRA's Code of Arbitration Procedure for Industry Disputes lists 13 specific elements that an

22  actual "award" must contain, including the damages requested and awarded and an allocation of

23  fees.  Shapren Decl., Ex. L.  The Order Regarding Liquidated Damages does not satisfy the

24  definition.  It is undoubtedly for this reason that the Panel declined to call its decision an "award"

25  and elected the more accurate name, "Order Regarding Liquidated Damages."  Even more to the

26  point, the Panel in this case has explicitly and entirely rejected Petitioner's effort to characterize the

27  Order as an "award" of any kind.  Shapren Decl., Ex. B ("The Panel's ***Order was not intended to be***

28  ***a Final Award or 'Interim Final Award'***...." (emphasis added)).

Whatever the name of the Panel's decision, the Order Regarding Liquidated Damages is not and does not purport to be a complete disposition of all the issues submitted by the parties for arbitration. On the contrary, the Order is a determination of an important, but not dispositive, legal issue regarding contract interpretation and enforcement. Numerous, substantive, and fundamental portions of the case remain unresolved, including the ultimate question of Petitioners' liability on Jefferies' breach-of-contract claim and, relatedly, Jefferies' entitlement to the liquidated damages remedy. Additionally, the arbitrators have been asked by both parties to award reasonable fees and costs (both attorneys' and FINRA fees) in an amount to be established at another, as-yet unscheduled hearing.

The Panel issued an incomplete determination of the case because that is what the parties asked it do when they requested a particular bifurcation of the arbitration proceedings. Both the parties and the Panel always understood that, whatever conclusion the Panel reached regarding the enforceability of the liquidated damages clause, there would be more hearings to resolve the whole of the arbitration matter, unless the parties agreed otherwise. The Order itself establishes that the Panel itself did not issue the Order as a final award, but merely as a first step in deciding the claims before it. The Panel expressly retained jurisdiction over the remaining substantive issues by recognizing the existence of "remaining issues" and announcing its readiness to schedule whatever briefing and hearing was needed to resolve those issues. Shapren Decl., Ex. A at 4. More recently, the Panel has further clarified this point, explaining that the "Order Regarding Liquidated Damages concluded the *first portion* of a bifurcated proceeding." Shapren Decl., Ex. B (emphasis added). Moreover, the Panel put the question of its intent regarding finality entirely beyond cavil by stating, without equivocation, that the "Order was *not intended to be a Final Award* …. subject to confirmation or vacatur by a court." *Id.*

Arbitrators, of course, have the authority to issue interim rulings as to only certain portions of a case. "In principle, there is nothing wrong with this practice." *Union Switch & Signal Div. Am. Standard, Inc. v. United Elec, Radio & Mach. Workers of Am., Local 610*, 900 F. 2d 608, 611 (3d Cir. 1990). It is entirely reasonable for an arbitrator, like the Panel in this case, to use interim rulings as a "'time out' during arbitration in the hope that a partial resolution will inspire the parties

Motion to Dismiss Petition to Vacate        **394**        EXHIBIT 10

394

1  to work out their remaining differences on their own." *Id.*; *see also* Order at 4 ("[T]he panel will

2  await the determination of the parties as to whether this decision fully disposes of this case ….").

3  Such a resolution would allow the parties to avoid the time and expense of additional arbitration.

4  But the courts must, "take care to ensure that parties do not use these 'time outs' as an opportunity

5  to rush to court … to forestall a process that is not turning out as they might have wished." *Union*

6  *Switch*, 900 F. 2d at 611.  If such practices are allowed, "the arbitrator's time will only be spared, if

7  at all, at the great expense of vastly prolonged and unnecessary litigation, which is of course

8  precisely what arbitration exists to avoid." *Id.*  These policy considerations are directly implicated

9  here because both Jefferies and Gegenheimer still have claims pending in arbitration.  Rather than

10  seek resolution of those claims in the proper, agreed-to forum of arbitration, Gegenheimer initiated

11  this "more cumbersome and time-consuming judicial review process." *In re Sussex*, 781 F.3d at

12  1072 (citation omitted).

13        As noted above, the Ninth Circuit has recognized that, in least in theory, there may be

14  "extreme cases" where review of a non-final order is warranted.  But, like every other case the

15  Ninth Circuit has considered, "this is clearly not an 'extreme case' in which mid-arbitration

16  intervention could be justified." *In re Sussex*, 781 F.3d 1065, 1073 (9th Cir. 2015); *id.* (noting that,

17  while the Ninth Circuit has recognized an "extreme-case" exception to the finality requirement, it

18  has "never subsequently approved of such an intervention [in an ongoing arbitration]").  Petitioner

19  will not suffer a "severe irreparable injury," *Aerojet–General Corp. v. Am. Arbitration Ass'n*, 478

20  F.2d 248, 251 (9th Cir. 1973), or otherwise be prejudiced if the Court were to dismiss the Petition as

21  premature.  Whatever rights Gegenheimer might have for a court of law to later review the Panel's

22  decision regarding the enforceability of the liquidated damages provision would remain fully intact.

23  All he would have to do is wait until the Panel completes its appointed duty to decide the remaining

24  issues and issues an award as required by FINRA Rule 13904, which the Panel has recently stated it

25  intends to do forthwith.  Shapren Decl., Ex. B.  Nor is this a case where all that remains are

26  "ministerial" tasks.  *Millmen Local 550, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v.*

27  *Wells Exterior Trim*, 828 F.2d 1373, 1375 n.1 (9th Cir. 1987)  (9th Cir. 1987).  The essential

28  question of liability, both as to Jefferies' claim for breach of contract and Gegenheimer's

- 11 -

395

1  counterclaims, has not been answered, and additional hearings will soon be scheduled for the Panel

2  to resolve it. Even the question of remedies, assuming the Panel finds one or both of the parties

3  liable, will require the presentation of evidence not yet in the record. In short, the remaining

4  responsibilities of the Panel are both numerous and substantive and require more than the

5  application of mere formulas.

6           **C.     Petitioners' Lone Case is Inapposite.**

7         The Petitioner appeals to this Court to intervene in an ongoing arbitration matter and vacate

8  an Order that does not determine the issues in that case and, by clear instruction of the Panel, was

9  never intended to do so. On this point, Petitioner knows about the Panel's recent pronouncement

10  that the arbitration is not over and that additional hearings are needed before any final award can be

11  made. Shapren Decl., Ex. B. He could have brought this ***directly*** relevant fact to the Court's

12  attention in his newly re-noticed Petition and Memorandum of Law. He did not do so, leaving the

13  Court with the wrong impression that the Panel's entire view of this matter is set forth in the Order

14  Regarding Liquidated Damages.

15         In any event, Petition makes no effort to address, much less distinguish, the general rule

16  prohibiting court-review of interim or interlocutory awards. Instead, Petitioner declares that the

17  Order Regarding Liquidated Damages is "ripe for review" because it is a "final determination of a

18  fundamental issue" presented by the parties to the Panel. Pet'r's Mem. of Law at 12. In support of

19  this conclusion, Petitioner cites a single case that does not recognize the "fundamental issue"

20  standard propounded by Petitioner. Nor does the actual holding of the case apply as a matter of law

21  and fact to the Petition to Vacate now before this Court.

22         Petitioner relies exclusively on the Ninth Circuit's narrow holding in *Pacific Reinsurance*

23  *Management Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019 (9th Cir. 1991). Petitioner's entire

24  treatment of the case is set forth in a parenthetical that characterizes it as an example of an

25  "interlocutory arbitration order [that] was subject to district court review." Pet'r's Mem. of Law

26  at 12. This nominal description, however, fails to grapple with the unique nature of the order in that

27  case, which justified what would have, in ordinary circumstances, been deemed premature judicial

28  intervention. In *Pacific Reinsurance*, the arbitration panel had issued an "Interim Final Order" that

- 12 -

"did not attempt to address, even partially, the substantive issues before the arbitrator," but, rather, provided only "temporary equitable relief" to the claimants. 935 F.2d at 1022. The limited question presented to the Ninth Circuit was whether the district court had the authority to review and confirm that order prior to resolution of the actual issues submitted to the arbitrators. The court held that, because temporary equitable orders may be necessary to make the underlying "arbitration proceedings meaningful" and may be "essential to preserve the integrity of that [arbitration] process," such orders are "final orders that can be reviewed … by district courts under the FAA." *Id.* at 1023.

The highly specific and circumscribed holding of *Pacific Reinsurance* does not apply to the Petition before this Court. Most obviously, the Order Regarding Liquidated Damages does not provide equitable relief, temporary or otherwise, to either party. Moreover, unlike in *Pacific Reinsurance*, where immediate review and enforcement of the Order was needed to ensure that the future arbitration hearings would not be a complete waste of time, such review is not needed to protect the credibility and meaningfulness of the arbitration proceeding before the Panel. In short, neither party's "ability to comply with a final decision will be destroyed" if the Panel is allowed to proceed to decide the remaining issues. *See Southwest Regional Council of Carpenters v. Drywall Dynamics, Inc.*, No. CV–13–272–MWF (MANx), 2013 WL 12143955, at *2 (C.D. Cal. June 17, 2013) (granting motion to dismiss petition to confirm interlocutory arbitration order that did not provide "temporary or emergency relief").

**IV.    CONCLUSION**

For the reasons fully discussed above, Respondent Jefferies respectfully submits that this Court lacks jurisdiction to review the Petition to Vacate and requests that the Petition be dismissed.

DATED: February 22, 2018                                SULLWOLD & HUGHES


                                                        By: ___*/s/ James A. Hughes*_____
                                                            JAMES A. HUGHES

                                                        *Counsel for Respondent Jefferies LLC*

OF COUNSEL:
Andrew J. Shapren (*pro hac vice* to be submitted)

- 13 -

# EXHIBIT S

EXHIBIT S

1 SULLWOLD & HUGHES
James A. Hughes (SBN 88380)
2 1999 Harrison Street, 18th Floor
Oakland, CA 94612-3520
3 Telephone: (510) 496-4616
Facsimile: (415) 762-5338
4
BUCHANAN INGERSOLL & ROONEY PC
5 Andrew J. Shapren (PA I.D. 91142) (*pro hac vice*)
Two Liberty Place
6 50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555
7 Telephone: (215) 665-8700
Facsimile: (215) 665-8760
8
*Attorneys for Respondent Jefferies LLC*
9

10 **UNITED STATES DISTRICT COURT**

11 **NORTHERN DISTRICT OF CALIFORNIA**

12

13 JON A. GEGENHEIMER,

14                          Petitioner,

15      vs.

16 JEFFERIES LLC,

17                          Respondent.

18

19

| | |
|---|---|
| CASE NO. 3:18-cv-00746 VC | |
| **RESPONDENT JEFFERIES LLC'S RESPONSE IN OPPOSITION TO PETITION TO VACATE ARBITRATION AWARD** | |
| Judge: | Hon. Vince Chhabria |
| Date: | March 29, 2018 |
| Time: | 10:00 a.m. |
| Courtroom: | Courtroom 4, 17th Floor |

20

21

22

23

24

25

26

27

28

399

EXHIBIT S

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF RELEVANT FACTS ..................................................................... 1

    A. The "Facts" in Gegenheimer's Brief are Mere Allegations that Were not Considered by the Arbitrators. ...................................................................... 1

    B. Gegenheimer Signs, and then Breaches, His Agreement with Jefferies. ..................... 2

    C. Jefferies' Use of Liquidated Damages Provisions in its Employment Agreements ......................................................................................................... 3

    D. The Parties Submit Their Dispute to FINRA Arbitration and Agree to First Address the Enforceability of the Liquidated Damages Provision. ........................... 4

    E. The Order Regarding Liquidated Damages ................................................................. 5

III. ARGUMENT ................................................................................................................ 5

    A. Standard of Review ...................................................................................................... 5

        1. The Court does not have Jurisdiction to Review the Non-Final Order ........... 5

        2. The Federal Arbitration Act's "Very High Standard" for Vacatur ................. 6

        3. The Order Does not Violate Public Policy ..................................................... 7

    B. The Panel did not Manifestly Disregard California Law. ............................................ 7

        1. The Panel's Decision to Apply New York Law was Proper and Reasonable. ....................................................................................................... 8

        2. The Panel did not Manifestly Disregard California Law when it Correctly Found that the Agreement did not Implicate Section 16600. .......... 9

    C. The Panel did not Manifestly Disregard New York Law. ........................................ 12

IV. CONCLUSION ........................................................................................................... 15

- i -

400

EXHIBIT S

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.G. Edwards & Sons, Inc. v. McCollough*,
   967 F.2d 1401 (9th Cir. 1992) ..................................................................... 13

*Am. Ins. Brokerage Corp. of California v. Woodruff-Sawyer*,
   No. C 04-2527 MJJ, 2005 WL 2354119 (N.D. Cal. Sept. 26, 2005).......................... 10

*Angelica Textile Servs., Inc. v. Park*,
   220 Cal. App. 4th 495 (2013), *as modified* (Oct. 29, 2013), *as modified on denial*
   *of reh'g* (Nov. 7, 2013) ............................................................................... 9

*Bosack v. Soward*,
   586 F.3d 1096 (9th Cir. 2009) ............................................................... 6, 7, 12

*Carter v. Health Net of Cal., Inc.*,
   374 F.3d 830 (9th Cir. 2004) ........................................................................ 6

*Collins v. D.R. Horton, Inc.*,
   505 F.3d 874 (9th Cir. 2007) ........................................................................ 6

*Comedy Club, Inc. v. Improve West Associates*,
   553 F.3d 1277 (9th Cir. 2009) ...................................................................... 11

*Crown IT Servs., Inc. v. Koval-Olsen*,
   782 N.Y.S.2d 708 (2004) ............................................................................ 14

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
   479 F.3d 1099 (9th Cir. 2007) ...................................................................... 10

*DAR & Assocs., Inc. v. Uniforce Servs., Inc.*,
   37 F. Supp. 2d 192 (E.D.N.Y. 1999) ............................................................... 14

*DeMartini v. Johns*,
   693 Fed. Appx. 534 (9th Cir. 2017)................................................................. 6

*Fundingsland v. Omh Healthedge Holdings, Inc.*,
   No. 15-CV-01053-BAS (WVG), 2016 WL 3022053 (S.D. Cal. May 26, 2016) ........................ 9

*Gavaldon v. StanChart Sec. Int'l, Inc.*,
   No. 12CV3016-LAB MDD, 2014 WL 1292907 (S.D. Cal. Mar. 28, 2014) .......................... 6, 13

*GFI Brokers, LLC v. Santana*,
   No. 06 CIV. 3988 (GEL), 2009 WL 2482130 (S.D.N.Y. Aug. 13, 2009)................................. 14

- i -

*Jenks v. DLA Piper (US) LLP*,
    No. 13-cv-05381-VC, 2014 WL 3381947 (N.D. Cal. July 10, 2014) .............................. 7, 11, 13

*Khajavi v. Feather River Anesthesia Med. Grp.*,
    84 Cal. App. 4th 32 (2000) ........................................................................................... 10

*Kyocera Corp. v. Prudential–Bache T Servs.*,
    341 F.3d 987 (9th Cir. 2003) (en banc) ........................................................................ 6

*Lagstein v. Certain Underwriters at Lloyd's, London*,
    607 F.3d 634 (9th Cir. 2010) ..................................................................................... 6, 7

*Lincoln Nat'l Life Ins. Co. v. Payne*,
    374 F.3d 672 (8th Cir. 2004) ......................................................................................... 6

*Marsh USA Inc. v. Hamby*,
    28 Misc. 3d 1214(A), 958 N.Y.S.2d 61 (N.Y. Sup. Ct. 2010).................................... 8

*Metro Traffic Control, Inc. v. Shadow Traffic Network*,
    22 Cal. App. 4th 853 (1994) ....................................................................................... 10

*Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.*,
    44 F.3d 826 (9th Cir. 1995), *as amended* (Feb. 8, 1995)............................................ 6

*Millmen Local 550, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Wells
    Exterior Trim*,
    828 F.2d 1373 (9th Cir. 1987) ..................................................................................... 5

*Millsap v. Nat'l Funding Corp. of Cal.*,
    57 Cal. App. 2d 772 (1943) ........................................................................................ 10

*San Martine Compania De Navegacion, S.A. v. Saguenay Terminals Ltd.*,
    293 F.2d 796 (9th Cir. 1961) ..................................................................................... 6, 7

*Sanchez v. Elizondo*,
    878 F.3d 1216 (9th Cir. 2018) ............................................................................. 6, 7, 12

*In re Sussex*,
    781 F.3d 1065 (9th Cir. 2015) ..................................................................................... 5

*Touchstone Television Prods. v. Super. Ct.*,
    208 Cal. App. 4th 676 (2012) .................................................................................... 10

*Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*,
    41 N.Y.2d 420 (1977) ................................................................................................ 14

*United Title Agency, LLC v. Surfside-3 Marina, Inc.*,
    885 N.Y.S.2d 334 (2009)............................................................................................ 14

Response in Opposition to Petition to Vacate

3:18-cv-00746 VC

EXHIBIT S

*USA India Exp. Imp., Inc. v. Coca-Cola Refreshments USA, Inc.*,
   9 N.Y.S.3d 596 (N.Y. Sup. Ct. 2015) ........................................................................ 8

*ValueSelling Assoc., LLC v. Temple*,
   No. 09-CV-1493-JM, 2011 WL 2532560 (S.D. Cal. June 23, 2011) .......................... 13

**Statutes**

9 U.S.C. § 10(a)(4) .......................................................................................................... 6

CA Bus. & Prof. Code Section 16600 ................................................................... *passim*

Cal. Lab. Code §§ 2920, 2922, 2924-2926, and 2855 .................................................. 10

- iii -

# I.     INTRODUCTION

Petitioner Gegenheimer asks this Court to take the rare step of vacating the unanimous interim decision of a duly appointed three-person arbitration panel (the "Panel").  In its decision, the Panel did nothing more than find that certain terms of a written contract, freely entered into by two sophisticated parties at arms' length and with the advice of counsel, were enforceable. Gegenheimer's sole argument for vacatur is that the Panel manifestly disregarded the law in making its decision.  To meet the exceedingly high burden for his argument, Gegenheimer must adduce clear evidence that all three of the arbitrators understood and correctly stated well defined, explicit and clearly applicable law and yet proceeded to ignore it.  Gegenheimer cannot satisfy that burden.

# II.    STATEMENT OF RELEVANT FACTS

## A.     The "Facts" in Gegenheimer's Brief are Mere Allegations that Were not Considered by the Arbitrators.

Gegenheimer's Brief purports to rely on "background facts" contained in the parties' pleadings. Pet'r's Mem. at 6 n.3. As both parties and the Panel acknowledged at the hearing of this matter, the unsubstantiated factual allegations set forth in Gegenheimer's Answer and Counterclaims are not evidence.  Declaration of Andrew J. Shapren in Support Of Jefferies' Opposition to Petition to Vacate Arbitration Award ¶ 12.  During the hearing, the Panel stated that the only evidence it would consider in making its decision were the record documents attached to the parties' respective briefs and the Declaration of Chris Kanoff, which was admitted into evidence by agreement of the parties.  *Id.* Accordingly, the unsubstantiated allegations set forth in Gegenheimer's Brief are inapposite to the task before the Court.

Moreover, many of Gegenheimer's unsubstantiated factual allegations are demonstrably false.  The actual facts, properly supported by record evidence, are set forth in Jefferies' Opening Brief and the Opposition to Gegenheimer's Brief filed in the Arbitration. Ex. 5[1] at 3-11; Ex. 7 at 1-7.  Those facts are briefly summarized below.

---

[1] Numbered exhibits are exhibits to the Shapren Declaration, which is being filed with and in support of Jefferies' Opposition.

**B.** **Gegenheimer Signs, and then Breaches, His Agreement with Jefferies.**

Jefferies is a financial services firm that maintains a global investment banking practice.  In late November 2015, Jefferies began searching for a new managing director to fill a need for M&A coverage in its Technology Group.  Jefferies, with the assistance of an executive search firm, identified, and considered several qualified potential candidates for the position, including Gegenheimer. Ex. 5 at 6. After a lengthy interview process, Jefferies informed Gegenheimer that it intended to extend him an offer of employment and Gegenheimer communicated to Jefferies that he was interested in joining Jefferies.  *Id.* at 7.  Thereafter, Jefferies and Gegenheimer negotiated compensation, start date, and other terms of employment that were ultimately memorialized in an employment agreement (the "Agreement").  *Id.*

These negotiations were conducted at arm's length.  *Id.*  Gegenheimer is a well-educated, highly sophisticated and experienced professional.  *Id.*  Moreover, contrary to Gegenheimer's implication that he was left to deal with Jefferies alone, Pet'r's Mem. at 7-8, Gegenheimer, in fact, retained and consulted with an attorney.  *Id.* at 8; Ex. 7 at 2-3.  Indeed, Jefferies encouraged Gegenheimer to consult with an attorney, provided a list of optional attorney referrals, and even agreed to reimburse Gegenheimer for his legal fees if Gegenheimer ultimately joined Jefferies.  *Id.* Gegenheimer's lawyer, Robert Thomas, specializes in employment agreements, executive compensation, and employment counseling.  *Id.*  Jefferies provided Thomas with a draft of the proposed agreement in advance of the negotiations. Ex. 5 at 8; Ex. 7 at 2.

On May 18, 2016, Jefferies and Gegenheimer executed the Agreement. Ex. 5 at 8.  Contrary to Gegenheimer's bald assertion that he was "coerce[d]" or "pressure[d]" into signed the Agreement, Pet'r's Mem. at 8, Gegenheimer was always free, if he did not like the terms of the Agreement, to not sign it and remain in his lucrative position at Credit Suisse where he had worked for the past 13 years.  The only "pressure" Gegenheimer faced was that Jefferies' offer provided him an opportunity to make considerably more money than he had ever made in his life.

Because Gegenheimer's contract with Credit Suisse contained a notice or "garden leave" requirement, the Agreement required Jefferies to hold the position open for Gegenheimer for 90 days and required Gegenheimer to join Jefferies on or before August 17, 2016, after he complied

EXHIBIT 10046 VC

with his notice provision. Ex. 5 at 8. The Agreement included a generous compensation package for Gegenheimer including a seven-figure sum in the first year alone. *Id.* at 8-9.

In signing the Agreement, Gegenheimer agreed that, if he failed to commence employment with Jefferies by August 17, 2018, he would pay Jefferies liquidated damages in the amount of $1,000,000.[2] *Id.* at 9; *see also* Ex. 1 at 2; Ex. A (Agreement) at ¶ V, B.[3] Indicative of the mutuality of the parties' obligations found throughout the Agreement, Jefferies was similarly obligated to pay liquidated damages to Gegenheimer, albeit in a greater amount, in the event Jefferies failed to fulfill its obligation to hire Gegenheimer as agreed. Ex. 5 at 9-10; *see also* Ex. A at ¶ V, F.

On May 24, 2016, Gegenheimer informed Jefferies that, despite signing the Agreement, he would not join Jefferies as agreed, but instead would remain with Credit Suisse. Ex. 5 at 10. Jefferies has since discovered that, after signing the Agreement, Gegenheimer obtained more favorable terms of employment at Credit Suisse, including a promotion to Managing Director and a significant increase in guaranteed compensation for 2016. *Id.* at 10-11. Moreover, as was explained to the Panel, Credit Suisse agreed to indemnify Gegenheimer should Jefferies seek to enforce the liquidated damages provision. *See* Ex. 7 at 7. In short, rather than illegal restraining his ability to pursue employment, as he now claims, Gegenheimer used his Jefferies' contract to negotiate a better deal with Credit Suisse. By reneging on his promise to join Jefferies, Gegenheimer breached the Agreement and triggered the liquidated damages provision.

**C.** <u>**Jefferies' Use of Liquidated Damages Provisions in its Employment Agreements**</u>

The liquidated damages provision in Gegenheimer's Agreement is typical of Jefferies' employment contracts with its high level investment banking recruits. As thoroughly explained in the Declaration of Chris Kanoff, Jefferies suffers significant damages if, after it has carefully determined the need for a candidate, searched for and selected an appropriate candidate, worked to recruit a candidate to the exclusion of others, negotiated and executed a contract with a candidate,

---

[2] The $1,000,000 liquidated damages figure was arrived at by taking Gegenheimer's agreed upon first year's compensation at Jefferies in the form of salary ($350K) and 2016 Bonus ($720,834) and rounding down to $1,000,000. *See* Ex. B at ¶ 7.

[3] Lettered exhibits are exhibits to Jefferies' Opening Brief in Support of its Claim for Liquidated Damages and Appendix of Supporting Exhibits, which is Exhibit 5 to the Shapren Declaration.

EXHIBIT 10 3:18-cv-02086 VC

and prepared for the onboarding of the candidate, the candidate intentionally breaches the agreement to join Jefferies. Ex. B at ¶ 2. Given the many variables that could affect the damages Jefferies would suffer, it is not possible to quantify those damages with accuracy, so Jefferies developed a reasonable formula that would provide it with fair average compensation in the event of breach. *Id.* at ¶ 4. Jefferies determined that a liquidated damage consisting of the guaranteed compensation offered to the recruit for his/her first year at Jefferies was reasonable. *Id.* at ¶ 4.

### D. The Parties Submit Their Dispute to FINRA Arbitration and Agree to First Address the Enforceability of the Liquidated Damages Provision.

On August 19, 2016, Jefferies initiated FINRA arbitration proceedings against Gegenheimer. Ex. 2. Jefferies' Statement of Claim asserted a single cause of action against Gegenheimer, claiming that he "breached the Agreement by advising Jefferies that he will not join Jefferies as provided for in the Agreement." *Id.* at ¶ 36. With respect to remedies, Jefferies asked the Panel to enforce the liquidated damages provision and award "[l]iquidated damages … in the amount of $1,000,000." *Id.* at 10. Jefferies also requested compensatory damages, but only "if the liquidated damages clause is not enforced." *Id.*

Prior to the first hearing date, the parties informed the Panel of their agreement to have the Panel consider their claims and defenses in an atypical bifurcated process. Ex. 3. The parties asked the Panel to first "solely adjudicate whether the liquidated damages clause in the agreement is enforceable or unenforceable." *Id.* at 1. The Panel approved the parties' agreement. Ex. 4. On January 3, 2018, Jefferies submitted its Opening Brief in Support of its Claim for Liquidated Damages and Appendix of Supporting Exhibits. Ex. 5. On the same date, Gegenheimer submitted his Opening Brief. Ex. 6. On January 16, Jefferies submitted its Opposition Brief, and an Appendix containing copies of all legal authorities cited in its briefs. Exs. 7 & 8.[4] On the same date, Gegenheimer submitted his Opposition Brief. Ex. 9. At no time, however, did Gegenheimer provide the panel with copies of any authorities cited in his briefs. The hearing on this first phase of

---

[4] To illustrate what information was provided to the Panel, Jefferies has attached to the Shapren Declaration only the table of contents to the Appendix of Authorities, rather than the authorities themselves.

- 4 -

407 EXHIBIT 005 18-700846 VC

the case took place on January 24, 2018, during which the parties engaged in approximately five hours of oral argument. Shapren Decl. ¶ 11.

### E. The Order Regarding Liquidated Damages

On January 29, 2018, the Panel issued an "Order Regarding Liquidated Damages" (the "Order"), which held that the "liquidated damages clause … of the Agreement is enforceable by Jefferies against Gegenheimer." Ex. 1. More specifically, the Panel found that "the actual damages that would be sustained by Jefferies were inherently incapable of accurate estimation at the time the Agreement was entered into." *Id.* at 3-4. Additionally, "the liquidated damages amount [set forth in the Agreement] is reasonable in light of the anticipated probable harm" to Jefferies. *Id.* at 4. Lastly, "[t]he liquidated damages clause in the Agreement did not restrain [Gegenheimer] from engaging in his profession" in violation of Section 16600 of the CA Bus. & Prof. Code. *Id.*

## III. ARGUMENT

### A. Standard of Review

Gegenheimer offers two standards by which the Court should measure the merits of his Petition to Vacate. First, he relies on the "manifest disregard of the law" test. Second, he suggests that vacatur is appropriate to avoid a violation of public policy. The Petition, however, fails to adduce sufficient evidence to satisfy either of these standards and, for that reason, should be denied.

#### 1. The Court does not have Jurisdiction to Review the Non-Final Order.

It is well-settled that courts can only review arbitration awards that fully and finally dispose of all the issues put before the arbitrator and must avoid consideration of interim, interlocutory, or otherwise non-final determinations. *In re Sussex*, 781 F.3d 1065, 1071–72 (9th Cir. 2015); *Millmen Local 550, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Wells Exterior Trim*, 828 F.2d 1373, 1375 (9th Cir. 1987). Gegenheimer seeks to avoid this bar by proclaiming the Order to be final. Pet'r's Mem. at 12. For the reasons set forth in Jefferies' previously submitted Motion to Dismiss [Dkt. No. 16], Gegenheimer's wishful declaration is false, the Order is not a final disposition, and, for this reason alone, the Petition to Vacate should be denied.

- 5 -

## 2. The Federal Arbitration Act's "Very High Standard" for Vacatur

Section 10 of the FAA provides the "exclusive basis and standards in federal law for … vacating an arbitration award." *Gavaldon v. StanChart Sec. Int'l, Inc.*, No. 12CV3016-LAB MDD, 2014 WL 1292907, at *1 (S.D. Cal. Mar. 28, 2014) (citation omitted). The scope of review under the FAA for review of an arbitration award is "both limited and highly deferential." *DeMartini v. Johns*, 693 Fed. Appx. 534, 536 (9th Cir. 2017) (citation omitted). The "very 'high standard for vacatur'" includes cases "where the arbitrators exceeded their powers." *Sanchez v. Elizondo*, 878 F.3d 1216 (9th Cir. 2018) (quoting *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 641 (9th Cir. 2010)); 9 U.S.C. § 10(a)(4). As "shorthand" for this statutory test, the Ninth Circuit has recognized a "narrow 'manifest disregard for the law' exception" to the usual prohibition on a court's review of the merits of an arbitration award. *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007); *Kyocera Corp. v. Prudential–Bache T Servs.*, 341 F.3d 987, 997 (9th Cir. 2003) (en banc).

Gegenheimer has the burden of establishing manifest disregard, and it is a "difficult [standard] to satisfy." *Gavaldon*, 2014 WL 1292907, at *2. For an award to be in manifest disregard of the law, "[i]t must be clear from the record that the arbitrators recognized the applicable law and then ignored it." *Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995), *as amended* (Feb. 8, 1995) (citations omitted). Indeed, as the Ninth Circuit has long held, "the moving party must show that the arbitrator 'underst[oo]d and correctly state[d] the law, but proceed[ed] to disregard the same.'" *Collins*, 505 F.3d at 879 (quoting, with alterations, *San Martine Compania De Navegacion, S.A. v. Saguenay Terminals Ltd.*, 293 F.2d 796, 801 (9th Cir. 1961)).

To meet his burden, a petitioner must identify "some evidence in the record," *Bosack v. Soward*, 586 F.3d 1096, 1104 (9th Cir. 2009) (quoting *Lincoln Nat'l Life Ins. Co. v. Payne*, 374 F.3d 672, 675 (8th Cir. 2004)), that proves the arbitrators expressly recognized the "well defined, explicit, and clearly applicable" law and proceeded to intentionally disregard it. *Collins*, 505 F.3d at 880 (quoting *Carter v. Health Net of Cal., Inc.*, 374 F.3d 830, 838 (9th Cir. 2004)). As this Court has made clear, this burden cannot be met merely by the fact that petitioner presented cases or

identified other authority for the arbitrator. *Jenks v. DLA Piper (US) LLP*, No. 13-cv-05381-VC, 2014 WL 3381947, at *7 (N.D. Cal. July 10, 2014) (fact that petitioner "submitted clearly-established ERISA authority to the arbitrator … is not enough to state a claim that [arbitrator] 'recognized' the authority and then ignored it"). Nor can it be met by noting an adverse or even mistaken result. *Bosack*, 586 F.3d at 1104 (holding that vacatur requires evidence "other than the result"). Indeed, it is hornbook law that a mere showing that the arbitrators erred in interpreting or applying the law will not justify vacatur. *Sanchez*, 878 F.3d at 1221 ("It is not enough for petitioners to show that the panel committed an error – or even a serious error." (citations omitted)); *Lagstein*, 607 F.3d at 641 ("Manifest disregard of the law means something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law."). Something "beyond and different" than a mistake or a misapplication of the law is required. *San Martine Compania De Navegacion*, 293 F.2d at 801.

### 3. The Order Does not Violate Public Policy

Gegenheimer alternatively suggests that the Order "violates fundamental California public policy." Pet'r's Mem. at 12. Gegenheimer, however, does not offer any analysis or argument independent from his unavailing appeal to the "manifest disregard" test. In any event, as explained below, enforcement of the liquidated damages provision, does not violate California policy. Thus, even considering the demands of public policy, the Petition should be denied.

### B. The Panel did not Manifestly Disregard California Law.

Gegenheimer's first argument is dedicated to convincing this Court that the liquidated damages provision in the Agreement is a restrictive covenant that is unenforceable under California law. Thus, he contends, the Panel "improperly deprived Gegenheimer of his fundamental rights … and enforced an illegal restraint that violates Section 16600" when it decided the provision is enforceable. Pet'r's Mem. at 12. Gegenheimer asserts that the Panel made two related legal mistakes. First, he attacks the Panel's decision to "enforce the parties' agreement and apply New York law in deciding the issue presented." Ex. 1 at 3. Second, he claims that the Panel ignored Section 16600's general prohibitions against restrictive covenants. As a matter of fact and law, Gegenheimer is wrong on both counts. A proper review of the record shows that the Panel did not

EXHIBIT 0046 VC

disregard, ignore, or even mistakenly apply the law that governed the interpretation and enforcement of the liquidated damages provision.

### 1. The Panel's Decision to Apply New York Law was Proper and Reasonable.

The Panel's choice-of-law analysis rightly started with the fact that the parties agreed to have their disputes arising from or related to the Agreement controlled by the laws of New York. *See* Ex. A, at V, I ("This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York."). Choice of law provisions are regularly enforced as long as (1) the law provided for has a reasonable relationship to the parties or the transaction; and (2) the application of such law is not contrary to a fundamental public policy of a jurisdiction with a materially greater interest. *See USA India Exp. Imp., Inc. v. Coca-Cola Refreshments USA, Inc.*, 9 N.Y.S.3d 596 (N.Y. Sup. Ct. 2015). "[T]he issue [must be] of such overriding concern to the public policy of another jurisdiction as to override the intent of the parties and the interest of [New York] in enforcing its own policies." *Marsh USA Inc. v. Hamby*, 28 Misc. 3d 1214(A), 958 N.Y.S.2d 61 (N.Y. Sup. Ct. 2010) (citation omitted).

Gegenheimer asserts that the Agreement is not related to New York and argues that "[t]he only connection this matter has to New York is the fact that Jefferies is headquartered there." Pet'r's Mem. at 12, 14. In urging this conclusion, Gegenheimer misstates the facts of record and ignores the explicit findings of the Panel. Gegenheimer has substantial ties to New York. Beyond the fact that he intentionally engaged in negotiations to become employed with Jefferies – a company with its headquarters, principal place of business, and most of its employees in New York – many of his communications regarding that potential employment were with Jefferies' agents that he met *in New York*. *Id.* at 6; Ex. 7 at 4-5. Gegenheimer's meeting to negotiate his Agreement was even originally supposed to be held in New York. Ex. 5 at 18. Moreover, Gegenheimer regularly conducted business in New York on behalf of Credit Suisse, which is also headquartered in New York. *Id.* It is for these reasons that the Panel pithily stated that "New York has a reasonable relationship to the parties and the transaction," specifically finding that "Gegenheimer does business

- 8 -

there."[5]  Ex. 1 at 3.  Further, because, as discussed below, Section 16600 is not implicated in this case, California public policy cannot override New York's interest.

> 2.    The Panel did not Manifestly Disregard California Law when it Correctly Found that the Agreement did not Implicate Section 16600.

Gegenheimer's grievance about the choice of New York law is merely an alternative formulation of his real argument; namely, that the Panel "enforced an illegal restraint that violates Section 16600" of the California Business & Professions Code in manifest disregard of California law.  Pet'r's Mem. at 12.  In fact, a review of the actual Order shows that the Panel did not disregard California law.  Instead, it is clear from the record that the Panel correctly applied the law.  The Panel, for example, explained that prohibitions against illegal restraints required by Section 16600 apply, usually in post-employment cases, *see, e.g., Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 509 (2013), *as modified* (Oct. 29, 2013), *as modified on denial of reh'g* (Nov. 7, 2013), where the restrictions would "keep California residents from engaging in lawful employment."  Ex. 1 at 4.  But the liquidated damages provision in this case was not a restrictive covenant in such an agreement.  Rather, the provision at issue is a liquidated damages clause in an agreement that is akin to a ***term employment agreement*** in which an employee agrees to work for an employer for a specified period of time.

At set forth at length in Jefferies' Opposition Brief, Gegenheimer was required to commence his employment by a certain date and was required to work for Jefferies for at least one year.  Ex. 7 at 9-12.  Likewise, Jefferies was required to hire Gegenheimer by that certain date and could not terminate him without cause until December 31, 2017 without having to pay Gegenheimer substantial compensation.  *See id.*; *see also* Ex. A at ¶ V, F.  This arrangement was no different in substance than the countless employees in California who enter into fixed-term employment contracts with their employers.  Term agreements, of course, necessarily limit an employee's ability

---

[5] As Jefferies argued to the Panel, Ex. 5 at 12-19, Ex. 7 at 13-15, the forum selection clause in the Agreement obliged the Panel to approach the legal issues in this matter, including the enforcement of the choice of law provision, as would a New York court of law.  In any event, California courts also regularly enforce choice of law provisions under a standard materially identical to that applied by New York courts.  *Fundingsland v. Omh Healthedge Holdings, Inc.*, No. 15-CV-01053-BAS (WVG), 2016 WL 3022053, at *4 (S.D. Cal. May 26, 2016).

to leave and join a competitor. The California Labor Code, however, expressly recognizes the validity of term employment agreements and does not consider them to be a restraint of trade in violation of Section 16600. *See* Cal. Lab. Code §§ 2920, 2922, 2924-2926, and 2855 (discussing employment for a specified term, circumstances in which the employee or employer may prematurely terminate such an agreement without breaching it, and the 7-year limit on fixed-term contracts). Indeed, California courts have repeatedly interpreted, enforced, and recognized the validity of term contracts. *See, e.g.*, *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1106-07 (9th Cir. 2007); *Touchstone Television Prods. v. Super. Ct.*, 208 Cal. App. 4th 676, 683-84 (2012); *Khajavi v. Feather River Anesthesia Med. Grp.*, 84 Cal. App. 4th 32, 38-39 (2000); *Millsap v. Nat'l Funding Corp. of Cal.*, 57 Cal. App. 2d 772, 777 (1943). In fact, California courts have encouraged the use of fixed-term agreements by an employer. *See, e.g.*, *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 862 (1994) ("If Metro wanted to assure the continued availability of these employees (and their voice qualities and personalities) for future assignments or simply to shrink the pool of available talent, it could enter into exclusive long term contracts to that end.").

Put simply, contracts *of employment* as opposed to *post-employment restrictive covenants*, do not constitute the type of trade restraint prohibited by Section 16600. *See, e.g.*, *Am. Ins. Brokerage Corp. of California v. Woodruff-Sawyer*, No. C 04-2527 MJJ, 2005 WL 2354119 (N.D. Cal. Sept. 26, 2005). For all the same reasons, Section 16600 does not apply to an agreement to begin work by a particular date, like the Agreement and liquidated damages provision at issue here.

Both before the Panel and to this Court, Gegenheimer repeatedly misstates the nature of the Agreement. Contrary to Gegenheimer's representations that the liquidated damages provision "prohibits Gegenheimer from accepting employment with Credit Suisse or any other competitor for the three-month period prior to his employment with Jefferies," Pet'r's Mem., Ex. G at 12, the liquidated damages provision simply required Gegenheimer to join Jefferies on or before August 17, 2016. Before that time and during his garden leave, Gegenheimer not only was permitted to "remain employed with Credit Suisse," Pet'r's Mem. at 13, he was ***obligated*** to do so. Nor did the Agreement preclude Gegenheimer from working for a competitor. Under the Agreement,

- 10 -

1    Gegenheimer was free to do whatever he wanted for whomever he chose until he was required to

2    report to work at Jefferies on August 17, 2016. The only trigger for the liquidated damages was his

3    failure to show up for work at Jefferies as promised. And the Panel rightly and reasonably

4    recognized exactly that. Ex. 1 at 4 ("The Agreement did not require Gegenheimer to cease working

5    for Credit Suisse or refrain from working for any other competitor before joining Jefferies.").

6          In trying to find support for its claim that the Order must be vacated under the manifest

7    disregard for the law standard, Gegenheimer offers a brief reference to the Ninth Circuit's opinion

8    in *Comedy Club, Inc. v. Improve West Associates*, 553 F.3d 1277 (9th Cir. 2009). The court's

9    opinion in *Comedy Club* does not apply to the Panel's Order or, more generally, to the enforcement

10   of the liquidated damages provision for at least three reasons. First, and directly to the immediate

11   question of vacatur posed by the Petition, Gegenheimer has failed to point to any evidence from the

12   arbitration record that shows the Panel understood, stated, and ignored the governing law under

13   Section 16600. *See Jenks*, 2014 WL 3381947, at *7. In direct contrast to the arbitrator's opinion in

14   *Comedy Club*, which specifically addressed the case law that the court found dispositive, *see* 553

15   F.3d at 1292-93, there is no language in the Order that suggests the Panel was aware of, understood,

16   and disregarded the cases that Gegenheimer now suggests controls. Nor would there be, given that

17   the briefs Gegenheimer submitted to the Panel set forth no argument and offered no authority to

18   dispute Jefferies' claim that the Agreement was more like a term employment agreement that is

19   encouraged, rather than condemned, by California law. Gegenheimer, for example, did not even

20   refer the Panel to *Comedy Club*, the one case on which he now relies, and never argued that the

21   liquidated damages provision constituted an unenforceable in-term non-compete agreement.

22         Second, *Comedy Club* does not hold that all "in-term" restrictive covenants are invalid *per

23   se*. Rather, the damning feature of the covenant not to compete in that case was its "dramatic

24   geographical and temporal scope" that "foreclose[d] competition in a substantial share" of the

25   party's business. *Comedy Club*, 553 F.3d at 1292. In this case, as discussed above, the liquidated

26   damages provision does not actually foreclose Gegenheimer from continuing his employment with

27   Credit Suisse or even working for a competitor. It only requires that he join Jefferies at the agreed-

28   to time.

414     EXHIBIT 00546 VC

Third, *Comedy Club* does not make any ruling or holdings with respect to *term employment* agreements. To the contrary, *Comedy Club* discussed only franchise agreements and other agreements between business partners, as opposed to agreements between employers and employees. This, of course, is not surprising given that both the California legislature and California courts have expressly recognized the enforceability of term employment agreements, despite the fact that they inherently prohibit the employee from competing during the term.

In the end, while Jefferies submits the Panel's ruling was entirely correct, even if the Panel committed an error or misunderstood or misapplied the law, it is of no consequence. In fact, only at the end of his explanation of (inapplicable) California policy does Gegenheimer deign to mention the standard he must meet. Gegenheimer, however, does not direct this Court's attention to any evidence in the record that might be read to show that the Panel "understood and correctly stated the applicable law" and then ignored it. Gegenheimer's failure to actually engage the governing standard is understandable given that the record is utterly devoid of the kind of clear evidence required. In the end, therefore, like so many other parties unhappy with the result of their bargained-for arbitration, Gegenheimer can do no more than complain that the Panel got it wrong. Even if that plea were accurate, which it is not, it is not grounds for vacatur.

### C.  The Panel did not Manifestly Disregard New York Law.

Gegenheimer also claims that the Order must be vacated because it "inexplicably ignored New York law." Pet'r's Mem. at 17. Gegenheimer's argument in support of this claim does not even acknowledge, much less meet, the high standard that governs it. As noted above, Gegenheimer must have "some evidence in the record, other than the result," that the arbitrators were recognized, understood, and intentionally disregarded the law. *Bosack v. Soward*, 586 F.3d 1096, 1104 (9th Cir. 2009) (citation omitted). But Gegenheimer does not point to any language in the Order or to any other part of the record where the Panel can be said to have understood the law on which Gegenheimer relies, but purposefully elected to throw it aside in favor of its "own brand of industrial justice." *Sanchez v. Elizondo*, 878 F.3d 1216, 1221 (9th Cir. 2018) (citations omitted). Rather, Gegenheimer offers two other kinds of evidence, neither of which meets the high standard for vacatur.

- 12 -

First, Gegenheimer seeks to prove the Panel's alleged "manifest disregard" by noting that he "provided the Panel with ample legal authority" in his brief and pointed out that authority at the hearing. Pet'r's Mem. at 17. But "repeated citations to the cases in [an arbitration] brief," which the Panel fails to actually discuss, "does not amount to manifest disregard under the FAA." *ValueSelling Assoc., LLC v. Temple*, No. 09-CV-1493-JM, 2011 WL 2532560, at *4 (S.D. Cal. June 23, 2011). This Court has made this point perfectly clear in language wholly apposite to this case: "The mere submission of authority to arbitrator (even when the arbitrator requests it ….), cannot possibly give rise to a claim that the arbitrator 'recognized' that authority. Otherwise, there would be nothing to distinguish mere error … from manifest disregard" of the law. *Jenks v. DLA Piper (US) LLP*, No. 13-cv-05381-VC, 2014 WL 3381947, at *7 (N.D. Cal. July 10, 2014).

Second, and all that Gegenheimer is left with, is the fact that the Panel made its determination "without any explanation" or discussion of whether "liquidated and actual damages are mutually exclusive remedies under New York law." Pet'r's Mem. at 16, 19. Gegenheimer is right that the Order does not discuss this issue. Gegenheimer would have this Court find manifest disregard in the Panel's silence, but such a leap would be contrary to the law of the Circuit. It is well-settled that "[a]rbitrators are not required to state reasons for their findings, but are presumed to have made their award on permissible grounds." *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403 (9th Cir. 1992). For this reason, an "incomplete explanation of the panel's award, or *even a lack of explanation*, will not support vacatur." *Gavaldon v. StanChart Sec. Int'l, Inc.*, No. 12CV3016-LAB MDD, 2014 WL 1292907 (S.D. Cal. Mar. 28, 2014); *ValueSelling Assoc., LLC*, 2011 WL 2532560, at *4 (denying motion to vacate and holding that arbitrator's lack of citation to allegedly controlling case law was "ambiguous at best"). As this Court held in *Jenks*, "the arbitrator must actually 'recognize' clearly established … law," which can only be evidenced by a record expressly showing that she "understood and correctly stated the law." 2014 WL 3381947, at *7 (citation omitted); *id.* at *8 (dismissing petition to vacate where arbitrator "gave no indication she was consciously disregarding some clearly established rule").

Moreover, Jefferies asserted a number of arguments, and the record in this case supports, many explanations, beyond manifest disregard, for the Panel's determination that the liquidated

- 13 -

EXHIBIT 00046 VC

damages provision is enforceable under New York law. First, the specific reasoning and discussion of New York law that the Panel included in the Order – its explication of (a) the requirements for the enforcement of a liquidated damages provision, (b) the relevant time when the provision must be interpreted, and (c) who carries the burden of proof (in this case, Gegenheimer) – is entirely consistent with the governing law. *See* Ex. 1 at 3; *see also DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 200 (E.D.N.Y. 1999); *United Title Agency, LLC v. Surfside-3 Marina, Inc.,* 885 N.Y.S.2d 334, 335 (2009); *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977).[6]

Second, consistent with the principle that liquidated and actual damages should be treated as mutually exclusive remedies, in its Statement of Claim and thereafter, Jefferies never asked the Panel to award it both types of damage together and always treated them as mutually exclusive remedies. Shapren Decl. ¶ 13. Thus, the Panel may have been persuaded by the fact that, in seeking only liquidated damages, rather than actual damages, Jefferies was not seeking to "have [its] cake and eat it too," thereby avoiding the presumed evil identified in Gegenheimer's cases. Importantly, none of those cases address such a situation.

Third, Jefferies presented substantial evidence of the parties' respective bargaining positions and offered case law showing that New York courts in particular give deference to liquidated damages provisions where, as here, the parties to the agreement are sophisticated business people; where the parties have equal access to counsel; and where the parties have equal bargaining power. *See GFI Brokers, LLC v. Santana*, No. 06 CIV. 3988 (GEL), 2009 WL 2482130, at *8 (S.D.N.Y. Aug. 13, 2009)*; Crown IT Servs., Inc. v. Koval-Olsen*, 782 N.Y.S.2d 708 (2004). Jefferies argued that none of the cases cited by Gegenheimer involve the type of facts set forth in this case; facts which New York courts dictate require deference to the parties' agreement. Shapren Decl. ¶ 13.

Fourth, at the hearing, counsel for Jefferies reminded the Panel that the Agreement specifically provides for severability. *See* Ex. A at ¶ III, H. He argued that, if the Panel were so

---

[6] Gegenheimer does not quarrel with this fact. He also does not challenge the Panel's stated findings, "[b]ased on the record," that "the actual damages that would be sustained by Jefferies were inherently incapable of accurate estimation at the time of the Agreement was entered into and the liquidated damages amount is reasonable in light of the anticipated probable harm." Ex. 1 at 3-4.

EXHIBIT 00546 VC

inclined, it could sever any offending portion of the liquidated damages provision and enforce the remainder of the contract. Shapren Decl. ¶ 13. The Panel may have understood that severing the last sentence of the liquidated damages clause would have allowed Jefferies to do exactly what it was doing anyway, i.e., pursue liquidated damages to the exclusion of actual damages.

Lastly, Gegenheimer waived his defenses by agreeing that he, "will not assert any defenses, rights of set-off, or counterclaims as a reason for not fully repaying any amounts due under this Agreement." Ex. A. at III, C; Shapren Decl. ¶ 13. This provision too supports the Panel's determination to enforce the liquidated damages clause, notwithstanding the legal arguments that Gegenheimer raised.

Once again, while Jefferies submits that the Panel's decision was entirely correct, even if the Panel failed to review the cases cited by Gegenheimer, misunderstood them, or misapplied New York law, such error is not grounds for vacatur. Gegenheimer has invoked the strict and high standards of the FAA to have this Court vacate an Order resulting from the arbitration proceeding to which he agreed to submit. He has assumed the significant burden of proving, not that the Panel was wrong or mistaken, but that the Panel understood and correctly stated clearly applicable law and then intentionally disregarded it. Having failed to adduce any evidence from the record that meets this high standard required for vacatur, Gegenheimer's Petition must be denied.

## IV.   **CONCLUSION**

For the reasons fully discussed above, Respondent Jefferies respectfully submits that the Petition to Vacate fails to establish that the Panel exceeded its authority by manifestly disregarding the law, as required for vacatur under the FAA, and, therefore, that the Petition be dismissed.

DATED: March 7, 2018                                    SULLWOLD & HUGHES

                                                        By:   _/s/ James A. Hughes_
                                                              JAMES A. HUGHES

                                                        *Counsel for Respondent Jefferies LLC*

OF COUNSEL:
Andrew J. Shapren (*pro hac vice*)

- 15 -

# EXHIBIT T

EXHIBIT T

1    David Jacobs (State Bar No. 73545)
     Edward J. Loya, Jr. (State Bar No. 257346)
2    David M. Prager (State Bar No. 274796)
     EPSTEIN BECKER & GREEN, P.C.
3    1925 Century Park East, Suite 500
     Los Angeles, California 90067-2506
4    Telephone: 310.556.8861
     Facsimile: 310.553.2165
5    djacobs@ebglaw.com
     eloya@ebglaw.com
6    dprager@ebglaw.com
7
8    Attorneys for Petitioner
     JON A. GEGENHEIMER
9                    UNITED STATES DISTRICT COURT
10                  NORTHERN DISTRICT OF CALIFORNIA
11                       SAN FRANCISCO DIVISION
12
13   JON A. GEGENHEIMER,                  CASE NO. 18-cv-00746-VC
14              Petitioner,               **PETITIONER JON A. GEGENHEIMER'S
                                          OPPOSITION TO JEFFERIES LLC'S
15        v.                              MOTION TO DISMISS PETITION TO
                                          VACATE ARBITRATION AWARD**
16
17   JEFFERIES LLC,                       Judge:    Hon. Vince Chhabria
                                          Date:     March 29, 2018
18              Respondent.               Time:     10:00 a.m.
                                          Ctrm:     Courtroom 4, 17th Floor
19
20                                        [Filed concurrently with Declaration of
                                          David Jacobs]
21                                        **ORAL ARGUMENT REQUESTED**
22
23        Petitioner, Jon A. Gegenheimer ("Petitioner" or "Gegenheimer") hereby submits his
24   opposition to Respondent, Jefferies LLC's ("Respondent" or "Jefferies") Motion to Dismiss
25   Petition to Vacate Arbitration Award.
26   ///
27   ///
28   ///

                                        1

**<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION ................................................................................ 5

II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ........................... 6

    A.    Jefferies' Liquidated Damages Provision. ........................................ 6

    B.    Jefferies Commences the Arbitration Before FINRA. .......................... 7

    C.    The Parties Stipulate to a Bifurcated Hearing and the FINRA Panel
          Agrees That the First Part of the Bifurcated Hearing Will Address the
          Enforceability of the Liquidated Damages Provision. ........................... 7

    D.    The Panel's January 24, 2018 Hearing on the Liquidated Damages
          Provision. ................................................................................. 8

    E.    The Panel's January 29, 2018 "Order Regarding Liquidated Damages." ............ 10

    F.    Gegenheimer's Petition to Vacate the January 29, 2018 Order
          and Request to Stay the Arbitration Proceedings. ................................. 11

III.   ARGUMENT ..................................................................................... 11

    A.    This Court May Review the January 29, 2018 Order Because it is a Final
          Determination of the Discrete Issue Presented to the Panel in the
          First Phase of the Parties' Stipulated Bifurcated Hearing. ..................... 11

    B.    The Panel's January 29, 2018 Characterization of Its Award Does
          Not Have Any Bearing on the Finality of the Panel's Decision or
          Otherwise Make the Panel's Decision Unreviewable Under the FAA. ................ 15

    C.    Jefferies' Reliance on Rule 13904 of FINRA's Code of Arbitration
          Procedure for Industry Disputes (Mot. at 9) is Misplaced. ..................... 17

    D.    None of the Authorities Relied Upon by Jefferies Involves the
          Reviewability of An Arbitrator's Decision on a Discrete Issue That
          Was Resolved in the Context of A Stipulated Bifurcated Hearing. ..................... 17

IV.   CONCLUSION ................................................................................. 19

Firm:45738796v1             OPPOSITION TO JEFFERIES' MOTION TO DISMISS
                                     Case No. 18-cv-00746-VC

          EXHIBIT T

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aerojet–General Corporation v. American Arbitration Association*,
   478 F.2d 248 (9th Cir. 1973) ........................................................................17

*Crawford Grp., Inc. v. Holekamp*,
   No. 4:06-CV-1274 CAS, 2007 U.S. Dist. LEXIS 19159 (E.D. Mo. Mar. 19,
   2007) ..................................................................................................16

*Egan Jones Ratings Co. v. Pruette*,
   No. 16-mc-105, 2017 U.S. Dist. LEXIS 9388 (E.D. Pa. Jan. 24, 2017)................................14

*Hart Surgical, Inc. v. Ultracision, Inc.*,
   244 F.3d 231 (1st Cir. 2001)....................................................12, 13, 14, 18

*Island Creek Coal Sales Co. v. City of Gainesville*,
   729 F.2d 1046 (6th Cir. 1984) ..........................................................15, 18

*Metallgesellschaft A.G. v. M/V Capitan Constante*,
   790 F.2d 280 (2nd Cir. 1986)..........................................................................18

*Michaels v. Mariforum Shipping, S.A.*,
   624 F.2d 411 (2nd Cir. 1980)..........................................................................12

*Millmen's Local 550, United Bhd. of Carpenters & Joiners of Am., v. Wells
   Exterior Trim*,
   828 F.2d 1373 (9th Cir. 1987) ...........................................................12, 18

*New United Motor Mfg., Inc. v. United Auto Workers Local 2244*,
   617 F. Supp. 2d 948 (N.D. Cal. 2008) ...........................................................12, 16

*Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*,
   935 F.2d 1019 (9th Cir. 1991) ..........................................................................12

*Providence Journal Co. v. Providence Newspaper Guild*,
   271 F.3d 16 (1st Cir. 2001).............................................................................13

*Publicis Commc'n. v. True N. Commc'ns, Inc.*,
   206 F.3d 725 (7th Cir. 2000), 206 F.3d ...........................................15, 16, 18

*Schatt v. Aventura Limousine & Transp. Serv., Inc.*,
   603 F. App'x 881 (11th Cir. 2015) ..........................................................................18

3

1

2
*Sperry Int'l Trade v. Israel*,
  689 F.2d 301 (2d Cir. 1982)..................................................................15

3
*In re Sussex*,
  781 F.3d 1065 (9th Cir. 2015) ...............................................................18

4

5
*Trade & Transport, Inc. v. Natural Petroleum Charterers Inc.*,
  931 F.2d 191 (2d Cir. 1991)...............................................13, 14, 15, 18

6

7
*Union Switch & Signal Division Am. Standard Inc. v. United Electrical, Radio &
  Machine Workers of Am., Local 610*,
  900 F.2d 608 (3rd Cir. 1990) .........................................................12, 18

8

9
**Federal Statutes**

10
Federal Arbitration Act
  9 U.S.C.§ 10.............................................................................. *passim*

11

12
**California Statutes**

13
California Business and Professions Code
  § 16600.................................................................................5, 10

14

15
**Other Authorities**

16
FINRA Code of Arbitration Procedure for Industry Disputes
  Rule 13904 ..................................................................................17

17

18

19

20

21

22

23

24

25

26

27

28

*(entries above reproduced)*

4

I.  **INTRODUCTION**

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, Gegenheimer seeks to vacate the FINRA Arbitration Panel's January 29, 2018 interim or partial award, on the grounds that it was issued in manifest disregard of both New York and California law. This is important because if the Panel's interim award is unchecked, Jefferies will have created an architecture by which they will have succeeded in eviscerating a fundamental California public policy right for its citizens. In fact, emboldened by the result in Gegenheimer, Jefferies has now commenced three new arbitrations (to date) against California citizens to enforce its "liquidated damages" provision in violation of California Business and Professions Code 16600 and is flaunting the January 29, 2018 award as evidence of its liquidated damages clause's enforceability. (Declaration of David Jacobs in Opposition to Jefferies' Motion to Dismiss ("Jacobs Decl. (Opp.)"), ¶ 6.)

By agreement of the parties, the FINRA Arbitration Panel issued an Order whereby the Panel separately adjudicated the seminal issue presented in the arbitration—namely, the enforceability of the liquidated damages clause at issue in the case—and left for a later date a hearing on any remaining issues presented in the arbitration, if any (*i.e.*, Jefferies' attorneys' fees, Petitioner's equitable defenses, and Petitioner's counterclaims). Because the Panel's "interim award" that a $1 million liquidated damages provision is enforceable against Respondent is a full and final determination of that discrete issue, and because the Panel's award impacts all of the remaining issues in the arbitration, Petitioner is entitled to have this Court review the Panel's decision under the FAA.

As explained in more detail below, the parties agreed to an initial bifurcated hearing on the enforceability of the liquidated damages provision because they understood that the Panel's decision on this discrete issue had the potential to determine the outcome of the entire matter. In making the request for a bifurcated procedure, the parties made it abundantly clear that they were seeking a dispositive ruling on this central issue. Indeed, in granting the parties' request for a bifurcated hearing, the Panel acknowledged, "[t]he sole issue to be adjudicated by the Panel in the first part of the hearing shall be whether the liquidated damages clause in the agreement at

Firm:45738796v1

OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC

EXHIBIT T

issue is enforceable or unenforceable." ECF No. 15-8, Declaration of David Jacobs in Support of Gegenheimer's Petition to Vacate ("Jacobs. Decl., (Pet.)"), Ex. F. Where, as here, the parties have mutually agreed to submit a discrete, critical issue to a panel for full adjudication and final resolution—and the panel has issued a final ruling on that issue—the Panel's award must be treated as "final" for the purpose of review under the FAA. It is for this Court, and not the Panel, to decide whether the award is sufficiently reviewable; this Court makes that determination.

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.     Jefferies' Liquidated Damages Provision.

The basic facts concerning Gegenheimer's employment with Credit Suisse and Jefferies' offer of employment are not in dispute.[1] The critical issue presented in the FINRA arbitration is whether the liquidated damages clause in Section V(B) of Jefferies' Offer Letter (the "Liquidated Damages Provision") is enforceable.

That provision required Gegenheimer to pay the sum of $1 million in liquidated damages to Jefferies if he prospectively "breached" the Agreement and failed to actually commence employment with Jefferies on August 17, 2016 by staying at Credit Suisse or working for another competitor of Jefferies. The Liquidated Damages Provision provides that:

> If during the period beginning from the date you execute this Agreement until your Start Date (the "Interim Period"), you fail to commence employment by August 17, 2016, you agree to pay Jefferies $1,000,000 as liquidated damages ("Liquidated Damages"), which represent only an approximation of a portion of the anticipated loss created by such a violation. <u>For the avoidance of doubt, this Liquidated Damages provision is applicable only if you voluntarily fail to commence employment with Jefferies (except as a result of Jefferies' written withdrawal of this offer): (a) because you return as an employee of Credit Suisse or (b) to engage in Competitive Activity (as defined in the Jefferies Employee Handbook).</u> You agree the Liquidated Damages are reasonable and do not operate as a penalty, but reflect Jefferies'

---

[1] A complete and detailed factual background is set forth in Gegenheimer's Memorandum of Law In Support of Petition to Vacate the Arbitration Award Dated January 29, 2018 (ECF No. 15-1, Petition, at 6-11) and in the parties' respective pleadings before the Arbitration Panel. *See* ECF Nos. 15-5 and 15-6, Jacobs. Decl., (Pet.), Exs. C-D.

Firm:45738796v1

OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC

EXHIBIT T

reasonable approximation of a portion of its anticipated loss as a result of Jefferies' reliance on your commitment to render services pursuant to this Agreement by your Start Date, Jefferies' forbearance in holding the position of Managing Director in its Investment Banking Division open for you and not hiring another individual for this position during the Interim Period, and all costs incurred by Jefferies to fill the Investment Banking Division Managing Director position. <u>Nothing in this section shall prevent Jefferies from recovering its actual damages exceeding the Liquidated Damages, and Jefferies shall have the right to avail itself of all other available remedies.</u>

ECF No. 15-4, Jacobs Decl. (Pet.), Ex. B, section V(B), at 4 (emphasis added.)

On May 18, 2016, Gegenheimer signed Jefferies' Offer Letter and agreed to accept a position with Jefferies' technology investment banking group in San Francisco, California, a position that had been vacant since November 2015. On May 24, 2016, Gegenheimer informed Jefferies that he changed his mind about joining Jefferies and that instead he intended to continue his employment with Credit Suisse.

## B.    Jefferies Commences the Arbitration Before FINRA.

On August 19, 2016, Jefferies commenced the FINRA arbitration, asserting a single claim against Gegenheimer for breaching the Offer Letter. ECF No. 15-5, Jacobs Decl. (Pet.), Ex. C. Jefferies sought $1 million in damages pursuant to the Liquidated Damages Provision.

## C.    The Parties Stipulate to a Bifurcated Hearing and the FINRA Panel Agrees That the First Part of the Bifurcated Hearing Will Address the Enforceability of the Liquidated Damages Provision.

After discovery, the parties requested, and the Panel agreed, to hold a bifurcated hearing by which the Panel would initially adjudicate the enforceability of the Liquidated Damages Provision and reserve its decision on the remaining issues in the arbitration for a later hearing date.

On December 19, 2017, in making this request on behalf of the parties, Jefferies' counsel stated:

As the Panel likely knows from reviewing the pleadings, this case revolves largely around the enforceability of section V(B) in the agreement entered into by Claimant Jefferies and Respondent

7

OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC

EXHIBIT T

Gegenheimer, which requires Gegenheimer to pay liquidated damages in the event he fails to commence employment with Jefferies by August 17, 2016 (the 'liquidated damages clause'). <u>Initially, the parties wish to have the Panel solely adjudicate whether the liquidated damages clause in the agreement at issue is enforceable or unenforceable</u>.

Jacobs Decl. (Opp.), Ex. A, at 1 (emphasis added).

Thus, when the parties submitted their request for a bifurcated hearing, the parties made it abundantly clear that they expected the Panel's ruling on the enforceability of the liquidated damages clause to be a full and final determination on that issue—and that any future hearings, if necessary, would be limited solely to the remaining issues in the arbitration. *Id.*

On December 20, 2017, the Panel granted the parties' request for a bifurcated procedure, agreeing to adjudicate the enforceability of the liquidated damages clause before scheduling a hearing on any other issues presented in the arbitration. Acknowledging the express purpose of the bifurcated hearing, the Panel's bifurcation order specified that the only scheduled arbitration hearing would focus solely on the enforceability of the liquidated damages clause. In the Panel's words, "The sole issue to be adjudicated by the Panel in the first part of the hearing shall be whether the liquidated damages clause in the agreement at issue is enforceable or unenforceable." ECF No. 15-8, Jacobs Decl. (Pet.), Ex. F.

The parties simultaneously submitted Opening Briefs on January 3, 2018 and Responsive Briefs on January 15, 2018. ECF Nos. 15-9, 15-10, 15-11, 15-12, Jacobs Decl. (Pet.), Exs. G, H, I, J.

### D. The Panel's January 24, 2018 Hearing on the Liquidated Damages Provision.

On January 24, 2018, the FINRA Panel held the hearing on the enforceability of the Liquidated Damages Provision. ECF 15-2, Jacobs Decl. (Pet.), ¶ 12; ECF 15-3, Jacobs Decl. (Pet.), Ex. A, at 1. At the outset of the hearing, the parties thanked the Panel for helping the parties resolve this critical issue in an expeditious manner. Jefferies' counsel stated, "I do want to thank the panel for accommodating and agreeing to this bifurcated, somewhat unusual procedure we've agreed to. We do think it's the most efficient way to move this case forward and we appreciate your accommodation on that." Jacobs Decl. (Opp.), Ex. B, at 5.

8

Firm:45738796v1      OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC
427      EXHIBIT T

The Panel Chair summarized the scope of the hearing as follows:

> We have entered, the panel has entered an order limiting the issue
> to be decided as the first part of this hearing as that issue, whether
> the liquidated damages clause is enforceable or unenforceable, so
> the – and even the relief, you know, awarding a million dollars, no,
> that's not part of what we do today, or whenever we make an
> award or attorney's fees or costs. I realize that that's the panoply of
> remedies that would be available if the liquidated damages clause
> is enforceable, but that's not before us today. If there's a
> miscommunication about that, we should resolve it, I think we're
> in agreement that that's what we're about. So, the **award** will
> simply answer that question and provide the panel's reasoning and
> support of the answer to that question.

*Id.* at 48-49 (emphasis added).

Jefferies' counsel suggested that the Panel should decide both the enforceability of the Liquidated Damages Provision and the remedies available for the alleged breach of Jefferies' Offer Letter, but the Panel Chair made it clear that the Panel would limit the hearing to the single question concerning the enforceability of the Liquidated Damages Provision:

> Andrew Shapren:    I mean, aren't we dealing with technicalities?   I
> mean, if the liquidated damages clause is
> enforceable, what option is there other than to
> award Jefferies one million dollars?
>
> Larry Mills:    Well, I'm not, I'm not, I'm not suggesting that there
> would be some – other remedy. I'm suggesting that
> we have been asked to decide one question, and that
> was my stipulation, and that's what I put in the
> order on behalf of the panel, but that's what this is
> about, and we are bifurcated.

*Id.* at 49. As part of the hearing, the Panel heard "closing arguments" from both sides. The Panel conferred about the possibility of receiving limited testimony, but concluded that no testimony or further proceedings would be needed for the Panel to decide the issue that was presented. The Panel Chair stated, "We feel we have enough information in the record to proceed. We certainly have enough legal argument and briefing. By the way, you are—both sides are to be commended for that. It's been amazing. Giving us really good information . . . You've had your closing argument and typically following closing argument, the hearing would be closed, meaning we

9

OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC

EXHIBIT T

1  would not receive any further communications from you. We'll go deliberate and put out a

2  **written award**." *Id.* at 115-16.

3      At the conclusion of the hearing, the Panel Chair stated that the Panel's decision would

4  be an "interim award" and not a "final award" that disposes of all of the issues presented in the

5  arbitration. The Panel Chair stated, "[I]t will be an **interim award** in the kind of lingo of

6  arbitration. And there's nothing in this FINRA form that talks about **interim awards**. So, I think

7  it could be – I could style it as an order. It will definitely not be a final award." *Id.* at 117

8  (emphasis added). The Panel concluded the hearing by stating that they planned to issue their

9  interim award as soon as possible, stating, "I must say, on behalf of the Panel, we appreciate

10  your cooperation in presenting the issue. It's well presented. I mean, we've gotten really good

11  briefs and you know, both sides have been very well represented. And you make it hard for us,

12  but that's what – you know, that's why we get all the big bucks you get as a FINRA arbitrator . .

13  . We'll deliberate and see if we can get the **interim award** out in short order. Probably won't be

14  tomorrow, but we'll try to get it out as quickly as we can. And you won't hear from us, other

15  than through FINRA, with the delivery of the **interim award**." *Id.* at 119-20 (emphasis added).

16      **E.**    **The Panel's January 29, 2018 "Order Regarding Liquidated Damages."**

17      On January 29, 2018, the Panel issued an "Order Regarding Liquidated Damages,"

18  finding that: (1) New York law applied to the Offer Letter for this California employee; (2) under

19  New York law the Liquidated Damages Provision was enforceable; and (3) California Business

20  and Professions Code section 16600 did not apply to Gegenheimer. ECF No. 15-3, Jacobs Decl.

21  (Pet.), Ex. A.

22      The Panel's Order pointed out the discrete issue that was being addressed by the Order,

23  stating, "the case came before the panel on January 24, 2018, for the first portion of a bifurcated

24  proceeding" and "[t]he parties requested the panel to decide the sole issue of whether the

25  liquidated damages clause, Section V.B. of the agreement between the parties dated May 18,

26  2016, is enforceable or unenforceable." *Id.* In the "Conclusion" of the Order, the Panel rendered

27  its award, stating, "the panel finds and concludes that the liquidated damages clause in Section

28  V.B. of the Agreement between the parties is enforceable by Jefferies against Gegenheimer." *Id.*

Firm:45738796v1             OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC

EXHIBIT T

**Recognizing the significance of the Panel's decision, the Panel left open the possibility that the Panel's ruling might fully dispose of the case, stating, "[h]aving decided the sole issue presented for decision, the panel will await the determination of the parties as to whether this decision fully disposes of this case or whether there is a need to schedule a further hearing in the future on a mutually agreeable date."** *Id.* (emphasis added). In the final lines of the Order, the Panel informed the parties that the case would be closed unless the parties requested further proceedings.

### F.    Gegenheimer's Petition to Vacate the January 29, 2018 Order and Request to Stay the Arbitration Proceedings.

In light of the Panel's January 29, 2018 Order, on February 2, 2018, Gegenheimer filed a Petition to Vacate the Panel's Interim Award in the Northern District of California (the Petition was later re-noticed and re-filed on February 21, 2018, and the latter is the subject of Jefferies' Motion to Dismiss). The Panel was informed of Gegenheimer's Petition by letter dated February 8, 2018. Jacobs Decl. (Opp.), Ex. C. Therein, Gegenheimer requested a stay of the underlying arbitration proceedings while its petition to vacate the arbitration award was being considered. *Id.* On February 20, 2018, the Panel denied Gegenheimer's request for a stay. Jacobs Decl. (Opp.), Ex. D. In the order, the Panel said that its January 29, 2018 Order "concluded the first part of a bifurcated proceeding pursuant to a stipulation of the parties," but was nevertheless "not intended to be a Final Award or 'Interim Final Award' subject to confirmation or vacatur by a court." *Id.*

## III.   ARGUMENT

### A.    This Court May Review the January 29, 2018 Order Because it is a Final Determination of the Discrete Issue Presented to the Panel in the First Phase of the Parties' Stipulated Bifurcated Hearing.

Where parties to an arbitration mutually agree to submit a discrete issue to an arbitrator for full and final resolution, and the arbitrator makes a final ruling as that issue, the ruling is final for the purpose of seeking to have it confirmed or vacated under the FAA. In this case, the parties stipulated to a bifurcated hearing, the Panel agreed that the first part of the bifurcated hearing would address with finality the seminal issue in the arbitration (namely, the

11

OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC

EXHIBIT T

1    enforceability of the liquidated damages clause), and, after full briefing and oral argument, the

2    Panel rendered its decision on this discrete issue. The Panel's January 29, 2018 Order fully and

3    finally resolved that issue. As such, it is subject to review under the FAA.

4              Section 10 of the FAA grants a court authority to review and vacate an arbitration award.

5    *See* 9 U.S.C. §10. Generally, in order to be subject to judicial review, an arbitration award must

6    be final and binding as to all of the issues presented to the arbitrator. *See New United Motor*

7    *Mfg., Inc. v. United Auto Workers Local 2244*, 617 F. Supp. 2d 948, 954 (N.D. Cal. 2008);

8    *Millmen's Local 550, United Bhd. of Carpenters & Joiners of Am., v. Wells Exterior Trim*, 828

9    F.2d 1373, 1375 (9th Cir. 1987). Accordingly, a district court generally "does not have the power

10   to review an interlocutory ruling by an arbitration Panel" under the FAA. *Michaels v. Mariforum*

11   *Shipping, S.A.*, 624 F.2d 411, 414 (2nd Cir. 1980). But the finality requirement—or the

12   "complete arbitration" rule—is not an absolute bar to subject matter jurisdiction. *See Pac.*

13   *Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022 (9th Cir. 1991)

14   (discussing exceptions to finality rule); *see also Union Switch & Signal Division Am. Standard*

15   *Inc. v. United Electrical, Radio & Machine Workers of Am., Local 610*, 900 F.2d 608, 612-14

16   (3rd Cir. 1990) ("complete arbitration" rule is prudential, not jurisdictional).

17             Although the Ninth Circuit has not addressed the reviewability of an interim or partial

18   award arising from a bifurcated arbitration hearing,[2] the First Circuit and Second Circuit, along

19   with a number of federal district courts, recognize that a partial award rendered as part of the first

20   phase of a stipulated bifurcated arbitration hearing may be reviewed under the FAA. For

21   example, in *Hart Surgical, Inc. v. UltraCision, Inc.*, 244 F.3d 231, 233-34 (1st Cir. 2001), the

22   First Circuit held that where parties to an arbitration agree to bifurcate the proceeding (between

23   liability and damages), an award on liability alone is sufficiently "final" to be reviewable under

24   the FAA. Following the cases which have held that an arbitration award is final and subject to

25   review if it resolves a severable claim, the court reasoned that where the parties "submitted, in a

---

26   [2] However, the Ninth Circuit has observed that "[a]n agreement to bifurcate might suggest that

27   the parties and the arbitrator desired that each determination be final and binding"—meaning that
     there might be instances in which an arbitrator's interim award issued in the context of a

28   bifurcated hearing would be reviewable under the FAA. *Millmen's Local 550*, 28 F.2d at 1376,
     n.3.

12

discrete proceeding, all of the evidence pertaining to the issue of liability," and the arbitrators "conclusively decided every point required by and included in" the submission, the award was final with respect to that issue and subject to district court review (even though other issues remained). *Id.* at 233-35. In arriving at this conclusion, the court emphasized that "the definiteness with which the parties have expressed an intent to bifurcate is an important consideration." *Id.* at 235.

Similarly, in *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16 (1st Cir. 2001), the First Circuit decided "whether a partial arbitration award on liability is reviewable in the absence of formal bifurcation." *Id.* at 19. The court concluded that such an award is final:

> [T]he parties agreed to divide the arbitration hearing into two parts: the first phase required the arbitrator to determine whether the collective bargaining agreement had been violated; and the second phase required him to fashion a remedy. The arbitrator acknowledged this stipulation of the parties by noting, "If I find a violation of the contract, I should retain jurisdiction for purposes of facilitating compliance with a remedy." … All evidence related to the issue of liability was then presented to the arbitrator, and shortly thereafter he issued his decision on liability. In doing so, the arbitrator, in turn, "conclusively decided every point required by and included in" the liability phase. . . . Clearly, then, both the parties and the arbitrator agreed to bifurcate the arbitral proceeding and understood the determination of liability to be a final award.

*Id.* at 19-20 (citations omitted).

The Second Circuit came to a similar conclusion in *Trade & Transport, Inc. v. Natural Petroleum Charterers Inc.*, 931 F.2d 191, 195 (2d Cir. 1991). As explained by the Second Circuit, finality principles must be assessed in light of two other pertinent principles:

> First, the submission by the parties determines the scope of the arbitrators' authority. Thus, if the parties agree that the panel is to make a final decision as to part of the dispute, the arbitrators have the authority and responsibility to do so. Second, once arbitrators have finally decided the submitted issues, they are, in common-law parlance, "functus officio," meaning that their authority over those questions is ended. Thus, if the parties have asked the arbitrators to make a final ruling as to a particular issue and the arbitrators have

---

13

1    done so, the arbitrators have no further authority, absent agreement
2    by the parties, to redetermine that issue.

3    *Id.* at 195 (citations omitted).  More recently, the Eastern District of Pennsylvania, recognizing

4    that the Third Circuit had yet to weigh in on the issue, adopted the reasoning in *Hart* and *Trade*

5    *& Transport*, in holding that the "Partial Final Award as to liability only in this matter is a final,

6    reviewable order," and denying a motion to dismiss, "because the parties specifically stipulated

7    that the proceedings should be split into separate arbitrations on liability and damages." *Egan*

8    *Jones Ratings Co. v. Pruette*, No. 16-mc-105, 2017 U.S. Dist. LEXIS 9388, at *1 (E.D. Pa. Jan.

9    24, 2017).

10    Like the parties in *Hart* and *Trade & Transport*, Gegenheimer and Jefferies stipulated to

11    a bifurcated proceeding. *See* Jacobs Decl. (Opp.), Ex. A. Specifically, the parties agreed to have

12    the Panel resolve a critical issue regarding the enforceability of the Liquidated Damages

13    Provision in the May 18, 2016 agreement, a decision that was expressly intended to have

14    immediate, final, and collateral effect in the proceeding. *See id.* As summarized above, by letter

15    dated December 19, 2017, the parties jointly requested that the Panel approve their stipulation.

16    *Id.*

17    By Order dated December 20, 2017, the Panel agreed to hold a bifurcated hearing,

18    approving the "stipulation of the parties to a bifurcated procedure for this arbitration, with the

19    first part of the hearing solely for the purpose of having the Panel adjudicate whether the

20    liquidated damages clause in the agreement is enforceable or unenforceable." ECF No. 15-8,

21    Jacobs Decl. (Pet.), Ex. G. This limited issue was fully briefed, and a one-day hearing was held

22    on January 24, 2018, wherein the parties presented oral argument, based on the stipulated facts

23    and the arguments and evidence set forth in their moving and opposing papers. *See* ECF Nos. 15-

24    9, 15-10, 15-11, 15-12, Jacobs Decl. (Pet.), Exs. G, H, I, J; ECF Nos. 15-3, Jacobs Decl. (Pet.),

25    Ex. A, at 1 (stating that the Panel "considered the documentary evidence, extensive memoranda

26    of law, and the arguments of counsel").

27    The Panel understood and intended that its decision on the enforceability of the liquidated

28    damages clause would be final. *E.g.*, ECF Nos. 15-3, Jacobs Decl. (Pet.), Ex. A, at 4; Jacobs

14

Decl. (Opp.), Ex. A. The Panel's January 29, 2018 Order fully and finally resolved this discrete issue. ECF No. 15-3, Jacobs Decl. (Pet.), Ex. A, at 4 ("Having decided the sole issue presented for decision . . ."). Indeed, the Panel subsequently confirmed the finality of its decision, stating that the "January 29, 2018 Order . . . concluded the first part of a bifurcated proceeding pursuant to a stipulation of the parties." Jacobs Decl. (Opp.), Ex. D, at 2.

In sum, the parties and the Panel recognized the need for a separate, distinct, and final decision as to the enforceability of the Liquidated Damages Provision. Accordingly, the parties requested, and the Panel agreed, to hold a discrete proceeding, wherein the Panel considered all briefing and arguments that it needed to decide this single issue. The Panel's "interim award" conclusively "decide[d] every point required by and included in" the bifurcated hearing as their "authority and responsibility" demanded. *Trade & Trans.*, 931 F.2d at 195.

### B. The Panel's Characterization of Its Award Does Not Have Any Bearing on the Finality of the Panel's Decision or Otherwise Make the Panel's Decision Unreviewable Under the FAA.

Jefferies' assertion that the January 29, 2018 Order "is not an 'award' either in substance or in name" (Mot. at 9) elevates form over substance and ignores the finality of the Order on the sole issue presented to the Panel in the first phase of the bifurcated proceeding.

It is immaterial whether the Panel's decision is called an "order" or an "award"; it conclusively resolves the issue presented in the proceedings. The issue presented is a final determination of a discrete issue mutually submitted to the arbitrators in a stipulated bifurcated proceeding. "[C]ourts go beyond a document's heading and delve into its substance and impact to determine whether the decision is final." *Publicis Commc'n*, 206 F.3d at 729; *see Pac. Reins. Mgmt.*, 935 F.2d at 1022-23 (arbitral "interim final order" providing temporary equitable relief found to be final and subject to confirmation); *Island Creek Coal Sales Co. v. City of Gainesville*, 729 F.2d 1046, 1049 (6th Cir. 1984) (arbitral "interim order" that finally and definitively disposed of separate, discrete, self-contained issue found to be final and subject to confirmation); *Sperry Int'l Trade v. Israel*, 689 F.2d 301, 304 n.3 (2d Cir. 1982) (appeals court itself did not consider, but noted that district court found arbitral "award" that was final as to severable issues was final and subject to confirmation). A reviewing court must "delve into [an

Firm:45738796v1

OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC

EXHIBIT T

1    arbitration award's] substance and impact to determine whether the decision is final" under the

2    FAA. *Publicis Commc'n*, 206 F.3d at 729; *see New United Motor Mfg.*, 617 F. Supp. 2d at 958

3    (finding arbitration award regarding liability only was final, in part, on the grounds that "[t]here

4    [was] no evidence that either party believed that either the parties or the Arbitrator would be able

5    to reopen or revisit the liability phase once [the arbitrator] issued his award.").

6         While Jefferies correctly points out that the Panel's February 20, 2018 Order states that

7    the Panel's January 29, 2018 Order "was not intended to be a Final Award or 'Interim Final

8    Award' subject to confirmation or vacatur by a court" (Jacobs Decl. (Opp.), Ex. D), the

9    reviewability of the Panel's partial award does not turn on the Panel's characterization of that

10   decision. Rather, the reviewability of that decision turns on whether the ruling itself fully and

11   completely resolved the limited issue presented to the arbitrators as the parties and the Panel had

12   planned. *See, e.g., Crawford Grp., Inc. v. Holekamp*, No. 4:06-CV-1274 CAS, 2007 U.S. Dist.

13   LEXIS 19159, at *14 (E.D. Mo. Mar. 19, 2007) (looking to language of interim award to

14   determine whether the "interim award reached a final determination on the merits" on issues

15   presented in a bifurcated proceeding). The arbitrators' order of February 20th clearly notes that

16   the first part of the bifurcated hearing is concluded and the parties certainly asked the Panel to

17   finally decide a discrete issue which was critical in the arbitration. The Panel considered all of

18   the information that it needed to decide that question, and the Panel issued its "award" or

19   "interim award" in the form of the January 29, 2018 Order. In fact, at the hearing, the Panel used

20   the words "award" and "order" interchangeably, confirming that the Panel intended for its

21   decision to be treated as an "award" in the sense that it would be the final and complete ruling on

22   the issue presented (*see* Jacobs Decl. (Opp.), Ex. B, at 119 ("The decision will be forwarded to

23   the parties or their counsel – actually at the outset which counsel would be on there, so the two,

24   **the two who were designated will get the interim award or order, whatever we decide to**

25   **call it. This is FINRA.**") (emphasis added)). It is now for this Court (and not the Panel) to

26   decide whether the Panel's decision is reviewable under the FAA. For the reasons explained

27   above, the FAA permits the Court to review the Panel's decision on this seminal and discrete

28   issue.

16

OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC

EXHIBIT T

C.  **Jefferies' Reliance on Rule 13904 of FINRA's Code of Arbitration Procedure for Industry Disputes (Mot. at 9) is Misplaced.**

While Rule 13904 lists 13 items that normally appear as part of a FINRA "final award," several of these items would not be present in a FINRA "interim award," which is what is being challenged here. Indeed, neither of the parties reasonably expected to see any of the "missing" items in the Panel's "interim award"—namely, "[t]he damages and other relief requested," "[t]he damages and other relief awarded," "[a] statement of any other issues resolved," "[t]he allocation of forum fees and any other fees allocable by the panel," "[t]he dates the claim was filed and the award rendered," "[t]he number and dates of hearing sessions," and "[t]he location of the hearings"—as these items go beyond the limited scope of the first phase of the stipulated bifurcated hearing. Jefferies has not offered any authority in support of its assertion that all 13 items listed under Rule 13904 must be enumerated in an "interim award"; nor has Jefferies offered any authority to support the notion that this Court's review under the FAA hinges on whether the FINRA Panel's interim award lists all 13 items enumerated under Rule 13904.

As summarized above, at the January 24, 2018 hearing, the Panel consistently referred to the Panel's forthcoming ruling on the enforceability of the Liquidated Damages Provision as an "award" (*see* Jacobs Decl. (Opp.), Ex. B, at 49, 116) and an "interim award" (*see id.* at 117). Because Rule 13904 states that "all awards rendered under the Code are final," the Panel's January 29, 2018 should be treated as "final" for purposes of review under the FAA.

D.  **None of the Authorities Relied Upon by Jefferies Involves the Reviewability of An Arbitrator's Decision on a Discrete Issue That Was Resolved in the Context of A Stipulated Bifurcated Hearing.**

Jefferies relies on several circuit court decisions for the proposition that arbitration awards must be a final and complete disposition of all the issues submitted for arbitration by the parties. *See, e.g*, Mot. at 7-8. However, none of these cases considered the reviewability of an arbitrator's decision on a discrete legal issue that was presented to and decided by the arbitrator as part of a stipulated bifurcated hearing. Thus, the authorities relied upon by Jefferies are easily distinguishable. For example, *Aerojet–General Corporation v. American Arbitration Association*, 478 F.2d 248, 251 (9th Cir. 1973), concerned an attempt to seek review of a ruling

17

OPPOSITION TO JEFFERIES' MOTION TO DISMISS
Case No. 18-cv-00746-VC

EXHIBIT T

setting the place for arbitration. *In re Sussex*, 781 F.3d 1065, 1068 (9th Cir. 2015), involved a motion (while arbitration was pending) to disqualify an arbitrator for partiality. *Millmen's Local 550,* 828 F.2d at 1374, presented the issue of "[w]hether the Employer violated [the collective bargaining agreement] . . . and if so, what remedy" but did not involve a mutually-agreed bifurcated proceeding. And *Union Switch,* 900 F.2d at 609, involved the reviewability of a district court order denying a post-judgment motion seeking to return a dispute concerning remedial issues to the same arbitrator who had established liability. Because none of the cases that Jefferies cites addresses the reviewability of an arbitrator's interim award on a discrete issue presented in the context of a stipulated bifurcated hearing, they have no bearing on the matter before the Court and Jefferies' reliance on them is misplaced.

Similarly, the cases that Jefferies cites at footnote 2 (Mot. at 7) are distinguishable because they do not involve the review of an interim award in the context of a stipulated bifurcated arbitration hearing or otherwise address the holdings in *Hart* or *Trade and Transport.* Moreover, most of these decisions come from the Second, Sixth, and Seventh Circuits, all of which recognize exceptions to the "rule of finality" and permit review of interim orders addressing separate, discrete, and severable issues. *See e.g., Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 283 (2nd Cir. 1986) (interlocutory award subject to confirmation if it involves a "separate and independent claim"); *Trade & Transport, Inc. v. Natural Petroleum Charterers Inc.*, 931 F.2d 191, 195 (2d Cir. 1991) (final decision as to liability reviewable); *Island Creek Coal Sales Co. v. City of Gainesville*, 729 F.2d 1046, 1049 (6th Cir. 1984) ("interim order" that finally and definitively disposed of "separate, discrete, independent, severable issue" subject to confirmation); *Publicis Commc'n. v. True N. Commc'ns, Inc.*, 206 F.3d 725, 729 (7th Cir. 2000), 206 F.3d at 729 (arbitration award final and subject to review if it resolves a severable claim).

The Eleventh Circuit case that Jefferies cites is easily distinguishable. While *Schatt v. Aventura Limousine & Transp. Serv., Inc.*, 603 F. App'x 881, 887 (11th Cir. 2015) involved review of an interim arbitration award, the Eleventh Circuit's summary of the background of the arbitration proceedings makes it clear that the interim award did not arise in the context of a

18

stipulated bifurcated hearing—but rather in the context of a "full hearing" in which the arbitrator issued a piecemeal decision. Further, the appellee in that case did not file a responsive brief and the Eleventh Circuit did not have the benefit of complete briefing on the issues. Thus, given that the decision did not arise in the context of a stipulated bifurcated hearing and the appellee did not submit a brief on appeal, this decision should have no bearing on this Court's analysis.

## IV.   **CONCLUSION**

For the reasons explained above, Petitioner respectfully requests that the Court deny Jefferies' motion to dismiss Gegenheimer's petition to vacate the Panel's January 29, 2018 award. Petitioner respectfully requests an opportunity to address any questions the Court may have at the hearing.

Respectfully submitted,

DATED:   March 8, 2018                    EPSTEIN BECKER & GREEN, P.C.

By:      */s/ David Jacobs*
         _____
         David Jacobs
         Edward J. Loya, Jr.
         David M. Prager
         Attorneys for Petitioner
         JON A. GEGENHEIMER

19

# EXHIBIT U

David Jacobs (State Bar No. 73545)
Edward J. Loya, Jr. (State Bar No. 257346)
David M. Prager (State Bar No. 274796)
EPSTEIN BECKER & GREEN, P.C.
1925 Century Park East, Suite 500
Los Angeles, California 90067-2506
Telephone: 310.556.8861
Facsimile: 310.553.2165
djacobs@ebglaw.com
eloya@ebglaw.com
dprager@ebglaw.com

Attorneys for Petitioner
JON A. GEGENHEIMER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| JON A. GEGENHEIMER,<br><br>            Petitioner,<br><br>      v.<br><br>JEFFERIES LLC,<br><br>          Respondent. | CASE NO. 18-cv-00746-VC<br><br>[Assigned to Hon. Vince Chhabria]<br><br>**REPLY TO RESPONDENT JEFFERIES LLC'S OPPOSITION TO PETITIONER JON A. GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD**<br><br>Date:      March 29, 2018<br>Time:     10:00 a.m.<br>Ctrm:    Courtroom 4, 17th Floor<br><br>*[Filed concurrently with: Declaration of David Jacobs and Compendium]*<br><br>**ORAL ARGUMENT REQUESTED** |

Firm:45734924v16

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO
GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

440

EXHIBIT U

**<u>TABLE OF CONTENTS</u>**

I.     ARGUMENT ..................................................................................................5

      A.      The Panel Manifestly Disregarded California Law In Concluding That Cal. Bus. & Prof. Code Section 16600 Does Not Apply to the Liquidated Damages Provision. .......................................................5

           1.      The Panel Recognized and Understood Cal. Bus. & Prof. Code Section 16600 and Relevant Authority. .................................5

           2.      The Panel Ignored Section 16600's Plain Language That It Applies To "Every Contract" That Restrains Trade—And Thus Arrived At The "Fundamentally Incorrect" Interpretation That Section 16600 Applies Only To Post-Employment Restrictions..............6

           3.      The Panel Ignored Established California Law When It Concluded That The Liquidated Damages Provision Does Not Constitute A "Restraint" Under Section 16600...........................................8

      B.      The Panel Manifestly Disregarded Clear California Law That Choice Of Law Provisions That Violate Section 16600 Are Invalid.............................11

      C.      Even Assuming, *Arguendo*, That New York Law Applies, The Panel Manifestly Disregarded Established New York Law That Invalidates Liquidated Damages Clauses That Offer Both Liquidated Damages and Actual Damages. .......................................................................12

II.     CONCLUSION ..........................................................................................14

Firm:45734924v16

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO
GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

EXHIBIT U

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Carter v. Health Net of Cal., Inc.*

5
374 F.3d 830 (9th Cir. 2004) ......................................................14

6
*Coast Trading Co., Inc. v. Pac. Molasses Co.*,

7
681 F.2d 1195 (9th Cir. 1982) .......................................................8

8
*Comedy Club, Inc. v. Improv West Assocs.*,
553 F.3d 1277 (9th Cir. 2009) ...................................................6, 7

9

10
*Golden v. Cal. Emergency Physicians Med. Grp.*,
782 F.3d 1083 (9th Cir. 2015) ...................................................8, 9

11
*Scott v. Snelling & Snelling, Inc.*,

12
732 F. Supp. 1034 (N. D. Cal. 1990) ............................................11

13
*TGG Ultimate Holdings, Inc. v. Hollett*,
224 F. Supp. 3d 275 (S.D.N.Y. 2016)...........................................12

14

15

**California Cases**

16

*Alliance Payment Sys., Inc. v. Walczer*,
152 Cal. App. 4th 620 (2007) .......................................................9

17

18
*Application Grp. v. Hunter Grp.*,
61 Cal. App. 4th 881 (1998) ........................................................12

19

20
*Chamberlain v. Augustine*,
172 Cal. 285 (1916) .......................................................................8

21
*Dayton Time Lock Service v. Silent Watchman Corp.*,

22
52 Cal. App. 3d 1 (1975) ...............................................................6

23
*Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
20 Cal. App. 3d 668 (1971) ..........................................................12

24

25
*Gordon Termite Control v. Terrones*,
84 Cal. App. 3d 176 (1978) ...........................................................9

26
*M.L.G. Tr. v. Gov't of the Republic of Indon.*,

27
1994 U.S. Dist. LEXIS 14147 (N.D. Ill. Sep. 23, 1994) .............13

28

3

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO
GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

442

EXHIBIT U

1
2

*Morris v. Harris,*
    127 Cal. App. 2d 476 (1954) ......................................................................9

3

*Muggill v. Reuben H. Donnelley Corp.,*
    62 Cal. 2d 239 (1965) ..............................................................................9

4

**New York State Cases**

5
6

*Jarro Bdlg. Indus. Corp. v. Schwartz,*
    281 N.Y.S. 2d 420 (2d Dep't 1967).......................................................13

7

**California Statutes**

8
9

California Business & Professions Code
    § 16600.............................................................................. *passim*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO
GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

EXHIBIT U

Petitioner Jon A. Gegenheimer ("Petitioner" or "Gegenheimer") respectfully submits this Reply to Respondent Jefferies LLC's ("Respondent" or "Jefferies") Opposition to Gegenheimer's Petition to Vacate Arbitration Award.[1]

# I.  ARGUMENT

## A.  The Panel Manifestly Disregarded California Law In Concluding That Cal. Bus. & Prof. Code Section 16600 Does Not Apply to the Liquidated Damages Provision.

### 1.  The Panel Recognized and Understood Cal. Bus. & Prof. Code Section 16600 and Relevant Authority.

At the hearing, Jefferies' counsel downplayed the full scope of California Business & Professions Code Section 16600 ("Section 16600")[2] by stating that Section 16600 arises only in the context of post-employment restrictions and therefore did not apply to Gegenheimer. *See* Declaration of David Jacobs in Support of Reply ("Jacobs Decl. (Reply)"), Ex. A, at 22. Petitioner's counsel clarified that Section 16600's broad scope is not limited to post-employment covenants not to compete between employees and their employers, but rather that Section 16600 voids every contract that restrains anyone from engaging in a lawful profession or trade including restraints on prospective employment. *See, e.g.*, *id*. at 51-55. At the end of the hearing, the Panel Members stated they understood Petitioner's arguments with respect to the breadth of Section 16600. *Id.* at 106 ("I understand the arguments about California fundamental policy and whatnot[.]"); *see also id.* at 115-16. Moreover, in the Panel's January 29, 2018 Order, the Panel recited the full text of Section 16600. *See* ECF No. 15-3, Jacobs Decl. (Pet.), Ex. A, at 4. Thus, ample evidence in the record reflects that the Panel recognized, understood, and recited the full

---

[1] Jefferies contends that the Court lacks jurisdiction to review the Panel's January 29, 2018 Order because "the Order is not a final disposition." Opp. at 5. Petitioner fully briefed this issue in his Opposition to Respondent's Motion to Dismiss Petition to Vacate Arbitration Award, which Petitioner incorporates herein by reference. *See* ECF No. 22 (filed March 8, 2018).

[2] The only exceptions to Section 16600 authorized by the California Legislature are found in Chapter 1 of Part 2, of Division 7, of the California Business and Professions Code. Chapter 1 contains only a limited number of exceptions to restrictive covenants, none of which are applicable here.

5

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

EXHIBIT U

scope of Section 16600's broad prohibition against restraints on employment, yet failed to apply it to Petitioner.[3]

> **2.** **The Panel Ignored Section 16600's Plain Language That It Applies To "Every Contract" That Restrains Trade—And Thus Arrived At The "Fundamentally Incorrect" Interpretation That Section 16600 Applies Only To Post-Employment Restrictions.**

Despite recognizing and understanding the full breadth of the statute, the Panel inexplicably ignored Section 16600 law and policy. The Panel concluded that Section 16600 is limited to "post-employment non-competition agreements and restrictive covenants," and that Section 16600 does not apply to the Liquidated Damages Provision because it "is not a post-employment restrictive covenant." ECF No. 15-3, Jacobs Decl. (Pet.), Ex. A, at 4. Because the Panel's interpretation ignores Section 16600's plain language and the cases offered by Petitioner for the Panel's consideration, which apply Section 16600 to "every contract" and not just "post-employment non-competition agreements and restrictive covenants," the Panel's interim award is in manifest disregard of the law. Accordingly, it must be vacated.

As the Ninth Circuit recognized in *Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277 (9th Cir. 2009), where an arbitrator's award "interpret[s] [the law] in a way to render it inapplicable," such disregard for the law is "fundamentally incorrect" and constitutes "manifest disregard of the law," justifying vacatur of the award. *Id.* at 1293-94. In *Comedy Club*, the Ninth Circuit reviewed an arbitrator's award enforcing a nationwide non-competition covenant between two parties to a trademark licensing arrangement concerning the operation of restaurants and comedy clubs across the country. The Ninth Circuit found that the ground stated by the arbitrator to disregard applicable authority—namely, *Dayton Time Lock Service v. Silent Watchman Corp.*, 52 Cal. App. 3d 1, 6 (1975)—was "fundamentally incorrect," because "[t]he arbitrator's award, while aware of *Dayton Time Lock*, interpreted it in a way to render it inapplicable to this case" and "[t]he arbitrator's award effectively quarantines [appellant] from

---

[3] Jefferies asserts that "[a]t no time . . . did Gegenheimer provide the panel with copies of any authorities cited in his briefs." Opp. at 4. However, Jefferies neglects to point out that the Panel specifically requested that Petitioner not provide the Panel with a compendium of cases, on the ground that the Panel could look up the cases themselves. *See* Jacobs Decl. (Reply), Ex. A, at 117-18.

Firm:45734924v16

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

EXHIBIT U

engaging in its business in forty-eight states until 2019 and does not follow well-established California law." *Id.* at 1293. The Ninth Circuit made it clear that Section 16600's broad protections must not be abrogated by an arbitrator's decision to limit Section 16600's scope: "Even under the permissive standard with which we view arbitral positions, the economic restraint . . . on competition is too broad to be countenanced in light of the clear prohibition of section 16600 as interpreted by the California courts." *Id.* Similarly, the Panel's "fundamentally incorrect" interpretation of Section 16600 (interpreting Section 16600 to apply only to "<u>post-employment</u> non-competition agreements and restrictive covenants," as opposed to "every contract") rendered it inapplicable to the Liquidated Damages Provision. As in *Comedy Club*, this Court should vacate the Panel's January 29, 2018 Order, to give the Panel an opportunity to assess the enforceability of the Liquidated Damages Provision with the correct legal standard in mind.

Jefferies' efforts to distinguish *Comedy Club* are unpersuasive. To begin with, Jefferies contends that "[i]n direct contrast to the arbitrator's opinion in *Comedy Club*, which specifically addressed the case law that the court found dispositive, . . . there is no language in the Order that suggests the Panel was aware of, understood, and disregarded the cases that Gegenheimer now suggests controls" Opp. at 11. Jefferies is mistaken. As explained above, Petitioner relies on Section 16600's plain language (which the Panel recited in full in its interim award), the cases that Petitioner briefed and argued before the Panel, and the Panel's decision to disregard Section 16600 law and policy by limiting the scope of Section 16600 to "<u>post-employment</u> non-competition agreements and restrictive covenants." Like the arbitrator's award in *Comedy Club*, the Panel's interpretation is "fundamentally incorrect" and, therefore, must be vacated. Additionally, Jefferies' assertion that Petitioner "did not even refer the Panel to *Comedy Club*," Opp. at 11, is disingenuous. It would have made no sense for Petitioner to discuss *Comedy Club* with the Panel. This vacatur action before this Court, and not the FINRA hearing, is the appropriate forum in which to discuss *Comedy Club*'s application of the "manifest disregard" standard. Moreover, Jefferies' observation that *Comedy Club* "does not hold that all 'in-term' restrictive covenants are invalid *per se*" is irrelevant to the proposition for which *Comedy Club* is

7

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

EXHIBIT U

being offered.

### 3. The Panel Ignored Established California Law When It Concluded That The Liquidated Damages Provision Does Not Constitute A "Restraint" Under Section 16600.

Later in the January 29, 2018 Order, the Panel stated that "Section 16600 does not apply to an agreement to begin working by a particular date as provided in the Agreement,"[4] and that "[t]he [Liquidated Damages Provision] did not restrain Gegenheimer from engaging in his profession" because "[it] did not require Gegenheimer to cease working for Credit Suisse or refrain from working for any other competitor before joining Jefferies." ECF No. 15-3, Jacobs Decl. (Pet.), Ex. A, at 4. However, to violate Section 16600, an agreement does not need to require anyone to refrain from working for any particular employer or competitor; rather, it must simply impose "a restraint of a substantial character" regardless of "the form in which it is cast." *Chamberlain v. Augustine*, 172 Cal. 285, 288 (1916). The Liquidated Damages Provision, which assesses a $1 million penalty for Petitioner's decision to stay with Credit Suisse, is clearly such a restraint.

Section 16600's plain language is crystal clear. It states that "**every contract** by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600 (emphasis added). As the Ninth Circuit stated, "The statute does not specifically target covenants not to compete between employees and their employers: the text does not include any form of the word 'compete' or 'competition,' and does not even implicitly constrain itself to contracts concerning employment. Rather, section 16600 voids 'every contract' that 'restrain[s] someone 'from engaging in a lawful profession, trade, or business.'" *Golden v. Cal. Emergency Physicians Med. Grp.,* 782 F.3d 1083, 1086 (9th Cir. 2015). Thus, in *Chamberlain*, the seminal decision on section 16600 analyzing California's

---

[4] To the extent that the Panel's Order is premised on a characterization of the Liquidated Damages Provision as merely requiring Petitioner to show up to work on a particular date, such an award would be "completely irrational" because it would fail to "draw its essence from the agreement." *Coast Trading Co., Inc. v. Pac. Molasses Co.*, 681 F.2d 1195, 1197 (9th Cir. 1982) (holding that an "arbitrator is confined to the interpretation and application of the parties' agreement" and that an "award is legitimate only so long as it draws its essence from the . . . agreement") (internal quotation marks omitted). Therefore, it is subject to vacatur on that basis as well.

Firm:45734924v16

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

EXHIBIT U

predecessor to section 16600, which continues to guide the California courts under the current statute, *see Golden,* 782 F. 3d at 1090, the California Supreme Court invalidated a provision in a contract that required one party to pay $5,000 in liquidated damages if he took up employment within a certain geographical area. The court reasoned that although the contract did not affirmatively prevent the party from engaging in his lawful business, "[i]t imposes upon him a liability in the sum of $5,000 if he does engage in such business" and thus **"he is not as free to do so as he would have been if he were not bound by it."** *Chamberlain*, 172 Cal. at 288. (emphasis added).

As Petitioner explained in his briefs before the Panel, ECF No. 15-9, Jacobs Decl., Ex. G, at 12-15, and during oral argument, Jacobs Decl. (Reply), Ex. A, at 51-55, Section 16600 does not permit the imposition of a penalty for employee choice. California state and federal courts, following *Chamberlain* and its progeny, have applied Section 16600 to agreements affecting future employment, *see*, *e.g.*, *Golden*, 782 F.3d at 1090 (observing that a "no re-hire" provision in settlement agreement could run afoul of Section 16600); retirement plans that require individuals to forfeit pension rights if they work for a competitor, *see*, *e.g.*, *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d 239, 243 (1965) (holding a "provision forfeiting plaintiff's pension rights if he works for a competitor restrains him from engaging in a lawful business and is therefore void"); and payment provisions that impose a cost for competition, *see*, *e.g.*, *Morris v. Harris*, 127 Cal. App. 2d 476, 477-78 (1954) (liquidated damages of $20 per month if former employee violates a client non-solicitation provision violates Section 16600); *Gordon Termite Control v. Terrones*, 84 Cal. App. 3d 176, 179 (1978) (employee's agreement to pay employer $50 for each account he calls on following the termination of his employment violated Section 16600); *Alliance Payment Sys., Inc. v. Walczer*, 152 Cal. App. 4th 620, 637 (2007) (provisions that impose a cost for competition, no less than those that prohibit competition, are considered restraints on trade). Like the restraints at issue in those cases, the Liquidated Damages Provision's $1 million penalty qualifies as a "restraint of substantial character" because it made Petitioner less "free" to remain at Credit Suisse "as he would have been if he were not bound by it." *Chamberlain*, 172 Cal. at 288.

Firm:45734924v16

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

EXHIBIT U

In an effort to evade Section 16600's broad application, Jefferies characterizes the Liquidated Damages Provision as a "contract of employment" and states that "[t]he only trigger for the liquidated damages was [Gegenheimer's] failure to show up for work at Jefferies as promised." Opp. at 10-11. Putting aside for a moment the absurdity of Jefferies' assertion that the Liquidated Damages Provision merely assessed a $1 million penalty for not showing up to work on time, Jefferies already admitted in its brief before the FINRA Panel that the Liquidated Damages Clause was designed to be a deterrent to continue to work for a Jefferies' competitor. Jefferies explained, "[i]t is . . . so limited to reflect reality – which is that the reason candidates breach agreements like this is most often because they, like Gegenheimer, opportunistically used their contract with Jefferies to negotiate better terms with their current employer." ECF No. 15-10, Jacobs Decl. (Pet.), Ex. H, at 32. Thus, contrary to Jefferies' assertions in the Opposition Brief before this Court, Jefferies already explained to the FINRA Panel that the Liquidated Damages Provision was intended to <u>deter</u> Petitioner from "opportunistically" seeking a better employment situation for himself at Credit Suisse. Jefferies' liquidated damages clause is quintessential anticompetitive conduct and is exactly the type of restraint that Section 16600 prohibits.

The Court should reject Jefferies' misleading assertion that the Liquidated Damages Penalty is akin to a "term employment agreement in which an employee agrees to work for an employer for a specified period of time." Opp. at 9. To begin with, Petitioner's Offer Letter unmistakably states that Gegenheimer's employment would be "at will," not an employment agreement for a term. *See* ECF No. 15-4, Jacobs Decl. (Pet.), Ex. B, section III (A), at 3. By its terms, the Liquidated Damages Provision is specifically limited to the "Interim Period," defined as "the period beginning from the date you execute this Agreement <u>until your Start Date</u>," and expressly did not apply to a term of employment. *See id.* at 4 (emphasis added). Moreover, none of the "term of employment" cases cited by Jefferies discuss Section 16600. The reason for that is clear: whereas the Liquidated Damages Provision at issue here imposed a significant restraint on Petitioner's ability to remain at Credit Suisse or work for a competitor, none of the term

Firm:45734924v16

1   employment provisions in the cases that Jefferies cited imposed such a restraint on employee
2   mobility.

3       **B.      The Panel Manifestly Disregarded Clear California Law That Choice Of
4                Law Provisions That Violate Section 16600 Are Invalid.**

5       Petitioner's counsel educated the Panel on Section 16600's application to choice of law
6   provisions. *See* Jacobs Decl. (Reply), Ex. A, at 49-52. In turn, the Panel confirmed that they
7   understood the law that applied, stating, "we could be anywhere, and we could still apply New
8   York law which is agreed in the agreement and I understand the arguments about California
9   fundamental policy and whatnot . . . It's really about the choice of law.  And we do have a choice
10  of law clause, and we have to deal with a potential conflict of fundamental California policy, but
11  that's it." Jacobs Decl. (Reply), Ex. A, at 106. Yet, despite the Panel's understanding that Section
12  16600 invalidates choice of law provisions that deprive Californians of Section 16600's
13  protections, the Panel determined that New York law applied to the dispute and ignored Section
14  16600's clear prohibition against employment restraints.

15      Jefferies contends that the Panel correctly determined that New York law applied to the
16  parties' agreement, because Petitioner's marginal contacts with New York are sufficient to
17  establish a "reasonable relationship" of the parties to New York. *See* Opp. at 8.  However,
18  Jefferies, like the Panel, completely disregards Section 16600 in its discussion of the choice of
19  law analysis. The threshold issue is not whether a New York choice of law provision is
20  "reasonable" given the parties' contacts to New York.  Rather, the issue is whether enforcement
21  of the New York choice of law clause would violate Section 16600's strong public policy, such
22  that the choice of law provision should be rendered void. *See Scott v. Snelling & Snelling, Inc.*,
23  732 F. Supp. 1034, 1039 (N. D. Cal. 1990) ("California law will not give force to a choice of law
24  clause where the contract contains a provision which violates a strong California public policy.")
25  (internal quotation marks omitted).

26      The Panel's "fundamentally incorrect" interpretation of the scope of Section 16600
27  (discussed *supra* at 3-7) is fatal to both Panel's substantive determination of the applicability of
28  Section 16600 and the Panel's related determination that the New York choice of law provision

11

did not violate Section 16600. Because the two issues are intertwined—and the Panel ignored clearly established law concerning Section 16600 by limiting Section 16600 to "<u>post-employment</u> non-competition agreements and restrictive covenants," ECF No. 15-3, Jacobs Decl. (Pet.), Ex. A, at 4—the Panel manifestly disregarded Section 16600 when it enforced the New York choice of law provision. Petitioner provided the Panel with ample authority from California and New York demonstrating that courts routinely invalidate contractual choice of law provisions when they violate Section 16600, *see* ECF No. 15-9, Jacobs Decl. (Pet.), Ex. G, at 7-12; *see also* ECF No. 15-11, Jacobs Decl. (Pet.), Ex. I, at 5-7, but the Panel ignored them. *See, e.g., Application Grp. v. Hunter Grp.*, 61 Cal. App. 4th 881, 905 (1998) (Maryland choice-of-law provision in an employment contract restricting employees' mobility found unenforceable because it violated Section 16600); *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 20 Cal. App. 3d 668, 673 (1971) (New York choice-of-law provision in employment agreement containing a non-compete provision invalid and must yield to Section 16600); *TGG Ultimate Holdings, Inc. v. Hollett*, 224 F. Supp. 3d 275, 281-83 (S.D.N.Y. 2016) (refusing to enforce a New York choice-of-law provision against employees who worked in California because the underlying events occurred in California and New York law would be contrary to the significant public policy embodied in Section 16600).

   C.   **Even Assuming, *Arguendo*, That New York Law Applies, The Panel Manifestly Disregarded Established New York Law That Invalidates Liquidated Damages Clauses That Offer Both Liquidated Damages and Actual Damages.**

   Contrary to Jefferies' assertion that there is no language "in the Order or . . . any other part of the record where the Panel can be said to have understood the law on which Gegenheimer relies," there is indeed evidence in the record that the Panel acknowledged, understood, and ignored clear New York law that prohibits exactly the type of liquidated damages clause at issue here. At the hearing, Petitioner's counsel discussed the New York rule at length, stating, "[t]he law is so clear on the language of the restrictions and in New York, the language of the restriction against having a liquidated damages provision that also seeks actual damages . . . No. It's invalid. And if they had no intention of doing it, they wouldn't have put it in. Full stop, it's illegal in New York. So, if Jefferies wants to continue, you know, unless they want to withdraw

12

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO
GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

EXHIBIT U

their claim that the contract is governed by New York, you really don't even have to go any further than that to invalidate the liquidated damages provision." Jacobs Decl. (Reply), Ex. A, at 94; *see also id.* at 68-70; ECF No. 15-11, Jacobs Decl. (Pet.), Ex. I, at 12-16.

In response to Petitioner's insistence that New York law prohibited the enforcement of the type of liquidated damages clause at issue in this litigation, the Chairman stated that he believed counsel's representations regarding New York law. The Chairman stated, "you were talking about the liquidated damages clause as 'unenforceable in New York because there is a reserved right to get actual damages' and you were very sure about that, and <u>I'm confident that there is some law that says that</u>, but I don't know what case or what statute says that." Jacobs Decl. (Reply), Ex. A, at 111 (emphasis added). In response to the Chairman's request for a case that sets forth this proposition, Petitioner's counsel pointed to *Jarro Bdlg. Indus. Corp. v. Schwartz*, 281 N.Y.S. 2d 420 (2d Dep't 1967). Jacobs Decl. (Reply), Ex. A, at 111. Before counsel could provide the Chairman with the specific page in the *Jarro* decision in which the court discussed this issue, the Chairman located the relevant passage in Petitioner's brief referencing the *Jarro* decision and other New York cases, and stated, "I - here it is. Jarro - J-a-r-r-o. And I see a quote - it's on page 15 of, 14 and 15. Thank you. <u>That answers my question.</u>" Jacobs Decl. (Reply), Ex. A, at 112 (emphasis). Thus, the Panel acknowledged, discussed, understood, and <u>was confident that the law supported Petitioner's arguments on this issue</u>—and yet, the Panel ignored long-established New York law when it issued an interim award enforcing the Liquidated Damages Clause despite clear precedent prohibiting its enforcement. *See Jarro*, 281 N.Y.S.2d at 426; *see also, e.g., United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004) ("Under no circumstances … will liquidated damages be allowed where the contractual language … show[s] that the contract provides for the full recovery of actual damages, because liquidated and actual damages are mutually exclusive remedies under New York law."); *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 418 (S.D.N.Y. 2016) ("Because the liquated damages provision in the Remedy Clause guarantees Defendants a "minimum recovery" regardless of actual damages, while preserving their right to pursue actual damages if they so desire, the Remedy Clause is unenforceable" under New York law.) *M.L.G.*

13

1   *Tr. v. Gov't of the Republic of Indon.*, Case No. 89 C 6649, 1994 U.S. Dist. LEXIS 14147, at *9

2   (N.D. Ill. Sep. 23, 1994) (observing that under long-standing Illinois and New York law

3   "optional liquidated damages clauses are properly characterized as penalties, and are therefore

4   not enforceable") (citing, *e.g.*, *Stock Shop, Inc. v. Bozell & Jacobs, Inc.*, 481 N.Y.S.2d 269, 271

5   (Sup. Ct., N.Y. Cty. 1984) (invalidating liquidated damages clause where it allowed the "option

6   to seek … actual damages.")). The Panel did so even though Petitioner pointed out to the Panel

7   at the hearing, and Jefferies failed to rebut, that "[t]here are <u>no cases that say otherwise</u>." Jacobs

8   Decl. (Reply), Ex. A, at 69 (emphasis added).

9           The Panel's refusal to apply "well defined, explicit, and clearly applicable" law

10   constitutes manifest disregard of New York law. *See Carter v. Health Net of Cal., Inc.* 374 F.3d

11   830, 838 (9th Cir. 2004). For that reason, the Panel's interim award cannot stand.

12   **II.**     **CONCLUSION**

13           For the reasons explained above, Petitioner respectfully requests that the Court GRANT

14   Petitioner's Petition to Vacate Arbitration Award.

16                               Respectfully submitted,

17   DATED:   March 14, 2018               EPSTEIN BECKER & GREEN, P.C.

19                     By:     */s/ David Jacobs*

20                                 David Jacobs
                                Edward J. Loya, Jr.

21                                 David M. Prager
                                Attorneys for Petitioner

22                                 JON A. GEGENHEIMER

Firm:45734924v16

REPLY TO RESPONDENT JEFFERIES' OPPOSITION TO
GEGENHEIMER'S PETITION TO VACATE ARBITRATION AWARD
Case No. 18-cv-00746-VC

EXHIBIT U

# EXHIBIT V

EXHIBIT V



Financial Industry Regulatory Authority

## FINRA Dispute Resolution

## Order

**Case Number:** 16-02461

**Case Name:** JEFFERIES LLC v. GEGENHEIMER

**Issues Addressed:** (ie., name of motion or request, by which party)
Scheduling additional hearing dates for second part of bifurcated proceedings.

**Pre-Hearing Conference Held?:** ⊙ Yes   ○ No   (circle one)

Date/Time: March 20, 2018, at 10:30 a.m

Participating in the conference were:

Chairperson: Lawrence R. Mills

Panelist: Minnie Loo

Panelist: A. James Oakes

Claimant's Representative: Andrew J. Shapren

#1 Respondent's Representative: David Jacobs

#2 Respondent's Representative:

FINRA Dispute Resolution Staff:

**Decided by:**   ○ Chairperson ⊙ Panel   (circle one)

**Rulings:**[1]

After considering the pleadings submitted by the parties (and oral arguments, if pre-hearing conference held), the Panel/Chairperson rules as follows:

---

1 If more space is needed, add additional pages.

EXHIBIT V

1. The second portion of the arbitration hearing in this bifurcated proceeding shall commence on July 23, 2018, at 9:00 a.m. at a site in San Francisco, California determined by FINRA.

2. The hearing shall continue for four (4) days through Thursday, July 26, 2018, if necessary.

3. The parties shall comply with the deadlines for pre-hearing submissions contained in the FINRA Code of Arbitration for Industry Disputes.

The parties should comply with this order by _____

If the parties settle this matter prior to the hearing, the forum fees for this pre-hearing conference (or discovery-related motion decided without a pre-hearing conference) are assessed as follows:

50 % to Claimant(s), jointly and severally
50 % to Respondent(s), jointly and severally
____ % assessed to _____
____ % assessed to _____
____ % assessed to _____
____ % assessed to _____

x ⟶ R. Mๅll

Date: March 22, 2018

Chairperson,
On behalf of the Arbitration Panel

Revised 11/12/15

EXHIBIT V

# EXHIBIT W

EXHIBIT W

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JON A. GEGENHEIMER,

       Plaintiff,

     v.

JEFFERIES LLC,

       Defendant.

Case No. 18-cv-00746-VC

**ORDER GRANTING MOTION TO DISMISS PETITION TO VACATE ARBITRATION AWARD**

The motion to dismiss the petition to vacate the arbitration award is granted. Although the decision of the panel regarding the liquidated damages provision is very likely wrong (perhaps to the point that the panel should be understood to have manifestly disregarded the law), the panel's decision is not yet subject to review by a federal district court. In the Ninth Circuit, an arbitrator's ruling following the first phase of a bifurcated proceeding is not "final and reviewable." *Millmen Local 550 v. Wells Exterior Trim*, 828 F.2d 1373, 1375 (9th Cir. 1987). This is particularly clear in cases where, as here, the order is not "intended by the arbitrator to be a complete determination of the claims." *Id.* at 1376 (citation omitted). Further, Gegenheimer has not shown that this is one of those "extreme cases" that would warrant district court review even in the absence of a final ruling. *Id.* at 1377. Dismissal is without prejudice to filing a new petition at the end of the arbitration.

**IT IS SO ORDERED.**

Dated: March 29, 2018

HON. VINCE CHHABRIA
United States District Judge

EXHIBIT W

# EXHIBIT X

EXHIBIT X



EPSTEIN
BECKER
GREEN

Attorneys at Law

David Jacobs
310.557.9517
djacobs@ebglaw.com

April 6, 2018

<u>VIA EMAIL & Portal</u>

Mr. Lawrence R. Mills
C/O Michele Collins, Case Manager
FINRA
300 South Grand Avenue
Suite 1700
Los Angeles, CA 90071-3135
Michele.Collins@FINRA.org

Re:   <u>Jefferies LLC v. Jon Alan Gegenheimer FINRA Arbitration No.: 16-02461</u>

Dear Mr. Mills:

On behalf of Respondent Jon Alan Gegenheimer, we write in response to the Panel's request that the parties confirm their respective clients' availability for a hearing on the second phase of this arbitration, which was tentatively scheduled to take place on July 23-26, 2018. On March 21, 2018, we notified Jefferies' counsel that Gegenheimer is available on those dates. We also informed Jefferies' counsel that Gegenheimer intends to call four Jefferies witnesses -- Christopher Kanoff, Benjamin Lorello, Richard Handler and Brian Friedman -- to testify at the hearing and asked for confirmation that they were available to testify on the proposed dates. On March 22, 2018, Jefferies' counsel confirmed that Kanoff would be available on July 23 or 24, but objected to producing any witness other than Kanoff and flatly refused to provide any information regarding the availability of Lorello, Handler and Friedman (the "Jefferies Witnesses"). On April 4, 2018, Jefferies' counsel informed us that, contrary to their prior confirmation of Kanoff's availability, he is unavailable to testify on any of the July 23-26 dates that were set aside for the hearing. As a result, the parties and the Panel must select new dates for the hearing.

Before new hearing dates can be scheduled, Jefferies' refusal to produce the Jefferies Witnesses to testify at the hearing requires resolution by the Panel. Only then can the hearing be rescheduled for dates on which the parties and *all* witnesses are available to testify. For the reasons set forth below, Gegenheimer respectfully requests that the Panel direct Jefferies to produce the Jefferies Witnesses to testify at the hearing. The parties and the Panel will then be able to schedule the hearing to take place on dates when the Panel, the parties and all witnesses, including the Jefferies Witnesses, are available to testify.

Epstein Becker & Green, P.C.  |  1925 Century Park East, Suite 500  |  Los Angeles, CA 90067  |  t  310.556.8861  |  f  310.553.2165 | ebglaw.com

460

EXHIBIT X

Lawrence R. Mills
FINRA Dispute Resolution
April 6, 2018
Page 2

Gegenheimer's need to present all relevant evidence at the hearing, including testimony from the Jefferies Witnesses, is underscored by the Panel's February 20, 2018 Order stating that the Panel's January 29, 2018 Order was not intended to be a final award or an interim final award subject to confirmation or vacatur by a court and that the arbitration must continue to resolve the remaining issues. Shortly thereafter, on March 29, 2018, the U.S. District Court for the Northern District of California ruled that Gegenheimer's motion to vacate the Panel's January 29, 2018 decision was premature, but also stated that the decision's conclusion that the liquidated damages provision was enforceable is "very likely wrong" and "perhaps to the point that the panel should be understood to have manifestly disregarded the law." (Ex. A.) The District Court also invited Gegenheimer to refile his motion to vacate the January 29, 2018 decision at the conclusion of the hearing. (*Id.*) In light of the District Court's observations and the Panel's confirmation that the January 29, 2018 decision is not a final award, we are confident the Panel will proceed with an open mind and allow Gegenheimer to present all relevant evidence at the hearing -- which includes testimony from the Jefferies Witnesses, as well as testimony from Gegenheimer, Kanoff and an expert witness. At the conclusion of the hearing, after the Panel hears all relevant evidence, Gegenheimer expects that the Panel will reach a final determination that the liquidated damages provision is unenforceable.

For the reasons explained below, Jefferies' willingness to produce Kanoff to testify at the hearing does not obviate the need for testimony from the Jefferies Witnesses, as Kanoff cannot testify about Gegenheimer's separate meetings and communications with each of the Jefferies Witnesses because Kanoff was not there. Jefferies' objection to producing all of the essential Jefferies Witnesses is meritless and its refusal to at least provide information regarding the Jefferies Witnesses' availability smacks of bad faith. Each of the Jefferies Witnesses actively participated in the underlying events that led to this proceeding and their testimony is required in order for Gegenheimer to defend against Jefferies' claim and assert his counterclaims.

### A. Jefferies Is Incorrect That the Only Issues Remaining Pertain to an Award of Damages and Attorneys' Fees.

Jefferies' apparent position that the only remaining issues in this matter consist of the perfunctory step of awarding it $1 million dollars and determining the amount of its attorneys' fees is specious. The Panel's January 29, 2018 determination that the liquidated damages provision in Jefferies' offer letter is enforceable under New York law addressed the very narrow legal issue of whether the liquidated damages provision is enforceable on its face, but it did not resolve the separate issue regarding the merits of Jefferies' breach of contract claim under the facts and circumstances of this case. Moreover, the Panel acknowledged that its decision regarding the enforceability of the liquidated damages provision was neither a final decision nor an interim final decision. That acknowledgement, as well as the District Court's clear indication that the January 29, 2018 decision is wrong and may be vacated, leaves open the possibility that the Panel will reach a different conclusion after hearing all of the evidence.

Lawrence R. Mills
FINRA Dispute Resolution
April 6, 2018
Page 3

In addition to Gegenheimer's contention that the liquidated damages provision is unenforceable, Gegenheimer will present evidence at the hearing demonstrating that, under the specific facts and circumstances in this case, Jefferies is precluded from enforcing the liquidated damages provision against Gegenheimer even if it was facially valid.  As described more fully below, Gegenheimer intends to show that (i) the liquidated damages provision is unconscionable, (ii) Jefferies is estopped from enforcing the liquidated damages provision based on statements made by Friedman and Handler when they met separately with Gegenheimer, and (iii) Jefferies' unlawful conduct precludes it from recovering damages from Gegenheimer.

### B. Testimony From the Jefferies Witnesses Is Critical to Establishing Gegenheimer's Defenses.

In order for Gegenheimer to adequately present his defenses, he requires testimony from Kanoff and the three Jefferies Witnesses, each of whom was personally and actively involved in the underlying events regarding Gegenheimer. The attached documents produced in discovery are just a few representative examples demonstrating that each Jefferies Witness was personally involved in the underlying events.

- An email dated March 14, 2016 from Scott Atkinson, an employee of Jefferies' executive recruitment firm, to **Lorello** discusses their "action plan" to recruit the "most qualified/interested candidates" for Jefferies, including Gegenheimer.  (Ex. B);

- On April 12, 2016, Jefferies employee Jason Greenberg sent an email to **Lorello** discussing their strategy to recruit Gegenheimer, including the "need to move [Gegenheimer] along in process" but deliberately delaying an offer to Gegenheimer (without Gegenheimer's knowledge) until Jefferies hires a "#1" for the office. (Ex. C);

- On May 18, 2016, **Friedman** sent an email to Kanoff, copying **Lorello** and **Handler**, expressly approving the terms of Jefferies' offer to Gegenheimer, including the amount of liquidated damages to include in the offer letter, which was also approved by **Lorello**.  (Ex. D);

- On May 25, 2016, Atkinson informed **Lorello** that Gegenheimer "is trying to pull out" and needed **Lorello** or Kanoff to step in to retain Gegenheimer. (Ex. E);

- On May 26, 2016, **Lorello** sent an email to Kanoff regarding the possibility that Gegenheimer might decide to remain with Credit Suisse.  In that email, **Lorello** emphasized how important Gegenheimer was to him and **Brian Friedman**, and stressed the need for **Lorello**, **Friedman** and Kanoff to control efforts to dissuade Gegenheimer from remaining with Credit Suisse, stating: "[o]n Gegenheimer you

Lawrence R. Mills
FINRA Dispute Resolution
April 6, 2018
Page 4

must let **Brian [Friedman]** know immediately.  And you must be the front end in rescuing him back. I do NOT want Jason and Phil controlling this."  (Ex. F);

- An email dated May 29, 2016 reveals that **Lorello** reached out to Gegenheimer directly to discuss Gegenheimer's potential decision to remain with Credit Suisse and also confirms that there were further communications between **Lorello** and Gegenheimer regarding that issue. (Ex. G); and

- On June 6, 2016, Gegenheimer was instructed to travel to New York to meet separately with **Ben Lorello**, **Brian Friedman** and **Richard Handler** to discuss Gegenheimer's decision to remain with Credit Suisse.  (Ex. H).

This small sampling of emails demonstrates that Lorello, Friedman and Handler were actively involved in recruiting Gegenheimer and each of them has independent, personal knowledge regarding, among other things, the strategy for recruiting Gegenheimer in conjunction with Jefferies' raid of Credit Suisse's West Coast Technology Investment Banking division (the "West Coast Tech Group"); the terms of Jefferies' offer to Gegenheimer, including the liquidated damages provision; the separate meetings and communications each of them had with Gegenheimer after learning that Gegenheimer was considering remaining employed by Credit Suisse; and Jefferies' deliberative process in seeking to enforce the liquidated damages provision against Gegenheimer.  Testimony from each of these individuals regarding his personal involvement in the underlying events is essential in order for Gegenheimer to have a full and fair opportunity to defend himself in this proceeding.[1]

### C. Gegenheimer's Challenge to the Unconscionable Nature of the Liquidated Damages Clause is Central to His Defense—and Testimony From the Jefferies Witnesses Is Needed for Him to Assert this Challenge.

One of the issues Gegenheimer intends to address at the hearing is his claim that the liquidated damages provision is unconscionable under the particular facts and circumstances of this case.  Under New York law, an agreement is unenforceable when it "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms."  *Gillman v. Chase Manhattan Bank,*

---

[1] Courts have recognized that it is fundamentally unfair to prevent a party to an arbitration from presenting evidence at a hearing.  *See, e.g., Tempo Shain Corp. v. Bertek, Inc.*, 120 F. 3d 16, 18 (2nd Cir. 1997) (vacating award because "panel's refusal to continue the hearings to allow [a witness] to testify amounts to fundamental unfairness and misconduct sufficient to vacate the arbitration award"); *Harvey Aluminum v. United Steelworkers of America* 263 F. Supp. 488 (C.D. Cal. 1967) (vacating arbitration award where party was prevented from presenting evidence); *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985) (arbitrator "must give each of the parties to the dispute an adequate opportunity to present its evidence and argument").

Lawrence R. Mills
FINRA Dispute Resolution
April 6, 2018
Page 5

*N.A.*, 73 N.Y.2d 1, 10 (1988); *see also, e.g., Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977) (stating that for a liquidated damages clause to be permissible, it must be "neither unconscionable nor contrary to public policy") (*citing Mosler Safe Co. v Maiden Lane Safe Deposit Co.*, 199 N.Y. 479, 485 (1910)).  Even a facially valid liquidated damages provision can be unconscionable based on the underlying facts and circumstances. Indeed, a determination of unconscionability is an inherently fact specific inquiry that requires a factfinder to take a "'flexible' approach, examining all the facts and circumstances of a particular case.'" *Brennan v. Bally Total Fitness,* 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002).

In order for Gegenheimer to present a complete picture of the facts and circumstances surrounding Jefferies' inclusion and enforcement of the liquidated damages provision, he requires testimony from Lorello, Friedman and Handler, each of whom has *independent* knowledge of facts relevant to Gegenheimer's unconscionability defense, including: (a) his discussions with Gegenheimer regarding the terms and conditions of Gegenheimer's prospective employment with Jefferies and the financial penalties if Gegenheimer chose to remain with Credit Suisse after signing Jefferies' offer letter; (b) what, if any, consideration was given to the reasonableness of the $1 million liquidated damages provision in Gegenheimer's offer letter, including consideration of Gegenheimer's income and ability to pay a $1 million liquidated damages provision; (c) his role in determining, approving or directing the inclusion and/or amount of the liquidated damages provision in Gegenheimer's offer letter; (d) the strategy used to induce Gegenheimer to sign the offer letter while Jefferies was simultaneously hiring five senior Managing Directors with whom Gegenheimer worked, including the use of a "Cone of Silence" or similar tactic; (e) his discussion(s) with Gegenheimer regarding Gegenheimer's decision to remain with Credit Suisse and representations as to whether Jefferies would pursue legal action against Gegenheimer; and (f) Jefferies' decision to seek to enforce the liquidated damages provision against Gegenheimer and the deliberative process by which Jefferies arrived at that decision.

These issues are highly relevant to determining whether the liquidated damages provision is unconscionable under New York law.  If Gegenheimer is prevented from calling these witnesses, his ability to defend himself will be seriously compromised.

### D. Testimony From the Jefferies Witnesses Is Essential to Gegenheimer's Argument That Jefferies Is Estopped From Enforcing the Liquidated Damages Provision.

Gegenheimer also intends to demonstrate at the hearing that Jefferies is estopped from enforcing the liquidated damages provision.  This defense is based primarily on two separate, pivotal meetings Gegenheimer had with Friedman and Handler in New York, shortly after he informed Jefferies that he was considering staying with Credit Suisse.

On June 8, 2016, Gegenheimer was summoned to New York to meet separately with Friedman and Handler to discuss Gegenheimer's second thoughts about joining Jefferies.

Lawrence R. Mills
FINRA Dispute Resolution
April 6, 2018
Page 6

During Gegenheimer's meeting with Handler, Handler made certain representations to Gegenheimer that reasonably caused Gegenheimer to believe that there would be no negative repercussions if he chose to remain at Credit Suisse.

Gegenheimer also met separately with Friedman during that June 8 visit to New York. In that meeting, Friedman encouraged Gegenheimer to make the best decision for himself and his family. Friedman's representations to Gegenheimer during this meeting, like Handler's representations, made it clear to Gegenheimer that there would be no adverse consequences if he decided to remain at Credit Suisse.

Handler's and Friedman's representations and assurances to Gegenheimer that Jefferies would not penalize him if he decided to remain with Credit Suisse were decisive factors in Gegenheimer's decision to remain with Credit Suisse. Under New York law, Handler's and Friedman's representations and conduct preclude Jefferies from enforcing the liquidated damages provision. *Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982) (doctrine of equitable estoppel "is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought"); *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgt.*, L.P., 7 N.Y.3d 96, 106 (2006) (in action to enforce a non-compete agreement, court found that plaintiff may be estopped from enforcing agreement based on actions that reasonably led defendant to conclude that agreement would not be enforced).

For these reasons alone, Handler and Friedman are essential witnesses and must be directed to testify at the hearing.

### E. Testimony From the Jefferies Witnesses Will Establish That Jefferies' Unclean Hands Preclude It From Enforcing the Liquidated Damages Provision.

Gegenheimer also requires testimony from each of the three Jefferies Witnesses to demonstrate at the hearing that, as a basic matter of fairness and equity, Jefferies' own misconduct in connection with its recruitment of Gegenheimer as part of its broader raid of Credit Suisse precludes it from recovering liquidated damages from Gegenheimer. The Panel's primary obligation to consider the equities of this case is emphasized in FINRA's Arbitrator's Guide, which states that: "it is equitable to prefer arbitration to the law court, for the arbitrator keeps equity in view, whereas the judge looks only to the law, and the reason why arbitrators were appointed was that equity might prevail" (quoting *Domke on Aristotle*, page 9 of the Arbitrator's Guide).

Gegenheimer intends to demonstrate at the hearing that the equities in this case weigh decidedly against awarding Jefferies any damages, liquidated or otherwise, including evidence that the liquidated damages provision in Gegenheimer's offer letter was used as an anti-competitive tool in furtherance of Jefferies' unlawful raid of Credit Suisse's West Coast Tech

EXHIBIT X

Lawrence R. Mills
FINRA Dispute Resolution
April 6, 2018
Page 7

Group.  Jefferies' raid was made possible by its inducement of five senior managing directors employed by Credit Suisse to assist Jefferies in recruiting other Credit Suisse employees, including Gegenheimer, in violation of their fiduciary and contractual obligations to Credit Suisse.  Based on the perceived need for Gegenheimer to provide M&A service to the team poached by Jefferies, Jefferies used high pressure tactics to ensure that Gegenheimer accepted Jefferies' offer of employment.  Jefferies' egregious misconduct precludes it from enforcing the liquidated damages provision against Gegenheimer. *See Wells Fargo Bank v Hodge*, 92 A.D.3d 775 (2d Dept. 2012) (party is barred from obtaining relief if it engaged in immoral, unconscionable conduct directly related to the subject matter in litigation); *Integra Optics, Inc. v. Messina*, 2016 N.Y. Slip Op. 51106(U) (N.Y. Supreme Court, Albany 2016) (denying plaintiff's request for injunctive relief to enforce restrictive covenant where defendant had evidence that plaintiff used threats to obtain defendant's assent).

Documentary evidence produced by Jefferies confirms that each of the Jefferies Witnesses was heavily involved in the planning and execution of the raid of Credit Suisse's West Coast Tech Group and Jefferies' perceived need to employ Gegenheimer as part of that raid.  In order for Gegenheimer to present this "unclean hands" defense at the hearing, testimony is required from Lorello, Handler and Friedman regarding each individual's particular role in orchestrating the raid, the decision to recruit Gegenheimer as part of that raid,  discussions with the five former Credit Suisse employees who were poached by Jefferies regarding their need for Gegenheimer to follow them to Jefferies and the use of high-pressure recruitment tactics to coerce Gegenheimer into signing the offer letter in furtherance of the raid.

### F. Testimony From the Jefferies Witnesses Will Be Essential to Gegenheimer's Counterclaims.

Testimony from Lorello, Handler and Friedman is also necessary in order for Gegenheimer to present evidence at the hearing in support of his counterclaims, including his claim that Jefferies' use of an unconscionable liquidated damages provision in furtherance of its unlawful raid violates FINRA Rule 2010's mandate that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade," constitutes unfair competition and represents an abuse of FINRA process.  Gegenheimer requires testimony from each of these senior Jefferies executives who participated in recruiting Gegenheimer to demonstrate that, under the unique facts in this case, the liquidated damages provision was never intended to remedy Jefferies' potential losses if Gegenheimer chose to remain employed by Credit Suisse, but was instead used offensively to intimidate and coerce Gegenheimer into joining Jefferies against his will.

Lawrence R. Mills
FINRA Dispute Resolution
April 6, 2018
Page 8

**G. In the Event That Jefferies Fails to Produce the Jefferies Witnesses At the Hearing, the Panel Must Draw An Adverse Inference Against Jefferies and Preclude Jefferies From Challenging Gegenheimer's Affirmative Defenses and Counterclaims.**

Alternatively, if Jefferies continues to refuse to produce Lorello, Friedman and Handler to testify at the hearing, then the Panel should at a minimum draw an adverse inference that the testimony from each of those witnesses would confirm that (a) the liquidated damages provision in Gegenheimer's offer letter is unconscionable under the facts and circumstances of this case; (b) the statements made by Friedman and Handler on June 8, 2016, which assured Gegenheimer that Jefferies would not take legal action if he chose to remain with Credit Suisse, preclude Jefferies from seeking damages from Gegenheimer; and (c) Jefferies' gross misconduct in connection with its recruitment of Gegenheimer – including its efforts to hire Gegenheimer as part of its unlawful raid of Credit Suisse's technology investment banking group and its inducement of Credit Suisse employees to help recruit Gegenheimer in violation of their fiduciary obligations to Credit Suisse – precludes Jefferies from recovering damages from Gegenheimer. Additionally, the Panel should issue an Order precluding Jefferies from presenting any evidence at the hearing challenging Gegenheimer's affirmative defenses and counterclaims. *See, e.g.*, FINRA Rule 13212(a) (authorizing panel to sanction a party for failure to comply with any provision of the Code of Arbitration or order of the panel, including a sanction precluding a party from presenting evidence); and FINRA Rule 13511 (authorizing sanctions for failure to comply with FINRA's discovery rules).

\* \* \*

For all of the reasons set forth above, Gegenheimer respectfully requests that the Panel direct Jefferies to produce Lorello, Friedman and Handler to testify at the hearing in this matter or, alternatively, issue an Order drawing an adverse inference against Jefferies (as summarized above) and precluding Jefferies from presenting any evidence at the hearing challenging Gegenheimer's affirmative defenses and counterclaims.

Thank you for your consideration of this request.

Very truly yours,

*/s/ David Jacobs*

David Jacobs

cc:     Andrew J. Shapren, Esq.

# Exhibit A

EXHIBIT X

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JON A. GEGENHEIMER,

        Plaintiff,

    v.

JEFFERIES LLC,

        Defendant.

Case No. 18-cv-00746-VC

**ORDER GRANTING MOTION TO DISMISS PETITION TO VACATE ARBITRATION AWARD**

The motion to dismiss the petition to vacate the arbitration award is granted. Although the decision of the panel regarding the liquidated damages provision is very likely wrong (perhaps to the point that the panel should be understood to have manifestly disregarded the law), the panel's decision is not yet subject to review by a federal district court. In the Ninth Circuit, an arbitrator's ruling following the first phase of a bifurcated proceeding is not "final and reviewable." *Millmen Local 550 v. Wells Exterior Trim*, 828 F.2d 1373, 1375 (9th Cir. 1987). This is particularly clear in cases where, as here, the order is not "intended by the arbitrator to be a complete determination of the claims." *Id.* at 1376 (citation omitted). Further, Gegenheimer has not shown that this is one of those "extreme cases" that would warrant district court review even in the absence of a final ruling. *Id.* at 1377. Dismissal is without prejudice to filing a new petition at the end of the arbitration.

**IT IS SO ORDERED.**

Dated: March 29, 2018

HON. VINCE CHHABRIA
United States District Judge

EXHIBIT X

United States District Court
Northern District of California

# Exhibit B

EXHIBIT X

| | |
|---|---|
| **From:** | Atkinson, Scott <satkinson@heidrick.com> on behalf of Atkinson, Scott |
| **Sent:** | Monday, March 14, 2016 4:32 AM |
| **To:** | Benjamin Lorello |
| **Cc:** | Ryan, Daniel; Payne, Madelyn; Anderson, Charles; Guenette, Jessica |
| **Subject:** | TMT Summary |

Hey Ben,

It was good to speak with you tonight. Dan and I wanted to follow up with a quick summary outlining our action plan with our most qualified/interested candidates for our TMT searches.

**Technology M&A**
Overall we narrowing our focus down to [Redacted] and Gegenheimer. The hope would be to make two hires from this pool – one senior and one junior.
*(Senior MD Hire)*
[Redacted] – MD, Co-Head of Technology M&A – Meeting with Phil in CA this week. Interested and would be a good hire.
[Redacted] – MD, Co-Head of Investment Banking, [Redacted] – Meeting with Phil in CA this week. Interested and would be a good hire.
[Redacted] – MD, Co-Head of Technology M&A, [Redacted] Meeting Phil in CA this week. Lower level of interest. I think [Redacted] and [Redacted] are more commercial and would be better hires than [Redacted]
[Redacted] MD, Technology MA [Redacted] – Would be a strong hire, but can't move LA and would be expensive.
*(Junior MD Hire)*
[Redacted] – MD, [Redacted] Would be a great hire as a #2 MD in the group. He's meeting Phil on 3/15.
**Jon Gegenheirmer** – Director, Tech M&A, BAML – Would be a great hire as a #2 MD in the group. He's meeting Phil on 3/15.

**Software**

# Redacted

**Steve West** – MD, Co-Head of Software, Credit Suisse – Would be a hire for this upcoming year.

# Redacted

**Scott Atkinson**
Heidrick & Struggles
One California Street  |  Suite 2400  |  San Francisco, CA  |  94111
T: +1 (415) 291 5244   |  M: +1 (914) 610 9944  |  E: satkinson@heidrick.com

471                                                        EXHIBIT X

Confidential

HEIDRICK & STRUGGLES

WE HELP OUR CLIENTS CHANGE THE WORLD,
ONE LEADERSHIP TEAM AT A TIME™

472                                         EXHIBIT X

Confidential
JEFFERIES00001263

# Exhibit C

EXHIBIT X

| | |
|---|---|
| **From:** | Jason Greenberg <jasgreenberg@jefferies.com> on behalf of Jason Greenberg |
| **Sent:** | Tuesday, April 12, 2016 4:24 PM |
| **To:** | Benjamin Lorello |
| **Cc:** | Philip Berkowitz |
| **Subject:** | In case we don't speak about Jon Gegenheimer |

We are trying to hire three senior MDs – [Redacted] (#1 choice, love to hire, doesn't want to come to Jefferies, unlikely at this time), [Redacted] (speaking today, trying to convince him to meet you, come here, seems promising at the moment), and [Redacted] (haven't met yet, trying to meet, unclear). Want to get this hire done first, to make sure leader of West Coast Tech M&A has input into broader hiring. Hoping to get this done in next couple weeks.

Gegs is the senior SVP hire (MD promote either this year or next year expectation) to be #2 in M&A on West Coast. We need to move him along in process, but will likely wait (he doesn't know this) until we get #1 on BoD (e.g., [Redacted] for West Coast M&A to determine if we sign Gegs. Gegs comes from CS, has a good reputation, and is being chased right now (his mentor went to run Tech M&A at Morgan Stanley and would probably hire him). I want to make sure we keep Gegs interested, feeling like he's moving along, etc. I think he would say "yes" to us, so I want him to feel like he could be part of our organization.

Happy to discuss live. I'm on cell - # below.

_____

**Jason Greenberg**
Managing Director, Head of Global Tech M&A
Jefferies LLC
520 Madison Avenue, 8th Floor
New York, NY 10022
Work:  +1.212.323.7551
Cell:    +1.415.531.2044

EXHIBIT X

Confidential

JEFFERIES00001452

# Exhibit D

EXHIBIT X

**From:** Brian Friedman [bfriedman@jefferies.com] on behalf of Brian Friedman
**Sent:** Wednesday, May 18, 2016 8:51 PM
**To:** Chris Kanoff
**Cc:** Benjamin Lorello; Richard Handler
**Subject:** Re: offer approval email - Jon Gegenheimer - MD, Technology M&A

Ok

On May 18, 2016, at 4:46 PM, Chris Kanoff <ckanoff@jefferies.com> wrote:

> Requesting your approval.  Jason and Phil are onboard for this.  We were going to make him an offer last week and held off because of the other CS situation.  Trying to hire him today.
>
> **From:** Peggy Fay **On Behalf Of** Benjamin Lorello
> **Sent:** Wednesday, May 18, 2016 1:44 PM
> **To:** Chris Kanoff; Benjamin Lorello
> **Subject:** RE: offer approval email - Jon Gegenheimer - MD, Technology M&A
>
> Per Ben approved
>
>
> Peggy Fay
> Executive Assistant
> Investment Banking
> Jefferies LLC
> 520 Madison Ave., 7th Floor
> New York, NY 10022
> Phone:212-284-8104
> Fax:646-786-5476
> pfay@jefferies.com
>
> **From:** Chris Kanoff
> **Sent:** Wednesday, May 18, 2016 4:38 PM
> **To:** Benjamin Lorello
> **Subject:** FW: offer approval email - Jon Gegenheimer - MD, Technology M&A
>
>
> Ben – for your review and approval, below are terms for Jon Gegenheimer, our recommended candidate for Managing Director for Technology.  Jon is currently employed by Credit Suisse as a Director in Technology M&A.
>
> Jon has a deep expertise in marketing the firm's M&A capability, in conjunction with the coverage partners and via independent deal/client efforts.  Jon also has day-to-day engagement of Credit Suisse's public and private technology clients across a complete portfolio of financial products and extensive experience in all attributes of M&A execution, related vertical coverage and ancillary advisory services.
>
> Jon was interviewed by yourself, Chris Kanoff, Phil Berkowitz, Tommaso Zanobini and Jason Greenberg. The feedback was very positive.
>
> **Proposed Offer**
> Name: Jon Gegenheimer

EXHIBIT X

Confidential

JEFFERIES00001619

Team: Technology
Title: MD
Location: San Francisco
Salary: $350K
2016 Bonus: $720,834 guarantee; 5 year service period
Start Date: August 18, 2016
Buy out of leave behind: up to $280K, pending forfeiture documentation; 4 year service period
Liquidated damages: $1mm
Garden leave: 365 days through 2017 and 135 days thereafter
Head-hunter: H&S
HH Success fee: $275K

**Comp History:**

**Employer: Credit Suisse**
Title: Director, Technology M&A
Dates of employment: 2003 to present
2016 Base: $250K
Leave Behind: $279,062
Garden Leave: 90 days
Term Reason (Voluntary or involuntary):

**2015**
Title: Director
Total Compensation: $370K
Base: $250k
Bonus: $120K

**2014**
Title: Director
Total Compensation: $650K
Base: $220K
Bonus: $380K

**2013**
Title: Director
Total Compensation: $600K
Base: $220K
Bonus: $380K

2012
Title: Director
Total Compensation: $560K
Base: $200K
Bonus: $360K

**2011**
Title: Vice President
Total Compensation: $475K
Base: $200K
Bonus: $275K

**2010**

477                                            EXHIBIT X

JEFFERIES00001620

**Title:** Vice President
Total Compensation: $350K
Base:   $200K
Bonus:  $150K

**2009**
**Title:**  Vice President
Total Compensation: $323,250
Base: $100K
Bonus:$223,250

**2008**
Title: Associate
Total Compensation: $265K
Base: $100K
Bonus:  $165K

**Mary McCooey**
**Senior Vice President, Global Head of Talent Acquisition**
Jefferies, LLC,  520 Madison Avenue, New York, NY 10022
Tel: 212.284.2572 |Mobile: 914.960.3092 | Fax: 646.417.5572 | Email: mmccooey@jefferies.com

478

EXHIBIT X

JEFFERIES00001621

# Exhibit E

**From:** Atkinson, Scott <satkinson@heidrick.com> on behalf of Atkinson, Scott
**Sent:** Wednesday, May 25, 2016 11:31 PM
**To:** Benjamin Lorello
**Cc:** Chris Kanoff (ckanoff@jefferies.com); Mary McCooey; Ryan, Daniel
**Subject:** Jon Geggenheimer - Credit Suisse

Ben,

Jon Geggenheimer is trying to pull out. We are all over him but need you or Chris to step in here as well. CS is in his ear.

I am in direct contact with him. Please call me.

Scott

**Scott Atkinson**
Heidrick & Struggles
One California Street  |  Suite 2400 |  San Francisco, CA  |  94111
T: +1 (415) 291 5244   |  M: +1 (914) 610 9944   |  E: satkinson@heidrick.com

HEIDRICK & STRUGGLES

WE HELP OUR CLIENTS CHANGE THE WORLD,
ONE LEADERSHIP TEAM AT A TIME™

480                                                        EXHIBIT X

JEFFERIES00002974

# Exhibit F

EXHIBIT X

**From:**      Benjamin Lorello <blorello@jefferies.com> on behalf of Benjamin Lorello
**Sent:**      Thursday, May 26, 2016 8:35 AM
**To:**        Chris Kanoff
**Subject:**   IMPORTANT

On Gegenheimer you must let Brian know immediately.
And you must be the front end in rescuing him back. I do NOT want Jason and Phil controlling this.
Thanks

Benjamin D. Lorello
Global Head of
Investment Banking & Capital Markets
Jefferies LLC
520 Madison Ave., 7th Floor
New York, NY 10022
Phone: 212-284-4677
Cell: 646-701-3344
blorello@jefferies.com

482                                                      EXHIBIT X

# Exhibit G

EXHIBIT X

**From:**       Jon Gegenheimer <jon.gegenheimer@aol.com> on behalf of Jon Gegenheimer
**Sent:**       Sunday, May 29, 2016 5:12 AM
**To:**         Benjamin Lorello
**Subject:**    Re: Jon. Tried you earlier. Pls call me at home 2122625512. Thanks. Ben.

Hi Ben.  I'm sorry today got away from me.  I will give you a shout tomorrow.  Talk soon.
Jon

Sent from my iPhone

On May 28, 2016, at 3:54 PM, Benjamin Lorello <blorello@jefferies.com> wrote:


Benjamin D. Lorello
Global Head of
Investment Banking & Capital Markets
Jefferies LLC
520 Madison Ave., 7th Floor
New York, NY 10022
Phone: 212-284-4677
Cell: 646-701-3344
blorello@jefferies.com

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. In the United Kingdom, Jefferies operates as Jefferies International Limited; registered in England: no. 1978621; registered office: Vintners Place, 68 Upper Thames Street, London EC4V 3BJ. Jefferies International Limited is authorized and regulated by the Financial Conduct Authority.

EXHIBIT X

JEFFERIES00001941

# Exhibit H

EXHIBIT X

Message

| | |
|---|---|
| **From**: | Jason Greenberg [jasgreenberg@jefferies.com] |
| **Sent**: | 6/6/2016 8:10:31 AM |
| **To**: | Jon Gegenheimer [jon.gegenheimer@aol.com] |
| **CC**: | Chris Kanoff [ckanoff@jefferies.com] |
| **Subject**: | Re: Meetings on Wednesday |

Jon,
Are you confirmed then?
Thanks.
Jason.

Sent from my iPhone

On Jun 6, 2016, at 5:51 PM, Jon Gegenheimer <jon.gegenheimer@aol.com> wrote:

Thanks Jason.  Have a safe trip.

Sent from my iPhone

> On Jun 6, 2016, at 1:22 AM, Jason Greenberg <jasgreenberg@jefferies.com> wrote:
>
> Jon,
>
> Have locked down meetings for you Wednesday at 520 Madison Avenue in NY as follows:
> Ben Lorello at 130pm
> Rich Handler at 2pm
> Brian Friedman at 3pm
>
> Unfortunately I'm in Israel for our annual Tech Conference. Let Chris Kanoff know if there are any
changes to your availability. Really hope this can work. The team is excited to spend time with you.
>
> Best, Jason.
>
>
> Sent from my iPhone
>
> Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any
attachments, are confidential to the ordinary user of the email address to which it was addressed. If you
are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part
of it in any form whatsoever. This email may be produced at the request of regulators or in connection
with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of
transmission. Use by other than intended recipients is prohibited. In the United Kingdom, Jefferies
operates as Jefferies International Limited; registered in England: no. 1978621; registered office:
Vintners Place, 68 Upper Thames Street, London EC4V 3BJ. Jefferies International Limited is authorized
and regulated by the Financial Conduct Authority.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any
attachments, are confidential to the ordinary user of the email address to which it was addressed. If you
are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part
of it in any form whatsoever. This email may be produced at the request of regulators or in connection
with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of
transmission. Use by other than intended recipients is prohibited. In the United Kingdom, Jefferies
operates as Jefferies International Limited; registered in England: no. 1978621; registered office:
Vintners Place, 68 Upper Thames Street, London EC4V 3BJ. Jefferies International Limited is authorized
and regulated by the Financial Conduct Authority.

EXHIBIT X

CONFIDENTIAL

JG00000280

# EXHIBIT Y

**Buchanan Ingersoll ∧ Rooney** PC

Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA  19102-2555

T 215 665 8700
F 215 665 8760

www.bipc.com

**Andrew J. Shapren**
215 665 3853
andrew.shapren@bipc.com

April 16, 2018

**VIA EMAIL AND PORTAL**

Michele Collins, Case Manager
FINRA
300 South Grand Avenue
Suite 1700
Los Angeles, CA 90071-3135

> Re:   **Jefferies LLC v. Jon Alan Gegenheimer**
>         **FINRA Arbitration Case Number:  16-02461**

Dear Ms. Collins:

    I write on behalf of Jefferies in response to Respondent Gegenheimer's April 6, 2018 letter to the Panel (the "April 6 Letter") in which he makes the baseless and harassing demand that the Panel order Jefferies to produce three of its highest level executives as witnesses in this matter.  These executives had extremely limited involvement in Gegenheimer's recruitment to Jefferies and no involvement whatsoever in the negotiation of the contract that is the subject of the claims and defenses in this matter.  For the reasons stated herein, Gegenheimer's request that Jefferies produce senior executives Benjamin Lorello, Richard Handler, and Brian Friedman (together, the "Executives") as witnesses should be denied.  Jefferies requests that the Panel schedule a telephonic pre-hearing conference so the parties may be heard on this issue and may discuss rescheduling the second phase of the evidentiary hearings in this matter.[1]

    **A.   Introduction and Background**

    This case revolves around the enforceability of section V(B) in the May 18, 2016 Agreement entered into by Jefferies and Gegenheimer, which requires Gegenheimer to pay liquidated damages in the event he failed to commence employment with Jefferies by August 17, 2016 (the "Liquidated Damages Clause").  As the Panel is aware, the parties agreed to a bifurcated procedure in this matter.  The parties asked the Panel first to "solely adjudicate

---

[1] As discussed further herein, Jefferies requests that the hearing dates tentatively scheduled for July 23-26, 2018 be rescheduled due to a pre-existing conflict of Chris Kanoff, the Jefferies' executive who was involved in the negotiation and execution of the contract at issue.

EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 2 -

whether the liquidated damages clause in the agreement is enforceable or unenforceable." *See* December 19, 2017 letter to the Panel, attached hereto as Exhibit A, at p. 1. On January 29, 2018, after extensive briefing and a hearing, the Panel issued an "Order Regarding Liquidated Damages" (the "Order"), which held that the "liquidated damages clause … of the Agreement is enforceable by Jefferies against Gegenheimer."

Following the Panel's determination that the Liquidated Damages Clause is enforceable, limited issues remain for determination in the second phase of the hearing. Those issues are: 1) establishing Gegenheimer's liability for breach of contract and, in turn, Jefferies' entitlement to damages in the amount of $1 million as provided in the enforceable Liquidated Damages Clause, 2) establishing Jefferies' entitlement to attorneys' fees and costs as provided in the Agreement, and 3) the disposition of Gegenheimer's counterclaims (to whatever extent they remain at issue in light of the January 29, 2018 Order).[2]

Despite the narrow issues remaining for adjudication, Gegenheimer, clearly unhappy with the Panel's January 29, 2018 Order, has now submitted a vindictive request that the Panel order three of Jefferies' highest ranking executives to testify in the second phase of hearings in this case. Specifically, Gegenheimer demands that the Panel order the appearances of:

- **Richard Handler**. Mr. Handler is the Chairman of the Board and Chief Executive Officer of Jefferies Group, and CEO of Leucadia National Corp, Jefferies' parent company.

- **Brian Friedman**. Mr. Friedman is the Chairman of the Executive Committee of Jefferies and President of Leucadia National Corp.

- **Benjamin Lorello**. Mr. Lorello is the Global Head of Investment Banking & Capital Markets at Jefferies. Mr. Lorello also serves of the Global Co-Head of Investment Banking together with Chris Kanoff.

Each of the Executives is based out of Jefferies' New York City headquarters. More importantly, none of the Executives had any discussions with Gegenheimer prior to him signing the Agreement regarding the negotiation of its terms or its execution.

Gegenheimer asks this Panel to order the Executives to testify in this matter *in addition* to the testimony of Chris Kanoff, Jefferies Executive Vice President and Global Co-Head of

---

[2] Gegenheimer asserted counterclaims for violation of FINRA Rule 2010, unfair competition, tortious interference with contract, and abuse of process. Significantly, each of these counterclaims is premised on Gegenheimer's contention that the Liquidated Damages Clause is unenforceable (so much so that Jefferies' claim is frivolous). However, the Panel has already determined that the Liquidated Damages Clause is enforceable.

EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 3 -

Investment Banking at Jefferies.   Mr. Kanoff is the Jefferies executive who has lead responsibility for recruiting and hiring in the Investment Banking division and was the senior Jefferies employee involved in presenting, negotiating, and executing the Agreement at issue. Mr. Kanoff testified by Declaration at the prior hearing and both parties have indicated they may call Mr. Kanoff as a witness at the future hearing.   However, after the March 20, 2018 Pre-Hearing Conference regarding scheduling in this matter, in which the parties and the arbitrators tentatively scheduled the second phase of hearings for July 23-26, 2018, counsel for Jefferies learned that Mr. Kanoff was not available during those dates due to a previously scheduled personal obligation.   On April 4, 2018, counsel for Jefferies advised counsel for Gegenheimer of Kanoff's unavailability and proposed the week of August 20-24, 2018 for replacement dates, subject to the Panel's availability.   Rather than respond to Jefferies' counsel, Gegenheimer chose to instead file its April 6 Letter with the Panel seeking to compel Jefferies' three highest level executives.

There is no basis for Gegenheimer's request.   As discussed below, Gegenheimer's purported justification to call the Executives as witnesses is based on:  1) his misguided attempt to re-arbitrate the portion of this case that has already been decided; and 2) purported claims and defenses that he has never pled or raised.   Moreover, as a factual matter, the Executives do not have any non-cumulative information that bears on any issue remaining for the Panel to adjudicate.[3]

It is clear that Gegenheimer's request to compel the appearance of the three Executives was made for the purpose of harassing Jefferies and not for the purpose of obtaining essential testimony in this case.   The disingenuous nature of Gegenheimer's request is patently evident.   In

---

[3] The Panel has broad discretion to determine whether to hear evidence and, contrary to Gegenheimer's assertions, fundamental fairness does not require the Panel to allow Gegenheimer to present every piece of relevant evidence, nor does it require the Panel to hear cumulative or irrelevant evidence.   *Areca, Inc. v. Oppenheimer & Co.*, 960 F. Supp. 52, 55 (S.D.N.Y. 1997)(citations omitted).   Arbitrations may "proceed with only a summary hearing and with restricted inquiry into factual issues." *Id.* (internal citations and quotations omitted)(emphasis in original).   While arbitrators must have before them enough evidence to make an informed decision, they "need not compromise the speed and efficiency that are the goals of arbitration by allowing the parties to present *every piece* of relevant evidence" and "need not hear cumulative or irrelevant evidence." *Id.* (internal citations and quotations omitted).   *See also Arbitration between Lemoine Skinner III v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. C 03-2625 VRW, 2003 WL 23174478, at *5–6 (N.D. Cal. Dec. 29, 2003)("Fundamental fairness only requires that the parties be provided an adequate opportunity to present [their] evidence and arguments and to present evidence sufficient to enable the arbitrators to make an informed decision….Arbitration is intended to be efficient, expeditious, and economical, and arbitrators may restrict the scope of the arbitration accordingly.")(internal citations and quotations omitted).

EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 4 -

fact, in his April 6 Letter to the Panel, Gegenheimer has made numerous arguments and statements that are flatly contradicted by his own prior statements to this Panel.  By way of example, despite Gegenheimer's new assertions in his April 6 Letter that a whole host of issues remain to be adjudicated in the second phase of the hearings in this matter, Gegenheimer previously took the position that the matters for determination in this entire case were very limited.  Specifically, in September 2017, Gegenheimer told this Panel, **"the only issues to be decided by the panel are whether Jefferies' liquidated damages provision was a legitimate attempt to estimate its damages in the event of a breach, or an improper attempt to impose a financial penalty on Gegenheimer if he decided against joining Jefferies."**  *See* Gegenheimer's September 18, 2017 Opposition to Jefferies' Discovery Motions, attached hereto as Exhibit B at p. 4 (emphasis added).  Notably, these two issues were decided by the January 29, 2018 Order, leaving only the limited issues discussed above to be resolved in the second phase of the arbitration.

As further discussed below, rather than continue with his prior and true position, Gegenheimer has decided it is better suited to his interests to assert new contradictory and disingenuous arguments.  As the Panel will see, at this point Gegenheimer (actually Credit Suisse) will say anything, regardless of its truth or merit, to further his attempt to drag Jefferies' highest level executives into this hearing in the hopes that such a distraction will induce Jefferies to compromise its claim.

**B.   Gegenheimer's Request to Compel the Appearance of the Executives Should be Denied**

1.   The Executives do not have any non-cumulative information pertinent to the issues in this case.

In this case, Jefferies' sole claim is to enforce the Liquidated Damages Clause. Gegenheimer's counterclaims each are premised on his argument that the Liquidated Damages Clause is unenforceable.  Here, the three Executives that Gegenheimer seeks to compel to testify in this matter have no knowledge relevant to those claims that would not be entirely cumulative of the testimony of other witnesses, namely Mr. Kanoff and Gegenheimer himself.  Notably, Gegenheimer himself has acknowledged that Mr. Kanoff and Gegenheimer are the only witnesses with knowledge regarding the limited matters in dispute, as they were the only individuals identified by Gegenheimer as witnesses he might call during the first phase of this proceeding.  *See* Gegenheimer's January 11, 2018 Witness List, attached hereto as Exhibit C.

The evidentiary exhibits attached to Gegenheimer's April 6 Letter do not change this analysis.  To the contrary, they actually support the conclusion that Mr. Kanoff is the Jefferies witness with personal knowledge regarding the limited matters in dispute and that any testimony by the Executives would be either completely irrelevant or, at best, cumulative of the testimony offered by Mr. Kanoff.

EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 5 -

For example, Exhibits B and C to Gegenheimer's April 6 Letter demonstrate only that Mr. Lorello was kept apprised of the status of Jefferies' recruitment of Gegenheimer by others (Scott Atkinson and Jason Greenberg) with more direct involvement.[4]

Exhibit D to Gegenheimer's April 6 Letter shows that it was Mr. Kanoff who set forth the terms of Gegenheimer's employment offer, which were then given a perfunctory approval by Mr. Lorello (through his administrative assistant, Peggy Fay) and Mr. Friedman due to their senior executive roles.  Significantly, Mr. Friedman or Mr. Handler signs off on every employment offer for a position of vice president and above made by Jefferies company-wide.  Similarly, in his role, Mr. Lorello signs off on virtually every offer of employment made by Jefferies in its Investment Banking and Capital Markets Division.  For his part, Mr. Handler was merely copied on the approval of the offer for Gegenheimer that Mr. Kanoff put together.

Exhibits E and F demonstrate that, true to form, it was Mr. Kanoff who was tasked with attempting to change Gegenheimer's mind after he breached his Agreement and reneged on his promise to join Jefferies.

Exhibits G and H demonstrate merely that Lorello, Freidman and Handler had communications with Gegenheimer *after* he reneged and breached the Agreement.  As discussed at length below, these discussions are plainly not relevant to the claims and defenses in this case.

Tellingly, Gegenheimer has not alleged that either Mr. Handler or Mr. Friedman so much as had a conversation with Gegenheimer prior to the time that he informed Jefferies he would breach the Agreement, which occurred on May 24, 2016.  Similarly, although Mr. Lorello interviewed Gegenheimer in early March 2016, over two months before Gegenheimer signed the Agreement, Exhibits B and C to Gegenheimer's April 6 Letter show that Jefferies' recruitment of Technology M&A candidates, including Gegenheimer, was led by other Jefferies employees, who merely kept Mr. Lorello apprised of Jefferies' progress.  Furthermore, it is undisputed that it was Mr. Kanoff who discussed the Agreement and the Liquidated Damages Clause with Gegenheimer.  None of the Executives were involved in negotiating the Liquidated Damages Clause or had any communications with Gegenheimer about the Agreement before he signed it and then reneged.  Simply put, the Executives have no information pertinent to the issues in the case.

---

[4] The Panel should note that although other individuals had far more involvement in recruiting Gegenheimer to Jefferies than the Executives, Gegenheimer has not asked for those individuals as witnesses.  Gegenheimer's decision to request *only* Jefferies' highest level executives as witnesses make his harassing motive all the more clear.

EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 6 -

> 2. <u>Gegenheimer's argument that the Liquidated Damages Clause is unenforceable has already been adjudicated in the first phase of the bifurcated proceeding.</u>

In addition to the non-existence of factual ties between the Executives and any issues in this case, Gegenheimer's April 6 Letter is premised in large part on the fiction that the Panel has not yet decided whether the Liquidated Damages Clause is enforceable. Gegenheimer goes so far as to say that he "expects that the Panel will reach a final determination that the liquidated provision is unenforceable." *See* April 6 Letter at 2. Obviously, if this were the case, the bifurcated procedure the parties and the Panel agreed to would be rendered entirely meaningless. This cannot be so. While there is still work for the Panel to do before issuing its Award, the issue of the enforceability of the Liquidated Damages Clause has been fully determined in accordance with the agreed upon bifurcated procedure in this case.

Gegenheimer speciously supports his attempt to re-litigate the first phase of this case by arguing that the Panel only addressed the issue of whether the Liquidated Damages Clause is "enforceable on its face." *See* April 6 Letter at 2. Whatever this odd assertion may mean, it is unequivocally false. In the first portion of the case the Panel was tasked with the simple question of whether "***the liquidated damages clause in the agreement is enforceable or unenforceable***." *See* Exhibit A at 1 (emphasis added). The parties agreed to submit briefs, stipulated facts, and/or a limited presentation of testimony regarding the issue of the enforceability of the Liquidated Damages Clause. There were no limitations whatsoever on how or why the clause may be unenforceable. Gegenheimer had the opportunity to present any and all legal arguments and factual evidence he believed was necessary for the Panel to decide the issue. He chose to present the arguments and evidence he presented. He does not now get a second bite at the apple to present arguments and/or evidence that he decided not to present at the appropriate time.

Gegenheimer also appears to assert that a District Court's Judge's casual and completely unexplained dicta in granting Jefferies' Motion to Dismiss the wasteful Petition to Vacate filed by Gegenheimer could justify re-litigating the first phase of this case. The Panel should not be swayed. Clearly, in granting Jefferies' Motion to Dismiss, the Judge did not formally consider the merits of Gegenheimer's Petition to Vacate and certainly did not invest the time and attention analyzing the issues in this case that this Panel has invested. Moreover, Jefferies is confident that, if and when a judge actually adjudicates a motion for vacatur of this Panel's ruling on the Liquidated Damages Clause, the Court will undoubtedly confirm the ruling under the applicable standard of review.[5]

---

[5] The dismissal of Gegenheimer's Petition to Vacate as untimely should come as a surprise to no one. Yet, Jefferies was forced to expend substantial attorneys' fees responding to Gegenheimer's Petition. Jefferies will be seeking those fees, in addition to those expended in this arbitration, during the upcoming second phase of arbitration hearing.

EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 7 -

      3.  <u>Gegenheimer's argument that the Liquidated Damages Clause is
"unconscionable" has already been adjudicated.</u>

Gegenheimer's argument that the Executives' testimony is relevant to and necessary for his defense that the Liquidated Damages Clause is unconscionable and therefore unenforceable is a perfect example of Gegenheimer attempting to re-litigate the issue that has already been adjudicated. Specifically, the Panel has already decided that the Liquidated Damages Clause <u>is enforceable</u>. Moreover, Gegenheimer even made *this exact argument* during the first phase of the case. In fact, in Gegenheimer's opening brief he argued the Liquidated Damages Clause was "an unconscionable financial penalty if Gegenheimer decided against commencing employment with Jefferies." *See* Gegenheimer's Opening Brief, at p. 6. Gegenheimer likewise argued that Jefferies' enforcement of the Liquidated Damages clause was "unconscionable" in his response brief (*See* Gegenheimer's Opposition Brief at p. 27) and continued with the argument during the hearing, stating:

> If Jefferies is allowed to undermine not only California law, but New York law, and putting in what I think any decent, fair-minded person would say is *unconscionable penalty* for not moving forward with the new employment six days after first singing an offer letter . . . this could really become a huge problem"

*See* Portion of transcript of January 24, 2018 hearing at p. 71; attached hereto as Exhibit D.

Thus, Gegenheimer's defense that the Liquidated Damages Clause is not enforceable because it is unconscionable has already been adjudicated. To the extent Gegenheimer failed to present legal authority or evidence to support that defense during the first phase of the hearing, his opportunity to do so has been waived due to his express agreement to bifurcate the case.

      4.  <u>In addition to the fact that the issue already been adjudicated, Gegenheimer
never pled an estoppel defense and has admitted that his motivations to breach
are not relevant to this matter.</u>

In his April 6 Letter, Gegenheimer attempts to justify his harassing request to compel the Executives, in particular Messrs. Handler and Friedman, by asserting that they have independent knowledge relevant to Gegenheimer's "defense" that Jefferies should be estopped from enforcing the Liquidated Damages Clause. Gegenheimer's position centers on the brand new allegation that, in meetings two weeks after Gegenheimer had already breached the Agreement, Handler and Friedman supposedly "made representations to Gegenheimer that reasonably caused Gegenheimer to believe there would be no negative repercussions if he chose to remain at Credit Suisse." *See* Gegenheimer's April 6 Letter, at p. 6. Gegenheimer's argument fails for many reasons.

                  EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 8 -

First, Gegenheimer's newly conjured "estoppel" defense is nothing more than an argument for why the Liquidated Damages Clause is unenforceable. Accordingly, the argument should have been made, if at all, during the first phase of this bifurcated proceeding in which the precise question of the enforceability of the Liquidated Damage Clause was at issue. Gegenheimer is not entitled to make new arguments regarding enforceability of the Liquidated Damages Clause at this stage.

Second, any evidence regarding the alleged representations by Handler and Friedman is completely irrelevant to the claims and defenses in this matter. As a purely practical matter, Gegenheimer notified Jefferies on May 24, 2016 that he would not join Jefferies as agreed. Therefore, any representations made during June 8, 2016 meetings two weeks later could not have factored into Gegenheimer's already made decision to breach.

Third, Gegenheimer never pled this purported defense. In fact, Gegenheimer's April 6 Letter is the first time these alleged representations by Handler and Friedman have been raised by Gegenheimer. Gegenheimer's Answer and Counterclaims, filed on October 19, 2016 makes no mention of these supposed representations. *See* Gegenheimer's Answer and Counterclaims attached hereto as Exhibit E. Even more significantly, <u>*Gegenheimer has not pled estoppel as an affirmative defense in this matter*</u>. *See id.* Thus, the Executives' testimony cannot possibly be "essential" to Gegenheimer's defenses and Gegenheimer's attempts to compel Jefferies' highest level Executives to testify (or indeed introduce any evidence) regarding this non-existent defense should be rejected.

Fourth, not only has Gegenheimer not pled estoppel as an affirmative defense, but earlier in this proceeding, Gegenheimer also took the position that his motivations to breach are not relevant to the claims and defenses in this matter. In his successful attempt to limit the discovery sought by Jefferies in this matter, Gegenheimer previously provided the Panel the following summary of his defenses and counterclaims in this matter: "Gegenheimer's defenses to Jefferies' claim are based on allegations that the liquidated damages provision is illegal under California statutory law, an unenforceable penalty under both California and New York law and a product of Jefferies' use of coercive tactics to pressure Gegenheimer into signing the offer letter. Gegenheimer's counterclaims go one step farther, alleging that Jefferies' purported attempt to enforce an unlawful penalty is a violation of FINRA's rules prohibiting commercial dishonesty and an abuse of FINRA's arbitration procedures." *See* Exhibit B, at p. 2. Accordingly, it is clear that Gegenheimer's defenses and counterclaims in this case have always been focused on the parties' conduct leading up to the signing of the Agreement, rather than any conduct occurring after the signing of the Agreement.

Gegenheimer did not stop there. In that same filing, Gegenheimer specifically and repeatedly stated that the limited nature of the claims and of his defenses made Gegenheimer's motivations for choosing to stay employed at Credit Suisse irrelevant. *See id.* at p. 2 - 4. Gegenheimer specifically stated that his "**motivation for deciding against becoming a Jefferies**

Michele Collins, Case Manager
April 16, 2018
Page - 9 -

**employee is immaterial to Jefferies' breach of contract claim or Gegenheimer's counterclaims.**"  Thus, by Gegenheimer's own admission, his motivations for deciding not to ultimately join Jefferies, including any alleged reliance on representations made by Messrs. Handler or Friedman is not relevant to any of the claims or defenses in this case.

Finally, all of this is to say nothing of the absurdity of Gegenheimer's "estoppel" argument.  New York law requires three elements on the part of the party estopped:  (1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive, of the true facts.  *See Holm v. C.M.P. Sheet Metal, Inc.*, 89 A.D.2d 229, 234–35, 455 N.Y.S.2d 429, 433 (1982).  The elements pertaining to the party asserting estoppel are (1) lack of knowledge of the true facts; (2) good faith reliance; and (3) a change of position.  *Id.*  These are commonly termed the elements of detrimental reliance.  *Id.*

Gegenheimer's newly asserted estoppel argument is that on June 8, 2016, he met with Messrs. Handler and Friedman and they allegedly made representations that made Gegenheimer believe that there would be no negative consequences to his reneging.  This argument is meritless for many reasons.  First, in the April 6 Letter, Gegenheimer fails to even allege what Mr. Handler allegedly said that could possibly support an estoppel argument.  With respect to Mr. Friedman, Gegenheimer alleges only that he "encouraged him to make the best decision for himself and his family."  *See* April 6 Letter at 5-6.  Such a statement does not and cannot support an assertion of "estoppel" in any jurisdiction under any definition.[6]  Second, there can be no doubt that Jefferies' goal was to have Gegenheimer honor his Agreement and join Jefferies, not to have him remain at Credit Suisse.  Therefore, Gegenheimer cannot establish the requisite element of intent.

Just as significantly, Gegenheimer cannot establish the elements of detrimental reliance.  Not only is it unreasonable for Gegenheimer to rely on Mr. Friedman's alleged statement to "make the best decision for himself and his family," as a basis for believing Jefferies would not enforce the Liquidated Damages Clause, but *Gegenheimer did not change his position in reliance on these alleged statements*.  Rather, Gegenheimer breached the Agreement on May 24, 2016 by telling Jefferies he would not join and, following the June 8, 2016 meeting when these alleged representations were made, Gegenheimer continued with that same position.

Gegenheimer's attempt to use a never before raised estoppel argument to drag Jefferies' two highest ranking executives to the hearing should be flatly rejected.

---

[6] Gegenheimer's "estoppel" argument is also in direct contravention of his prior argument to the Panel regarding how he supposedly was coerced and pressured into joining Jefferies.

EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 10 -

    5.  <u>Gegenheimer has not pled a defense of unclean hands and the matter of whether Jefferies' hiring of other Credit Suisse employees was lawful is not properly before this Panel.</u>

Gegenheimer also attempts to justify his harassing request to compel the Executives by asserting their purported testimony is relevant to his defense that Jefferies is precluded from enforcing the Liquidated Damages Clause because Jefferies recruited Gegenheimer as part of a an alleged "raid" of Credit Suisse.  This argument fails for numerous reasons.

First, once again, this is merely another argument as to why the Liquidated Damages Clause may be unenforceable that Gegenheimer was required to raise, if at all, during the first phase of this bifurcated proceeding.  He failed to do so.

Second, Gegenheimer's argument fails because, like estoppel, he has not pled an unclean hands defense in his Answer and Counterclaims.  *See* Exhibit E.

Third, Gegenheimer previously told this Panel that the factual allegations regarding Jefferies' hire of other individuals from Credit Suisse's technology group contained in his Answer and Counterclaims were "**made solely to provide an appropriate narrative context. <u>They are not relevant to Gegenheimer's defenses or his counterclaims and he does not intend to offer evidence regarding those issues at the hearing.</u>**"  *See* Exhibit B at p. 4. Again, Gegenheimer took this position in arguing that Jefferies was not entitled to requested discovery regarding what Gegenheimer then described as "background allegations that have no bearing on the actual issues that will be presented at the hearing."  *Id*.  Gegenheimer now attempts to take an entirely contradictory position, apparently having decided it would better suit his interests at this point in the litigation. Clearly Gegenheimer (really Credit Suisse) has decided at this point that it will say just about anything to the Panel without any regard to the truth or merit of its position.

Fourth, the issue of whether Jefferies' conduct in hiring other individuals from Credit Suisse's technology investment banking group was lawful is the subject of a separate FINRA arbitration pending between Credit Suisse and Jefferies (the "Credit Suisse Arbitration"), is not before the Panel in this case, and certainly should not be decided on only a portion of the evidence necessary for such a determination.  It would be inappropriate for this Panel to make findings of fact or law regarding issues that are the subject of a separate arbitration proceeding.[7]  Moreover, the Credit Suisse Arbitration, which has been started, but not concluded, is likely to take 15 days of evidentiary hearings and require the testimony of a number of witnesses from Jefferies *and Credit Suisse* and the consideration of hundreds of documents that have not been produced in this matter and are the subject of a Confidentiality Stipulation.  As stated, Jefferies strongly objects to any suggestion that it is proper for this Panel to make any determinations regarding the ultimate issue for

---

[7] The Chair will recall that he previously denied both parties' requests for any discovery related to the Credit Suisse Arbitration or Jefferies' hire of Credit Suisse employees other than Gegenheimer.

           EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 11 -

determination in the Credit Suisse Arbitration.  However, in the unlikely event the Panel was to decide this issue was before them here, then Jefferies would require the testimony of a number of additional witnesses, including a significant number of Credit Suisse employees.

6.  <u>Gegenheimer's true purpose in calling the Executives is to harass Jefferies.</u>

It is clear that Gegenheimer's purpose in calling the Executives in this matter is not to obtain relevant testimony for his defenses and counterclaims, but to harass Jefferies for exercising its right to enforce an Agreement voluntarily signed by Gegenheimer.  Gegenheimer's intent to harass is evident from his insistence on the testimony of Jefferies' highest level Executives coupled with the failure to request other witnesses with more relevant involvement in Gegenheimer's recruitment, his attempt to now rely on defenses that were never pled and never raised before, and his brazen decision to make disingenuous arguments to the Panel that directly contradict his prior arguments. Notably, Gegenheimer's attorneys in this matter also represent Credit Suisse in the Credit Suisse Arbitration that Credit Suisse initiated against Jefferies for hiring five former Credit Suisse bankers.  Gegenheimer's attorneys also represent other Credit Suisse employees who Jefferies has sued to enforce similar liquidated damages clauses.  It is clear that Gegenheimer, his attorneys, and Credit Suisse are unhappy with the Panel's January 29, 2018 Order.  Accordingly, they are seeking to make it as expensive and difficult as possible for Jefferies to enforce its rights under the Agreement and similar agreements, by making Jefferies respond to baseless motions and by attempting to have four of Jefferies' most senior executives have to take time out of running the company in order to testify in this matter. Gegenheimer's attempts to harass Jefferies should not be permitted.

C.  **Gegenheimer's Requests for Adverse Inferences are Inappropriate and Premature**

Gegenheimer's motives for harassment are made further evident by his baseless request that the Panel draw adverse inferences if Jefferies does not agree to produce the Executives, and bar Jefferies from presenting evidence challenging Gegenheimer's affirmative defenses and counterclaims.  As an initial matter, there is no basis in the FINRA Rules or anywhere else for the proposition that Jefferies must produce any witness Gegenheimer (or his attorneys) takes it into his head to call, regardless of their relevance or involvement in the matter at issue, or face adverse inferences and be precluded from presenting evidence.  Jefferies' proper objection to producing its highest level executives in this matter is entirely appropriate under the FINRA Rules.  Rather, the FINRA Rules only permit such sanctions for a "failure to comply with any provision in the Code, or any order of the Panel."  *See* FINRA Rule 13212.   As there is no order from the Panel on this issue to date, and no indication that Jefferies would fail to comply with any such order, any request for Sanctions is premature.

EXHIBIT Y

Michele Collins, Case Manager
April 16, 2018
Page - 12 -

### D.  Jefferies Requests that the Hearings Tentatively Scheduled for July 23-26, 2018 be Rescheduled

Although there is no dispute that Mr. Kanoff will be available as a witness for the second phase of hearings in this matter, after the March 20, 2018 Pre-Hearing Conference during which the parties and the arbitrators tentatively scheduled the second phase of hearings in this matter for July 23-26, 2018, counsel for Jefferies learned that Mr. Kanoff was not available during those dates due to a previously scheduled obligation.  Accordingly, Jefferies respectfully requests that the hearing dates in this matter tentatively scheduled for July 23-26, 2018 be rescheduled for any 4 dates during the week of August 20-24, 2018 or on other mutually agreeable dates for the parties and the Panel.

### E.  Conclusion

For the reasons set forth herein, Jefferies requests that all the relief requested in Gegenheimer's April 6 Letter be denied and that the hearing dates in this matter tentatively scheduled for July 23-26, 2018 be rescheduled.

Sincerely yours,

Andrew J. Shapren

cc:    Robert D. Goldstein, Esq.
        David Jacobs, Esq.
4836-9489-4945, v. 4

EXHIBIT Y

# EXHIBIT "A"

EXHIBIT Y

# Buchanan Ingersoll ⚓ Rooney PC

**Andrew J. Shapren**
215 665 3853
andrew.shapren@bipc.com

Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA  19102-2555

T 215 665 8700
F 215 665 8760

www.buchananingersoll.com

December 19, 2017

**VIA PORTAL**

Michele Collins, Case Manager
FINRA
300 South Grand Avenue
Suite 1700
Los Angeles, CA   90071-3135

> Re:  *Jefferies LLC v. Jon Alan Gegenheimer*
>      **Arbitration Case Number:  16-02461**

Dear Ms. Collins:

I represent Jefferies LLC in the above-referenced arbitration.  I write to inform the Panel that both parties have agreed to a bifurcated procedure for this arbitration subject, of course, to the Panel's approval.

As the Panel likely knows from reviewing the pleadings, this case revolves largely around the enforceability of section V(B) in the agreement entered into by Claimant Jefferies and Respondent Gegenheimer, which requires Gegenheimer to pay liquidated damages in the event he fails to commence employment with Jefferies by August 17, 2016 (the "liquidated damages clause").  Initially, the parties wish to have the Panel solely adjudicate whether the liquidated damages clause in the agreement at issue is enforceable or unenforceable.  In furtherance of a decision on that issue, the parties intend to each submit an opening brief arguing their position and a response brief countering the other party's opening brief.  The parties will file opening briefs on or before January 3, 2018 and response briefs on or before January 15, 2018.  The parties then propose to have a hearing on the scheduled hearing dates of January 23-26, 2018 solely on the enforceability of the liquidated clause.  That hearing will consist of stipulated facts and/or a limited presentation of testimony and oral argument from the parties' counsel.  The parties anticipate the hearing will take no more than 2 days.  Accordingly, the parties suggest we retain January 24-25 for the hearing and cancel the hearing dates of January 23 and 26.

As the parties will more fully argue in their briefs and arguments, depending on how the Panel rules on the issue of the enforceability of the liquidated damages clause, the Panel's decision may fully dispose of the case or may result in the need for another hearing to be scheduled in the future on a mutually agreeable date.  For example, depending on the Panel's decision, a future hearing on Jefferies' actual damages and/or Gegenheimer's counterclaim may be appropriate.

Michele Collins, Case Manager
December 19, 2017
Page - 2 -

     The parties believe that this procedure will be the most efficient and effective manner in which to adjudicate this case and hope the Panel approves this proposal.  The parties are willing to answer any questions the Panel may have.

                  Sincerely,

                  Andrew J. Shapren

AJS/ath
cc:    Robert Goldstein, Counsel for Mr. Gegenheimer
       (via portal and email)

4847-9818-0953, v.1

EXHIBIT Y

# EXHIBIT "B"

EXHIBIT Y



EPSTEIN
BECKER
GREEN

Attorneys at Law

Robert D. Goldstein
t 212.351.4634
f 212.878.8600
RGoldstein@ebglaw.com

September 18, 2017

<u>VIA DR Portal</u>

Mr. Lawrence R. Mills, Esq.
C/O Michele Collins
FINRA Dispute Resolution
300 South Grand Avenue, Suite 1700
Los Angeles, CA 90071
Michele.Collins@finra.org

    Re:  Jefferies LLC v. Jon A. Gegenheimer
          FINRA Case No. 16-02461

---

### JON A. GEGENHEIMER'S OPPOSITION TO JEFFERIES' MOTION TO COMPEL DISCOVERY FROM JON GEGENHEIMER & MOTION TO SEEK DISCOVERY FROM CREDIT SUISSE SECURITIES (USA) LLC

---

      Respondent Jon A. Gegenheimer ("Respondent" or "Gegenheimer"), by and through his attorneys, Epstein Becker & Green, P.C., respectfully requests, pursuant to FINRA Rule 13509, that the Panel deny Jefferies LLC ("Jefferies") motion to compel discovery from Gegenheimer (the "Motion to Compel") and motion seeking to discovery from non-party Credit Suisse Securities (USA) LLC ("Credit Suisse").[1]

      Jefferies' motions to compel the production of irrelevant and intrusive discovery from Gegenheimer and his current employer, Credit Suisse, proves the point made in Gegenheimer's Answer and Counterclaims that Jefferies is abusing the FINRA arbitration process by pursuing a frivolous claim to punish Gegenheimer for his decision against becoming a Jefferies employee. It is also an improper attempt to interfere with Gegenheimer's current employment relationship by attempting to draw Gegenheimer's current employer, Credit Suisse, into this dispute.

---

[1] This response is submitted by and on behalf of Mr. Gegenheimer, who has been sued in his individual capacity. Credit Suisse is not a party to this proceeding, has not been served with any discovery demands or requests in this proceeding and Gegenheimer is not authorized to make any statements on Credit Suisse's behalf with respect to Jefferies' claims.

Mr. Lawrence R. Mills, Esq.
September 18, 2017
Page 2

Jefferies' one and only claim against Gegenheimer seeks an award of $1 million in liquidated damages pursuant to an offer letter Gegenheimer signed four business days before he decided against becoming a Jefferies employee.  That liquidated damages provision is illegal under well-settled California law for all of the reasons set forth in Gegenheimer's motion to compel discovery from Jefferies.  But even if the liquidated damages provision was not a plain violation of California Labor Code section 16600 and California public policy, the only issues that warrant discovery in this case are the bases for Jefferies' calculation of $1 million in liquidated damages and the circumstances under which Jefferies pressured Gegenheimer to sign the offer letter in the first place.  Virtually all of that discovery is in Jefferies' sole and the exclusive possession.

The discovery sought by Jefferies, including documents concerning the terms and conditions of Gegenheimer's employment with Credit Suisse and other potential employers and Gegenheimer's communications with Credit Suisse regarding another FINRA arbitration, do not advance any of the claims or defenses in this action or serve any purpose.  To the contrary, Jefferies' motion to compel is a transparent attempt to use this proceeding as a means of obtaining information that Jefferies may find useful for its defense in a separate FINRA proceeding, which is made clear by Jefferies' Information Request Nos. 12, 13 and 18-20 and Document Request Nos. 11, 19 and 28, discussed in more detail below.

Jefferies' attempt to use Gegenheimer's defenses and counterclaims as justification for its discovery demands is equally frivolous.  Gegenheimer's defenses to Jefferies' claim are based on allegations that the liquidated damages provision is illegal under California statutory law, an unenforceable penalty under both California and New York law and a product of Jefferies' use of coercive tactics to pressure Gegenheimer into signing the offer letter.  Gegenheimer's counterclaims go one step farther, alleging that Jefferies' purported attempt to enforce an unlawful penalty is a violation of FINRA's rules prohibiting member firms from engaging in commercial dishonesty and an abuse of FINRA's arbitration procedures.  None of those defenses or counterclaims justify Jefferies' demands for discovery regarding Gegenheimer's motivations for choosing to stay employed with Credit Suisse.[2]

Further, this dispute concerns Jefferies use of the liquidated damages provision as an anti-competitive tool and Gegenheimer's interactions with Jefferies.  Jefferies' overbroad discovery requests are an extension of Jefferies' bad faith motivation for including an unenforceable liquidated damages provision in its offer letter and commencing this action against Gegenheimer.  Jefferies' motion to compel is just a further example of its use of unlawful tactics designed to chill employee mobility and send a message to other market participants that they will be punished for getting on the wrong side of Jefferies.

---

[2] For a more detailed discussion of the legal issues in this dispute, we respectfully direct the Panel to Section II of  Gegenheimer's Motion to Compel Discovery Withheld by Claimant Jefferies, LLC.

Mr. Lawrence R. Mills, Esq.
September 18, 2017
Page 3

I.  **The Panel Should Deny Jefferies' Motion to Compel**

    a.  **Documents and Information Related to Gegenheimer's Discussions with Credit Suisse (Information Request No. 5, 15, & 25; Document Request No. 9)**

        Jefferies argues that it is entitled to the above-referenced discovery regarding Gegenheimer's communications with Credit Suisse because it concerns Gegenheimer's motivation for allegedly breaching the Offer Letter. Gegenheimer's motivation for deciding against becoming a Jefferies employee is immaterial to Jefferies' breach of contract claim or Gegenheimer's counterclaims. The material facts underlying Jefferies' breach of contract claim are undisputed. The parties agree that Gegenheimer signed Jefferies' offer letter on May 16 and informed Jefferies of his decision to remain at Credit Suisse six days later. The only issues to be decided by the panel are whether Jefferies' liquidated damages provision was a legitimate attempt to estimate its damages in the event of a breach, or an improper attempt to impose a financial penalty on Gegenheimer if he decided against joining Jefferies.

        Thus, Jefferies does not have the right to discovery regarding Gegenheimer's employment discussions with Credit Suisse "to create a timeline of relevant events and identify individuals with knowledge of the facts" because those facts are simply irrelevant to the issues in this case. Gegenheimer's intent is not an element of Jefferies' action for breach of contract; nor is it an element of Gegenheimer's defenses and counterclaims. Under California law, "motives are irrelevant" to breach of contract claims. *Alki Partners, LP v. DB Fund Services, LLC,* 4 Cal. App. 5th 574, 597 (2016) ("a party's purported motive to breach a contract is not relevant to the issue of whether there has been a breach"); *Applied Equipment Corp. v. Litton Saudi Arabia Ltd,*. 7 Cal.4th 503, 516 (1994) ("the law generally does not distinguish between good and bad motives for breaching a contract"); *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 699 (1988) ("in traditional contract law, the motive of the breaching party generally has no bearing on the scope of damages that the injured party may recover for the breach"). *See also Metropolitan Life Insurance Company v. Noble Lowndes*, 84 N.Y.2d 430 (1994) (party's motivation for not performing under a contract is immaterial to determining whether the party breached the agreement).

    b.  **The Terms and Conditions of Gegenheimer's Employment at Credit Suisse Request No. 6 & 7; Document Request No. 5-7 & 15)**

        Jefferies' motion to compel the production of documents regarding the terms and conditions of Gegenheimer's employment with Credit Suisse fails for the same reason as its efforts to compel discovery regarding Gegenheimer's communications with Credit Suisse – it is based on the false premise that Gegenheimer's motivations for deciding against employment with Jefferies have some probative value. *Alki Partners, LP v. DB Fund Services, LLC,* 4 Cal. App. 5th at 597. Here again, Jefferies ignores the fact that Gegenheimer's motivations for deciding against becoming a Jefferies employee is immaterial to Jefferies' claim for $1 million in liquidated damages.

Mr. Lawrence R. Mills, Esq.
September 18, 2017
Page 4


Jefferies attempts to justify these discovery demands by arguing that they seek discovery that is necessary to prove its theory that Gegenheimer used Jefferies' offer letter as leverage to negotiate better terms and conditions of employment with Credit Suisse. Even if this were true, it has no bearing on the enforceability of Jefferies' liquidated damages provision or its improper motivations for commencing this arbitration proceeding. Moreover, there would be nothing wrong with any such efforts. California Business and Professional Code Section 16600 is designed to facilitate employees' ability to market themselves to different employers and develop an efficient market for their services. Evidence of whether Gegenheimer acts in accordance with his economic self-interest is in no way probative of the legal issues in this arbitration, it is a red herring designed to divert the panel with an irrelevant narrative.

Jefferies also tries to justify its patently overbroad requests by pointing to allegations in Gegenheimer's Answer and Counterclaims that address Gegenheimer's decision against participating in Jefferies' raid of Credit Suisse's technology investment banking group. Jefferies seizes on those allegations to argue that Gegenheimer put his motivation at issue by mentioning his disapproval of Jefferies' recruitment of five other Credit Suisse employees at the same time as Gegenheimer. Once again, Jefferies misses the mark. Gegenheimer's allegations were made solely to provide an appropriate narrative context. They are not relevant to Gegenheimer's defenses or his counterclaims and he does not intend to offer evidence regarding those issues at the hearing. Jefferies is not entitled to discovery regarding background allegations that have no bearing on the actual issues that will be presented at the hearing.

### c. Documents Related to Gegenheimer's Job Search (Information Request No. 4; Document Request No. 14)

These requests serve as prime examples of Jefferies' efforts to engage in a fishing expedition. Jefferies claims that it needs information regarding Gegenheimer's search for other employment to show that Gegenheimer used the offer letter as leverage in salary negotiations with other employers. By advancing this argument, Jefferies essentially contends that the enforceability of its liquidated damages clause is somehow contingent on whether Gegenheimer was entertaining other job offers. As discussed above, that is not the law. Jefferies does not, because it cannot, explain how any efforts by Gegenheimer to search for another job is relevant to Jefferies' attempt to enforce its $1 million liquidated damages provision or Gegenheimer's claim that Jefferies is abusing the FINRA arbitration process.

It bears repeating that Jefferies' efforts to enforce the liquidated damages provision, and Gegenheimer's allegations that the liquidated damages provision is void and unenforceable, require discovery that is almost exclusively in Jefferies' possession. Jefferies' attempt to obtain plainly irrelevant discovery regarding other job searches by Gegenheimer turns on its head the fundamental legal principle that a party's motivations are irrelevant to breach of contract claims.

Mr. Lawrence R. Mills, Esq.
September 18, 2017
Page 5

    d.   **Documents Related to *Credit Suisse Securities (USA) LLC v. Jefferies Group LLC,* FINRA No. 16-01898 (Information Request No. 12, 13, 18-20; Document Request No. 11, 19 and 28)**

    Jefferies' improper motivations are most plainly seen in its request for documents concerning Credit Suisse's claims against Jefferies in a separate FINRA proceeding in which Gegenheimer is not even a party.  Jefferies' requests seek information which is irrelevant to this arbitration and represent an obvious attempt to obtain discovery in this proceeding to assist Jefferies in another FINRA proceeding.

    Jefferies asserted need for this information is based on a mischaracterization of Gegenheimer's defenses and counterclaims.  The FINRA proceeding referenced in Jefferies' document requests involves Credit Suisse's claim that Jefferies unlawfully raided Credit Suisse's Technology Investment Banking Group (the "Tech Group"). That raid occurred on May 17, 2016 – the day before Gegenheimer signed the Offer Letter— when five Managing Director's in Credit Suisse's Tech Group resigned from Credit Suisse and joined Jefferies.

    In view of this background information, Jefferies' requests are patently improper and seek to use this proceeding as a means of obtaining additional discovery for use in the FINRA raiding arbitration.  As with Jefferies' other requests included in its motion to compel, these discovery demands are entirely irrelevant to Jefferies' claim for enforcement of its liquidated damages provision.  They are equally irrelevant to Gegenheimer's defenses and counterclaims regarding Jefferies' improper use of the liquidated damages provision as a form of extortion intended to intimidate Gegenheimer into working for Jefferies or face financial ruin.

    Jefferies disingenuously claims that its requests regarding the source of Gegenheimer's information concerning the raiding case are relevant to his counterclaims.  This misconstrues Gegenheimer's allegations.  Gegenheimer's counterclaims allege that Jefferies' decision to try to enforce Section V(B) of the offer letter is motivated by an unlawful purpose.  Although Jefferies knows Section V(B) is invalid, it seeks to enforce it because of its *in terrorum* effect on Gegenheimer, FINRA Members and other FINRA associated persons.  Regardless of the spin Jefferies tries to put on its motion to compel discovery regarding another FINRA proceeding, it cannot escape the fact that it is blatantly using this proceeding to improperly obtain discovery relevant to another proceeding.

    The requests are also improper because they seek information that is protected by the attorney-client and/or work product privileges.  In his role as a Director in the Technology Investment Banking Group who worked with the Former Credit Suisse Employees, and was solicited by Jefferies at the same time Jefferies raided the Tech Group, any communications between Gegenheimer and Credit Suisse regarding the FINRA raiding arbitration are protected from disclosure by the work-product privilege as well as the attorney-client privilege.  For example, Information Request No. 18 asks Gegenheimer to "identify each individual with whom you discussed, at any time, that the hiring of the [Former Credit Suisse Employees] and you constituted an illegal raid."  The only context in which Gegenheimer discussed the legality of

Mr. Lawrence R. Mills, Esq.
September 18, 2017
Page 6

Jefferies recruitment of the Former Credit Suisse Employees was in discussions with Credit Suisse's counsel and/or to assist Credit in anticipation of litigation.  Similarly, Information Request No. 12 asks Gegenheimer to identify the basis for his "knowledge that Credit Suisse's Tech Group would be severely damaged" by Jefferies' raid.  Nor only is this information irrelevant to the issues in this proceeding, it also purports to seek discovery that is obviously privileged.

e. **Gegenheimer's Claimed Damages (Information Requests 29 & 30)**

Jefferies' motion to compel responses to these information requests should be denied because the requests fall outside the scope of discovery under applicable FINRA rules.  FINRA Rule 13506(a) provides that information requests should be "limited to identification of individuals, entities, and time periods related to the dispute." Information Requests 29 and 30 purport to require Gegenheimer to provide detailed calculations of his claimed damages.  The FINRA Rules do not provide for an exception to this requirement merely because the requests concern assertions in a counterclaim.

f. **Gegenheimer's Discussions With Third Parties Concerning Section V(B) of the Offer Letter Are Irrelevant (Information Request No. 17)**

Simply put, the enforceability of the Section V(B) of the Offer Letter is not contingent on who Gegenheimer discussed the offer letter with.

g. **Documents and Information Related to any Indemnification Agreement with Credit Suisse (Information Request No. 26; Document Request No. 4)**

Jefferies' request for indemnification agreements between Credit Suisse and Gegenheimer suffer from the same infirmities as its other requests – it is not relevant to Jefferies' claim for liquidated damages or its improper use of this FINRA proceeding to punish Gegenheimer for his decision against joining Jefferies.  The question of whether or not Credit Suisse has agreed to indemnify Gegenheimer does not bear on the merits of any of the claims or defenses in this matter.

h. **Documents Related to Expert Witnesses (Information Request No. 21; Document Request No. 25)**

At this time, Gegenheimer has not retained an expert witness to testify in this matter, and therefore Gegenheimer does not have documents or information responsive to these requests.

Mr. Lawrence R. Mills, Esq.
September 18, 2017
Page 7

## <u>CONCLUSION</u>

Gegenheimer has engaged Jefferies in good faith to produce documents and information relevant to the issues in dispute.  Jefferies now seeks to burden Gegenheimer by compelling him to produce additional, and irrelevant information, whose sole purpose is to assist Jefferies in diverting the Panel's attention away from the factual disputes which have actual legal significance.  Even worse, Jefferies is deliberately seeking to interfere with Gegenheimer's current employment relationship with Credit Suisse by seeking permission to request discovery from Credit Suisse that is irrelevant to the issues in this case and an attempt to end-run the discovery process in a separate FINRA proceeding between Jefferies and Credit Suisse. Respondent Gegenheimer respectfully requests that Jefferies' motion to compel and motion seeking discovery from non-party Credit Suisse be denied in their entirety.

Very truly yours,

*/s/ Robert Goldstein*

Robert D. Goldstein

cc:     Andrew Shapren
        andrew.shapren@bipc.com

# EXHIBIT "C"

EXHIBIT Y



**EPSTEIN
BECKER
GREEN**

Attorneys at Law

Robert D. Goldstein
t  212.351.4634
f  212.878.8600
RGoldstein@ebglaw.com

January 11, 2018

<u>VIA EMAIL</u>

Andrew J. Shapren
Buchanan Ingersoll & Rooney, P.C.
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
Andrew.Shapren@bipc.com

Re:   <u>Jefferies LLC v. Jon Alan Gegenheimer, FINRA Arbitration No.: 16-02461</u>

Dear Andrew:

When we spoke yesterday, you indicated that Jefferies still intends to proceed with a hearing on January 24th and possibly the 25th to present testimony addressing allegations in Mr. Gegenheimer's January 3, 2018 written submission.  As I stated yesterday, we previously consented to Jefferies' submission of an affidavit to eliminate the need for a hearing on the enforceability of the liquidated damages provision.  When we asked the Panel to reserve the 24th and 25th, it was to preserve those dates for a limited hearing in the event we could not agree on a stipulation regarding the basis for the liquidated damages clause.  When we subsequently agreed that Jefferies could submit an affidavit in lieu of the stipulation, we did so with the understanding that the affidavit eliminated the need for a hearing and that the parties would appear on January 24 for oral argument.  If we had known that Jefferies planned on proceeding with the hearing even after we consented to the affidavit, we would not have agreed to the submission of an affidavit.

Based on our understanding that there would not be a hearing, we did not submit a letter identifying potential witnesses and exhibits.  Since it now appears that a hearing will take place on January 24 and 25, 2018, Mr. Gegenheimer identifies the following individuals who he may call to testify at the hearing.  Mr. Gegenheimer reserves the right to supplement this list, if necessary.

a.  Jon Gegenheimer

b.  Chris Kanoff, EVP and Co-Head of Investment Banking for Jefferies; and

c.  All witnesses identified by Jefferies LLC.

January 11, 2018
Page 2

Pursuant to Rule 13514, Mr. Gegenheimer may present any of the following documents as exhibits at the hearing of this matter:

a.  All documents produced by the parties during discovery;

b.  All correspondence between or among counsel for the parties;

c.  All pleadings (and exhibits thereto), discovery requests and discovery responses served by either party in this matter;

d.  All invoices for costs, expenses, or attorneys' fees incurred by or on behalf of Gegenheimer in this matter; and

e.  All documents identified by Jefferies LLC pursuant to Rule 12514.

Gegenheimer reserves the right, pursuant to Rule 13514, to introduce additional evidence for rebuttal or impeachment purposes.

Very truly yours,

*/s/ Robert D. Goldstein*

Robert D. Goldstein

Cc: Michele Collins, FINRA Case Administrator (via Portal)

# EXHIBIT "D"

FINRA ARBITRATION

NO. 16-02461

---

JEFFERIES LLC,

Claimant,


v.


JON A GEGENHEIMER

Respondent.

---

January 24, 2018

1

EXHIBIT Y

1  leave will actually start working for them at the end. Certainly, it has a

2  chilling effect. I'm sure the majority of people signing these agreements see

3  that, you know, don't necessarily think about asking a lawyer and they just

4  assume, "Oh boy, I better platter this, even if another opportunity comes

5  along, because I don't have the money, I can't pay that." So, it has that

6  chilling effect. What Jefferies is now asking – I think this is – in some

7  ways a test case. Jefferies wants to continue doing this. If Jefferies is

8  allowed to undermine not only California law, but New York law, and putting

9  in what I think any decent, fair-minded person would say is unconscionable

10  penalty for not moving forward with the new employment six days after first

11  signing an offer letter. If they're allowed to do it in this case, they're

12  just going to do it, and it's gonna become an industry-driving... this could

13  really become a huge problem and if they're allowed to do it in California,

14  then it's even worse, because now you have a blueprint for getting around

15  16600. You know, they tried to do it in the past – people have tried to do

16  it, and companies, through the Forum Selection Provision. And it's true that

17  in the past, prior to Rule 925, Forum Selection Provisions were kind of a

18  loophole, a way to get out of California. And especially in Federal courts,

19  it worked a lot of times. We have 925 now, so you can't do that and I've

20  never, by the way, we've never maintained that Section 925 applies here.

21  We've cited it to point out why this is such an important public policy in

22  California. But the expression of public policy in 16600 and in Section 925

23  would be undermined if you have these crafty, creative provisions, liquidated

24  damages, because you didn't join with us – as long as you didn't go to these

25  competitors. I mean, it's – it's I think pretty apparent on its face what's

71

# EXHIBIT "E"

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**DISPUTE RESOLUTION**

Jefferies, LLC,

Claimant,

- against -

Jon A. Gegenheimer,

Respondent.

FINRA Arbitration No. 16-02461

**ANSWER AND**
**COUNTERCLAIMS**

      Jon A. Gegenheimer, ("Gegenheimer" or "Respondent") by and through his attorneys Epstein Becker & Green, P.C., answers Jefferies, LLC's ("Jefferies") Statement of Claim as follows:

      1.    Denies the allegations set forth in Paragraph 1 of the Statement of Claim, except admits that he signed the document attached as Exhibit A to the Statement of Claim (the "Offer Letter") on or about May 18, 2016 and respectfully refers the Panel to the Offer Letter for a full and accurate recitation of its terms.

      2.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 2 of the Statement of Claim.

      3.    Denies the allegations set forth in Paragraph 3 of the Statement of Claim, except denies knowledge or information sufficient to form a belief as to the truth of Jefferies' allegedly lost business opportunities, and affirmatively asserts that he has not breached any lawful obligation owed to Jefferies and Jefferies is not entitled to any damages, attorneys' fees, costs or any other damages in this proceeding.

4.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 4 of the Statement of Claim.

5.      Admits the allegations set forth in Paragraph 5 of the Statement of Claim.

6.      Denies the allegations set forth in Paragraph 6 of the Statement of Claim except admits the quoted language is contained in the Offer Letter and respectfully refers the Panel to the Offer Letter for a full and accurate recitation of its terms.

7.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 7 of the Statement of Claim.

8.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 8 of the Statement of Claim.

9.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 9 of the Statement of Claim, except admits that he had discussions with Jefferies regarding potential employment and further admits that he was and still is employed by Credit Suisse and performs mergers and acquisitions work in the technology industry.

10.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 10 of the Statement of Claim, except admits that he communicated with Jefferies regarding an offer of employment.

11.      Denies the allegations set forth in Paragraph 11 of the Statement of Claim except admits that he is an investment banker specializing in mergers and acquisitions.

12.      Admits the allegations set forth in Paragraph 12 of the Statement of Claim.

FIRM:1000488631v4

EXHIBIT Y

13.     Denies that the allegations in paragraph 13 contain a full and accurate recitation of the contents of the Offer Letter and respectfully refers the Panel to the Offer Letter for a full and accurate recitation of its terms.

14.     Denies the allegations set forth in Paragraph 14 of the Statement of Claim.

15.     Denies that the allegations in paragraph 15 contain a full and accurate recitation of the contents of the Offer Letter and respectfully refers the Panel to the Offer Letter for a full and accurate recitation of its terms.

16.     Denies that the allegations in paragraph 16 contain a full and accurate recitation of the Offer Letter and respectfully refers the Panel to the Offer Letter for a full and accurate recitation of its terms.

17.     Denies that the allegations in paragraph 17 contain a full and accurate recitation of the Offer Letter and respectfully refers the Panel to the Offer Letter for a full and accurate recitation of its terms.

18.     Neither admits nor denies the allegations set forth in paragraph 18 as they are legal conclusions to which no response is required and, to the extent an answer is required, denies the allegations.

19.     Denies the allegations set forth in Paragraph 19 of the Statement of Claim.

20.     Denies that the allegations in paragraph 20 contain a full and accurate recitation of the Offer Letter and respectfully refers the Panel to the Offer Letter for a full and accurate recitation of its terms.

21.     Denies the allegations set forth in Paragraph 21 of the Statement of Claim, except admits that on May 24, 2016 Gegenheimer informed Jefferies that he would continue his employment with Credit Suisse.

3

EXHIBIT Y

22.     Denies the allegations set forth in Paragraph 22 of the Statement of Claim, except denies knowledge or information regarding the adequacy of Jefferies' investment banking mergers and acquisitions coverage.

23.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 23 of the Statement of Claim, except denies that Jefferies had a legitimate expectation that Gegenheimer would participate in Jefferies' unlawful raid of Credit Suisse's technology investment banking division.

24.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 24 of the Statement of Claim.

25.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 25 of the Statement of Claim, except denies breaching any duty to Jefferies, contractually or otherwise.

26.     Denies the allegations in Paragraph 26 of the Statement of Claim, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding Jefferies' recruitment efforts and further denies that Claimant is entitled to any damages or other relief from Gegenheimer.

27.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 27 of the Statement of Claim and further denies that Claimant is entitled to any damages or other relief from Gegenheimer.

28.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 28 of the Statement of Claim and further denies that Claimant is entitled to any damages or other relief from Gegenheimer.

4

FIRM:1000488631v4

EXHIBIT Y

29.     Denies the allegations set forth in Paragraph 29 of the Statement of Claim and further alleges that Jefferies had no reasonable or legitimate expectation that it would receive revenue as a result of its employment of Gegenheimer, which was in furtherance of Jefferies' unlawful raid of Credit Suisse's technology investment banking division.

30.     Denies the allegations set forth in Paragraph 30 of the Statement of Claim and further alleges that Jefferies had no reasonable or legitimate expectation that Gegenheimer would participate in Jefferies' unlawful raid of Credit Suisse's technology investment banking division.

31.     Denies the allegations set forth in Paragraph 31 of the Statement of Claim and further alleges that Jefferies had no reasonable or legitimate expectation that it would enjoy any business opportunities as a result of its unlawful raid of Credit Suisse's technology investment banking division.

32.     Denies the allegations set forth in Paragraph 32 of the Statement of Claim and further alleges that Jefferies has no right to recover any losses arising out of Gegenheimer's refusal to participate in Jefferies' unlawful raid of Credit Suisse's technology investment banking division.

33.     Denies the allegations set forth in Paragraph 33 of the Statement of Claim.

34.     In response to Paragraph 34 of the Statement of Claim, Gegenheimer repeats and realleges his answers to Paragraphs 1 through 33 as if set forth in full herein.

35.     Denies the allegations set forth in Paragraph 35 of the Statement of Claim.

36.     Denies the allegations set forth in Paragraph 36 of the Statement of Claim.

37.     Denies the allegations set forth in Paragraph 37 of the Statement of Claim.

38.     Denies the allegations set forth in Paragraph 38 of the Statement of Claim.

5

EXHIBIT Y

## FIRST DEFENSE

39.     Paragraph V(B) of the Offer Letter constitutes an unlawful and unenforceable restraint on Gegenheimer's right to engage in a lawful profession, trade, or business in violation of California Business and Professional Code Section 16600.

## SECOND DEFENSE

40.     The so-called liquidated damages provision in Paragraph V(B) of the Offer Letter, which purports to require Gegenheimer to pay Jefferies $1,000,000 if Gegenheimer chooses not to commence employment with Jefferies, constitutes an illegal and unenforceable penalty.

## THIRD DEFENSE

41.     The so-called liquidated damages provision in Paragraph V(B) of the Offer Letter, which purports to require Gegenheimer to pay Jefferies $1,000,000 if Gegenheimer chooses not to commence employment with Jefferies, is unconscionable and unenforceable.

## FOURTH DEFENSE

42.     Gegenheimer was fraudulently induced by Jefferies to sign the Offer Letter based on Jefferies' active concealment of its intention to employ Gegenheimer in furtherance of a broader scheme to unlawfully raid Credit Suisse's technology investment banking business and misappropriate Credit Suisse's confidential information.

## FIFTH DEFENSE

43.     The Offer Letter is void and unenforceable, as it was made for the illegal purpose of assisting Jefferies' efforts to misappropriate Credit Suisse's technology investment banking division in violation of FINRA Rule 2010.

6

## SIXTH DEFENSE

44.     The Offer Letter is void and unenforceable as it is based on illegal consideration which would have required Gegenheimer to participate in Jefferies' unlawful raid of Credit Suisse's West Coast technology investment banking division.

## SEVENTH DEFENSE

45.     Claimant's alleged damages are too remote and speculative to support any recovery in this proceeding.

## EIGHTH DEFENSE

46.     Claimant has failed to diligently mitigate its alleged damages, if any, and is therefore barred from receiving the relief requested in the Statement of Claim.

## COUNTERCLAIMS

Counterclaim-Complainant Jon A. Gegenheimer, by and through his attorneys Epstein Becker & Green, P.C., hereby asserts the following counterclaims against Counterclaim-Respondent Jefferies and alleges as follows:

47.     Gegenheimer has been employed by Credit Suisse since 2003 and currently serves as a Director in Credit Suisse's Technology Group within the Investment Banking and Capital Markets Division (the "Tech Group") based in San Francisco, California.

48.     In or about January 2016, Gegenheimer spoke with a recruitment firm regarding a potential employment opportunity to work in Jefferies' West Coast Technology Group.

49.     Between January 27, 2016 and May 18, 2016, Gegenheimer met with several Jefferies' representatives to discuss a potential position with Jefferies.  Gegenheimer also discovered that Jefferies was in discussions with at least five Managing Directors in Credit

7

EXHIBIT Y

Suisse's Tech Group regarding employment with Jefferies.  Those Managing Directors were aware that Jefferies was recruiting Gegenheimer and informed him that they expected him to follow them to Jefferies. The pressure placed on Gegenheimer to join Jefferies was exacerbated by his knowledge that Credit Suisse's Tech Group would be severely damaged by the mass resignation of those Managing Directors.

50.     Jefferies further induced Gegenheimer to resign from Credit Suisse by offering him a position as a Managing Director and a substantial increase in compensation.  On or about May 18, 2016, Jefferies provided Gegenheimer with the Offer Letter which contemplated that Gegenheimer's employment with Jefferies would commence on or before August 17, 2016.  The Offer Letter also contained a provision purporting to require Mr. Gegenheimer to pay Jefferies a $1,000,000 cash penalty should he choose to remain an employee of Credit Suisse, and a notice provision requiring him to provide 365 days' notice of his intention to terminate employment during his first year with Jefferies.

51.     Under pressure from the Managing Directors who were leaving Credit Suisse to join Jefferies, Gegenheimer reluctantly signed the Offer Letter on May 18, 2016.

52.     Shortly after executing the Offer Letter, it became apparent to Gegenheimer that Jefferies' recruitment of Gegenheimer and the five Managing Directors was not the product of free and fair competition, but was instead a full-scale raid of Credit Suisse's West Coast technology investment banking division.

53.     Among other things, it was apparent to Gegenheimer that Jefferies and the five Managing Directors orchestrated the Managing Directors' mass resignation from Credit Suisse on May 17, 2016.

EXHIBIT Y

54.     Gegenheimer also became aware that the five Managing Directors who resigned *en masse* on May 17 had accessed and printed a substantial amount of Credit Suisse's confidential and proprietary information, which they apparently intended to use to compete with Credit Suisse.  Gegenheimer also learned that Jefferies continued to solicit even more Credit Suisse employees even after the five Managing Directors had resigned.  Upon information and belief, Jefferies was able to target and solicit those additional Credit Suisse employees through the use of Credit Suisse's confidential information that was provided by the former Managing Directors.

55.     On May 24, 2016, less than a week after he signed the May 18, 2016 Offer Letter, Gegenheimer decided that he would not be a party to Jefferies' unlawful and anti-competitive conduct and informed Jefferies of his decision to remain with Credit Suisse.

56.     Although only four business days had elapsed between Gegenheimer's execution of the Offer Letter and his decision to remain with Credit Suisse, Jefferies now takes the absurd position that that Gegenheimer is obligated to pay Jefferies the sum of $1 million dollars as a result of his decision to remain employed by Credit Suisse.

57.     Jefferies' claim is based on a provision in Section V(B) of the Offer Letter, which purports to require Gegenheimer to pay Jefferies $1 million in liquidated damages should he fail to commence employment with Jefferies by August 17, 2016.  That provision is unlawful on its face.  The $1 million payment has no relationship to any actual damages Jefferies could reasonably expect to suffer as a result of Gegenheimer's decision to remain employed by Credit Suisse.  The provision is instead an unlawful and extortionate attempt to coerce Gegenheimer into participating in Jefferies' unlawful activities under the threat of a $1 million penalty.

FIRM:1000488631v4

EXHIBIT Y

## Count I: Violation of FINRA Rule 2010

58.     Gegenheimer repeats and realleges each and every allegation set forth herein.

59.     As a FINRA member, Jefferies has an obligation to comply with the letter and spirit of FINRA Rule 2010, which provides that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."

60.     Jefferies' attempt to impose a $1 million penalty against Gegenheimer for declining employment with Jefferies less than one week after signing Jefferies' Offer Letter, is a blatant attempt to use the threat of financial ruin as a means of forcing Gegenheimer to commence employment with Jefferies against his will.  As such, Jefferies' conduct constitutes a gross violation of both the letter and the spirit of FINRA Rule 2010.

61.     Jefferies has further violated the letter and spirit of FINRA Rule 2010 by seeking to enforce a $1 million penalty provision against Gegenheimer as punishment for Gegenheimer's decision to remain employed by Credit Suisse rather than participate in Jefferies' unlawful raid of Credit Suisse's Tech Group and misappropriation of Credit Suisse's confidential information.

62.     Jefferies' violations of FINRA Rule 2010 has caused Gegenheimer harm, including damage to his professional reputation as a direct result of Jefferies' commencement of a frivolous FINRA proceeding seeking to enforce a contractual penalty that Jefferies knows, or should know, is illegal and unenforceable.

63.     Based on the foregoing, Gegenheimer is entitled to an award in an amount to be determined at arbitration, together with punitive damages, interest, attorneys' fees and costs.

FIRM:1000488631v4

EXHIBIT Y

**Count II: Unfair Competition**

64.     Gegenheimer repeats and realleges each and every allegation set forth herein.

65.     Jefferies has abused FINRA's dispute resolution process by commencing a patently frivolous arbitration proceeding for the primary, improper purpose of punishing Gegenheimer for his refusal to participate in Jefferies' unlawful conduct.  Jefferies is also misusing FINRA's dispute resolution process as an anti-competitive tool by pursuing time-consuming and expensive litigation in an attempt to distract Gegenheimer from performing his duties and responsibilities at Credit Suisse.

66.     Jefferies' conduct is intended to provide Jefferies with an unfair competitive advantage in the highly specialized technology investment banking industry by burdening Gegenheimer with frivolous litigation in an attempt to diminish his ability to compete against Jefferies.  As such, Jefferies' conduct constitutes unfair competition.

67.     Based on the foregoing, Gegenheimer is entitled to an award in an amount to be determined at arbitration, together with punitive damages in an amount to be determined at arbitration, plus interest, attorneys' fees and costs.

**Count III: Tortious Interference With Contract and Economic Relations**

68.     Gegenheimer repeats and realleges each and every allegation set forth herein.

69.     Gegenheimer had and has business opportunities in the small, highly specialized M&A technology investment banking industry.  Jefferies willfully and deliberately commenced this frivolous FINRA proceeding against Gegenheimer in an attempt to impair

Gegenheimer's ability to pursue those opportunities and thereby provide Jefferies with an unfair competitive advantage in pursuing those business opportunities for itself.

70.     Jefferies' conduct has directly interfered with Gegenheimer's prospective economic opportunities and is intended to prevent Gegenheimer from obtaining the economic benefits of those opportunities.

71.     Jefferies' interference with Gegenheimer's prospective economic opportunities was done willfully and with the malicious intention of inflicting harm on Gegenheimer.

72.     As a direct result of Jefferies' interference with Gegenheimer's prospective economic opportunities, Gegenheimer has suffered, and will continue to suffer, economic harm, including economic losses he has sustained or will sustain as a result of Jefferies' misconduct.

73.     Based on the foregoing, Gegenheimer is entitled to an award in an amount to be determined at arbitration, together with punitive damages in an amount to be determined at arbitration, plus interest, attorneys' fees and costs.

## Count IV: Abuse of Process

74.     Gegenheimer repeats and realleges each and every allegation set forth herein.

75.     Jefferies commenced this FINRA arbitration by utilizing the FINRA dispute resolution process to assert jurisdiction over Gegenheimer, despite the fact that Jefferies knew or should have known that its claims are legally and factually without merit.  The actual purpose behind Jefferies' commencement of this proceeding is to punish Gegenheimer for his refusal to participate in Jefferies' unlawful conduct and misuse FINRA's dispute resolution

FIRM:1000488631v4

EXHIBIT Y

process as an anti-competitive attempt to distract Gegenheimer from performing his duties and responsibilities at Credit Suisse.

76.     In so doing, Jefferies has abused FINRA's dispute resolution process.

### **Prayer For Relief**

**WHEREFORE,** Gegenheimer Counterclaimant respectfully requests that the FINRA Panel issue an award in its favor demands judgment:

1. Dismissing Jefferies' Statement of Claim in its entirety, with prejudice;

2. Awarding Gegenheimer the costs, disbursements and reasonable attorneys' fees he has incurred and will continue to incur in this proceeding;

3. Awarding Gegenheimer compensatory damages on each of his counterclaims in an amount to be determined at the hearings in this matter;

4. Awarding Gegenheimer punitive damages on each of his counterclaims in an amount to be determined at the hearings in this matter; and

5. Awarding Gegenheimer such other relief, general or special, legal or equitable, to which Gegenheimer is justly entitled.

Dated:    October 19, 2016                     EPSTEIN BECKER & GREEN, P.C.

                                               Robert D. Goldstein

                                               250 Park Avenue
                                               New York, NY 10177
                                               Tel: 212.351.4500

                                               Attorneys for Respondent
                                                 Jon A. Gegenheimer

13

FIRM:1000488631v4

# EXHIBIT Z



EPSTEIN
BECKER
GREEN

Attorneys at Law

David Jacobs
310.557.9517
djacobs@ebglaw.com

April 24, 2018

**VIA EMAIL & Portal**

Mr. Lawrence R. Mills
c/o Michele Collins, Case Manager
FINRA
300 South Grand Avenue
Suite 1700
Los Angeles, CA 90071-3135
Michele.Collins@FINRA.org

Re:   Jefferies LLC v. Jon Alan Gegenheimer, FINRA Arbitration No. 16-02461

Dear Mr. Mills:

On behalf of Respondent Jon Alan Gegenheimer, we write in further support of our request for an order requiring Jefferies to produce its employees Benjamin Lorello, Richard Handler, and Brian Friedman, together with Chris Kanoff (the "Jefferies Witnesses") to testify at the hearing in this proceeding, and to briefly respond to Jefferies' April 16, 2018 letter opposing Gegenheimer's request ("Jefferies' April 16 Letter").

**A. The Second Phase of the Bifurcated Hearing Will Address the Critical Issue of Whether the Liquidated Damages Provision Should Be Enforced.**

Jefferies' April 16 Letter is based on the false premise that the Panel's January 29, 2018 interim decision resolves all of the substantive issues in this case and that the second phase of the bifurcated hearing should be limited to the ministerial task of awarding Jefferies $1 million for breach of contract and determining the amount of Jefferies' legal fees. As the Panel is well aware, however, the Panel's interim award only addressed the enforceability of the liquidated damages clause, but left for a later date a hearing on the remaining issues presented in the arbitration, namely, adjudication of Gegenheimer's equitable defenses, Gegenheimer's counterclaims and attorneys' fees.[1] For the reasons explained in Gegenheimer's April 6, 2018 letter to the Panel

---

[1] On December 20, 2017, the Panel granted the parties' request for a bifurcated procedure, agreeing to adjudicate the general enforceability of the liquidated damages clause before scheduling a hearing on any other issues presented in the arbitration. The Panel's bifurcation order specified that the initial bifurcated hearing would focus solely on the enforceability of the liquidated damages clause. In the Panel's words, "The sole issue to be adjudicated by the Panel in the first part of the hearing shall be whether the liquidated damages clause in the agreement at issue is enforceable or unenforceable" (Ex. A).

Lawrence R. Mills
FINRA Dispute Resolution
April 24, 2018
Page 2

("Gegenheimer's April 6 Letter"), each of the Jefferies Witnesses has personal, non-duplicative knowledge of facts relevant to Gegenheimer's equitable defenses. For example, Handler and Friedman each met with Gegenheimer in one-on-one meetings in New York, during which they both made certain representations to Gegenheimer and assured him that Jefferies would not penalize him if he decided to remain with Credit Suisse. Gegenheimer has a right to present the Jefferies Witnesses' testimony in an effort to prove up these defenses. Gegenheimer's defenses have not yet been adjudicated and the testimony of the Jefferies Witnesses is crucial to a fair hearing on those defenses; it is not an attempt to harass the witnesses as Jefferies claims.[2]

### B. Jefferies' April 16 Letter Confirms That the Jefferies Witnesses Played Critical Roles in Jefferies' Recruitment of Gegenheimer.

While Jefferies seeks to have the Panel pre-judge what each of the Jefferies Witnesses would testify about, based on Jefferies' self-serving summary of what they might say—rather than agreeing to bring these witnesses before the Panel so that the Panel Members can hear directly from them—Jefferies' April 16 Letter confirms several of the key points offered by Gegenheimer in support of his request.

Specifically, Jefferies admits that Lorello, Friedman, and Handler participated at critical points in Jefferies' recruitment of Gegenheimer, stating that:

- Lorello "interviewed Gegenheimer in early March 2016, over two months before Gegenheimer signed the Agreement" (Jefferies' April 16 Letter at 5);

- Lorello approved Gegenheimer's employment offer (*id.*);

- Lorello was "kept apprised of the status of Jefferies' recruitment of Gegenheimer" (*id.*);

- "Lorello, Freidman and Handler had communications with Gegenheimer" after Gegenheimer indicated that he may want to remain at Credit Suisse (*id.*);

- There was a period when "Mr. Kanoff . . . was tasked with attempting to change Gegenheimer's mind" about staying with Credit Suisse (*id.*); and

- Jefferies' employees "kept Mr. Lorello apprised of Jefferies' progress [with Gegenheimer]" (*id.*).

---

[2] Gegenheimer's April 6 Letter puts Jefferies on notice that Gegenheimer plans to assert an equitable estoppel defense at the hearing. To avoid any doubt, Gegenheimer plans to file a formal motion to amend the Answer to assert this defense.

EXHIBIT Z

Lawrence R. Mills
FINRA Dispute Resolution
April 24, 2018
Page 3

These admissions on Jefferies' part, together with Gegenheimer's detailed proffer and the documentation offered in support of Gegenheimer's April 6 Letter (including the clear evidence that Kanoff is not privy to conversations in which Lorello, Friedman, and Handler participated), demonstrate that all of the Jefferies Witnesses are necessary witnesses and that Gegenheimer must be permitted to call them as witnesses at the final hearing.

**C. If the Panel Were to Deny Gegenheimer's Request, That Would Be An Independent Ground for Vacating the Panel's Final Award Because the Jefferies Witnesses' Testimony Is "Pertinent and Material" to This Matter.**

The Panel should reject Jefferies' effort to wall off key Jefferies witnesses, as such a decision would be tantamount to a denial of Gegenheimer's right to due process and serve as an independent ground for vacating the Panel's final award. *See* 9 U.S.C. § 10(a)(3) (authorizing a federal district court to issue an order vacating an award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy"); *see also Tempo Shain Corp. v. Bertek, Inc.*, 120 F. 3d 16, 18 (2d Cir. 1997) (vacating final award because "panel's refusal to continue the hearings to allow [a witness] to testify amounts to fundamental unfairness and misconduct sufficient to vacate the arbitration award").

**D. Jefferies' Comments Regarding the District Court's March 29, 2018 Order Are Incorrect.**

Jefferies' comments regarding the District Court's March 29, 2018 Order both insult the Court and show a deliberate deafness to what the Court was communicating. As the Panel knows, the District Court concluded that Ninth Circuit precedent precluded it from reviewing the Panel's interim award because the Panel's award is not yet "final and reviewable" (Ex. B (citing *Millmen Local 550 v. Wells Exterior Trim*, 828 F.2d 1373, 1375 (9th Cir. 1987)). However, in granting Jefferies' motion to dismiss based solely on the *Millmen* case, the Court stated that "the decision of the panel regarding the liquidated damages provision is very likely wrong (perhaps to the point that the panel should be understood to have manifestly disregarded the law)" (*id.*). The Court's observation is not, as Jefferies wishes, "casual and completely unexplained dicta" (Jefferies' April 16 Letter at 6). Rather, it goes right to the heart of the petition to vacate and this litigation.

Moreover, Jefferies' assertion that the District Court "certainly did not invest the time and attention analyzing the issues in this case that this Panel has invested" (Jefferies' April 16 Letter at 6) is not only erroneous conjecture on Jefferies' part, but is belied by the proceedings before the District Court. Prior to issuing its Order, the District Court had before it <u>all of the briefing and pleadings that were filed in this FINRA proceeding</u> regarding the enforceability of the liquidated damages provision. The Court would not have commented on the merits of the Panel's decision if it had not invested the time and attention necessary for it to formulate a considered opinion on the merits of the January 29, 2018 Order. Jefferies' bold assertion that "the Court will undoubtedly confirm the ruling under the applicable standard of review" (*id.*) is contradicted by the plain language of the Court's Order. The District Court explicitly stated that the Panel's decision may

EXHIBIT Z

Lawrence R. Mills
FINRA Dispute Resolution
April 24, 2018
Page 4

not hold up under the applicable standard of review and thus the Court's Order directly draws into question the confirmability of the Panel's decision.

Fundamental fairness demands that Gegenheimer be afforded the opportunity to present the testimony of the Jefferies Witnesses. Alternatively, the Panel should draw an adverse inference against Jefferies and preclude Jefferies from offering any evidence, during its case in chief or on rebuttal, refuting Gegenheimer's testimony or documentary evidence regarding the statements and actions of the three witnesses.

Thank you for your consideration of this request.

Very truly yours,

*/s/ David Jacobs*

David Jacobs

cc:   Andrew J. Shapren, Esq.

EXHIBIT Z

# Exhibit A

EXHIBIT Z



FINRA
Financial Industry Regulatory Authority

## FINRA Dispute Resolution

## Order

**Case Number:** 16-02461

**Case Name:** JEFFERIES LLC v. JON A. GEGENHEIMER

**Issues Addressed:** (ie., name of motion or request, by which party)
1. Claimant's request for a prehearing conference for the purpose of scheduling additional hearing dates; and
2. Respondent's request for suspension of further proceedings pending a final judicial determination of the enforceability of the liquidated damages provision.

**Pre-Hearing Conference Held?:**　○ Yes　⊙ No　(circle one)

Date/Time: 

Participating in the conference were:

Chairperson: _____

Panelist: _____

Panelist: _____

Claimant's Representative: _____

#1 Respondent's Representative: _____

#2 Respondent's Representative: _____

FINRA Dispute Resolution Staff:

**Decided by:** ○ Chairperson ⊙ Panel　(circle one)

**Rulings:**[1]

After considering the pleadings submitted by the parties (and oral arguments, if pre-hearing conference held), the Panel/Chairperson rules as follows:

---

1 If more space is needed, add additional pages.

537　　　　　　　　　　　　EXHIBIT Z

1. The Panel's January 29, 2018 Order Regarding Liquidated Damages concluded the first portion of a bifurcated proceeding pursuant to a stipulation of the parties. This arbitration must continue to resolve the remaining issues.

2. The Panel's Order was not intended to be a Final Award or "Interim Final Award" subject to confirmation or vacatur by a court.

3. Accordingly, claimant's request for a prehearing conference to schedule additional hearing dates is GRANTED. Respondent's request for a stay of the proceedings in this arbitration is DENIED.

The parties should comply with this order by contacting FINRA by 2/28/18.

If the parties settle this matter prior to the hearing, the forum fees for this pre-hearing conference (or discovery-related motion decided without a pre-hearing conference) are assessed as follows:

50 % to Claimant(s), jointly and severally
50 % to Respondent(s), jointly and severally
____ % assessed to _____
____ % assessed to _____
____ % assessed to _____
____ % assessed to _____

X ~~Dave R. Mills~~          Date: February 20, 2018

Chairperson,
On behalf of the Arbitration Panel

Revised 11/12/15

EXHIBIT Z

# Exhibit B

EXHIBIT Z

United States District Court
Northern District of California

1
2
3
4
5
IN THE UNITED STATES DISTRICT COURT
6
FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8
JON A. GEGENHEIMER,

Case No. 18-cv-00746-VC

9
      Plaintiff,

10
   v.

**ORDER GRANTING MOTION TO DISMISS PETITION TO VACATE ARBITRATION AWARD**

11
JEFFERIES LLC,

12
      Defendant.

13

14
      The motion to dismiss the petition to vacate the arbitration award is granted.

15
Although the decision of the panel regarding the liquidated damages provision is very

16
likely wrong (perhaps to the point that the panel should be understood to have manifestly

17
disregarded the law), the panel's decision is not yet subject to review by a federal district

18
court. In the Ninth Circuit, an arbitrator's ruling following the first phase of a bifurcated

19
proceeding is not "final and reviewable." *Millmen Local 550 v. Wells Exterior Trim*, 828

20
F.2d 1373, 1375 (9th Cir. 1987). This is particularly clear in cases where, as here, the

21
order is not "intended by the arbitrator to be a complete determination of the claims." *Id.*

22
at 1376 (citation omitted). Further, Gegenheimer has not shown that this is one of those

23
"extreme cases" that would warrant district court review even in the absence of a final

24
ruling. *Id.* at 1377. Dismissal is without prejudice to filing a new petition at the end of the

25
arbitration.

26
      **IT IS SO ORDERED.**

27
      Dated: March 29, 2018

28

HON. VINCE CHHABRIA
United States District Judge

540                                            EXHIBIT Z